# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF
# TEXAS, FORT WORTH DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br> STATE OF ALASKA, <br><br> STATE OF IOWA, <br><br> STATE OF NEBRASKA, *ex rel*. Michael T. Hilgers, Attorney General, <br><br> and <br><br> STATE OF TEXAS, *ex rel*. Ken Paxton, Attorney General, <br><br>   Plaintiffs, <br><br>      v. <br><br> WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, INC., a Texas corporation, <br><br> WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, INC., an Illinois corporation, <br><br> and <br><br> UNITED STATES PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, <br><br>   Defendants | Case No. _____ <br><br> **COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF** |

1

**TABLE OF CONTENTS**

I.    SUMMARY OF THE CASE.................................................................................... 5

II.   JURISDICTION AND VENUE ......................................................................... 15

III.  PLAINTIFFS .................................................................................................... 15

IV.   DEFENDANTS ................................................................................................ 16

V.    COMMON ENTERPRISE ............................................................................... 17

VI.   COMMERCE.................................................................................................... 19

VII.  BACKGROUND ............................................................................................... 19

   A.   Transition doctors founded WPATH to promote the transition service industry's
   financial interests after losing academic support and insurance coverage for medical
   transition services. ...................................................................................................... 19

   B.   Through SOC-8, WPATH fully embraces the medical transition of children............. 21

VIII. WPATH'S DECEPTIVE PRACTICES............................................................ 24

   A.   WPATH developed SOC-8 without regard for scientific protocols ............................ 24

   B.   WPATH knows that its recommendations are not supported by scientific evidence or a
   medical consensus ...................................................................................................... 36

   C.   Independent reviews and guidelines reinforce that WPATH's recommendations and
   claims regarding pediatric medical transition are unsupported by competent and reliable
   scientific evidence ...................................................................................................... 45

   D.   WPATH falsely claims that pediatric medical transition is "lifesaving" and, in so
   doing, misrepresents the risks and benefits of pediatric medical transition ......................... 49

IX.   WPATH OPERATES FOR ITS MEMBERS PROFIT ................................... 69

   A.   WPATH has pushed—and continues to push—to expand insurance coverage to benefit
   its members.................................................................................................................. 71

   B.   WPATH provides other economic benefits to members ............................................. 81

   C.   WPATH promotes the purchase of its members' pediatric medical transition services 81

   D.   WPATH also profits itself by leveraging its position as the *de facto* authority on
   transition medicine in the United States.................................................................... 85

X.    WPATH HAS PROVIDED TO CLINICIANS THE MEANS BY WHICH THEY
   DECEIVE CHILDREN AND THEIR PARENTS INTO PURCHASING PEDIATRIC
   MEDICAL TRANSITION SERVICES....................................................................... 87

   A.   Clinicians invoke WPATH and provide families with WPATH's deceptive material. 90

   B.   Clinicians repeat and rely on WPATH's claims without attribution to sell transition
   procedures.................................................................................................................... 92

C.    Clinicians follow and rely on WPATH in failing to adequately disclose side effects.. 95

D.    Clinicians use SOC-8's deceptive diagnosis and treatment guidelines to sell medical transition services ................................................................................................ 96

XI.    WPATH CAUSES INJURY IN AND TO ALASKA ............................................... 100

XII.    WPATH CAUSES INJURY IN AND TO IOWA....................................................... 100

XIII.    WPATH CAUSES INJURY IN AND TO NEBRASKA ........................................... 101

XIV.    WPATH CAUSES INJURY IN AND TO TEXAS..................................................... 103

XV.    CORE DECEPTIVE STATEMENTS ....................................................................... 103

XVI.    VIOLATIONS OF THE FTC ACT, AK CPA, IOWA CONSUMER PROTECTION ACT, NE UDTPA, AND TEXAS DTPA .................................................................. 111

XVII.    CONSUMER INJURY ............................................................................................. 117

XVIII.    PRAYER FOR RELIEF ........................................................................................... 118

Plaintiffs the Federal Trade Commission ("FTC" or "Commission"), the State of Alaska, the State of Iowa, the State of Nebraska *ex rel.* Michael T. Hilgers, Attorney General ("Nebraska"), and the State of Texas, ex rel. Ken Paxton, Attorney General ("Texas"), for their Complaint allege:

1. Plaintiff the FTC brings this action for Defendants' violations of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a), 52. For these violations, the FTC seeks relief, including a permanent injunction pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

2. Plaintiff Alaska brings this action for Defendants' violations of the Alaska Consumer Protection Act, AS §§ 45.50.471, 45.50.501, and 45.50.551. For these violations, Alaska seeks relief, including a permanent injunction, civil penalties, restitution, attorneys' fees and costs, and other appropriate relief as authorized by AS §§ 45.50.501, 45.50.551(b), and 45.50.537.

3. Plaintiff Iowa brings this action for Defendants' violations of the Iowa Consumer Fraud Act. Iowa Code § 714.16. For these violations, Iowa seeks relief including: a permanent injunction, civil penalties, disgorgement, attorney's fees, costs, and other appropriate relief as authorized by Iowa Code.

4. Plaintiff Nebraska brings this action for Defendants' violations of the Nebraska Uniform Deceptive Trade Practices Act ("NE UDTPA"), Neb. Rev. Stat. § 87-301 *et seq.* For these violations, Nebraska seeks relief, including a permanent injunction, civil penalties, attorneys' fees, costs and other appropriate relief as authorized by Neb. Rev. Stat. §§ 87-303(b), 87-303.05, and 87-303.11.

5. Plaintiff Texas brings this action for Defendants' violations of the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code §§ 17.41-17.63. For these violations,

Texas seeks relief, including a permanent injunction, civil penalties, restitution, attorneys' fees, costs, and all other appropriate relief provided by Texas law.

## I.    SUMMARY OF THE CASE

6.    The World Professional Association for Transgender Health ("WPATH") is an organization founded and incorporated in Texas that operates for the profit of its members by promoting the medical transition services that its members provide to children.[1] These services—drugs, surgeries, and other interventions—are sold to consumers whose children express dissatisfaction with, or report distress about, their sex-linked biological and anatomical characteristics (their "sex traits"). WPATH's membership predominantly consists of clinicians who profit from these services, including surgeons, endocrinologists, psychiatrists, and pediatricians.

7.    To maintain and expand the market for transition services, WPATH provides its members and other clinicians with the means to promote the purchase of medical transition services in a variety of ways. Chief among them is the self-publication, distribution, and promotion of what it calls the "Standards of Care" ("SOC"). WPATH represents that the SOC— the latest version being SOC-8, published in 2022—are evidence- and consensus-based clinical guidelines for providing medical transition services, including for children who express dissatisfaction with or report distress about their sex traits.

8.    The SOC recommends life-altering surgeries for children such as penis removal,

---

[1] This Complaint uses the common definition of "children" throughout. See Child, Black's Law Dictionary (12th ed. 2024) (defining a child as "1. An unemancipated person under the age of majority" or "3. A boy or girl; a young person"). WPATH often uses a different definition of "children," and refers to a child as an "adolescent" when he or she "reach[es] Tanner stage 2 of puberty," which may occur as early as 8 or 9 years old. Eli Coleman, *et al.*, Standards of Care for the Health of Transgender and Gender Diverse People, Version 8 S44, S64 (2022) (hereinafter "SOC-8").

facial surgery, and breast amputation. One woman who—at age 14—resided in the Dallas-Fort Worth area and underwent breast amputation elsewhere in Texas is now an adult, and provided the FTC with written consent to disclose an image taken of her scarred chest following the surgery. *See* Image A. The photograph clearly demonstrates the life-altering nature of these procedures.

9. In addition to representing that the SOC itself, and the life-altering surgeries it recommends, reflect expert consensus and high-quality evidence, WPATH represents in the SOC that these and other transition services are medically necessary and effective at preventing suicide in children, that puberty blockers are fully reversible, that cross-sex hormones improve mental health, and that breast amputations are safe, effective, and consistently and directly increase children's health-related quality of life.

10. WPATH's representations have further deceived many consumers into believing that its treatment guidelines are based on strong evidence derived from scientific methods. Numerous parents and patients, responding to an FTC Request for Information ("RFI") in 2025 about the medical transitioning of children, have expressed complete confidence that WPATH and its SOC are reliable and trustworthy sources. For example, one person stated that "[t]he guidelines of major professional organizations such as . . . WPATH . . . have been clear and follow evidence-based care for these youth for optimal best outcomes." Another wrote, "[g]ender-affirming care for minors already has a number of medical standards and best-practices based on the . . . WPATH Standards of Care which have a substantial and proven research basis." Another commenter stated that "[s]cience shows that transitioning per WPATH . . . lowers the rate of suicide among individuals with in-congruence of gender with their assigned sex at birth."

11.    Medical professionals have also been duped. One clinician responded to the RFI by stating that "[t]he WPATH standards of care does an excellent job providing recommendations and guidelines for practices that are evidence based and expert reviewed." Another said, "[a]s a mental health professional . . . affirming and coordinated healthcare, informed by recognized standards of care (including WPATH), provides young people and their families with stability, safety." Unfortunately, this is not the case.

12.    WPATH recommends that medical transition services be provided to children as young as 8 or 9 years old. One form of genital surgery that WPATH approves for minors is "vaginoplasty," in which the surgeon cuts off the bulk of a child's testicles and penis. The surgeon restructures the patient's scrotum to mimic a "clitoris" and "labia." Finally, to simulate a vagina, the surgeon carves a wound next to the patient's anus, severs and discards the penile shaft and testicles while saving the penile skin, and lines the wound with the patient's emptied penile skin.

13.    The significant number of children being medically transitioned in recent years is driven at least in part by WPATH's removal of age limits for most interventions. WPATH removed any age limitations for breast amputation, penis removal, or any other procedure except one specific type of genital surgery for girls in the final version of SOC-8. WPATH's removal of these age limitations was not based on a change in the medical consensus or evidence. Indeed, one WPATH leader admitted to "struggl[ing] to find any sound evidence-based argument(s) underpinning" the removal of the age limitations. WPATH nonetheless removed the age limits, expanding the customer base of its members and exposing children to significant mental and physical harm.

14.    The success of WPATH's systematic efforts to expand eligibility for transition

services to children in order to profit its members is difficult to overstate. Through the SOC and its other efforts, WPATH has created and currently sustains a lucrative industry of pediatric medical transition services. Over roughly the past two decades, the number of pediatric medical transition providers has multiplied rapidly. The first pediatric medical transition clinic in the United States opened in 2007. By 2015, there were at least forty-one pediatric medical transition clinics across the United States, many embedded within major children's hospitals and academic medical centers. Between 2017 and 2021, the number of children who were diagnosed yearly with distress about their sex traits in the U.S. nearly tripled from around 15,000 in 2017 to about 42,000 in 2021.

15. Clinicians rely on WPATH's representations when diagnosing children, exactly as WPATH intends. Also as WPATH intends, in clinical encounters, clinicians repeat WPATH's assertions in the SOC and elsewhere about the necessity, safety, and purported benefits of medical transition when persuading children and their parents to purchase it. Clinicians also direct parents to WPATH's publications, website, and the SOC as authoritative sources of medical information. Many, if not most, sales of pediatric medical transition services would not happen without WPATH.

16. Major health insurance companies likewise rely on the SOC's determination of medical necessity. That is no accident. In fact, WPATH crafted the SOC with the explicit goal of guaranteeing that insurers would classify medical transition services as medically necessary and therefore covered by their insurance plans. Indeed, SOC-8's drafters repeatedly emphasized in internal communications that SOC-8 should be written to guarantee insurance coverage— including by replacing objective criteria with provider discretion, removing age minimums, and issuing broad "medical necessity" declarations for nearly every medical-transition intervention.

As a result, most major insurance companies now foot the bill for pediatric medical transition services, including services that parents would otherwise be unable or unwilling to purchase without insurance.

17.     Through these and other efforts, WPATH's professional members have profited immensely from the organization's work. But this profit has come at the expense of children and their parents. To advance its members' financial interests, WPATH has made false, misleading, or unsubstantiated statements—both in the SOC and other public-facing materials—regarding medical consensus and medical necessity, as well as the safety and efficacy of medical transition.

18.     WPATH falsely asserts that its recommendations are the result of rigorous scientific procedures and expert consensus, even though WPATH disregarded established guideline-development standards, ignored the results of its own evidence reviews, and removed age limits in response to external pressure rather than scientific evidence. WPATH further represents that puberty blockers are fully reversible despite internal admissions from SOC-8's authors that this claim required an "asterisk," and it repeatedly asserts that cross-sex hormones and breast amputations improve children's mental health even though WPATH's own leaders privately acknowledged "gaps in research," lack of "research basis," and very low quality evidence. WPATH also misleadingly characterizes pediatric medical transition as "lifesaving" and "medically necessary," despite the absence of evidence that these interventions reduce the incidence of suicide.

19.     As WPATH intends, its statements provide the means for medical providers to repeat misleading, false, incomplete, or unsubstantiated information when persuading parents to purchase medical transition services for their children. WPATH informs its members—expressly or by implication—that children who express dissatisfaction with or distress about their sex traits

9

face a higher risk of suicide unless they undergo medical transition, and it repeatedly characterizes transition as "lifesaving" despite the absence of evidence that these interventions reduce the risk of suicide. Also as WPATH intends, clinicians recite these claims to parents, often presenting transition as the only alternative to a child's death. In many cases, including those discussed below, providers explicitly ask parents whether they "would rather have a live daughter or a dead son," or vice-versa. These statements echo WPATH's messaging, rely on WPATH's false and unsubstantiated assertions, and induce the purchase of pediatric transition services from WPATH members.

20.    If that were not enough, WPATH has also failed to disclose material information about the significant risks and life-long side effects associated with medical transition drugs, surgeries, and other interventions. For example, although puberty blockers can cause hot flashes, lethargy, psychosocial harms, and long-term cognitive deficits, WPATH omits or minimizes these risks in the SOC. Likewise, WPATH fails to adequately disclose that cross-sex hormones carry significant harms for minors, including mood disturbances, vocal pain, pelvic pain, pelvic floor dysfunction, clitoral discomfort, vaginal pain, persistent sexual dysfunction continuing after cessation of use, and erectile pain—effects that can be permanent. And regarding breast amputations, WPATH does not meaningfully disclose the inability to breastfeed, nerve damage that frequently follow these procedures, nor the serious risk of necrosis. By failing to disclose these material risks, WPATH provides the means by which clinicians can unequivocally recommend the purchase of medical transition services to parents and children. WPATH's misrepresentations and deceptive omissions are thus the means by which providers mislead parents and children to their detriment about the necessity, efficacy, safety, and scientific basis of pediatric medical transition. These misrepresentations and deceptive omissions have caused

10

unspeakable physical and psychological harm to countless children, as reflected in the sworn statements attached hereto and described below. For example, parents and children have reported being told by clinicians that puberty would resume as normal if puberty-blocking drugs stopped being administered.[2] Others were not informed of the various side effects of puberty blockers,[3] such as brain fog and an inability to concentrate,[4] hot flashes,[5] anxiety or depression,[6] urinary incontinence or bloody urine,[7] and genital pain.[8] Serious side effects of cross-sex hormones also were frequently undisclosed or not adequately disclosed,[9] such as experiencing psychotic episodes and other mental-health problems,[10] genital atrophy and pain,[11] leaking from the nipples,[12] inhibited body height,[13] and sexual dysfunction or inability to orgasm.[14] Complications from breast amputation were similarly undisclosed or insufficiently disclosed, such as extreme pain,[15] bruising and internal bleeding.[16]

21.     One Texas girl was admitted to a psychiatric facility in Fort Worth after a stressful family-related incident. There, a doctor repeatedly questioned her about whether she identified as a male—she liked stereotypically masculine hobbies like playing video games and

---

[2] *E.g.*, Ex. 4, Decl. of Caroline Miller at ¶¶ 14, 17.
[3] *E.g.*, Ex. 5, Decl. of Elisabeth Bourne at ¶ 16.
[4] *E.g.*, Ex. 6, Decl. of Clementine Breen at ¶ 16.
[5] *E.g.*, Ex. 7, Decl. of Jonathon Skinner at ¶¶ 32, 35.
[6] *E.g.*, Ex. 4, Decl. of Caroline Miller at ¶¶ 20–21.
[7] *E.g.*, Ex. 7, Decl. of Jonathon Skinner at ¶¶ 35, 36–39, 44, 46; Ex. 8, Decl. of Melissa Skinner at ¶ 37.
[8] *E.g.*, Ex. 7, Decl. of Jonathon Skinner at ¶ 35.
[9] *E.g.*, Ex. 7, Decl. of Jonathon Skinner at ¶ 26; Ex. 9, Decl. of ███████████ at ¶ 14; Ex. 5, Decl. of Elisabeth Bourne at ¶ 16.
[10] *E.g.*, Ex. 6, Decl. of Clementine Breen at ¶¶ 43, 45, 49, 56; Ex. 10, Decl. of ████████ at ¶¶ 33, 45; Ex. 1, Decl. of Soren Aldaco at ¶ 26.
[11] *E.g.*, Ex. 6, Decl. of Clementine Breen at ¶¶ 24–25; Ex. 7, Decl. of Jonathon Skinner at ¶¶ 49–50, 53; Ex. 1, Decl. of Soren Aldaco at ¶ 25.
[12] *E.g.*, Ex. 7, Decl. of Jonathon Skinner at ¶ 48.
[13] *E.g.*, Ex. 7, Decl. of Jonathon Skinner at ¶ 57.
[14] *E.g.*, Ex. 7, Decl. of Jonathon Skinner at ¶ 76.
[15] *E.g.*, Ex. 10, Decl. of ████████ at ¶¶ 39, 55.
[16] *E.g.*, Ex. 1, Decl. of Soren Aldaco at ¶¶ 34–37.

was self-conscious about how her body was changing in puberty. The psychiatrist did not meaningfully address her complex family situation or existing mental health issues, but instead "affirmed" her as a male. At a support group in the Dallas-Fort Worth area, she learned that the treatment for her "cross-sex identity was medical transition" in accordance with the "standards of care" which "came from an organization called 'WPATH.'" Acting on that advice, this girl underwent pediatric medical transition by injecting testosterone, blocking her estrogen, and undergoing breast amputation. She has since accepted that she is a woman and stopped taking testosterone, but she "continue[s] to experience ongoing health problems including fatigue, joint pain, clitoral cysts, and a lot of pain and physical discomfort in [her] upper chest and shoulders" from her medical transition treatments.[17]

22.    Through this lawsuit, the FTC is taking action to stop the unconscionable harm inflicted by WPATH's ongoing furnishing of the means necessary for its members and other clinicians to make deceptive claims about the necessity, safety and efficacy of pediatric medical transition drugs, surgeries, and other treatments on children and their parents. The FTC has received hundreds of reports from consumers of medical transition services, including patients and parents, as well as healthcare professionals. In particular, numerous parent and patient declarants have complained to the FTC about serious medical complications arising from medical transition services—and that the risks and side effects that they incurred were often not, or not adequately, disclosed to them. For example, one consumer complained that nobody disclosed "that taking cross-sex hormones and undergoing major surgery at 14 years old could leave me with pelvic floor dysfunction and urinary incontinence, problems I have to manage now

---

[17] Ex. 1, Decl. of Soren Aldaco at ¶ 41.

as a young adult. I'm only 20 years old. They didn't tell me that these complications are common

enough to be known risks, and yet they were hidden from me at an age where I didn't even

understand what these terms meant, let alone the impact they would have on my daily life."

23.     Additionally, consumers report serious harms that continue after they stop taking

cross-sex hormones and identifying as the opposite sex:

- "Today, my chest area is still weak and strange-feeling, and I have limited range of motion in my arms. My voice is deep. I have been told I might not be able to bear a child because of the puberty blocker and five years of testosterone use."[18]

- "I still suffer from urinary incontinence if I sneeze, cry, laugh, or lift something heavy. Just bending over can cause a trickle. I am like a faucet that does not turn off. It is just a constant drip, even though I have been to physical therapy and tried medications. I often wear multiple pairs of underwear or change my underwear throughout the day. I typically wear black pants in public to disguise the leaks. I have never experienced an orgasm."[19]

- "I lost the ability to scream normally when I started taking testosterone. I still cannot scream, and I have recurrent nightmares of not being able to scream when I need to."[20]

- "I experienced nerve pain and electrical sensations from the mastectomy, which continues to this day. I now wear prosthetic breasts, and the mild compression helps with my nerve pain while I am wearing them. I wear those or a sports bra when I am intimate with my girlfriend to modulate or buffer the raw nerves. With only a shirt on, or when my girlfriend lays on my bare chest, the pain is excruciating."[21]

- "I continue to experience ongoing health issues, including fatigue, joint pain, clitoral cysts, and a lot of pain and physical discomfort in my upper chest and shoulders. I also have nerve issues around my mastectomy scars. I get strong, weird sensations at the bottom of the scars."[22]

24.     These consumer complaints coincide with mounting scientific and international

---

[18] Ex. 6, Decl. of Clementine Breen at ¶ 60.
[19] Ex. 7, Decl. of Jonathon Skinner at ¶¶ 75–76.
[20] Ex. 10, Decl. of ███████ at ¶ 53.
[21] Ex. 10, Decl. of ███████ at ¶ 55.
[22] Ex. 1, Decl. of Soren Aldaco at ¶ 41.

criticism and rejection of WPATH's approach, including by the English National Health Service's Cass Review and by countries such as Sweden and Finland, all of which have examined the same body of evidence that WPATH claims to have analyzed, yet reached starkly different conclusions. The Cass Review found that several existing guidelines (including WPATH's) lack methodological rigor, and that no reliable data supports strong recommendations for puberty blockers and cross-sex hormones. Similarly, Sweden and Finland, after conducting their own systematic reviews, now classify pediatric medical transition as experimental, prohibit or severely restrict the use of puberty blockers and cross-sex hormones in children outside of research settings, or prohibit transition surgeries for children entirely.

25.    In November 2025, the U.S. Department of Health and Human Services published a 400-page report titled "Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices" ("The HHS Report"), which assessed the evidence base for the medical interventions on children that WPATH recommends and concluded that it is exceptionally weak. The HHS Report also highlighted potential risks and side effects of medical transition services—and ultimately recommended psychological therapy as the generally appropriate treatment for children who express dissatisfaction with, or report distress about, their sex traits. The HHS Report's authors commented that their "[r]eview is published against the backdrop of growing international concern about pediatric medical transition. Having recognized the experimental nature of these medical interventions and their potential for harm . . . health authorities in a number of countries have imposed restrictions. For example, the U.K. has banned the routine use of puberty blockers as an intervention for pediatric gender dysphoria."

26.    The FTC therefore has reason to believe that WPATH is violating or is about to violate laws enforced by the Commission. Specifically, WPATH's ongoing and intentional

furnishing of the means and instrumentalities by which its members and other clinicians deceive consumers into purchasing pediatric medical transition services violates the FTC Act and must be enjoined. Alaska, Iowa, Nebraska and Texas similarly have reason to believe that the laws of their respective states have been violated and must be redressed.

## II.    JURISDICTION AND VENUE

27.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

28.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (c)(2), and (d); and 15 U.S.C. § 53(b).

## III.    PLAINTIFFS

29.    The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces Section 12 of the FTC Act, 15 U.S.C. § 52, which prohibits false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce.

30.    The State of Alaska is one of fifty sovereign states of the United States. Cori M. Mills is the duly appointed Attorney General of the State of Alaska and is empowered by the Alaska Consumer Protection Act, AS §§ 45.50.471, 45.50.501, and 45.50.551 to bring an action in the name of Alaska to restrain unfair or deceptive acts or practices, and to seek restitution and civil penalties therefor.

31.    The State of Iowa is one of fifty sovereign states. Brenna Bird is the duly elected Attorney General of the State of Iowa and is empowered to bring an action in the name of the

State of Iowa. *See* Iowa Code § 13.2. The Iowa Consumer Fraud Act provides a cause of action for deceptive practices. *See* Iowa Code § 714.16.

32. The State of Nebraska is one of fifty sovereign states of the United States. Michael T. Hilgers is the duly elected Attorney General of the State of Nebraska and is empowered by the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. §§ 87-303.05, 303.11 to bring an action in the name of Nebraska to protect the public from deceptive or unconscionable trade practices.

33. The State of Texas is one of fifty sovereign states of the United States. Ken Paxton is the duly elected Attorney General of the State of Texas and is empowered by the Texas Deceptive Trade Practices Act to bring an action in the name of the State of Texas, and in the public interest, to protect the public from false, misleading, and deceptive acts and practices in the conduct of any trade or commerce. *See* Tex. Bus. & Com. Code § 17.47.

## IV.   DEFENDANTS

34. Defendant the World Professional Association for Transgender Health, Inc., ("WPATH-TX") was incorporated in Texas in 1980. WPATH-TX remains an active Texas domestic corporation, with Northwest Registered Agent LLC serving as its registered agent in Texas and with a registered office in Texas. WPATH-TX's current bylaws state that it is a Texas corporation.

35. Thirty-seven years after WPATH-TX was organized, Defendant World Professional Association for Transgender Health, Inc., was incorporated in Illinois ("WPATH-IL") in 2017.

36. The United States Professional Association for Transgender Health ("USPATH") is an unincorporated affiliate of WPATH that WPATH controls.

37.     At all times relevant to this Complaint, WPATH-TX, USPATH, and WPATH-IL (collectively, "WPATH"), operated for the profit of their members.

## V.     COMMON ENTERPRISE

38.     At all times relevant to this Complaint, WPATH-TX, WPATH-IL, and USPATH have operated as a common enterprise.

39.     The operations of WPATH-TX, USPATH, and WPATH-IL are managed by the same management company: Veritas Association Management, Inc.

40.     Veritas Association Management, Inc. (which operated as Veritas Meetings Solutions, Inc. until 2020) ("Veritas") was co-founded by Sue O'Sullivan, who serves as Veritas' president. Veritas provides management services for "more than 44 . . . healthcare associations and professional meetings" and lists over 50 clients including WPATH and USPATH.

41.     Veritas's president and co-founder incorporated WPATH-IL and serves as one of its directors.

42.     Blaine Vella signed WPATH-TX's most recent filing with the Texas Secretary of State, which listed her title as "Executive Director." The filing also lists Veritas's address as WPATH-TX's principal place of business. Indeed, at least at the time of that submission, Veritas employed Vella as its "Vice President for Client Leadership" while she simultaneously served as "Executive Director, World Professional Association for Transgender Health." WPATH-TX lists its principal place of business as Veritas's address, 1061 E Main St. STE 300, East Dundee IL 60118.

43.     WPATH-TX and WPATH-IL have overlapping officers and directors

44.     WPATH's website does not distinguish between the two WPATH entities and simply brands itself as "WPATH." WPATH's current website lists its Executive Committee and

17

Board of Directors as: Asa Radix as President; Marci Bowers as Immediate Past-President; Loren Schechter as President-Elect; Chris McLachlan as Secretary; Stephen Rosenthal as Treasurer; Javier Belinky, Kamilla Kamaruddin, Scott Leibowitz, Beth McElrea, Tonia Poteat, Sari Reisner, and Josua Safer as Board members; and Annelou L.C. de Vries, Johanna Olson-Kennedy, Erika Castellanos, and Soufiane Benaouda as Board members and representatives of affiliate organizations.

45.    In 2024, the website listed a single set of officers for "WPATH":  President as Marci Bowers, Immediate Past President as Walter Pierre Bouman, President Elect as Asa Radix, Secretary as Jamie Veale, Treasurer as Loren Schechter, Board members: Christina Richards, Stephen Rosenthal, Sanjay Sharma, Scott Leibowitz, Chris McLachlan, Sari Reisner, and Joshua Safer. As filed with the Texas Secretary of State in 2024, WPATH-TX identifies its officers and directors as the identical set of twelve people: Marci Bowers (President), Pierre Bouman (Immediate Past President), Asa Radix (President Elect), Jamie Veale (Secretary), Loren Schechter (Treasurer). It listed its directors as: Christina Richards, Stephen Rosenthal, Sanjay Sharma, Scott Leibowitz, Chris McLachlan, Sari Reisner, and Joshua Safer.

46.    In its 2023 annual report, WPATH-IL listed its corporate officers and directors as four of the same people, plus Veritas' president: Marci Bowers (President), Jaimie Veale (Secretary), Loren Schechter (Treasurer), Sue O'Sullivan (Director), Marci Bowers (Director), Jaimie Veale (Director). In its 2026 annual report, WPATH-IL lists its officers and directors as five of the same people, plus Veritas's president: Asa Radix (President), Chris McLachlan (Secretary), Stephen Rosenthal (Treasurer), Marci Bowers (Director), Loren Schechter (Director), Sue O'Sullivan (Director). The WPATH website currently lists three of the same people as officers: Asa Radix as President, Chris McLachlan as Secretary, and Loren Schechter

18

as President-Elect.

47.     WPATH-TX and WPATH-IL intermingle their finances. For tax year 2022, 2023, and 2024 (the most recent year for which tax records are available), WPATH filed its tax returns with the Internal Revenue Service as a Texas corporation. For tax years 2020 and 2021, WPATH filed its tax returns as an Illinois corporation. WPATH used the same Employer Identification Number for all filings.

48.     WPATH formed USPATH pursuant to WPATH-TX's bylaws, which permit the formation of "Regional Affiliate Organizations." Pursuant to WPATH-TX's bylaws, USPATH's representative (currently, USPATH president Johanna Olson-Kennedy) sits on WPATH's board as a "representative Director." USPATH members automatically become WPATH members, and WPATH members who reside in the United States are automatically USPATH members.

49.     The WPATH entities operate the website domain "wpath.org" as the enterprise's main internet presence. USPATH's main internet presence is located on the WPATH website, at "wpath.org/USPATH/", where USPATH lists its Board of Directors, publishes press releases and newsletters, and provides membership information.

## VI.   COMMERCE

50.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as Section 4 of the FTC Act defines "commerce." 15 U.S.C. § 44.

## VII.  BACKGROUND

### A. Transition doctors founded WPATH to promote the transition service industry's financial interests after losing academic support and insurance coverage for medical transition services.

51.     America's first "Gender Identity Clinic" opened at Johns Hopkins University in

1966 under the leadership of a plastic surgeon. It aimed to "reassign" patients' sexes using surgery.

52. Clinicians struggled to define the precise contours of the condition they were treating and many expressed concern that not everyone seeking such significant interventions was an appropriate candidate for them.

53. In 1974, psychiatrist Norman Fisk proposed "liberalizing the indications" for medical transition through "employing the diagnostic term gender dysphoria syndrome." Under this model, doctors initiated transition treatment based on the expressed desire to do so, which broadened the number of patients that would be referred to surgery.

54. Meanwhile, some mental health professionals criticized transition doctors for operating without evidence of long-term benefit. After one Johns Hopkins psychiatrist published a paper showing no objective patient benefit to transition, the university shut down its clinic in 1979. Other universities followed.

55. The loss of academic support for transition services posed an existential threat to the burgeoning medical transition services industry. After a decade of growth, transition doctors were losing the support of insurance providers whose coverage decisions had facilitated that initial growth. In 1979, against this backdrop, transition doctors formed the organization that would become WPATH.

56. To address the growing problem that the loss of insurance coverage presented, WPATH published its "Standards of Care," which purported to establish clinical guidelines for the diagnosis and treatment of persons experiencing dissatisfaction with or distress about their sex traits.

**B. Through SOC-8, WPATH fully embraces the medical transition of children.**

57.    Since 1981, WPATH has revised its "Standards of Care" seven times, culminating in SOC-8 in 2022. In the initial 1981 version of the Standards of Care, WPATH acknowledged that "[h]ormonal and surgical sex reassignment is extensive in its effects, is invasive to the integrity of the human body, has effects and consequences which are not, or are not readily, reversible, and may be requested by persons experiencing short-termed delusions or beliefs which may later be changed and reversed." WPATH emphasized that prospective patients often underestimated those risks, and that "published and unpublished case histories" revealed patients who ultimately "regretted" these treatments and found the final results "to be psychologically dehabilitating [*sic*]."

58.    Recognizing these serious and often irreversible medical risks, WPATH concluded that "[h]ormonal and surgical sex reassignment may be conducted or administered only to persons obtaining their legal majority" or who had been legally emancipated.

59.    But this guidance would quickly change. In 1987, Dr. Peggy Cohen-Kettenis, a psychologist who would later become a WPATH board member and leading voice within the organization, founded a medical transition clinic for minors in Utrecht, Holland. At the time, no transition clinics worldwide were known to medically transition children before age 16, and surgical procedures were performed only on adults.

60.    Dr. Cohen-Kettenis published articles about administering puberty blockers, pharmaceuticals which prevent natural pubertal development, in children beginning at age 12. Her co-author was a "professor of transsexuality," Dr. Louis Gooren, who believed that humans could possess a "brain sex" which was different from their "genetic, gonadal and genital sex."

61.    Despite not having performed any studies on children who had been puberty-

blocked at that age, they claimed that puberty blockers were "fully reversible; in other words, no lasting undesired effects are to be expected." Ferring Pharmaceuticals, a manufacturer of puberty blocking drugs, sponsored their work.

62.    Dr. Cohen-Kettenis presented her research on cross-sex identified youth at international WPATH conferences beginning in the 1980s. She then served on WPATH's board for four-year terms beginning in 1995 and 2003; Dr. Gooren served on WPATH's board for the intervening term. By the 2000s, WPATH regularly hosted their presentations on pediatric medical transition.

63.    In SOC 6, published in 2001, WPATH endorsed administering puberty blockers to children as soon as puberty begins. Dr. Cohen-Kettenis and Dr. Gooren served on SOC-6's drafting committee. At this time, only one published article purported to show evidence that puberty blockers are a safe and effective medical transition procedure: a case report on a single patient of Dr. Cohen-Kettenis. In that report, a young girl whose depression was improved by therapy but who continued to display tomboyish traits and express a desire to be a boy was administered puberty blockers, followed eventually (after the patient reached age 18) by hormone therapy, a mastectomy, an ovariectomy, and a metoidioplasty (a procedure to surgically separate the clitoris from surrounding tissue to create the appearance of a "micropenis"). Dr. Cohen-Kettenis reported no physical side effects from any of the procedures, "slightly improved" results on most psychological questionnaires, and that the patient was subjectively satisfied with the procedures. Dr. Cohen-Kettenis reported this case to be "the first we know of to show that pubertal delay and subsequent hormonal and surgical intervention . . . has resulted in a positive outcome."

64.     Despite only having a single report regarding a single person, WPATH issued a

22

full-throated endorsement of administering puberty blockers at the onset of puberty. WPATH's recommendation for "fully reversible" puberty blockers remained in SOC-7, and remains in SOC-8, the current version.

65.     Most children who begin taking puberty blockers proceed to cross-sex hormones. From 2017 to 2021, almost 15 thousand children were started on cross-sex hormone treatment. As explained in more detail below, cross-sex hormones attempt to induce physical changes to make a child more closely resemble the opposite sex. SOC-8 contains a chapter titled "Children," discussing diagnosis and treatment recommendations for pre-pubescent children, and an "Adolescent" chapter discussing diagnosis and treatment recommendations for children who have reached the onset of puberty. SOC-8 endorses cross-sex hormones for children who have "[r]eached Tanner stage 2," which is the onset of puberty—a threshold that many girls cross at age 8 and many boys at age 9.

66.     WPATH also recommends various surgeries as a part of pediatric medical transition, including breast amputation and penis removal. WPATH removed any age limitations for breast amputation, penis removal, or any other procedure except one type of genital surgery for girls in the final version of SOC-8.

67.     Over the past twenty years, the ranks of pediatric medical transition doctors have grown. The first pediatric medical transition services clinic in the United States opened in 2007, but by 2015, there were at least 41 pediatric medical transition clinics across the United States. From 2017 to 2021 the number of children who were diagnosed yearly with distress about their sex traits in the U.S. nearly tripled from about 15,000 in 2017 to about 42,000 in 2021. And in 2025, a single hospital in Colorado administered puberty blockers to 257 children for the purpose of medical transition. As the HHS report notes, "[r]eports from individual clinics suggest that

medicalization is the norm, rather than the exception."

## VIII.  WPATH'S DECEPTIVE PRACTICES

### A.  WPATH developed SOC-8 without regard for scientific protocols

68.    Typically, the medical profession develops what are called "trustworthy guidelines" to optimize medical care. According to the National Academy of Medicine ("NAM"), a competent and reliable guideline for medical care bears several "characteristics."

69.    The methodology WPATH used to create SOC-8 does not satisfy accepted medical standards of evidence. Consequently, WPATH's assertions about the necessity, safety, and efficacy of pediatric medical transition drugs, surgeries, and other interventions are not supported by competent and reliable scientific evidence. Nor do they bear the hallmarks of a trustworthy guideline.

70.    To begin with, the NAM explains that a trustworthy guideline is "based on a systematic review of existing evidence" and "on an explicit and transparent process that minimizes distortions, biases, and conflicts of interest." Conflicts of interests are "circumstances that create a risk that professional judgments or actions . . . will be unduly influenced by a secondary interest" such as "financial interests" and non-financial interests including "the pursuit of professional advancement and recognition." The "potential for conflicts of interest are great when funding for [clinical practice guideline] development . . . comes from . . . specialty societies, which might benefit or whose members might gain from guideline recommendations." "Potential sources of bias in the development of clinical practice guidelines include professional affiliations and practice specialization, reimbursement incentives, intellectual preconceptions and previously stated positions, and the desire for recognition and career advancement." Particular concern exists when those creating the guidelines are practicing physicians. Their "secondary

24

interest (*i.e.,* increased income from increased services) has the potential to bias physicians' primary interest in their patients' welfare" resulting in "harm [to] patients who receive unnecessary services." Thus, groups developing practice guidelines should severely restrict the influence of biased professionals including by "exclud[ing] panel members with conflicts from deliberating, drafting, or voting on specific recommendations."

71.    According to the NAM, a trustworthy guideline should further "provide a clear explanation of the logical relationships between alternative care options and health outcomes." And it should "provide ratings of both the quality [certainty] of evidence and the strength of the recommendations."

72.    WPATH's SOC-8 fails to meet these criteria for multiple reasons: WPATH selected authors who had conflicts of interest; WPATH ignored the consensus protocol that SOC-8 purports to follow; WPATH failed to adhere to proper protocols both in evaluating scientific and medical evidence and in making recommendations based on that evidence; and WPATH made material changes to its recommendations in response to external pressure rather than scientific evidence.

73.    As WPATH knows, its members and others use the SOC to make claims to parents and children. Thus, WPATH's assertions that its recommendations represent evidence-based and "consensus-based expert opinion" give members and other clinicians the means to misrepresent to consumers that the SOC reflects expert scientific consensus and to repeat the unsubstantiated statements therein when persuading parents and children to purchase pediatric medical transition services in accordance with WPATH's recommendations.

74.    For example, one parent visited an endocrinologist to discuss purchasing pediatric medical transition services for her child. That doctor sent the parent a link to WPATH's then-

current SOC-7 after she asked for information supporting cross-sex hormones.[23] And another parent visited a transition clinic but was reluctant to purchase pediatric medical transition services. A clinic worker responded by informing this parent that WPATH's guidelines were the standard of care.[24]

### i. WPATH failed to disclose biases and conflicts of interest in the development of SOC-8.

75.    WPATH provides to members and other clinicians the means to falsely convey to parents and patients that WPATH's guidelines are based on a reliable methodology which follows established scientific procedures, including by minimizing biases and conflicts of interest amongst its drafters. That false representation about process is crucial to WPATH's claims regarding the necessity, safety, and efficacy of pediatric medical transition and specific transition services—claims that clinicians also convey to parents.

76.    For example, SOC-8 claims that it followed the NAM and World Health Organization ("WHO") standards on managing conflicts of interest. Yet WPATH ignored WHO standards requiring that those "who have major conflicts of interest, be they financial or nonfinancial, cannot be appointed to the [guideline development group]." And it likewise ignored the NAM standards, which provide that subject matter experts with conflicts of interest "can share their expertise with the [guideline development group] as consultants and as reviewers . . .  but generally should not serve as members of the [guideline development group]." And even where it is necessary for a guideline development group to have members with conflicts of interest, the NAM cautions that "[m]embers with [conflicts of interest] should represent not more than a minority of the [guideline development group]" and that "[t]he chair or

---

[23] Ex. 5, Decl. of Elisabeth Bourne at ¶ 19.
[24] Ex. 11, Decl. of Gwen Turecki at ¶ 7.

cochairs should not be a person(s) with [conflicts of interest]."

77.    Far from attempting to manage or minimize conflicts of interest, WPATH's author selection process ensured that SOC-8's drafters would harbor biases and conflicts of interest. Thus, SOC-8 is a product of bias and financial conflicts of interest, and therefore not based on a reliable methodology that follows established scientific procedures.

78.    The WHO warns against allowing "intellectual conflicts of interest" to taint the development of guidelines, and the NAM warns that individuals with "intellectual relationship[s] that may impact [their] ability to approach a scientific question with an open mind," and whose "community standing" might be impacted by voicing dissent have conflicts of interest. Nevertheless, WPATH exclusively selected authors for SOC-8 who already supported medical transition services. For example, the selection criteria for SOC-8 Revision Committee co-chairs and Chapter Leads required that each be a "[l]ongstanding WPATH Full Member in good standing" and a "[w]ell recognized advocate for WPATH and the SOC."

79.    These conflicts of interest were not merely intellectual—SOC-8 authors often stood to benefit personally and financially from guideline recommendations. WPATH's former president and current board member Dr. Marci Bowers is a prime example of the conflicts of interest that affected SOC-8's development. Dr. Bowers, who has advocated for performing genital surgeries on children, made more than a million dollars in a single year from transition surgeries but declared it "absurd" to disclose that conflict or attempt to account for it in SOC-8.

80.    Those conflicts were not limited to Dr. Bowers. Dr. Eli Coleman, a leader of the SOC-8 drafting effort, testified in a deposition that "most participants in the SOC-8 process had financial and/or nonfinancial conflicts of interest." Dr. Coleman himself was the director of the University of Minnesota's Institute for Sexual and Gender Health—which provides puberty

blockers and cross-sex hormones to children—for over three decades. In May 2023, after SOC-8 was published, the Institute renamed itself the Eli Coleman Institute for Sexual and Gender Health.

81.    The leader of an external review team lamented that "[d]isclosure, and any necessary management of potential conflicts, should take place *prior* to the selection of guideline members" but "this was not done here."

82.    Notwithstanding these conflicts of interest, WPATH falsely represents that SOC-8 complied with WHO and NAM standards in reviewing "[c]onflicts of interests . . . as part of the selection process" and determining that "[n]o conflicts of interest were . . . significant or consequential."

83.    But WPATH's selection process, as a leading SOC-8 author admitted, resulted in most—if not all—SOC-8 authors having conflicts of interest that were significant and consequential.

### ii. Contrary to its claims, WPATH failed to obtain consensus on consequential changes to recommendations in SOC-8 regarding the provision of transition services to children

84.    WPATH knowingly provides members and other clinicians the means to convey to parents and children that medical consensus supports the provision of transition services to children. WPATH represents in SOC-8 that it developed its recommendations through a specific process that yielded expert consensus. But WPATH failed to follow that process and failed to obtain consensus among SOC-8 drafters for key recommendations regarding pediatric medical transition services. It published its recommendations and represented them as the product of medical consensus nevertheless.

85.    WPATH claims that SOC-8 used the "Delphi process," which is a formal method

28

of developing recommendations based on expert consensus.

86.    The Delphi process ensures a level of consensus by posing a question to experts who answer anonymously. Those answers are collated, ranked, and voted upon. That process continues until a consensus statement is reached based on the highest ranked choice.

87.    WPATH failed to follow Delphi when developing SOC-8. The most glaring example of SOC-8's departure from this framework is the removal of age minimums for pediatric medical transition drugs, surgeries, and services including cross-sex hormones, breast amputations, surgical penis removal, and facial surgery. The initial draft of SOC-8 included age minimums ranging from 14 to 17 years old for cross-sex hormones, chest surgeries, facial surgeries, genital surgeries,[25] and other surgeries. These age limits were the product of WPATH's "expert consensus" but were removed at the last minute because of external pressure, as discussed in more detail below.[26]

88.    The removal of age minimums did not itself go through Delphi. At least one WPATH member could not "see how we can simply remove something that important from the document—without going through a Delphi—at this final stage of the game."

89.    WPATH failed to disclose that it disregarded the results of the Delphi process with respect to age limits and thus its statement that "[c]onsensus on the final recommendations was attained using the Delphi process" is false.

### iii.    WPATH misrepresented the quality of evidence underlying its guidelines for pediatric medical transition services

90.    Publicly, WPATH provides members and other clinicians the means to convey to parents and children that its recommended transition services reflect quality medical evidence

---

[25] As in the final draft, an age limit of 18 was set for phalloplasty.
[26] See *infra,* ¶¶ 107–116.

and established scientific methodology. Privately, SOC-8 drafters knew that they did not have sufficient medical evidence to support their recommendations. Moreover, WPATH did not follow its stated methodology for grading the quality of evidence and exaggerated the quality of evidentiary support for medical transition services.

91.    Dr. Coleman acknowledged in a 2023 strategy memo to his fellow drafters that "[a]ll of us are painfully aware that there are many gaps in research to back up our recommendations."

92.    In 2024, Dr. Amy Tishelman, the lead drafter of SOC-8's Children chapter, admitted in an NPR interview that she and her peers had no "research basis" for making decisions or a sufficient "evidence base to know what the best treatments are":

> TISHELMAN: [W]e're talking about assessments [prior to transitioning a child], but we really don't have research on what assessments are effective. Right now, we don't have a research basis for making those decisions, but at least we could bring together a diversity of sophisticated clinicians who do believe that transgender youth exist, to come up with some guidelines about what we mean by assessment.
>
> NPR: That is so remarkable. We don't even know yet what the best assessments are, let alone we don't have an evidence base to know what the best treatments are.
>
> TISHELMAN: No.

93.    But that lack of evidence did not deter the SOC-8 authors, who knew "what we should end up with" in SOC-8 despite the lack of evidence. In other words, WPATH's SOC-8 authors had prejudged that SOC-8 would ultimately make strong recommendations in favor of pediatric medical transition regardless of whether the quality of the evidence supported such recommendations.

94.    In February 2026, Dr. Tishelman justified transitioning children despite not understanding "the etiology [of desiring transition], or why," by comparing pediatric medical

30

transition to knowing "that the sun and the moon existed before we understood anything about why. Lots of things we observe in life, we know to be true, and we don't understand them."

95.    Although WPATH had recommended prescribing puberty blockers to children as early as SOC-6, in connection with the preparations for SOC-8 members of WPATH's guideline development group acknowledged that "there is no agreement on [the use of puberty blockers] within pediatric endocrinologists," that "a global consensus on 'puberty blockers' does not exist," that various European countries had begun restricting puberty blockers and expressing skepticism about their use, and that they did not believe that SOC-8's recommendation "is supported by the data."

96.    Moreover, as former WPATH board member Dr. Erica Anderson explained in 2025, there is not "a lot of long term research on the use of puberty blockers," so experts "don't know" whether they "affect not just the advance of physical development but also . . . cognitive development . . . and emotional development" amongst other side effects. Thus, SOC-8 lacked sufficient medical and scientific basis for its strong recommendation that puberty blockers be administered to children because WPATH could not support the claim that "there are few downsides of" doing so.[27]

97.    Despite the acknowledged lack of evidence, SOC-8 purported to use a version of the "GRADE" system. That system asks a clinical question that is then answered by a systematic literature review of available evidence. Reviewers then assess the evidence and assign it a value of "very low, low, moderate, or high." Next, the reviewers weigh the evidence and make a recommendation for or against a particular medical intervention. Finally, the reviewers classify

---

[27] See *infra,* ¶ 103 (noting SOC-8's representations regarding the requisite level of evidentiary support for its recommendations).

that recommendation as "strong" or "weak."

98. The quality of evidence reflects the certainty of that evidence. High quality evidence means that a reviewer is "very confident that the true effect" of a treatment "lies close to that of the estimate of the effect." Very low quality evidence means that a reviewer has "very little confidence in the effect estimate: the true effect is likely to be substantially different from the estimate of effect."

99. Evidence quality can suffer for several reasons, including risk of bias, unexplained variations in results, evidence that is not directly applicable to the research question, precision flaws like small sample sizes or wide confidence intervals, publication bias, selective reporting, and other problems.

100. Low-quality and very-low-quality evidence often contain serious flaws, including failure to account for comorbidities, failure to control for the placebo effect, selective inclusion of respondents, unrepresentative respondents, lack of comparison groups, lack of controls for differences with comparison groups if any were present, and short follow-up intervals.

101. According to the NAM, a trustworthy guideline should "provide ratings of both the quality [certainty] of evidence and the strength of the recommendations."

102. But WPATH decided not to include the results of its GRADE review of evidence in SOC-8. This was a deliberate decision to obfuscate the strength of the evidence supporting WPATH's recommendations and allow WPATH to overstate the strength of its evidence.

103. SOC-8's misleading methodology purports to rely on GRADE despite not following the GRADE system. SOC-8 states that the phrase "we recommend" is a "strong recommendation" which indicates that: "the evidence is of high quality," that "there is a high degree of certainty [that the intervention's] effects will be achieved in practice," that "there are

32

few downsides of [the] therapy/intervention/strategy," and that "there is a high degree of acceptance among providers and patients or those for whom the recommendation applies." Conversely, the term "we suggest" is a "weak recommendation."

104.   With respect to children, SOC-8 "recommend[s] . . . surgical interventions for eligible*" children, referring the reader to the summary criteria for eligibility contained in SOC-8 Appendix D and the Adolescents chapter generally for eligibility criteria. Appendix D lists surgeries including "breast augmentation, orchiectomy, vaginoplasty, hysterectomy, phalloplasty, metoidioplasty, and facial surgery." By using "we recommend," SOC-8 represents that its recommendations for these surgeries are "[s]trong recommendations" because the "evidence is of high quality" with few accompanying downsides.

105.   WPATH's recommendations are false and misleading because they represent that they are supported by high-quality evidence and that the treatments in question have few downsides. In reality, WPATH's recommendations are unsupported by high-quality evidence, and the recommended procedures often have severe and permanent negative physical and psychological side effects. Indeed, at least some of WPATH's recommendations are contrary to the results of WPATH's consensus process. Thus, WPATH provides the means by which clinicians deceive parents when claiming that strong evidence and scientific consensus support pediatric medical transition.

106.   For example, in initial drafts of SOC-8, WPATH included a strong recommendation in favor of administering puberty blockers "after [children] first exhibit physical changes of puberty," despite WPATH grading the supporting evidence as "moderate." In the published final version of SOC-8, WPATH decided to omit its "moderate" grade. Thus, because SOC-8 claims that a "strong recommendation" reflects that "the evidence is of high

33

quality," the omission of WPATH's "moderate" grade misrepresents that the evidence supporting administering puberty blockers is of high quality. Clinicians rely on SOC-8's representations about the strength of the evidence when assuring parents that purchasing puberty blocker treatment is medically necessary to treat their children.

### iv. Improper external pressure, not scientific or medical evidence, also led to WPATH's recommendations in SOC-8 pertaining to pediatric medical transition services

107.    Finally, WPATH's claim that its guidelines are the product of scientific evidence and medical consensus is also untrue as to key portions of SOC-8, including the lack of age minimums for nearly all aspects of pediatric medical transition other than phalloplasty for girls, because those recommendations are the result of external pressure, not scientific or medical evidence. Specifically, WPATH provides the means that enable clinicians to deceive parents and children by representing or implying that that SOC-8 reflects evidence-based scientific consensus.

108.    For example, Admiral Rachel Levine, then serving as the Assistant Secretary for Health at the United States Department of Health and Human Services, was "extremely supportive of the SOC 8" and "very eager for its release—so to ensure integration in the US health policies of the Biden government." As shown below, Admiral Levine's office pressured WPATH to lift age limitations on medical transition services and that pressure contributed to WPATH's decision to lift all age limitations.

109.    SOC-8's drafters initially included recommended minimum ages for various pediatric medical transition services. These recommendations had gone through SOC-8's Delphi process. But these age limits would have reduced the pool of potential customers for pediatric medical transition services by restricting provision of those services to those above the specified

ages.

110.    In July 2022, Admiral Levine's Chief of Staff spoke with a SOC-8 author and expressed concern that WPATH's then-proposed minimum ages for a variety of pediatric medical transition services (which underscore that patients are children) would "result in devastating legislation" limiting those services. Such legislation would also have damaged the careers and livelihood of many of WPATH's members, who profit from the legality of pediatric medical transition service. Accordingly, Admiral Levine's Chief of Staff asked "if the specific ages can be taken out."

111.    WPATH members discussed this request in light of their shared financial objective of "help[ing] in the fight against" what they termed "the conservative anti trans agenda." A co-lead of SOC-8's Adolescent chapter explained that if age minimums were in SOC-8, "[t]he conservatives will only hone in on the ages and say that WPATH is supporting 'cutting off healthy girl breasts at 15 years old.'" If SOC-8 stayed silent on ages, the reasoning went, "[i]t doesn't give them the headline."

112.    Some WPATH members expressed concerns that acquiescing to external pressure would harm the "messaging and marketing" of SOC-8. For example, then-WPATH president Dr. Walter Pierre Bouman stated that it would not be "appropriate to take any feedback from a nonmedical professional seriously." But those concerns were ignored. Indeed, one SOC-8 author wrote that, in a meeting, Admiral Levine "asked us to remove" references to minimum ages. Another WPATH member wrote, after suggesting a "compromise" solution, that "it is frustrating to have politics in our brains as we make these decisions. But it is what it is!"

113.    The outside pressure continued. According to a WPATH leader, the American Academy of Pediatrics threatened to "actively publicly oppose" SOC-8 if WPATH did not

remove the age minimums. Dr. Bouman expressed "surprise[] that a 'reputable' association" like "the AAP [wa]s so thin on scientific evidence" for its demands. Dr. Bouman likewise "struggle[d] to find any sound evidence-based argument(s) underpinning" the AAP's demanded changes.

114.    But WPATH made the change anyway. Specifically, WPATH caved to this external pressure and removed the age minimums, which, relative to the initial SOC-8 draft, broadened the class of potential patients to whom its members could sell transition services to include children of even younger ages. And WPATH did this to further the profits of its members, despite the acknowledged absence of high-quality evidence supporting the change and in violation of its own stated procedures, including by disregarding the Delphi process that it purported to follow.

115.    One WPATH committee member acknowledged that it was "the most strange experience" to see WPATH eliminate minimum age recommendations at the "last minute" after internal discussion made clear that "nobody [on the committee] wanted to [eliminate] them, and personally not agreeing with the change."

116.    Ultimately, the removal of age limits at the behest of interested third parties was intended to—and did—increase the profits generated by WPATH's members by expanding the pool of potential patients to include more and younger children.

### B. WPATH knows that its recommendations are not supported by scientific evidence or a medical consensus

#### i. WPATH commissioned an evidence review, then blocked the results from being published

117.    SOC-8's authors commissioned systematic reviews of evidence regarding pediatric medical transition from Johns Hopkins University. A team led by Dr. Karen Robinson

was to conduct those reviews, grade the evidence, and present the results to the SOC-8 drafters to inform their work.

118.    Dr. Robinson told a government official in 2020 that she and her team had "completed and submitted reports of reviews (dozens!) to WPATH."

119.    In commissioning these reviews, WPATH secured significant control over the creation and use of any of the Johns Hopkins reports, including whether they would ultimately be published. Among other things, WPATH required that the Johns Hopkins team "use the Data[28] for the benefit of advancing transgender health in a positive manner" and "involve[] at least one member of the transgender community in the design, drafting of the article, and the final approval of the article." Only after meeting these criteria could Johns Hopkins seek final approval from the WPATH Board of Directors for publication.

120.    Johns Hopkins examined "multiple types of [pediatric medical transition] interventions (surgical, hormone, voice therapy . . .)," and "found little to no evidence about children and adolescents."

121.    WPATH rejected multiple Johns Hopkins manuscripts, causing Dr. Robinson to express frustration that WPATH was "trying to restrict our ability to publish."

122.    This was not the only notable evidentiary exclusion from SOC-8. For example, two preliminary articles regarding a study by later USPATH president Dr. Johanna Olson-Kennedy and others formed the evidence base of SOC-8. Two subjects of that study committed suicide during the period of observation. Yet SOC-8 did not disclose or discuss those deaths and

---

[28] WPATH's policy defines "Data" to include essentially any work done by Dr. Robinson's team in connection with SOC-8, to include "raw data, research data, records, reports, notes, tables, writing, sound recordings, pictorial reproduction, drawings or other graphical representations, and works of any similar nature (whether or not copyrighted) which are generated or specified to be delivered by Dr Robinson and her team in connection with the update and development of the SOC8."

how they might undermine SOC-8's conclusion that pediatric medical transition improved psychological well-being.

123. Because WPATH fears that open scientific debate will result in less profit and business for its members, WPATH routinely suppresses opposing scientific viewpoints by intentionally concealing information. For example, one WPATH member complained on a "WPATH Member Forum" in 2021 that when WPATH members publicly disagree with each other, "[i]t doesn't help me with my corporate, HR, and DEI clientele." This WPATH member feared that open discussion of detransitioners, or those who undergo medical transition but later return to living as their sex, potentially jeopardized his or her income. Indeed, the WPATH member complained that public debates "reduce[] the inclusion/exclusion battle to mutually opposing academics with paychecks at stake, which means companies are less likely to invest in trans and gender expansive infrastructure."

124. A WPATH member forwarded this post to WPATH leaders, commenting that "it is very well articulated feedback for WPATH."

125. Thus, WPATH works to protect its members' revenues by quashing internal debate, including the type of debate that is necessary to the scientific process and development of medical guidelines. Relatedly, those associated with WPATH have worked to keep crucial details concerning patient encounters, patient outcomes, and their efforts to expand the market for medical transition services hidden to reduce potential criticism. Dr. Kellan Baker, whose doctorate is in health policy and management, lectured WPATH conference attendees in 2023 to "[k]eep it simple" because "[i]t is really, really, really detrimental right now for us to provide, unfortunately, a lot of detail about who we are, who our patients are, what our work looks like."

126. WPATH also suppresses debate and dissension by engaging in personal attacks

38

and invective. As the Cass Review, an independent review commissioned by England's National Health Service, noted, "the toxicity of the debate" around transition services "is exceptional," and "[t]here are few other areas of healthcare where professionals are so afraid to openly discuss their views, where people are vilified on social media, and where name-calling echoes the worst bullying behaviour."

127. WPATH contributes to that toxicity. For example, the American Medical Association privately declined to "endorse" SOC-8 because it generally does not back "standards of care" as they "fall outside of [the AMA's] expertise." WPATH's then-president, Dr. Walter Pierre Bouman, forwarded the AMA's email to other WPATH leaders, speculating that "the AMA and its current custodians" were "probably some white heterosexual cisgender hillbillies from nowhere."

### ii. WPATH has falsely represented in SOC-8 that pediatric medical transition is the standard of care for children experiencing dissatisfaction with or distress about their sex traits

128. Despite the low-quality evidence supporting pediatric medical transition, WPATH represents that pediatric medical transition is the "Standard of Care" for children who express dissatisfaction with or distress about their sex traits.

129. A "standard of care" typically reflects the collective judgment of the medical community and best available research evidence regarding the diagnosis of specific conditions and safe and effective treatment. A "standard of care" informs medical malpractice law, where the standard of care sets the bar that physicians must meet based on the norms of a given practice area.

130. By titling its publication "Standards of Care," WPATH purposely represents that the SOC has the hallmarks of traditional standards of care used by the medical community and

courts of law. But as WPATH's president-elect Dr. Loren Schechter conceded under oath, despite bearing the name, the SOC "is not considered" by courts to be "the standard of care" for treating sex-trait-related dissatisfaction or distress. When asked why WPATH nonetheless titles its marquee publication "Standards of Care," Dr. Schechter quipped, "I didn't come up with that in 1979. I was 17 years old." Yet WPATH continues to represent that its recommendations are in fact the "standard of care" for children's medical care.

131.    As the HHS report notes, SOC-8's recommendations do not represent medical consensus as to the appropriate manner of care for pediatric medical transition services.  To the contrary, "[t]here is currently no international consensus about best practices for the care of children and adolescents with gender dysphoria." WPATH's use of the term "standards of care" with respect to medical transition (including cross-sex hormones, puberty blockers, and surgical interventions), and WPATH's recommendations for those treatments, additionally implies that such treatments are standard, appropriate, and universally and widely accepted. In fact, those procedures are not standard and are, in fact, prohibited or discouraged in many states and countries. The procedures are the subject of significant medical debate as to their appropriateness and effectiveness and evidence supporting performing them on children is weak or nonexistent.

### iii.    WPATH is aware of myriad factors that lead children to experience distress about their sex traits, but still directs clinicians to medically transition children notwithstanding potential alternative diagnoses and treatments

132.    There are numerous potential root causes of a child's distress about or discomfort with their sex traits. For example, some minors who seek to transition are girls who want to escape being girls because they were sexually assaulted,[29] or gay teenagers who are

---

[29] *E.g.*, Ex. 6, Decl. of Clementine Breen at ¶ 57.

uncomfortable with or confused about their sexual orientation.[30] At first glance, WPATH appears to acknowledge this fact—at least as to mental illness and trauma. In practice, however, WPATH leads clinicians to disregard it, directing children to medical transition procedures instead of the care they need.

133.    WPATH acknowledges that patients who express discomfort with or distress about their sex traits have "a higher prevalence of depression," "anxiety," and "suicidality" and have often experienced "complex trauma," "discrimination," and "violence." SOC-8 notes that "it is critical to differentiate gender incongruence from specific mental health presentations" including "trauma," "parent/child interaction difficulties," "obsessions and compulsions," "broader identity problems," and even "psychotic thoughts."

134.    This is a frequent problem due to the prevalence of mental health morbidities for children who express discomfort with or distress about their sex traits. A Finnish study covering all Finnish adolescents referred for medical transition services between 1996 and 2019—over 2,000 children and over 16,000 control-group individuals—found that 45.7% of the adolescents referred to medical transition services had psychiatric morbidity, while only 15.0% of the control group presented psychiatric morbidities.

135.    Despite the awareness of these potential alternative causes of distress, SOC-8 discourages "gatekeeping practices" which WPATH decries as a "barrier to the provision of" what it deems necessary medical transition procedures. "Gatekeeping," however, simply refers to a clinicians' diligent application of eligibility criteria to determine whether to administer medical transition procedures.

---

[30] *See* Ex. 10, Decl. of ▮▮▮▮▮ at ¶¶ 5–9; Ex. 7, Decl. of Jonathon Skinner at ¶¶ 3–11.

136.    Even if WPATH legitimately encouraged clinicians to investigate whether medical transition treatment is appropriate for a given child, SOC-8 offers no genuine method for making such a determination. Indeed, WPATH defines "gender incongruence" as a subjective "experience" that is "deeply felt" by the child. It offers no objective diagnosis criteria for clinicians. SOC-8 asserts that some distress about sex traits stems from biological factors that exist "from birth," while other distress is "a developmental process," and that "it is not possible to distinguish between those" causes in individual cases. It is likewise "impossible to delineate the contribution of various factors contributing" to a child's dissatisfaction or distress with their sex traits. As the HHS Report notes, "the diagnosis of gender dysphoria is based entirely on subjective self-reports and behavioral observations, without any objective physical, imaging, or laboratory markers." Instead, it "centers on attitudes, feelings, and behaviors that are known to fluctuate during adolescence."

137.    Thus, at face value, SOC-8 purports to require rigorous diagnostic procedures, namely that clinicians "undertake a comprehensive biopsychological assessment of adolescents who present with gender identity-related concerns and seek medical/surgical transition-related care." In practice, however, this is an empty requirement that lacks any concrete, objective criteria. The assessments are framed only in broad, indeterminate terms, telling clinicians they "should aim to understand the adolescent's strengths, vulnerabilities, diagnostic profile, and unique needs to individualize their care." WPATH's procedures do not specify what these factors mean, how they should be evaluated, or how they should influence clinical decisions. Instead, what these factors mean, and how they should be determined or weighed, WPATH leaves entirely to individual clinicians.

138.    That indeterminate and desultory guidance is unsurprising since, as the lead

drafter of SOC-8's Children chapter conceded, "we don't have a research basis for making those decisions." Indeed, that is why WPATH effectively discourages clinicians from seeking to understand and address the source of a child's distress. Presenting at a WPATH conference, psychologist Dr. Laura Kuper of the University of Texas Southwestern Medical Center mocked a clinician who tried to "understand" a child patient's "sexuality" before beginning medical transition, stating: "Well, wait a minute, I'm a grown woman and I don't even quite know exactly which box I'd want to tick, so I—Are you asking [the child] to pigeonhole?"

139.    A responsible clinician faced with a child who expresses distress about their sex traits might wish to engage in in therapy or treatment to encourage a child to become comfortable with their sex traits. SOC-8 emphatically forecloses this option. It dismisses such approaches as "reparative" and "conversion therapy" and provides a strong recommendation against attempting them. Indeed, it states that such "efforts may be viewed as a form of violence."

140.    Despite providing no tools to determine the source of a child's distress, SOC-8 tells clinicians that, when faced with a child who expresses that they are the opposite sex, clinicians need not—indeed, should not—seek to resolve a child's issues regarding mental health and trauma before administering cross-sex hormones and performing medical transition surgeries. SOC-8 makes clear that "not all mental health challenges can or should be resolved completely" before administering transition procedures and tells clinicians not to allow "addressing mental illness and substance use disorders" to be "a barrier to" medical transition. They are advised only to ensure that "any mental health concerns are treated sufficiently" so that medical transition treatments "can be provided optimally," meaning that the child will take their transition medications consistently, "attend follow up medical appointments," and exercise "self-

care, particularly in a postoperative course," that is, after a mastectomy or genital surgery has been performed.

141.   The practical—and intended—result is that SOC-8 permits disregarding and leads clinicians to disregard other causes of distress and encourages proceeding to medical transition as soon as possible. As a result, many medical transition clinics lack adequate mental health staff. If they do provide some form of talk therapy, it often focuses on the child's aesthetic preferences. For example, a WPATH member and the medical director of a public university's transition clinic, explained that the clinic's "psychology and social work" interactions with a 17-year-old boy uncovered that "Frank-N-Furter from Rocky Horror [Picture Show] really aligns with [the patient's] gender expression, and so began to explore what that would look like and we were able to access breast forms in a corset and [the patient] reported that this really feels affirming to them."

142.   SOC-8 also fails to acknowledge that many children expressing distress about their sex traits as puberty approaches are simply gay or lesbian. To the contrary, it discourages clinicians from adequately pursuing this possibility, asserting that clinicians "must be sensitive to the history of (mis)use of sexual identity and orientation as a gatekeeping function to exclude transgender people from" receiving medical transition procedures. As a result, clinicians perform medical transition procedures on children instead of helping them to become comfortable with their sexuality.

143.   For example, one endocrinologist at a university medical center, who has testified to following the WPATH Standards of Care when treating his patients, told a 13-year-old boy who felt anxious about his attraction to other boys that he was not a gay boy but rather had a

"female brain."[31]

144.    One woman in recalls that growing up, she felt like a boy in a girl's body. She identified with male romantic leads in movies and was rowdy and aggressive. Even though she had crushes on girls in middle school, she could not fathom being gay—she did not personally know any lesbians except a gym teacher whom her classmates mocked. She adopted a "transgender" identity and visited a public university's pediatric medical transition clinic, where a psychologist agreed with the woman's theory that she was a male. An endocrinologist and WPATH conference presenter prescribed this woman testosterone when she was 16. After using testosterone for years and undergoing breast amputation at 16, this woman now recognizes that she is a lesbian, not a man.[32]

C. **Independent reviews and guidelines reinforce that WPATH's recommendations and claims regarding pediatric medical transition are unsupported by competent and reliable scientific evidence**

145.    The independent reviews conducted by several European government entities reinforce that SOC-8's guidelines and recommendations for providing transition services to children are unsupported by competent and reliable scientific evidence.

146.    For instance, the English National Health Service commissioned an Independent Review, known as the Cass Review after Dr. Hilary Cass, the Chair of the Independent Review. Dr. Cass published the review in 2024.

147.    The Cass Review sought to definitively examine the current state of the medical evidence regarding care for children who express discomfort with or distress about their sex traits. To that end, the Cass Review "commissioned systematic reviews on a range of issues from

---

[31] Ex. 7, Decl. of Jonathon Skinner at ¶ 24; *see* Ex. 8, Decl. of Melissa Skinner at ¶ 13.
[32] Ex. 10, Decl. of ███████ at ¶¶ 4–7, 8, 11, 19–23, 25, 35–36, 57.

epidemiology through to treatment approaches, and international models of current practice."

148.    As the Cass Review noted, systematic reviews provide "the highest form of evidence" by summarizing "the literature on a particular question" and "us[ing] explicitly defined and reproducible methods to systematically search, critically appraise, and synthesize primary research information." In doing so, systematic reviews are "designed to be reproducible, reliable and to eliminate bias." Using these standardized and reproducible methods "ensures that, as far as is possible, different people appraising a paper will come to similar conclusions."

149.    For the Cass Review, the University of York conducted an "independent research programme" which provided "the best available collation of published evidence."

150.    The Cass Review examined existing guidelines addressing pediatric medical transition and concluded that "[o]nly five" of the twenty-three such "guidelines published between 1998 and 2022" claimed to employ a "systematic approach to searching for and/or selecting evidence."

151.    According to the Cass Review, most guidelines, including SOC-8, scored "poorly on the rigour of development, applicability and editorial independence domains."

152.    The Cass Review noted that "it was difficult to detect what evidence had been reviewed and how this informed development of the recommendations. For example, most of the guidelines described insufficient evidence about the risks and benefits of medical treatment in adolescents, particularly in relation to long-term outcomes. Despite this, many," including SOC-8, "then went on to cite this same evidence to recommend medical treatments."

153.    The Cass Review also noted that "[e]arly versions of two international guidelines - the Endocrine Society 2009 and WPATH [SOC] 7 - influenced nearly all the other guidelines, except for the recent Nordic guidelines." And the Endocrine Society and WPATH guidelines

were themselves "closely interlinked, with WPATH adopting Endocrine Society recommendations, and acting as a co-sponsor and providing input to drafts of the Endocrine Society guideline." SOC-8 is also a product of this incestuous cycle, as it "cited many of the other national and regional guidelines to support some of its recommendations, despite these guidelines having been considerably influenced by WPATH [SOC] 7."

154.    The Cass Review concludes that "[t]he circularity of this approach may explain why there has been an apparent consensus on key areas of practice despite the evidence being poor." That circular approach, combined with other problems including the failure to "follow[] the international standards for guideline development" and "lack [of] developmental rigour," "raise[] serious questions about the reliability of current guidelines" like SOC-8. The Cass Review also found that SOC-8 "overstates the strength of the evidence in making [its] recommendations."

155.    For example, there is "insufficient and/or inconsistent evidence about the effects of puberty suppression on psychological or psychosocial health," which is a conclusion "in line with the finding of . . . other systematic reviews, apart from the systematic review commissioned by WPATH." As for why WPATH reached a different conclusion, the Cass Review explained that "eight of the 12 studies" that WPATH considered "were rated as low quality."

156.    Notably, the Cass Review reported that the two systemic guidelines which WPATH had not influenced, "the recent Nordic guidelines" from Sweden and Finland, had a far stronger evidentiary basis than WPATH's guidelines. Specifically, as part of the Cass Review, the University of York evaluated guidelines using "AGREE II [Appraisal of Guidelines, Research, and Evaluation] . . . which is the most commonly applied and comprehensively validated appraisal tool" for clinical guidelines. Among other things, that tool evaluates "rigour

47

of development," which "is an important bedrock of guideline development" that "includes systematically searching the evidence, being clear about the link between recommendations and supporting evidence, and ensuring that health benefits, side effects and risks have been considered in formulating the recommendations." The Cass Review found that SOC-8 scored 38% on "rigour of development."

157.    Only the Swedish and Finnish guidelines "scored above 50% for rigour of development." In contrast to WPATH, the Swedish and Finnish guidelines concluded that there was a "lack of robust evidence about medical [transition] treatments," leading "to a recommendation that treatments should be provided under a research framework or within a research clinic." The Cass Review further observed that the Nordic guidelines were "the only guidelines that have been informed by an ethical review conducted as part of the guideline development." Accordingly, the Cass Review concludes that "only the Finnish (2020) and the Swedish (2022) guidelines could be recommended for use in practice."

158.    Unsurprisingly, the Finnish and Swedish guidelines recommend a significantly different treatment approach to SOC-8. For example, rather than undertake a process where a doctor's role is simply to assist a child with accomplishing "embodiment goals," the Swedish guidelines restrict the use of puberty blockers and cross-sex hormones by children to narrowly defined exceptional cases in the context of clinical research, with surgeries likewise limited to exceptional circumstances. Even then, the Swedish guidelines still prohibit medical transition services without significant additional precautions, including that clinicians identify and successfully treat any other mental health conditions before proceeding with these experimental treatments.

159.    The Finnish guidelines impose similar restrictions. They categorize pediatric

medical transition as an "experimental practice," prohibit pediatric medical transition surgery, and also prohibit administering puberty blockers and cross-sex hormones if the patient has any major untreated psychiatric comorbidities. Taken together, the Cass Review and guidelines from Sweden and Finland illustrate that there is no consensus concerning pediatric medical transition services.

160.    Accordingly, the Cass Review and practices in Sweden and Finland underscore the absence of competent and reliable scientific evidence supporting WPATH's SOC-8. Nevertheless, WPATH disseminates SOC-8 to clinicians, knowing and expecting that they will convey these unsubstantiated recommendations to consumers and children, thereby providing the means and instrumentalities for others to make unsubstantiated claims about medical transition interventions.

**D. WPATH falsely claims that pediatric medical transition is "lifesaving" and, in so doing, misrepresents the risks and benefits of pediatric medical transition**

161.    Medically transitioning children can involve blocking the onset of puberty with drugs, administering cross-sex hormones, and performing surgeries on the face, chest, and genitals. These medical interventions have serious, physically harmful, and irreversible effects.

162.    Importantly, the overall quality of evidence purporting to show a benefit to pediatric medical transition is very low.

163.    Despite the low-quality of evidence supporting pediatric medical transition, WPATH represents that its recommendations—which by and large recommend the medical transitioning of children—are the "Standard of Care" for treating children who express dissatisfaction with or distress about their sex traits.

**i. WPATH's representation that medical transition is necessary and effective to prevent suicide in children is false, misleading, or unsubstantiated**

164.    SOC-8 asserts that "chest dysphoria" can lead to anxiety, depression, and distress, all of which can be treated by mastectomy. SOC-8 additionally asserts that not providing medical transitioning can lead to depression and anxiety. SOC-8 further claims that "hormone therapy is considered a lifesaving intervention," and that medical transition "is associated with a substantial reduction in the risk of suicide attempt[s]."

165.    To reach these and other conclusions, WPATH relies on spurious studies that frequently fail to control for the placebo effect or contain other serious defects. WPATH also ignores or dismisses evidence that suggests there are no benefits to pediatric medical transitioning, or that pediatric medical transition harms mental health. Despite arguing against legal restrictions that had been placed on pediatric medical transition services, counsel for the American Civil Liberties Union in *United States v. Skrmetti* conceded to the Supreme Court at oral argument in that case that "there is no evidence [] in the studies that [transition] treatment reduces completed suicide."

166.    WPATH nevertheless asserts that medical transition is "lifesaving" despite the lack of evidence to substantiate the claim that medical transition is necessary and effective at preventing suicide.

167.    Although WPATH does not explicitly claim in SOC-8 that medical transition reduces completed suicide, WPATH instead asserts that medical transition treatments reduce "suicidality" and "suicidal ideation." But a reasonable consumer, hearing that pediatric medical transition "reduces suicidality" would understand those claims to mean that medical consensus and scientific evidence establish that medical transition is necessary and effective to prevent suicide.  Thus, regardless of whether WPATH refers to "suicidality" or "suicide" in the materials

50

(SOC-8) that it provides to its members and other clinicians, the net impression that consumers take away is the same.

168.    Indeed, that medical transition is lifesaving—*i.e.*, necessary and effective to prevent suicide—is precisely the message that WPATH intends to convey. As Dr. Johanna Olson-Kennedy, the current president of USPATH, told ABC News, "[w]e often ask parents, [w]ould you rather have a dead son than a live daughter?"

169.    WPATH has deceived consumers by claiming that "high quality evidence" supports its treatment recommendations and its assertion that medical transition is "lifesaving" —causing many parents and patients to reasonably, but incorrectly, believe that SOC-8 is grounded on reliable methods and solid evidence. Numerous consumers, responding to an FTC Request for Information ("RFI") in 2025 about the medical transitioning of children, expressed their reliance upon or confidence in WPATH's guidelines. For instance, one commentator stated, "for trans and gender diverse people, especially youth, access to gender affirming care is imperative and life-saving. The current recommendations provided by . . . WPATH for gender-affirming care [prevent an eight-fold increase in the risk of children] attempt[ing] suicide." Another wrote, "WPATH ha[s] stated that this care is safe, and necessary. The amount of harm that will be caused by restricting or banning gender affirming care will be life threatening to trans children."

170.    WPATH's representations thus leverage parents' fear that their child might commit suicide to obtain parental consent for the purchase of medical transition services, despite the lack of evidence that such treatments will in fact alleviate the child's distress and reduce their risk of suicide.

### ii. WPATH's representation that puberty blockers are fully reversible is false, misleading, or unsubstantiated

171.    Puberty is the stage between childhood and adulthood during which a person becomes capable of reproduction. The onset of puberty typically occurs between ages 9 and 14 in boys and 8 and 13 in girls. SOC-8 recommends that clinicians begin medical transition when children reach puberty.

172.    Puberty begins and proceeds through complex endocrine signaling. In the brain, the anterior pituitary gland secretes gonadotropin hormones, which act on the gonads (ovaries or testes) to stimulate the synthesis of sex steroids (testosterone in boys; estrogen and progesterone and in girls) and promote gametogenesis, the biological process of forming mature germ cells (sperm in boys and eggs in girls). During puberty, sex steroid hormones promote skeletal growth, muscle and nerve development, reproductive development, and cognitive development in both sexes.

173.    Puberty blockers impede these developments and come in two forms. A doctor may inject the drug on a regular schedule (*e.g.*, monthly) or implant a device in the child's arm that lasts for a certain period (*e.g.*, twelve months) and then is typically removed.[33]

174.    The Food and Drug Administration ("FDA") has approved various pharmaceuticals classified as gonadotropin-releasing hormone agonists—commonly called "puberty blockers" or GnRHas—for the treatment of "precocious puberty," which occurs when a child's pituitary gland activates prematurely. Puberty blockers act directly on the pituitary gland to significantly reduce the release of gonadotropins, which prevents the onset or further pubertal development. Once a child reaches a normal age at which to begin puberty, the use of puberty

---

[33] *See* Ex. 12, Decl. of ███████ at ¶ 16 (describing process of implanting puberty blockers); *e.g.*, Ex. 4, Decl. of Caroline Miller at ¶¶ 18 (discussing implantation), 27 (discussing removal).

blockers is discontinued.

175.    These drugs have other FDA-approved uses, such as in androgen deprivation therapy for adult males with prostate cancer and for estrogen deprivation in adult females with endometriosis.

176.    The FDA has not approved puberty blockers for the treatment of patients who express dissatisfaction with or distress about their sex traits, or for healthy children of normal pubertal age. Their use in pediatric medical transition is thus "off-label," a term that refers to doctors prescribing FDA-approved medications for a purpose, dosage, or population not listed on the FDA-approved label.

### a.  WPATH asserts that puberty blockers are fully reversible

177.    WPATH recommends that puberty blockers be prescribed to children despite serious side effects that can include bone issues and psychosocial harms (*i.e.*, mental, emotional, and social harms), while failing to adequately disclose, discuss, and warn against other side effects, which include hot flashes, long-term cognitive deficits, and lethargy.

178.    Despite the side effects, SOC-8 recommends that clinicians begin medical transition as early as 8 or 9 years old and represents that puberty blockers are "fully reversible." It repeats that representation elsewhere, too. For example, in a presentation that WPATH continues to publish on its website entitled "Applying and Understanding the WPATH Standards of Care (SOC) Through the Healthcare Providers Lens," WPATH asserts that puberty blockers are "fully reversible."

179.    Consumers are deceived by these assertions. For example, a respondent to the FTC's 2025 RFI stated, "[t]here are multiple organizations that support providing gender affirming care to both adults and children … [including] WPATH. The care given to minors is

53

safe and completely reversible."

180. While SOC-8 purports to emphasize "the importance of addressing other risks and benefits of pubertal suppression," rather than proceeding to disclose and discuss the aforementioned risks and side effects, WPATH instead focuses on purported benefits by suggesting that puberty blockers will result in "improvement in romantic and sexual satisfaction for adolescents."

181. Despite these risks, WPATH claims that the use of puberty blockers "is generally safe with the development of hypertension being the only short-term adverse event" when used for medical transition of children. It further asserts that there are "no known long-term adverse events" when used for its FDA-approved purpose on children experiencing precocious puberty, and claims that puberty blockers are "medically necessary" for children being medically transitioned.

182. As shown below, these recommendations wrongly state and imply that puberty blockers' off-label use to medically transition children is scientifically established as safe and effective.

b. **WPATH's representation that puberty blockers are safe, effective, and reversible is false, misleading, or unsubstantiated**

183. When clinicians administer puberty blockers as part of pediatric medical transition, they prevent naturally timed puberty in children. That causes a condition known as hypogonadotropic hypogonadism ("HH"). HH occurs because puberty blockers cause the pituitary gland's release of gonadotropins to stop, meaning the gonads cannot produce the sex steroids testosterone or estrogen and, consequentially, pubertal development halts, disrupting the progression of the child's physical, cognitive, and reproductive development.

184. Additionally, HH is associated with a range of increased health risks including

anemia; headaches, fatigue, and hot flashes;[34] impaired brain development and functioning; diminished mental health and depression;[35] decreased bone mineral density, osteoporosis, and bone fractures; and sexual dysfunction.

185.    Although these children remain stalled in a prepubertal or early pubertal stage, their classmates progress through puberty, impeding the puberty-blocked child's social development and undermining that child's psychological well-being.

186.    During adolescence, the brain undergoes substantial reorganization that involves profound structural and functional changes aimed at increasing efficiency and maturity. At least one study has found that children who undergo puberty blockers for more than one year have decreased executive function compared to those who do not block puberty, prompting concerns that puberty blockers may temporarily or permanently disrupt brain maturation and cause significant neuropsychological consequences.

187.    The accrual of peak bone mass typically occurs during puberty. Sex steroid hormones play an essential role in the mineralization of the skeleton.

188.    Failure to reach peak bone density may lead to increased risk of osteoporosis and fractures later in life, including debilitating fractures of the spine and hip.

189.    Studies on pediatric patients undergoing medical transition have consistently demonstrated decreases in bone density with the use of puberty blockers.

190.    No studies have considered the effects of medical transition on the bone health of pediatric patients into middle age or late adulthood.

---

[34] *E.g.*, Ex. 7, Decl. of Jonathon Skinner at ¶ 35 (hot flashes, muscle spasms, "could not keep weight on"); Ex. 6, Decl. of Clementine Breen at ¶ 16 (hot flashes and "sluggish[ness]").
[35] *E.g.*, Ex. 12, Decl. of ███████ at ¶¶ 60–62; Ex. 4, Decl. of Caroline Miller at ¶¶ 21, 25; Ex. 6, Decl. of Clementine Breen at ¶ 16 (brain fog).

191.    When children receiving puberty blockers later receive cross-sex hormones, bone mineralization typically increases, but a critical period for bone-density accrual during adolescence may have been missed or shortened, because bone density accrual slows during the patient's twenties and then begins to decline. Children administered puberty blockers may therefore never reach their possible peak bone density. Although SOC-8 does disclose that "[a] prolonged hypogonadal state in adolescence," including due to "GnRHa monotherapy," "is often associated with an increased risk of poor bone health later in life," it immediately proceeds to minimize this risk, noting that "bone mass accrual is a multifactorial process that involves a complex interplay between endocrine, genetic, and lifestyle factors."

192.    Puberty blockers also inhibit or prevent genital growth during a possibly critical period, with potential harms to future sexual function in both boys and girls. Research on sexual-function outcomes in children who undergo pediatric medical transitioner is also meager and lacking.

193.    Transition drugs, including puberty blockers, are linked to erectile pain for boys and men. This is a common patient complaint. But when a teenage boy in Michigan tried to investigate why arousal created a sensation of broken glass scraping against his penis, doctors repeatedly assured him it was not caused by the transition drugs.[36]

194.    Safety data for puberty blockers as used in children of normal pubertal age are meager or absent. Despite the lack of research, SOC-8 provides a "strong recommendation" that clinicians administer puberty blockers to children, thereby asserting that "the evidence [for the intervention] is of high quality," "there are few downsides," and "there is a high degree of

---

[36] Ex. 7, Decl. of Jonathon Skinner at ¶¶ 49–50, 52–53.

acceptance among providers" for the treatment.

195.    WPATH knows that its representations about the reversibility of puberty blockers are deceptive. Dr. Scott Leibowitz, who co-authored the relevant chapter of SOC-8, acknowledged behind closed doors that the claim puberty blockers are "reversible" should have an "asterisk" next to it.

### iii.    WPATH's representation that cross-sex hormones are safe, effective, and improve mental health is false, misleading, or unsubstantiated

196.    Transition doctors administer cross-sex hormones to help children reach their "embodiment goals," *i.e.*, to shape the way their sex characteristics develop to control their appearance. For example, transition doctors prescribe testosterone to girls to make them appear more like boys. Indeed, as the HHS report notes, these "embodiment goals" often "serve as the primary guide for treatment decisions." SOC-8 directs doctors to honor these goals as "medically necessary."

197.    Cross sex-hormones are FDA-approved for conditions like hypogonadism (when the gonads produce little or no sex steroids) or menopause. The use of cross-sex hormones for pediatric medical transition is off-label and not FDA approved.

198.    In SOC-8, WPATH strongly recommends that clinicians administer cross-sex hormones to children who have "Reached Tanner stage 2," which is the onset of puberty.[37] In other words, SOC-8 recommends that WPATH members and clinicians inject girls as young as 8 with testosterone, if that 8-year-old has begun puberty and expresses discomfort with her sex traits.

---

[37] See, *e.g.*, Ex. 7, Decl. of Jonathon Skinner at ¶ 47 (describing being prescribed estrogen at 13); Ex. 6, Decl. of Clementine Breen at ¶ 18 (describing being prescribed testosterone at 13); Ex. 9, Decl. of ███████████ at ¶ 13 (describing clinical worker advocating for cross-sex hormone treatment for declarant's 14-year-old); Ex. 2, Decl. of Cassidy Andrews at ¶ 24 (girl prescribed testosterone at 14).

### a. WPATH represents that cross-sex hormones are safe, effective, and improve mental health

199.    In SOC-8, WPATH represents that cross-sex hormones are medically necessary for children who express discomfort with or distress about their sex traits, and that cross-sex hormone use is an appropriate treatment as early as the onset of puberty.

200.    WPATH claims in public statements that the administration of cross-sex hormones is "safe" for children and asserts in SOC-8 that cross-sex hormone therapy "has been shown to improve quality of life and to decrease depression and anxiety."

201.    WPATH asserts that hormone therapy "positively impact[s] the mental health and quality of life of [children]" and "is considered a lifesaving intervention."

202.    WPATH therefore represents, expressly and by implication, that the administration of cross-sex hormones to children is lifesaving, safe, effective, and improves mental health.

203.    WPATH makes these representations despite a panoply of side effects that it acknowledges exist, along with additional side effects that it fails to disclose. Among the side effects that WPATH acknowledges are hyperkalemia, hypertriglyceridemia, weight gain, cardiovascular disease, cerebrovascular disease, meningioma, hypertension, erectile dysfunction, type 2 diabetes, low bone mass, hyperprolactinemia, polycythemia, infertility, acne, and androgenic alopecia.

204.    WPATH notes other potential side effects of the administration of cross-sex include "problematic sexual health outcomes" including "impact [on] sexual function, pleasure and sexual self-expression," and the potential "to impact reproductive functions and fertility," while noting that the "consequences are heterogenous" (*i.e.*, varied). But WPATH presents such impacts as reversible once the administration of cross-sex hormones ceases: "If hormonal

therapy is discontinued and gonads are retained, many physical changes will revert to pre-hormone therapy status . . . including . . . erectile dysfunction."

205.   SOC-8 fails to adequately disclose the existence and severity of additional effects for children treated with cross-sex hormones, which include mood disturbances, vocal pain, pelvic pain, pelvic floor dysfunction, clitoral discomfort, vaginal pain, persistent sexual dysfunction continuing after cessation of use, and erectile pain.

206.   Cross-sex hormones halt a child's normal pubertal development. Cross-sex hormones do not induce opposite-sex pubertal development. The natural endpoint of puberty—sexual maturation and reproductive capacity—does not result so long as cross-sex hormones continue to be administered. In fact, continued use can suppress or eliminate entirely the child's potential for sexual maturity and fertility.

207.   For example, an endocrinologist, who has testified to following the WPATH Standards of Care when treating his patients, implanted a puberty blocker in a boy who had never experienced erections and prescribed cross-sex hormones. The boy, now a 23-year-old man, stopped using transition drugs several years ago. But he has still never experienced an orgasm.[38] Nonetheless, in SOC-8, WPATH has failed to adequately disclose that sexual health dysfunction can persist even after a patient stops taking cross-sex hormones. Indeed, as noted above, WPATH represents that sexual function "will revert to pre-hormone therapy status."

208.   SOC-8 recommends cross-sex hormones even where there are alternative medical explanations for the child's expressed discomfort. For example, it endorses "hormone treatment if a transgender and gender diverse individual requires admission to a psychiatric . . . unit." And

---

[38] Ex. 7, Decl. of Jonathon Skinner at ¶ 76; *see* Ex. 12, Decl. of ███████ at ¶ 64 (describing this as a common side effect).

it advises that "the presence of [psychosis] symptoms does not necessarily equate to an inability to give consent" for interventions.

209.    Leveraging WPATH's guidance, transition doctors push hormonal interventions onto consumers—which can have detrimental psychoactive effects—even when children experience mental health crises.[39] For example, USPATH president Dr. Olson-Kennedy increased a 16-year-old girl's testosterone dose as she spiraled into "psychosis."[40]  For another, a Missouri doctor reacted to a girl's avoidance of school and hospitalization for mental health issues while on puberty blockers by prescribing her testosterone.[41]

### b. WPATH's representation that the administration of testosterone to girls is safe and effective and improves mental health is false, misleading, or unsubstantiated, including because of side effects that WPATH has failed to adequately disclose

210.    Testosterone comes in multiple forms. Patients may inject it on a regular basis (*e.g.*, weekly) or apply a less potent gel.

211.    In girls, high doses of testosterone may cause changes in musculature, thickening of vocal cords causing voice deepening, differences in fat distribution, increased facial and body hair, cystic acne, and male pattern hair distribution or loss. Serious health risks include high blood pressure, worsened cholesterol and lipid blood levels, insulin resistance, vaginal atrophy, persistent pelvic pain and discomfort, pelvic floor dysfunction, and cardiovascular problems. Emotional and mental instability may be additional consequences.[42]

212.    Girls and young women have also reported vocal issues including pain when

---

[39] *E.g.*, Ex. 6, Decl. of Clementine Breen at ¶¶ 43–51; Ex. 12, Decl. of ▮▮▮▮▮ at ¶¶ 54, 62, 68; Ex. 10, Decl. of ▮▮▮▮▮ at ¶ 33.
[40] Ex. 6, Decl. of Clementine Breen at ¶¶ 43–51.
[41] Ex. 12, Decl. of ▮▮▮▮▮ at ¶ 62.
[42] *E.g.*, Ex. 6, Decl. of Clementine Breen at ¶¶ 21, 42–51; Ex. 10, Decl. of ▮▮▮▮▮ at ¶ 33; Ex. 1, Decl. of Soren Aldaco at ¶ 26.

speaking, inability to sing, and inability to scream after starting testosterone. Thickened vocal cords are a permanent effect of testosterone; they do not return to original size when the patient stops using testosterone. Although SOC-8 does note that many patients "experience difficulties such as inadequate pitch lowering, compromised voice quality, vocal loudness, vocal endurance, pitch range, and flexibility," WPATH does not disclose vocal pain as a side effect.

213. Clitoral enlargement is an effect of testosterone in girls.[43] This can cause chafing against underwear and tight pants.[44] Girls and young women have reported strange feelings or dulled sensation in their clitorises after using testosterone.

214. A Texas woman reports that she began developing painful cysts on her clitoris after starting testosterone as a minor. The problem has not resolved since she stopped using testosterone years ago.[45]

215. Certain effects of testosterone in girls, such as thick vocal cords, changes to clitoral size and sensation, and hair growth, are irreversible.

216. Testosterone use in girls can cause reproductive organ atrophy, including thinning of vaginal epithelium; symptoms mimicking polycystic ovary syndrome; persistent pelvic pain and discomfort; and pelvic floor dysfunction leading to incontinence, constipation, and chronic pelvic pain. SOC-8 discloses "pelvic floor dysfunction" as a potential side effect only in connection with vaginoplasty, not the administration of testosterone or other cross-sex hormones.

217. To resolve the pelvic pain that testosterone use causes, transition doctors advise girls and young women to undergo hysterectomy. This operation renders the patient sterile.

218. Vaginal atrophy is painful and has significant consequences. It can make

---

[43] Ex. 12, Decl. of ███████ at ¶ 53.
[44] Ex. 12, Decl. of ███████ at ¶ 53.
[45] Ex. 1, Decl. of Soren Aldaco at ¶¶ 25, 41.

penetrative sex unbearable and even dangerous, as the thinned walls can rupture and hemorrhage. Such pain can impair other activities as well. For example, a 9th-grade girl undergoing medical transition had to quit cross country and track because she developed intense vaginal pain after starting testosterone.[46]

219.    SOC-8 notes that cross-sex hormones "may affect mood." The reality is much worse. People using cross-sex hormones for medical transition have reported mood disturbances including anxiety, depression, mood swings, suicidal ideation, and homicidal ideation. A California woman recalls transforming from being a "big reader and very polite" to "a horrible student" who "bull[ied] outcasts" after, at age 13, she took testosterone prescribed to her by Dr. Olson-Kennedy. After using testosterone for about 18 months, she began hallucinating that people were "stalking" her and that bugs were "crawling on [her] skin," having panic attacks, experiencing "intense delusions that [her] parents were demonic forces set against" her, and cutting herself because she "felt like there was something inside [her] that she could not get out."[47] SOC-8 fails to disclose these severe psychological side effects.

220.    Testosterone causes weight gain, which in turn causes more health problems.[48] A St. Louis transition clinic saw so many of its young female patients develop sleep apnea after gaining weight on testosterone that it began routinely screening every girl for the condition.[49]

221.    Girls and women using testosterone can become dependent on it.

---

[46] Ex. 6, Decl. of Clementine Breen at ¶ 24.
[47] Ex. 6, Decl. of Clementine Breen at ¶¶ 21, 43–51.
[48] Ex. 12, Decl. of ███████ at ¶ 51.
[49] Ex. 12, Decl. of ███████ at ¶ 51.

### c. WPATH's representation that the administration of estrogen and progesterone to boys is safe, effective, and improves mental health is false, misleading, or unsubstantiated, including because of side effects that WPATH has failed to adequately disclose

222.    In boys, transition doctors frequently administer a cocktail of estrogen, progesterone, and finally—to block testosterone production or uptake—a puberty blocker or anti-androgen medication, such as Spironolactone (Aldactone). Spironolactone is a potassium-sparing diuretic that blocks androgen receptors and inhibits testosterone production. Its primary on-label uses include managing high blood pressure and treating fluid retention associated with heart failure, liver cirrhosis, or kidney disease. It is not an FDA-approved treatment for medical transition.

223.    Side effects of estrogen use in boys include blood clots; high blood pressure; potential cardiovascular issues like a stroke, heart attack, or venous thromboembolism; decreased libido; erectile dysfunction; erectile pain; infertility; weight gain; mood swings; fluid leaking from nipples; and pain near the nipple.[50]

224.    Transition drugs, including estrogen, can cause erectile pain for boys and men. A presentation at a WPATH conference in 2021 reported that over half of respondents in a survey "reported experiencing painful erections while on hormone therapy." Despite these common patient reports of erectile pain,[51] SOC-8 does not disclose this risk.

225.    Many effects of estrogen in boys, such as breast growth, shrunken testicles, and stunted or arrested fertility, are generally irreversible.

226.    Many boys and young men on cross-sex hormone regimens complain of "brain fog," or inability to think clearly. Their parents report that these boys and young men seem

---

[50] *E.g.*, Ex. 7, Decl. of Jonathon Skinner at ¶¶ 48, 73; Ex. 12, Decl. of ███████ at ¶ 65.
[51] *E.g.*, Ex. 7, Decl. of Jonathon Skinner at ¶¶ 49–50; *see* Ex. 12, Decl. of ███████ at ¶ 63.

unable to regulate emotions or cope with social interactions.[52]

> #### iv. WPATH's representations that breast amputation for girls is safe, effective, and consistently results in better health and quality of life are false, misleading, or unsubstantiated

227.    WPATH's assertions in SOC-8 concerning the purported safety, efficacy, and health and quality of life benefits of breast amputation for minors are not supported by reliable evidence and fail to disclose the known risks associated with the procedure. By characterizing breast amputation as a routine, medically necessary intervention that consistently improves health-related quality of life, WPATH provides the means by which clinicians deceive consumers into purchasing breast amputations for children. These representations, and the omissions accompanying them, operate to mislead consumers regarding both the evidentiary basis for the procedure and the scope and severity of its potential adverse outcomes.

> #### a. WPATH represents that breast amputations are safe and effective, and consistently result in better health and quality of life

228.    WPATH represents in SOC-8 that breast amputations are safe, effective, and consistently result in better health and quality of life for girls experiencing dissatisfaction with or distress about their sex traits. SOC-8 states that "[t]he efficacy of top surgery has been demonstrated in multiple domains, including a consistent and direct increase in health-related quality of life," and a "consistent increase in satisfaction with body and appearance." WPATH adds that "the evidence demonstrates top surgery to be a safe and effective intervention." In sum, SOC-8 presents breast amputations as routine, medically necessary procedures that result in better health and quality of life.

229.    SOC-8 discloses minimal potential risks and side effects associated with breast

---

[52] *E.g.*, Ex. 13, Decl. of ██████████ at ¶¶ 19–24; *see* Ex. 12, Decl. of ██████████ at ¶ 66.

amputations. It says that "[c]hest surgeries" such as "mastectomy" "may adversely affect erogenous sensation." It recommends that patients should be "abstinent from tobacco/nicotine prior to gender-affirmation surgery" because "[t]obacco use has been associated with worse outcomes in plastic surgery, including overall complications, tissue necrosis, and the need for surgical revision." SOC-8 further recommends that "[i]ndividuals who undergo gender-affirming surgery of the chest should have ongoing breast cancer surveillance."

> ### b. WPATH's representations that breast amputation for girls is safe, effective, and consistently results in better health and quality of life are false, misleading, or unsubstantiated

230. Breast amputation, or mastectomy, involves removal of the mammary glands together with the ducts that transfer milk from the glands to the nipple. Breast amputation typically results in an inability to breastfeed and loss of erogenous sensation.

231. Clinicians have referred girls for breast amputations at age 12.

232. The immediate aftermath of breast amputation can be incredibly painful, and patients typically require intimate care for weeks afterward. For example, a WPATH member performed a breast amputation on a 14-year-old girl in San Francisco. The teen woke up from the operation feeling like she "had been hit by a truck" and found herself "hardly" able to "move [her] arms."[53]

233. Breast amputation is associated with numerous surgical complications, such as necrosis, seroma or lymphedema (fluid buildup and swelling), hematoma (localized clotted or pooled blood outside blood vessels), scarring, and nerve damage resulting in chronic pain or loss of sensation.

---

[53] Ex. 6, Decl. of Clementine Breen at ¶¶ 40–41.

234.    Breast amputation can involve removing the nipples and then sewing them back on—what SOC-8 refers to as nipple grafts. Some women who began transition as minors report that their nipples turned black and fell off afterward.[54] But SOC-8 describes "necrosis" as a potential risk only in connection with the use of tobacco. Some surgeons try to avoid this side-effect by advertising no-nipple breast amputations to girls and women who identify as nonbinary. Regardless, skin at the site of breast-amputation scars tends to droop in an effect known as "dog ears."

235.    Though SOC-8 discloses that breast amputation "may adversely affect erogenous sensation," this brief, qualified disclaimer substantially downplays the potential adverse outcomes from breast amputation. Many girls and women report strange sensations in their chests years after breast amputation, including rawness around scars, numbness near nipples, pain, and electrical sensations. Some cannot locate exactly where sensations are coming from, which could be a result of nerve damage. A Washington woman who underwent the surgery at 16 must wear a sports bra during intimacy to modulate the electrical sensations.[55] A California woman whose breasts were amputated at age 13 now experiences "extreme slicing sensations" in the area. A Massachusetts woman who underwent breast amputation at age 14 now feels an electric sensation in her scars and a deep pain below the skin that is hard to place. When her boyfriend touches her chest, she senses pressure but cannot say exactly where it is.

236.    USPATH president Dr. Olson-Kennedy, who referred a 14-year-old girl for breast amputation while she was recovering from sexual abuse,[56] dismisses concerns about breast amputation, declaring that "[i]f you want breasts at a later point in your life, you can go and get

---

[54] Ex. 2, Decl. of Cassidy Andrews at ¶¶ 41–42.
[55] Ex. 10, Decl. of ███████ at ¶ 55.
[56] Ex. 6, Decl. of Clementine Breen at ¶¶ 30, 35.

66

them." But the effects of breast amputations are irreversible. Implants will not function as a girl's natural breasts did—she will not regain erogenous sensation or the ability to breastfeed a baby. And even if the procedure avoids potential harms including failed reconstruction, the patient's reconstructed breasts will never look or feel normal.

237. In sum, WPATH's representation that breast amputation is safe, effective, and consistently results in better health and quality of life is false, misleading, or unsubstantiated, including because of significant side effects that SOC-8 fails to adequately disclose.

> **v. WPATH recommends surgical amputation of a child's penis and testicles as treatment for dissatisfaction or distress regarding sex traits**

238. One form of genital surgery performed on children is "vaginoplasty," in which the surgeon cuts off the bulk of a child's testicles and penis. The surgeon restructures the child's scrotum to mimic a "clitoris" and "labia." Finally, the surgeon carves a wound next to the child's anus, empties the penile skin, and lines the wound with the child's emptied penile skin.

239. It is inherently harmful and unsafe to surgically remove a child's healthy and functioning genitals. Nevertheless, WPATH deems it "medically necessary" for treating dissatisfaction with or distress about sex traits. WPATH represents that vaginoplasty is "associated with a low rate of complications." SOC-8 deems boys eligible for vaginoplasty after just twelve months of hormone therapy—though that requirement can be waived if the hormone therapy is not "required[]" to achieve the desired surgical result." SOC-8 claims that "there may be a benefit" to performing vaginoplasty on children, and indeed "recommend[s] surgeons consider" performing them on children. This is despite acknowledging that "[l]imited data are available on the outcomes for youth undergoing vaginoplasty."

240. SOC-8 cites a 2017 article, "Age Is Just a Number: WPATH-Affiliated Surgeons' Experiences and Attitudes Toward Vaginoplasty in Transgender Females Under 18 years of Age

in the United States." This title reflects the views of Dr. Marci Bowers, a plastic surgeon who is WPATH's immediate past president and a current board member. Dr. Bowers "advocate[s] for 17 as the new norm" for vaginoplasty and "continue[s] to maintain that 17 may indeed be the ideal age for surgery."

241.    This is in part due to the brutality of the procedure. Recovery from vaginoplasty requires the patient to "dilate" the new wound 3-4 times daily for months so that it does not heal. For this reason, some transition doctors, including Dr. Bowers, believe performing the surgery while the boy is a minor still living with his parents is preferable, rather than when the boy is living in a communal setting with limited privacy.

242.    WPATH clinicians lead children to vaginoplasty in other ways, as well. The erectile pain that often results from administering transition drugs to children can be so severe that it drives boys to seek surgical penis removal. A research team at UCLA found that "a huge chunk of" male medical transition patients "were not planning to have bottom surgery, but then change[d] their mind[s] as a result of the erectile pain."

243.    WPATH calls a common version of the vaginoplasty operation "penile inversion." This is misleading. While the procedure involves inverting the skin of the child's penile shaft, the shaft itself is removed and discarded along with the child's testicles.

244.    Likewise, "vaginoplasty" is inapt, as is WPATH's advertisement of a "neovagina," because the surgically-created wound is not any sort of vagina. It is constructed of different material, it does not have the same stretch and elasticity, it does not keep itself clean, it does not self-lubricate, and it cannot deliver a baby.

245.    Despite the risks and lack of benefits, this procedure is shockingly common. One pediatric medical transition clinic "routinely" referred minor boys seeking this surgery to

surgeons willing to perform it.[57] An academic study surveyed twenty WPATH-member surgeons, many of whom advertised their services on WPATH's public provider directory, and over half of the surgeons reported having performed a vaginoplasty on a child. These WPATH surgeons' "preferred method" was the "penile inversion" surgery, where the child's penile shaft was severed and discarded. One of the WPATH surgeons reported performing this operation on twenty different children.

## IX.    WPATH OPERATES FOR ITS MEMBERS' PROFIT

246.    WPATH misrepresents scientific and medical consensus and makes false, deceptive, or unsubstantiated claims regarding pediatric medical transition and related services for a simple reason: WPATH's members generate significant profit because of the organization's representations and guidance.

247.    WPATH's members predominantly work in fields related to the provision of transition services, including professionals who provide medical transition services to children. WPATH's members include doctors who prescribe drugs and perform surgery to modify patients' sex traits by, for example, amputating their breasts or instigating facial hair growth. Two of the five current members of WPATH's executive committee are surgeons who specialize in medical transition procedures, and a third member specializes in medical transition procedures for children. For example, Dr. Marci Bowers, WPATH's former president and current Executive Committee member, earned more than a million dollars in net income in 2023, mostly from performing transition surgeries. Each of these WPATH members, among many others, profits from WPATH's misrepresentations.

---

[57] Ex. 12, Decl. of ▮▮▮▮▮▮ at ¶ 48.

248.    Other members earn income in related work. For example, one "WPATH certified member/mentor" offers a $249 "Transgender & Intersex Cultural Competence Training" for healthcare "staff and contractors" covering interactions with transition patients. Others counsel patients who purchase transition services or conduct corporate trainings about how to accommodate such patients in the workplace. WPATH engages in a variety of acts and practices that increase these members' profits.

249.    Notably, pediatric medical transition services present lucrative opportunities for clinicians. Children can be put on puberty blockers. And puberty blockers are the first of many expensive interventions that will continue for the rest of the child's life as that child undergoes genital, chest, and face surgeries, have their gonads removed, and rely on exogenous cross-sex hormones. A vast majority of children prescribed puberty blockers as transition medicine eventually proceed to cross-sex hormones. Many eventually return for surgery.

250.    Critically, through its representations and guidelines, WPATH has successfully worked to expand public and private insurance payments to its members for transition services, including drugs and surgeries.  As a result of WPATH's claimed status as the authority on medical transition, WPATH has secured substantial insurance coverage for its members' pediatric medical transition drugs, surgeries, and services.

251.    The growing population of patients who have undergone medical transition also yields business for WPATH's non-physician members.

252.    As the Supreme Court explained in *California Dental Association v. FTC*, when an organization acts to secure insurance coverage for its members and "engages in lobbying, litigation, marketing, and public relations for the benefit of its members' interests," there is "no

difficulty in concluding" that the organization acts for the profit of its members.[58] WPATH

engages in those activities and therefore acts for the profit of its members.

### A. WPATH has pushed—and continues to push—to expand insurance coverage to benefit its members

253.    Since WPATH's members have sought to offer pediatric medical transitioning

since 2007, a primary obstacle to their profitability has been whether insurance companies would

cover transition services.

254.    Generally, private insurance companies and Medicaid provide coverage to

consumers only for services that are "medically necessary." The U.S. Centers for Medicare &

Medicaid Services, an agency within the Department of Health and Human Services, defines the

term as "[h]ealth care services or supplies needed to diagnose or treat an illness, injury,

condition, disease or its symptoms and that meet accepted standards of medicine."

255.    Insurance companies and State Medicaid offices maintain policies delineating

what services are "medically necessary" to diagnose or treat particular conditions, and therefore

what services their insurance policies will cover.

256.    The majority of Americans receive their health insurance from private insurers.

Additionally, Medicare, Medicaid, and various government health insurance programs cover

people, including children, who meet specific age, income, or health criteria.

257.    Health insurance typically does not cover all medical costs or services. Exclusions

or limitations on coverage are listed in the policy contract, typically in a "Summary of Benefits

Coverage" section. Typical exclusions include cosmetic surgery, alternative medicine (*e.g.*,

---

[58] *California Dental Ass'n v. FTC*, 526 U.S. 756, 767–68 (1999); see *FTC v. National Comm'n on Egg Nutrition*, 517 F.2d 485, 487–88 (7th Cir. 1975) (holding that the FTC had jurisdiction over an organization which made health claims because the organization "promote[d] the general interests of the egg industry" and made statements "to encourage the consumption of eggs by allaying fears the public may have about" them).

acupuncture, herbal healing), weight-loss surgery (*e.g.*, gastric bypass and bariatric surgery), unapproved medical care (*i.e.*, procedures not pre-approved by the insurer), experimental procedures (*i.e.*, treatments that use new technology or methods lacking proven outcomes), and elective surgeries (*i.e.*, non-medically necessary procedures).

258.    In the absence of insurance coverage, the market for transition services was severely constrained due to the exorbitant cost of these drugs, surgeries, and other interventions—some of which require a lifetime of care. For example, in 2012, pediatric medical transition providers lamented that without insurance coverage, the "incredibly high cost" of pediatric medical transition means that "[m]any, if not most" children "deemed appropriate candidates" were "unable to obtain the treatment."

259.    Starting in 2008, WPATH recognized that tapping into insurance payments was crucial to WPATH members' profits. Accordingly, WPATH acted, and continues to act, to ensure that its members are able to secure insurance payments for their services.

      **i.  WPATH developed its clinical guidelines to trigger maximum insurance coverage for pediatric medical transition services**

260.    In 2008, WPATH first declared that medical transition is "not 'cosmetic' or 'elective' or for the mere convenience of the patient," but instead was "understood to be medically necessary." It further "urge[d] insurance carriers and healthcare providers in the United States to eliminate transgender or trans-sex exclusions and to provide coverage for" what it deemed "the medically prescribed sex reassignment services necessary for their treatment and wellbeing." WPATH's statement of "medical necessity" was proposed and drafted by WPATH board member Jamison Green. Green did not have a medical degree, but rather a Master of Fine Arts in creative writing and was at the time engaged in what Green termed "lucrative" work "consulting with many corporations negotiating trans health with their insurance companies."

Green argued that WPATH "needed to be advocating for insurance coverage" more aggressively and that the declaration of "medical necessity" was "necessary to move forward on the insurance front, and it would also be helpful in some of the legal cases LGBT legal organizations were engaged in."

261.    When WPATH released SOC-7 in 2011,[59] it added new language dubbing cross-sex hormones and transition surgery "medically necessary." And when WPATH published its latest medical transition guidelines, SOC-8, in September of 2022 it further urged "health care systems to provide these medically necessary treatments and eliminate any exclusions from their policy documents and medical guidelines that preclude coverage for any medically necessary procedures or treatments." The "medical necessity statement" spans several pages of SOC-8 and begins by recommending that "health care systems should provide medically necessary gender-affirming health care for transgender and gender diverse people." It quotes the American Medical Association's definition of "medical necessity" and then applies that label to roughly 30 medical transition interventions.

262.    In fact, SOC-8 labels as "medically necessary" virtually every pediatric medical transition service that a transition doctor could perform for a fee, including administering puberty blockers, "voice surgery," "counseling,"[60] and "hair removal from . . . genital areas for gender affirmation," among many other transition services.

263.    WPATH does not limit its declarations of medical necessity to attempts to treat distress or discomfort regarding sex traits. They also include the pursuit of "embodiment goals," *i.e.*, changing patients' sex characteristics not because they are in distress, but simply because

---

[59] Its official publication date by WPATH's journal is 2012.
[60] SOC-8 places limits on what the counselors may say, as discussed *infra* ¶ 139.

they want to look different. This pursuit of "embodiment goals" is not limited by age. Under SOC-8, a doctor can prescribe testosterone to a seventh-grade girl not because the girl identifies as male or is in distress about her female body, but because her goal is to become more muscular. And under SOC-8, such an intervention is considered "medically necessary."

264.    The only pediatric medical transition service that SOC-8 does not deem "medically necessary" is one type of genital surgery, phalloplasty, on minor girls. WPATH may have conceded this point because such operations would likely violate statutes that criminalize female genital mutilation. In other words, performing such surgeries could hurt WPATH members rather than profit them.

265.    WPATH's maximalist labeling of medical transition services as "medically necessary" is not rooted in medical or scientific evidence, as demonstrated above. Rather, WPATH makes unsubstantiated medical necessity claims to obtain maximum insurance coverage for its members' pediatric medical transition services, thereby helping its members profit. As SOC-8 itself explains, "[m]edical necessity is central to payment, subsidy, and/or reimbursement."

266.    WPATH kept its objective—to obtain maximum insurance coverage for pediatric medical transition services—front-of-mind when drafting SOC-8. WPATH member and SOC-8 contributor Dr. Daniel Karasic wrote in August 2021 that SOC-8 "should allow for medical necessity to be determined by clinician assessment." WPATH adopted this approach because it would force "insurance regulatory bodies and independent medical reviewers" to wholly defer to transition service providers—generally WPATH members—rather than apply an objective standard when determining whether to cover transition services. Despite some WPATH members' concerns that clinicians were using WPATH's guidelines to medically transition too

74

many children, WPATH nevertheless pursued insurance coverage for these members.  SOC-8 further exhorts "governments" to "ensure" that medical transition coverage is "established, extended or enhanced (as appropriate) as elements in any Universal Health Care, public health, government subsidized systems, or government-regulated private systems that may exist."

267.   The lead drafter of SOC-8's mental health chapter, Dr. Karasic, wrote his colleagues that he "cannot overstate the importance of SOC 8 getting this right[,]" as "important lawsuits" were ongoing that concerned whether transition services are "medically necessary vs experimental or cosmetic." Dr. Karasic also prodded his co-drafters to "consider adding a medical necessity statement for care of minors."

268.   In May 2022, Dr. Karasic argued that SOC-8 should include a general statement on medical necessity. He reminded his co-drafters that "[m]edical necessity is at the center of dozens of lawsuits in the US right now over state actions to make trans care inaccessible [to children], as well as being at the center of all reimbursement for trans care in the US." Another drafter responded, "I fully support what [Dr. Karasic] is saying."

269.   One drafter thanked the team for drafting a "Medical Necessity Statement" because "we needed a tool for our attorneys to use in defending access to care here [in the United States]."

270.   Given the importance of insurance coverage to members' profits, WPATH was not content to let SOC-8 speak for itself. Shortly after disseminating SOC-8 to its members, WPATH created, published, and disseminated a presentation titled "Insurance Coverage of Gender Affirming Healthcare: WPATH SOC-8 Updates" explaining that "Insurers Must Update Adolescent Surgery Eligibility Criteria to be in Alignment with SOC-8" to include no lower age limit for surgery so long as the child has sufficient "emotional and cognitive maturity" to consent

75

to the procedures.

### ii. WPATH successfully secured insurance payments for the profit of its members

271. After WPATH's original 2008 "medical necessity" statement, WPATH leadership was "amazed" at the "powerful effect" it had and the changes in insurance coverage that resulted. By 2022, as an article in the New York Times Magazine reported, WPATH's Standards of Care had "influence[d] . . . the coverage offered by health insurers and national health services around the world." As the HHS Report notes, "[m]any U.S. public and private health insurers and regulatory bodies rely on SOC-8 when making coverage determinations."

272. SOC-8's recommendations are designed to allow almost any child who expresses a desire for medical transition treatments to receive them, and to have those procedures paid for by insurance providers. And where SOC-8 includes some prerequisite for treatment, like recommending that surgeons require letters of referral from mental health professionals, such requirements are a façade.

273. Today, many of the largest health insurance providers, both public and private, defer to WPATH's and SOC-8's declaration that medical transition drugs, surgeries, and services are medically necessary in determining whether to cover those interventions. For example:

A. ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████



274.    The net result of WPATH's efforts has been that, in the words of WPATH's then-

president Dr. Bowers, "insurers look to the" SOC "to set criteria for their members to be covered."

### iii.  WPATH's efforts led to significant profits for its members

275.    WPATH's successful efforts to obtain insurance coverage for pediatric medical transition services have unlocked enormous profits for WPATH's members.

276.    In 2024, while president of WPATH, Dr. Bowers testified to personally receiving more than a million dollars in income over the previous year, the vast majority of which came from performing transition surgeries. Most of Dr. Bowers' patients had private insurance.

277.    The Congressional Budget Office estimated in 2025 that Medicaid alone would pay transition providers $445 million over ten years, just for the medical transition of children.

278.    Pediatric medical transition is a profitable market for transition doctors because most children will naturally desist, or cease experiencing discomfort with or distress about their sex traits, if clinicians delay medical transition procedures.

279.    But by preventing the normal development of sex traits through puberty blockers, cross-sex hormones, and surgeries, clinicians instead reinforce the child's cross-sex identification creating a self-fulfilling prophecy. Clinicians profit from the procedures that otherwise would not have been performed, and they further profit from what is likely to be a lifetime of medical appointments, hormone prescriptions, and further procedures.

280.    Data from 2015 estimated the fixed costs of surgery to range from $10,308 to $22,025, with annual costs of $2,175 thereafter. Another study showed a significant increase in total expenditures on cross-sex hormone therapy from 2015 to 2019, corresponding with a significant increase in the number of "newly identified transgender" children over that period, and estimated the mean costs for medical transition surgeries to be $41,236 per person, with up

to $3,792 in annual costs from hormones alone. Another source estimates the cost of medical transition procedures from childhood through adulthood for a single male patient, including puberty blockers, cross-sex hormones, and surgical interventions, as between $87,300 and $410,600 over one's lifetime. That cost for a female patient is estimated between $66,500 and $605,500. The Human Rights Campaign, which advocates for insurance coverage of medical transition services, estimates that the cost of medical transition for a single patient can be as high as $75,000. But, as just explained, this is likely a low estimate.

281.    WPATH's members who work in hospital settings can become highly valued employees thanks to the revenue that pediatric medical transition attracts.

282.    Researchers at an academic medical center reported that the surgical transition procedures were a significant source of profit for self-pay and privately insured patients (where insurance covered those procedures). Overall, especially as the proportion of privately insured and self-pay patients increased, researchers found that providing surgical transition procedures "is profitable for both the surgical department and the hospital system" and thus providing medical transition procedures "can be a favorable addition to academic medical centers in the US."  This financial lifeline to academic medical centers comes at a time many are struggling to operate in the black.

283.    Pediatric medical transition clinics find ways to squeeze as much money as possible from the insurance industry. For example, a St. Louis clinic augmented its revenue by booking surgical suites for the quick, simple procedure of implanting a puberty blocker in a child's arm since insurance companies may pay more for interventions provided in a surgical

suite.[62] That pediatric medical transition clinic's revenue put the hospital's entire endocrinology department "in the black" after operating at a loss for years, according to one of its physicians.[63]

284.    One surgeon and WPATH member interviewed by an academic journal regarding transition surgeries on minors stated that "the biggest reason for why everyone is doing it now, is the money is flowing. Because now insurance is paying. And now all these institutions have to have a program yesterday."

285.    According to the program manager at a major university's transition clinic, in its first two years of operation, 2019 to 2021, the clinic "really blew" its financial goals "out of the water."

286.    Doctors at a large university medical center have noted behind closed doors that transition "surgeries bring in a lot of money" and that genital surgeries on women are "huge money makers."

287.    One doctor at another prominent university medical center claims that transition doctors can enhance the profitability of "healthcare systems" by "training" other healthcare professionals on referring potential patients to transition clinics and "getting people to surgery," a "high money producing" intervention.

288.    Hospitals and clinicians quickly realized the profitability of pediatric medical transition. By 2017, there were at least 41 pediatric medical transition clinics across the United States. Some prescribe transition drugs to hundreds of children each year. Pediatric medical transition clinics widely follow WPATH guidelines. The clinics typically administer puberty blockers and cross-sex hormones. They also promote surgery to minors and provide referrals to

---

[62] Ex. 12, Decl. of ███████ at ¶ 16.
[63] Ex. 12, Decl. of ███████ at ¶ 19.

surgeons, some of whom work within the same hospital system.[64] Where insurance companies require letters from mental health professionals, pediatric medical transition clinics supply templates to speed the process. For example, on a webpage advertising "breast augmentation" for 15-year-old boys (which has since been taken down), Boston Children's Hospital noted that "Sample letters are available on request from gendersurgery@childrens.harvard.edu."[65]

## B. WPATH provides other economic benefits to members

289. WPATH membership provides other pecuniary benefits.

290. One perk of membership is business advice. WPATH has used a listserv to counsel its members on securing payment from insurance companies for transitioning minors.[66] Its private conferences (discounted for members) train attendees on founding their own pediatric medical transition clinics and promoting their pediatric practice in the media.

291. WPATH's recommendations also provide legal cover to WPATH members. For example, at WPATH's annual conference following the release of SOC-8, Dr. Amy Tishelman, one of the Guidelines Development Group members, stated that minimum ages for medical transition procedures were removed from SOC-8 to protect clinicians from lawsuits, should the clinician decide to provide a treatment to someone younger than WPATH's previously specified age minimums.

## C. WPATH promotes the purchase of its members' pediatric medical transition services

292. WPATH directly promotes its members' services to the public. Until it became aware of the FTC's investigation earlier this year, WPATH operated a public provider directory

---

[64] Ex. 12, Decl. of ███████ at ¶¶ 48–50; Ex. 3, Decl. of Vanessa Sivadge at ¶ 14.
[65] *See also* Ex. 12, Decl. of ██████ at ¶ 27.
[66] Ex. 12, Decl. of ███████ at ¶¶ 44–45.

81

that allowed users to view "Certified Members" only. And it advertised "[i]nclusion in the online WPATH 'Find a Provider' search tool" as a perk of WPATH membership.

293. WPATH also promotes pediatric medical transition by employing a large public relations firm and undertaking "education" campaigns which advertise pediatric medical transition. The clear goal of these public "education" campaigns is to encourage the purchase of pediatric medical transition services, including by allaying concerns that children and parents may have about pediatric medical transition.

294. As more American doctors opened pediatric medical transition practices, WPATH and its members repeatedly called for children to be "educated" about transition. This amounted to a marketing campaign advancing WPATH members' financial interests.

295. In SOC-7, WPATH called for mental health professionals to "educate and advocate on behalf of clients within their community" at "schools," adding that "[t]his role may involve consultation with school counselors, teachers, and administrators."

296. As WPATH's public relations firm, BerlinRosen, has explained, "[h]ealth care providers are widely trusted to speak with authority and educate broad audiences."

297. In a seminal 2012 article on transitioning children, Dr. Spack and Dr. Edwards-Leeper—who would soon become a leader within WPATH—announced themselves as committed to "educating the public through organized discussions and appropriate media outlets." They had already achieved deferential coverage in Time (2007), NPR (2008), The Atlantic Monthly (2008), and the Boston Globe (2008).

298. Dr. Johanna Olson-Kennedy, another future WPATH board member then practicing at Children's Hospital Los Angeles, received coverage of her pediatric medical transition practice on ABC (2007). Her CHLA colleague Dr. Melvin Belzer promoted child

transition on CNN (2007) and MSNBC (2007).

299. BerlinRosen advises WPATH's members on how to speak with the media, including by suggesting that WPATH members claim that medical transition "is safe and effective and endorsed by all leading medical associations," among other similar claims.

300. WPATH also urges other doctors to carry WPATH's message to children.

301. For example, Dr. Scott Leibowitz, a SOC-8 drafter and WPATH member who has been affiliated with Nationwide Children's Hospital in Columbus, Ohio, argues that transition doctors should "ensure that gender is the fabric of all healthcare for all kids" by training pediatricians. According to Dr. Leibowitz, "[t]hat will help . . . pediatricians be able to ally with those parents who wouldn't even consider coming to a clinic that we provide." Such training includes directing pediatricians to ask children about their gender identities.[67]

302. A St. Louis transition clinic saw rapid results from such trainings. After transition doctors trained their colleagues in the cystic fibrosis ward, the clinic received a referral for a child within three months.[68] And after training colleagues who treated sickle cell anemia, a child with that condition asked to see a transition doctor.[69]

303. In 2015, Dr. Edwards-Leeper and other WPATH leaders drafted guidance for the American Psychological Association about the care of "transgender and gender-nonconforming" ("TGNC") people. Under the banner of the APA, they advised psychologists to direct their gay patients toward a cross-sex identity, asserting that some people who "assume that they must be gay, lesbian, bisexual, or queer" may simply lack "awareness of a TGNC identity." Thus, "[p]sychologists may need to provide" these supposedly unaware "TGNC people with

---

[67] Ex. 12, Decl. of ███ at ¶ 9.
[68] Ex. 12, Decl. of ███ at ¶ 11.
[69] Ex. 12, Decl. of ███ at ¶ 11.

information about TGNC identities."

304.    In 2016, Dr. Edwards-Leeper co-authored "Initial Clinical Guidelines for Co-Occurring Autism Spectrum Disorder and Gender Dysphoria or Incongruence in Adolescents" with 19 other clinicians, many of whom have been active in WPATH. They advised mental health professionals to screen autistic children for cross-sex identity by asking questions which could reveal "gender concerns," and trigger "a referral . . . to an appropriate gender specialist."

305.    These training-and-referral systems financially benefit WPATH's members and the institutions at which they work. One doctor at a major public university explained that "[h]ealth care systems rely heavily on high money producing medical interventions to fund themselves, particularly surgeries." Thus, an "institution [that] has a surgical program for" medical transition will profit from a "training" that "will improve getting people to surgery somehow." This doctor encouraged clinicians to "[l]ink the two" concepts and understand that that conducting WPATH trainings will increase the number of people having transition surgeries, which increases the revenue of the institution.

306.    WPATH's advertising efforts have been effective at increasing demand for its members' services. According to the Centers for Disease Control, 2% of high school students identified as "transgender" by 2017. Few had done so before WPATH began promoting that identity to children. In the 2010s, the rate of "adolescent gender dysphoria" increased by over 1,000%.

307.    These are far from WPATH's only efforts to promote pediatric medical transition. Even SOC-8 is a tool to promote pediatric medical transition to children and parents directly. SOC-8 encourages "individuals, their families, and social institutions" to "use the SOC-8 to understand how it can assist with promoting optimal health for" people, including children, who

express dissatisfaction with or distress about their sex traits.

308.    WPATH also posts statements on its website deceptively claiming that transition is "safe," "lifesaving," backed by "rigorous research" and "expert consensus," "evidence-based," and "medically necessary." Past WPATH president Jamison Green explains that such statements are "good strong documents that can be used by . . . members of the public to assist in the securing of transgender health and services."

309.    However they first become exposed to cross-sex identity, many children soon find themselves at a pediatric medical transition clinic staffed by WPATH members. The clinics' practice, in accordance with WPATH guidelines, is never to challenge what children say about their sex or suggest talk therapy to reconcile with their physical characteristics. When children say they want to modify their sex traits, the clinics' general practice—consistent with SOC-8's instructions—is to express support for that desire and carry it out.[70] And as discussed below, once a child enters a transition clinic, a clinician quickly diagnoses that child as being dissatisfied with or having distress about sex traits and pressures parents to immediately consent to pediatric medical transition.

### D.  WPATH also profits itself by leveraging its position as the *de facto* authority on transition medicine in the United States

310.    WPATH also profits itself by claiming to be the authority on transition medicine, then leveraging that authority to sell trainings and otherwise conduct profitable business.

311.    Self-publishing the so-called "Standards of Care" is one component of this business strategy. Those unaware of SOC-8's shortcomings and disinclined to closely examine its underlying evidence are deceived by WPATH's claims that it arrived at its recommendations

---

[70] *See* Ex. 12, Decl. of ▮▮▮▮▮▮ ¶¶ 12–13, 15.

via robust evidentiary review that comported with international standards of medical guidelines.

312.    Another component of WPATH's business strategy is its Global Education Initiative. The Initiative is WPATH's curriculum for training medical professionals on medical transition, both in the United States and around the world. Official collaborators include the American Medical Student Association and the World Health Organization.

313.    American hospitals, medical schools, and transition clinics rely on SOC-8 and the Initiative when setting standards, creating fellowships, and conducting other activities which touch on medical transition. For example, Mt. Sinai has established a "transgender psychiatry fellowship" in which fellows participate in WPATH's bi-annual conferences. Oregon Health and Sciences University provides a "gender surgery fellowship program" led by a WPATH member. Harvard Medical School provides continuing medical education led by senior WPATH leadership and SOC-8 drafters.

314.    Some governmental authorities require a WPATH certification—obtained through the Initiative—for certain types of employment. For example, the Washington State Department of Corrections requires that doctors performing medical transition treatments must either already be WPATH-certified or obtain that certification within two years. The Oregon Health Authority has a similar requirement. And California requires insurance companies to enroll in training offered by WPATH. Regulators projected that the training would result in an annual cost to insurance companies—and revenue to WPATH—of $163,400.

315.    WPATH's strategy has thus successfully rendered WPATH the self-appointed, *de facto* authority on transition medicine in the United States, bringing significant wealth to WPATH and its members.

X.   **WPATH HAS PROVIDED TO CLINICIANS THE MEANS BY WHICH THEY DECEIVE CHILDREN AND THEIR PARENTS INTO PURCHASING PEDIATRIC MEDICAL TRANSITION SERVICES**

316.   WPATH's false, misleading, or unsubstantiated representations have caused substantial consumer injury, including grievous bodily and psychological harm, to children experiencing dissatisfaction with or distress about their sex traits. WPATH also has injured these children's parents who paid for harmful medical transition treatments either out-of-pocket or in co-pays or insurance premiums. These injuries have occurred primarily through the means that WPATH supplies to clinicians.

317.   Clinicians base their diagnoses on WPATH's false, misleading, or unsubstantiated statements and guidance, repeat WPATH's false, misleading, or unsubstantiated statements to consumers—children and their parents—and recommend specific drugs, surgeries, and other interventions based on WPATH's false, misleading, or unsubstantiated representations, all while failing to disclose to children and parents the significant harmful side effects because WPATH fails to disclose them or downplays them in SOC-8. Although the experience of every child and parent is unique, sworn testimony, affidavits, and other evidence that the FTC has gathered demonstrate a consistent pattern: clinicians follow WPATH's script, and children and parents rely on those representations in deciding to purchase transition services, leading to significant physical, mental, financial, and psychological harm.

318.   Historically, children identified by clinicians as candidates for pediatric medical transition were typically those who did not conform to stereotypical social roles associated with their sex. Prior to widely available medical transition, most of these children desisted—*i.e.*, they ceased feeling dissatisfaction with or distress about their sex traits—and ultimately identified as gay.

319.     More recently, children identified by clinicians as candidates for pediatric medical conditions often present with serious mental health conditions such as anxiety, depression, and suicidality;[71] distress from a traumatic event or situation;[72] or neurodevelopmental difficulties like autism spectrum disorder.[73] These mental health and developmental challenges often correspond to or coexist with social problems which make these children feel like they do not fit in.[74]

320.     These children experience social pressure to consider their sex as the cause of their challenges. That pressure can manifest in various ways, including online and media influence,[75] homophobia,[76] peer influence,[77] and influence from adult figures in a child's life.[78] Many girls going through puberty feel like they are not feminine enough to fit in as girls.[79] Many of these children who feel that they do not fit in with members of their sex express dissatisfaction

---

[71] *E.g.*, Ex. 7, Decl. of Jonathon Skinner at ¶ 11 (panic attacks, intrusive thoughts, and obsessive thoughts); Ex. 10, Decl. of ▮▮▮▮ at ¶ 10; Ex. 14, Decl. of ▮▮▮▮ at ¶ 8; Ex. 1, Decl. of Soren Aldaco at ¶¶ 4, 6; Ex. 15, Decl. of Evelyn Neel at ¶ 2; Ex. 12, Decl. of ▮▮▮▮ at ¶ 14.

[72] *E.g.*, Ex. 6, Decl. of Clementine Breen at ¶¶ 3, 13, 31–32, 57 (sexual assault, difficult home situation, and abusive relationship); Ex. 5, Decl. of Elisabeth Bourne at ¶ 3 (friend was sexually assaulted and went to the ER); Ex. 14, Decl. of ▮▮▮▮ at ¶ 2 (fled with mother from domestic violence); Ex. 1, Decl. of Soren Aldaco at ¶ 6; Ex. 2, Decl. of Cassidy Andrews at ¶ 4; Ex. 15, Decl. of Evelyn Neel at ¶ 2 (sexual abuse); Ex. 12, Decl. of ▮▮▮▮ at ¶ 14.

[73] *E.g.*, Ex. 7, Decl. of Jonathon Skinner at ¶ 7 (diagnosed with autism at age 4); Ex. 9, Decl. of ▮▮▮▮ at ¶ 2 (child diagnosed with autism and a rare genetic developmental disorder); Ex. 8, Decl. of Melissa Skinner at ¶ 5; Ex. 1, Decl. of Soren Aldaco at ¶ 12; Ex. 12, Decl. of ▮▮▮▮ at ¶ 14.

[74] *E.g.*, Ex. 6, Decl. of Clementine Breen at ¶ 2; Ex. 7, Decl. of Jonathon Skinner at 4–11; Ex. 13, Decl. of ▮▮▮▮ at 2; Ex. 8, Decl. of Melissa Skinner at ¶¶ 5, 8; Ex. 1, Decl. of Soren Aldaco at ¶ 4.

[75] *E.g.*, Ex. 6, Decl. of Clementine Breen at ¶ 4; Ex. 7, Decl. of Jonathon Skinner at ¶ 15; Ex. 13, Decl. of ▮▮▮▮ at ¶ 6; Ex. 9, Decl. of ▮▮▮▮ at ¶ 5; Ex. 10, Decl. of ▮▮▮▮ at ¶ 11; Ex. 1, Decl. of Soren Aldaco at ¶ 3; Ex. 2, Decl. of Cassidy Andrews at ¶ 8.

[76] *E.g.*, Ex. 7, Decl. of Jonathon Skinner at ¶¶ 5–10; Ex. 10, Decl. of ▮▮▮▮ at ¶¶ 5–9.

[77] *E.g.*, Ex. 13, Decl. of ▮▮▮▮ at ¶ 5; Ex. 11, Decl. of Gwen Turecki at ¶ 2; Ex. 5, Decl. of Elisabeth Bourne at ¶ 5; Ex. 14, Decl. of ▮▮▮▮ at ¶¶ 3, 8.

[78] *E.g.*, Ex. 7, Decl. of Jonathon Skinner at ¶ 16 (adult math tutor and family friend identified as opposite sex); Ex. 4, Decl. of Caroline Miller at ¶¶ 5, 7 (child's father took him to gender-related counseling despite the child identifying as bisexual and "affirmed" the child as transgender); Ex. 15, Decl. of Evelyn Neel at ¶ 3 (psychiatrist "planted a seed in my head").

[79] *E.g.*, Ex. 6, Decl. of Clementine Breen ¶ 2, Ex. 10, Decl. of ▮▮▮▮ ¶¶ 4–5, Ex. 1, Decl. of Soren Aldaco ¶¶ 4–5.

with or distress about sex traits to a parent,[80] or another authority figure, like a school counselor.[81]

321.    Many parents ask a family doctor or mental health professional about their child's distress.[82] These individuals typically do not specialize in sex-trait modification and refer children to a specialized provider, like a transition clinic,[83] particularly if a local transition clinic has asked them to make such referrals.[84] Other parents schedule appointments with these clinics directly.[85] And some children are sent to transition clinics after being placed on psychiatric holds.[86]

322.    Regardless of where they end up, children and parents are unlikely to avoid being influenced by WPATH's deceptive claims and omissions. Indeed, WPATH board member and former president Dr. Marci Bowers claims that "the vast majority of mental health providers in the country that [Dr. Bowers is] familiar with follow the WPATH standards of care."

323.    Clinicians begin selling parents and children on medical transition procedures once they arrive at a medical transition provider's clinic. Sometimes, clinicians make the sale by directly invoking WPATH's name and providing parents with the SOC or other material containing WPATH's deceptive claims. Other times, clinicians repeat WPATH's deceptive claims without attribution. And even without telling parents, clinicians often rely on WPATH's

---

[80] *E.g.*, Ex. 7, Decl. of Jonathon Skinner at ¶ 17; Ex. 13, Decl. of ███████ at ¶ 8; Ex. 9, Decl. of ███ at ¶ 6; Ex. 8, Decl. of Melissa Skinner at ¶ 7; Ex. 10, Decl. of ███████ at ¶ 12; Ex. 11, Decl. of Gwen Turecki at ¶ 3; Ex. 14, Decl. of ███████ at ¶¶ 3, 5.
[81] *E.g.*, Ex. 6, Decl. of Clementine Breen at ¶ 4 (school counselor).
[82] *E.g.*, Ex. 13, Decl. of ███████ at ¶ 8; Ex. 9, Decl. of ███████ at ¶¶ 7–8; Ex. 11, Decl. of Gwen Turecki at ¶ 5; Ex. 14, Decl. of ███████ at ¶ 11.
[83] *E.g.*, Ex. 13, Decl. of ███████ at ¶ 8; Ex. 9, Decl. of ███████ at ¶ 8; Ex. 11, Decl. of Gwen Turecki at ¶ 5; Ex. 14, Decl. of ███████ at ¶ 11.
[84] *See* Ex. 12, Decl. of ███████ at ¶ 9.
[85] *E.g.*, Ex. 6, Decl. of Clementine Breen at ¶ 5; Ex. 7, Decl. of Jonathon Skinner at ¶ 18.
[86] *E.g.*, Ex. 10, Decl. of ███████ at ¶ 16; Ex. 1, Decl. of Soren Aldaco at ¶ 7; Ex. 15, Decl. of Evelyn Neel at ¶¶ 3, 6.

deceptive claims in making diagnoses and recommending treatment.

324.    Parents sometimes expend considerable resources paying for pediatric medical transition treatments and managing their side effects. For example, parents have paid between $9,300 and $20,000 for breast-amputation surgery.[87] In many other cases, parents are able to pay for the procedure through insurance coverage[88]—coverage that would not exist but for WPATH's deceptive statements that the treatment is medically necessary and purportedly backed by expert consensus. The result is that, in numerous cases and for numerous reasons, WPATH's deceptive statements provide clinicians with the means and instrumentalities to mislead consumers into subjecting their children to unnecessary medical transition services.

### A. Clinicians invoke WPATH and provide families with WPATH's deceptive material

325.    Clinicians directly invoke WPATH's "Standard of Care" in encouraging their patients to purchase transition services.[89] Clinicians also cite or provide materials citing WPATH and the "Standards of Care" when discussing diagnoses and pediatric medical transition with parents.[90] Parents and children often consider and trust this information when they agree to medical transition procedures.

326.    For example, a pediatric endocrinologist in California told a pediatric patient's mother that he follows the recommendations of WPATH. When the patient's mother asked for supporting studies and other evidence for medical transition, the doctor sent her a web link

---

[87] *See* Ex. 6, Decl. of Clementine Breen at ¶ 37; Ex. 10, Decl. of ▮▮▮▮▮ at ¶ 40.
[88] *E.g.*, Ex. 1, Decl. of Soren Aldaco at ¶ 18; Ex. 8, Decl. of Melissa Skinner at ¶ 40; Ex. 3, Decl. of Vanessa Sivadge at ¶ 16; Ex. 12, Decl. of ▮▮▮▮ at ¶ 19.
[89] *E.g.*, Ex. 10, Decl. of ▮▮▮▮▮ ¶ 24, Ex. 1, Decl. of Soren Aldaco at ¶¶ 10, 16; Ex. 2, Decl. of Cassidy Andrews at ¶ 18.
[90] *E.g.*, Ex. 11, Decl. of Gwen Turecki at ¶ 7; Ex. 5, Decl. of Elisabeth Bourne at ¶ 19.

directly to WPATH's SOC-7, which she then read.[91] Boston Children's Hospital Center for Gender Surgery cited "WPATH standards of care" on its page advertising breast implants for children. One online medical transition clinic asserts that it follows SOC-8 and promises to provide monthly prescriptions for transition services without an in-person visit, covered by major US insurers. It asserts that "puberty blockers are fully reversible" and that "children can begin their medical transition with puberty blockers." Stanford Medicine's Transgender Surgery team promises that it "follows the World Professional Association for Transgender Health (WPATH) guidelines to ensure patients are appropriate surgical candidates."

327.    One 13-year-old girl visited a Dallas, Texas clinic with her parents. A psychologist who has presented at WPATH conferences told the girl's parents that their daughter needed to undergo medical transition, including cross-sex hormones and breast amputation. When these parents expressed skepticism and asked how the psychologist "knew that medical transition would help" their daughter's distress, the psychologist "answered that WPATH recommended it."[92]

328.    One doctor at a large public university encouraged one 15-year-old patient to read the SOC. The girl, who was later prescribed testosterone and had her breasts amputated, believed based on her interaction with the doctor that WPATH was an official, authoritative medical organization.[93]

329.    A nurse, who worked at Texas Children's Hospital, recalls that a pediatric endocrinologist at that hospital recorded in patient charts that he "told parents he was following

---

[91] Ex. 5, Decl. of Elisabeth Bourne at ¶¶ 18–19.
[92] Ex. 2, Decl. of Cassidy Andrews at ¶¶ 12–18.
[93] Ex. 10, Decl. of ███████ ¶ 24.

WPATH's Standards of Care" and "explained WPATH's Standards of Care" to parents.[94] This doctor "frequently referenced WPATH" when communicating with parents.[95]

### B. Clinicians repeat and rely on WPATH's claims without attribution to sell transition procedures

330.    Even without directly referencing WPATH and the Standards of Care, clinicians often repeat deceptive phrases or concepts from SOC-8.

331.    Clinicians emphasize the need for pediatric medical transition by stating or strongly implying that if parents do not consent to medical transition, their children will commit suicide.[96] Some clinicians tell parents that if their children die, the parents will be to blame.[97] Clinicians often ask parents if they would "rather have a dead son or a living daughter," or vice versa.[98]

332.    Clinicians make these statements because WPATH represents that medical transition is "lifesaving" and SOC-8 expressly represents that medical transition is "medically necessary" and reduces suicidality, thereby providing clinicians with the rationale that they use to pressure parents into consenting. This approach aligns with that taken by USPATH president Dr. Johanna Olson-Kennedy, who has admitted to using such tactics to persuade parents to purchase transition services for their children.

---

[94] Ex. 3, Decl. of Vanessa Sivadge at ¶¶ 6–7.
[95] Ex. 3, Decl. of Vanessa Sivadge at ¶ 8.
[96] *E.g.*, Ex. 7, Decl. of Jonathon Skinner at ¶ 28 (clinician claimed that "60% of transgender kids kill themselves if they are not medically transitioned"); Ex. 6, Decl. of Clementine Breen at ¶ 9 (recounting that her parents told her "that [the clinician] had told them that I was suicidal and firm in my male identity. Neither was true"); Ex. 13, Decl. of ███████ at ¶¶ 14, 16; Ex. 4, Decl. of Caroline Miller at ¶¶ 13, 15; Ex. 9, Decl. of ███████ at ¶ 15; Ex. 8, Decl. of Melissa Skinner at ¶ 10; Ex. 5, Decl. of Elisabeth Bourne at ¶ 16; Ex. 14, Decl. of ███████ at ¶ 12; Ex. 2, Decl. of Cassidy Andrews at ¶¶ 11, 19; Ex. 15, Decl. of Evelyn Neel ¶ 8; Ex. 12, Decl. of ███████ at ¶ 30(b).
[97] *E.g.*, Ex. 6, Decl. of Clementine Breen at ¶ 37 (doctor told parents that their daughter might kill herself if her parents did not pay for a double mastectomy); Ex. 4, Decl. of Caroline Miller at ¶¶ 15, 18; Ex. 9, Decl. of ███████ at ¶¶ 15, 19; Ex. 14, Decl. of ███████ at ¶ 12.
[98] Ex. 8, Decl. of Melissa Skinner at ¶ 10; Ex. 13, Decl. of ███████ at ¶ 14; Ex. 9, Decl. of ███████ at ¶ 15; Ex. 2, Decl. of Cassidy Andrews at ¶ 11; Ex. 12, Decl. of ███████ at ¶ 30(b).

333.    For example, a Missouri clinician attempted to pressure a mother into consenting to puberty blockers for her son by rejecting her concerns and strongly implying that her son would commit suicide if she did not consent.[99] Dr. Olson-Kennedy told a girl's parents that the girl was suicidal and convinced that she was male, when neither was true. This caused the girl's mother to cry.[100] And an Arizona clinician addressing a boy and his parents asked if they would rather "have a live daughter or a dead son," telling the parents that if their son killed himself, it would be their fault.[101] A medical transition-supporting therapist repeated that these parents would be to blame if their son committed suicide.[102] And a Texas endocrinologist, who told parents that he was following WPATH's Standards of Care, warned them that there was a higher risk of a child harming themselves if the child is not "affirmed" in their desire to transition.[103]

334.    Clinicians maintain that pediatric medical transition is the only effective option and reject any alternative treatment options for a child's distress.[104] They repeat WPATH's claims that pediatric medical transition is the "standard of care" and is "medically necessary."[105]

335.    Dr. Johanna Olsen-Kennedy told a twelve-year-old girl that people who express distress about their sex traits are born in the wrong body; the girl concluded that medical treatment was required to correct her body. Dr. Olsen-Kennedy also told the girl's parents that the only treatment for that distress was medical transition, which requires hormone therapy. When the parents asked whether talk therapy was an option, Dr. Olsen-Kennedy claimed that it

---

[99] Ex. 4, Decl. of Caroline Miller at ¶¶ 13, 15.
[100] Ex. 6, Decl. of Clementine Breen at ¶¶ 9–10.
[101] Ex. 9, Decl. of ███████████ at ¶ 15.
[102] Ex. 9, Decl. of ███████████ at ¶ 19.
[103] Ex. 3, Decl. of Vanessa Sivadge ¶¶ 6, 10.
[104] *E.g.*, Ex. 6, Decl. of Clementine Breen at ¶ 11; Ex. 13, Decl. of █████████ at ¶ 15; Ex. 9, Decl. of █████ at ¶ 15; Ex. 10, Decl. of ███████ at ¶ 23; Ex. 2, Decl. of Cassidy Andrews at ¶ 16; Ex. 12, Decl. of ████████ at ¶¶ 36–37; *see also* Ex. 10, Decl. of ██████ at ¶¶ 36–38 (noting rushed nature of breast removal and a lack of determination by the surgeon of whether that surgery was necessary).
[105] Ex. 12, Decl. of ████████ at ¶ 30(c–d).

would not alleviate their daughter's distress.[106]

336.    Clinicians' claims are effective because SOC-8 frames these interventions as medically necessary, emphasizes early initiation of medical transition at the onset of puberty, and asserts that delaying such interventions may have "harmful effects." Relying on SOC-8, clinicians further create a sense of urgency by insisting that children immediately start taking drugs like puberty blockers or cross-sex hormones regardless of the parents' uncertainty over the source of a child's distress.[107]

337.    Under the guise that the treatments are necessary and lifesaving, clinicians sometimes take drastic measures to convince parents to consent to medical transition services. Some clinicians attempt to drive a wedge between parents and their children by sabotaging their relationship.[108] If parents disagree with one another about consenting to medical treatment, clinicians have encouraged the consenting parent to obtain an attorney.[109] A California transition doctor, speaking with both a young patient and his mother, told the son that if he felt unsafe at home, he should call the doctor.[110] One Georgia doctor recommended at a WPATH conference that doctors should threaten unsupportive parents by "letting parents know that" "[t]here are at least some child protective service workers who are willing to enforce the need for affirmation by parents."

---

[106] Ex. 6, Decl. of Clementine Breen at ¶¶ 8, 11.
[107] E.g., Ex. 7, Decl. of Jonathon Skinner at ¶ 21, 25–28; Ex. 6, Decl. of Clementine Breen at ¶¶ 11–13; Ex. 13, Decl. of ▮▮▮▮▮▮▮▮ at ¶¶ 16, 18; Ex. 4, Decl. of Caroline Miller at ¶¶ 12–13, 15, 17–18; Ex. 9, Decl. of ▮▮▮ at ¶ 13; Ex. 11, Decl. of Gwen Turecki at ¶ 10.
[108] E.g., Ex. 6, Decl. of Clementine Breen at ¶¶ 27–29; Ex. 13, Decl. of ▮▮▮▮▮▮ at ¶¶ 13–14; Ex. 8, Decl. of Melissa Skinner at ¶ 24.
[109] Ex. 12, Decl. of ▮▮▮▮▮ at ¶ 35.
[110] Ex. 13, Decl. of ▮▮▮▮▮ at ¶ 14.

**C. Clinicians follow and rely on WPATH in failing to adequately disclose side effects**

338.    Clinicians also downplay, deny, or omit serious side effects of puberty blockers, cross-sex hormones, surgeries, and pediatric medical transition generally,[111] consistent with SOC-8's failure to adequately disclose or otherwise downplay those side effects.[112] For example,

█████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████ Parents and children do not hear about how, for example, cross-sex hormones may cause fatal cardiovascular issues or how puberty blockers may lead to long-term cognitive deficits.

339.    Clinicians suggest that the side effects that they do acknowledge are not permanent and can be remedied.[113] Clinicians similarly repeat SOC-8's claim that puberty blockers are "fully reversible."[114]

340.    Collectively, WPATH's deceptive statements and material omissions cause parents to worry that their children are in mortal peril and that the only effective solution is to consent to pediatric medical transition.[115] In many cases, the pressure created by WPATH's

---

[111] *E.g.*, Ex. 7, Decl. of Jonathon Skinner at ¶¶ 32–61; Ex. 6, Decl. of Clementine Breen at ¶¶ 12, 16, 22–25, 39–51; Ex. 13, Decl. of ███████████ at ¶¶ 19–24; Ex. 4, Decl. of Caroline Miller at ¶¶ 10, 21–28; Ex. 9, Decl. of ███████ ███████ at ¶ 14; Ex. 8, Decl. of Melissa Skinner at ¶¶ 17–18, 37–39; Ex. 5, Declaration of Elisabeth Bourne at ¶ 16; Ex. 2, Decl. of Cassidy Andrews at ¶¶ 25, 27, 28, 35, 42, 49, 51, 52; Ex. 15, Decl. of Evelyn Neel at ¶¶ 15, 16, 19, 24, 34; Ex. 12, Decl. of ███████ at ¶ 30(d–e).
[112] See *supra* ¶¶ 161–245.
[113] *E.g.*, Ex. 7, Decl. of Jonathon Skinner at ¶ 26; Ex. 4, Decl. of Caroline Miller at ¶ 11.
[114] Ex. 12, Decl. of ███████ at ¶¶ 30(a), 33; *see* Ex. 4, Decl. of Caroline Miller at ¶¶ 14 (clinic worker "promised that puberty would resume as normal" upon stopping puberty blockers), 17 (same).
[115] *E.g.*, Ex. 4, Decl. of Caroline Miller at ¶ 18; Ex. 9, Decl. of ███████████ at ¶ 15; Ex. 6, Decl. of Clementine Breen at ¶¶ 9–10; Ex. 13, Decl. of ███████████ at ¶ 16; Ex. 12, Decl. of ███████ at ¶ 38.

unlawful conduct—and the fear it creates—causes parents to purchase pediatric medical transition drugs, surgeries, or services.[116]

### D. Clinicians use SOC-8's deceptive diagnosis and treatment guidelines to sell medical transition services

341.    By proclaiming SOC-8 to represent expert consensus, and that pediatric medical transition is the standard of care, WPATH gives clinicians justification to follow SOC-8's diagnosis and treatment guidelines, deceiving parents and children into agreeing to unnecessary and harmful treatments.

342.    In line with SOC-8's amorphous diagnosis guidelines, clinicians often diagnose children based on superficial and innocuous traits. The basis for these diagnoses often includes asking a child if they want to look different,[117] if they fear or dislike puberty,[118] if they are attracted to the same sex,[119] if they want to be referred to by cross-sex pronouns,[120] or if they enjoy hobbies or other activities commonly associated with the opposite sex,[121] without questioning whether the child's reported distress is truly caused by the child's sex traits.[122] One boy was told by an endocrinologist that being both feminine and attracted to boys indicated that he was female, which convinced the boy that he should have a female body.[123]

343.    Social workers, not doctors, often diagnose children with "gender dysphoria" and provide referrals to endocrinologists,[124] even after asking little more than how the child felt about

---

[116] *E.g.*, Ex. 4, Decl. of Caroline Miller at ¶ 18.
[117] *E.g.*, Ex. 9, Decl. of ███████████ at ¶ 11.
[118] *E.g.*, Ex. 6, Decl. of Clementine Breen at ¶ 7.
[119] *E.g.*, Ex. 7, Decl. of Jonathon Skinner at ¶¶ 23–24.
[120] *E.g.*, Ex. 16, Decl. of ███████████ at ¶¶ 22–24 (psychologist diagnosed 8-year-old boy with "gender dysphoria," despite lack of distress, after he said he did not care what pronouns she used for him).
[121] *E.g.*, Ex. 6, Decl. of Clementine Breen at ¶ 7.
[122] *E.g.*, Ex. 12, Decl. of ███████ at ¶ 25.
[123] Ex. 7, Decl. of Jonathon Skinner at ¶¶ 23–25.
[124] *E.g.*, Ex. 11, Decl. of Gwen Turecki at ¶ 7.

96

his or her body.[125] A case worker at a transition clinic routinely saw pediatric patients who did not even moderately present as the opposite sex and who had only recently expressed distress about their sex traits.[126] Clinicians follow WPATH's "Standards of Care" in making such diagnoses.[127]

344.  Regardless of the screening performed, transition clinics routinely diagnose children as experiencing distress about their sex traits and recommend pediatric medical transition, often after one short and perfunctory examination which typically involves separating children from parents.[128]

345.  Parents reasonably expect transition specialists to conduct a thorough examination of their children and exclude alternative causes of their children's distress, such as trauma, distress about sex-same attraction, autism, depression, or other mental-health issues, before recommending pediatric medical transition.[129] But following the SOC-8, clinicians instead proceed directly to medical transition.

346.  A case manager at a transition clinic in St. Louis, Missouri, frequently encountered parents who wanted their children to be assessed by a mental-health professional to determine whether they were experiencing distress related to their sex traits—and to possibly

---

[125] *E.g.*, Ex. 9, Decl. of ▇▇▇▇▇▇▇ at ¶¶ 10–11.
[126] *E.g.*, Ex. 12, Decl. of ▇▇▇▇▇ at ¶ 72.
[127] *E.g.*, Ex. 6, Decl. of Clementine Breen at ¶ 35; Ex. 12, Decl. of ▇▇▇▇▇ at ¶ 24; Ex. 3, Decl. of Vanessa Sivadge at ¶ 6; Ex. 7, Decl. of Jonathon Skinner at ¶¶ 22, 69.
[128] *E.g.*, Ex. 6, Decl. of Clementine Breen at ¶ 6–12; Ex. 13, Decl. of ▇▇▇▇▇ at ¶¶ 8, 11–14; Ex. 9, Decl. of ▇▇▇▇▇▇▇ at ¶16; Ex. 8, Decl. of Melissa Skinner at ¶¶ 9–10; Ex. 11, Decl. of Gwen Turecki at ¶¶ 6–7; Ex. 1, Decl. of Soren Aldaco at ¶¶ 7, 14–15; Ex. 2, Decl. of Cassidy Andrews at ¶¶ 15–16.
[129] *E.g.*, Ex. 6, Decl. of Clementine Breen at ¶ 5 (noting that her parents told her that they expected the clinic to determine that she was not transgender); Ex. 13, Decl. of ▇▇▇▇▇ at ¶¶ 9–10 (suspecting that "something else was probably going on" and hoping that "seeing a specialist would help define the problem"); *see also* Ex. 7, Decl. of Jonathon Skinner at ¶ 18 (expressing hope that the clinic would "help me figure myself out" and would not "automatically recommend medical transition"); *cf.* Ex. 12, Decl. of ▇▇▇▇▇ at ¶ 12 (explaining that parents wanted a gender clinic "to determine if [their children] were transgender, or that they wanted to explore a non-medical pathway (like therapy) to address their children's gender dysphoria") .

pursue non-medical intervention as a treatment for that distress. Her clinic offered neither mental-health assessments nor non-medical therapies. The clinic's mantra—simply repeating SOC-8—was that medical transition is medically necessary.[130]

347.    When parents offer an alternative basis for a child's distress, clinicians routinely reject that explanation, no matter how plausible or grounded it is in a parents' direct observations of their own children.[131] This pattern is a direct consequence of SOC-8, which explicitly and implicitly instructs clinicians not to allow mental-health conditions, trauma histories, autism, internalized homophobia, or other alternative causes of distress to "delay" medical transition, thereby giving clinicians the means and justification to disregard these explanations.[132] Indeed, consistent with SOC-8's general directions, clinicians have rejected out of hand that a child's distress or discomfort could be caused by a diagnosed chromosome disorder,[133] autism,[134] trauma from sexual assault,[135] body dysmorphia,[136] internalized homophobia or simply being gay,[137] social problems,[138] or the normal search for identity that often accompanies puberty.[139]

348.    For example, at the outset of a session conducted by a Michigan medical transition clinic, a social worker told a family that the purpose of their meeting was to determine how to align their son's body with his self-image, citing WPATH as the standard of care, without

---

[130] Ex. 12, Decl. of ███████ at ¶¶ 2, 12–13, 15, 30(d).
[131] *E.g.*, Ex. 13, Decl. of ███████ at ¶ 11; Ex. 9, Decl. of ███████ at ¶ 12; Ex. 8, Decl. of Melissa Skinner at ¶¶ 14–15; Ex. 11, Decl. of Gwen Turecki at ¶ 8; Declaration of Brynne Stulze at ¶ 14; *see also* Ex. 10, Decl. of ███████ at ¶ 22; Ex. 7, Decl. of Jonathon Skinner at ¶ 23 (rejecting the notion that the declarant, a male who is attracted to men, is gay, and declaring that he instead has "a female brain"); Ex. 2, Decl. of Cassidy Andrews at ¶ 17 (psychologist denies sexual abuse led to declarant's cross-sex identity);
[132] See *supra* ¶¶ 132–344, 33.
[133] *E.g.*, Ex. 9, Decl. of ███████ at ¶ 12.
[134] *E.g.*, Ex. 9, Decl. of ███████ at ¶ 12.
[135] *E.g.*, Ex. 2, Decl. of Cassidy Andrews at ¶ 17.
[136] *E.g.*, Ex. 9, Decl. of ███████ at ¶ 12.
[137] *E.g.*, Ex. 9, Decl. of ███████ at ¶ 12; Ex. 7, Decl. of Jonathon Skinner at ¶¶ 20–24.
[138] *E.g.*, Ex. 13, Decl. of ███████ at ¶¶ 2, 8.
[139] *E.g.*, Ex. 4, Decl. of Caroline Miller at ¶ 15; Ex. 9, Decl. of ███████ at ¶ 12.

first considering any of the child's many underlying emotional problems.[140]

349.    An Arizona boy was diagnosed with autism and a rare genetic disorder, which required both private therapy and a special education program at his public school. When his parents brought him to a transition clinic at age 14, a social worker diagnosed the root of his distress as discomfort with his sex traits and recommended cross-sex hormones after just a few questions about his feelings over his physical appearance—and with an apparent disregard to his developmental and other mental-health issues.[141]

350.    Another boy growing up in rural Michigan was taunted for being a "sissy." His own grandfather called him a slur that refers to gay men. Around age 12 he looked online for people to talk to about being gay. He found "transgender" influencers like Gigi Gorgeous and Jazz Jennings instead. Living in a community that was hostile to homosexuality, this boy believed that the influencers could have boyfriends only because they were medically transitioning. At 13, this boy, prompted by real-life and online messages that he was not masculine enough to be a real boy, told his mother he thought that he might be "transgender."[142]

351.    In a separate encounter, parents went to a California transition clinic and explained their son's social- and mental-health problems to a psychologist who immediately dismissed each as a potential cause of their son's distress. The psychologist immediately addressed their son with she/her pronouns.[143]

352.    USPATH president Dr. Johanna Olsen-Kennedy diagnosed a twelve-year-old girl as distressed over her sex traits and suicidal after a solo consultation in which the doctor asked

---

[140] Ex. 11, Decl. of Gwen Turecki at ¶¶ 5–8.
[141] Ex. 9, Decl. of ███████████ at ¶¶ 2–3, 9–13.
[142] Ex. 7, Decl. of Jonathon Skinner ¶¶ 6, 10, 12, 15, 17.
[143] Ex. 13, Decl. of ███████ at ¶¶ 2, 11–12.

the girl about her feelings regarding puberty, which were negative, but asked nothing about her past trauma (from sexual assault while she was in the first grade) or her difficult family situation.[144]

353.    A Michigan clinician seemingly ignored a boy's psychological distress in quickly diagnosing him with "transsexualism" and recommending that he see an endocrinologist for cross-sex hormone therapy.[145] His mother rejected the recommendation and he stopped identifying as female within months.[146]

## XI.    WPATH CAUSES INJURY IN AND TO ALASKA

354.    Plaintiff Alaska has sustained or will sustain injury because of Defendants' unlawful activities.

355.    Defendants' "Standards of Care" framework has been consulted, referenced by, or otherwise relied-upon by health care providers and/or their associated clinics or hospitals in the State of Alaska.

356.    Within the State of Alaska, multiple health care providers and/or their clinics or hospitals provide hormone therapy, medical transition surgical referrals, and other medical transition procedures, counseling, or services in reliance upon Defendants' activities or practices, such as their "Standards of Care" framework.

## XII.    WPATH CAUSES INJURY IN AND TO IOWA

357.    Plaintiff Iowa has sustained or will sustain injury because of Defendants' unlawful activities.

358.    Defendants' "Standards of Care" framework has been consulted, referenced by, or

---

[144] Ex. 6, Decl. of Clementine Breen at ¶¶ 3, 6–13.
[145] Ex. 11, Decl. of Gwen Turecki at ¶ 7.
[146] Ex. 11, Decl. of Gwen Turecki at ¶¶ 13–14.

otherwise relied on by health care providers and their associated clinics or hospitals in the State of Iowa.

359.    In the State of Iowa, multiple health care providers and their clinics or hospitals provided hormone therapy, medical transition, surgical referrals, and other medical transition procedures, counseling, or services in reliance on Defendants' activities or practices, such as their "Standards of Care" framework.

360.    The proliferation of Defendants' deceptive practices into Iowa prompted the Iowa Legislature to enact Iowa Code § 147.164, which prohibits pediatric medical transition related procedures for children.

361.    That law sadly came too late to protect many Iowa children from the harms caused by Defendants' deceptive practices.

## XIII.    WPATH CAUSES INJURY IN AND TO NEBRASKA

362.    Plaintiff Nebraska has sustained or will sustain injury because of Defendants' unlawful activities.

363.    The proliferation of Defendants' deceptive practices into Nebraska prompted the Nebraska Legislature to enact the "Let them Grow Act," Neb. Rev. Stat. § 71-7301 *et seq.*, in 2023, to protect children under the age of nineteen from pediatric medical transition.

364.    Notwithstanding the "Let Them Grow Act," Defendants' deceptive conduct continues to impact Nebraska. Even with the enactment of the "Let Them Grow Act," the Act grandfathers in children who were receiving prohibited treatment, including puberty-blocking drugs, cross-sex hormones, or both, prior to October 1, 2023.

365.    Further, groups that are aligned with Defendants' deceptive practices, such as the Trans Youth Emergency Project, operate to assist Nebraska children to leave the territorial

jurisdiction of Nebraska to obtain procedures that are prohibited by Nebraska law, meaning Nebraska cannot effectively legislate away harm to its citizens while Defendants' deceptive practices continue.

366.    The "Let Them Grow Act" also came too late to protect many Nebraska children from the harms caused by Defendants' deceptive practices. One such child was Luka Hein.

367.    Luka has a pending lawsuit in state district court in Douglas County, Nebraska,[147] against her mental health counselor, physicians, and the hospital that performed a double mastectomy and prescribed testosterone when she was sixteen years old.

368.    Luka's story has been widely publicized. Her publicly available complaint tells a tragic story of a 13-year-old girl who was grappling with her parents' divorce, victimization, and serious mental health issues, when she was misled into attributing her distress to her sex traits, consistent with Defendants' misrepresentations regarding children in Nebraska and elsewhere.

369.    The facility where Luka underwent a double mastectomy and received testosterone, Nebraska Medicine at the University of Nebraska Medical Center (UNMC), advertised that it followed and implemented WPATH's "Standards of Care," then SOC-7, in the treatment of children who express dissatisfaction with or distress about their sex traits.

370.    Luka's treatment providers at UNMC implemented WPATH's "gender affirming" model in her treatment and relied on WPATH's standards. Both her mental health counselor who recommended the double mastectomy and her physician prescribing testosterone were publicly identified "WPATH members." Before the medical procedures, Luka's parents—who were required to consent to the procedure—were asked if they would rather have a live son or a dead

---

[147] *Luka Hein v. UNMC Physicians, et al.*, Case No. CI 23-7318.

daughter.

371.    In 2023, after the harm caused by the removal of her breasts and years of testosterone, Luka detransitioned and questioned the legitimacy of her "treatments."

372.    Luka is just one example of a child harmed by Defendants' misrepresentations in Nebraska.

## XIV.    WPATH CAUSES INJURY IN AND TO TEXAS

373.    Plaintiff Texas has sustained or will sustain injury because of Defendants' unlawful activities.

374.    Defendants' "Standards of Care" framework has been consulted, referenced by, or otherwise relied on by health care providers and their associated clinics or hospitals in the State of Texas.

375.    In the State of Texas, multiple health care providers and their clinics or hospitals provided hormone therapy, medical transition, surgical referrals, and other medical transition procedures, treatment, counseling, or services in reliance on Defendants' activities or practices, such as their "Standards of Care" framework.

376.    The proliferation of Defendants' deceptive trade practices into Texas prompted the Texas Legislature to pass Senate Bill 14, which prohibits physicians and healthcare providers from providing medical transition treatment to minors. *See* Tex. Health & Safety Code Ann. § 161.702 *et seq*.

377.    Sadly, Senate Bill 14 came too late to protect many Texas children from the harms caused by Defendants' deceptive trade practices.

## XV.    CORE DECEPTIVE STATEMENTS

378.    In conclusion, this Complaint seeks relief for ten specific unlawful

misrepresentations or omissions, including:

(1)    WPATH misrepresents that pediatric medical transition is medically necessary to prevent suicide in children who express dissatisfaction with or report distress about their sex traits.

(2)    WPATH misrepresents that pediatric medical transition is effective at preventing suicide in children who express dissatisfaction with or report distress about their sex traits.

(3)    WPATH misrepresents that puberty blockers are fully reversible.

(4)    WPATH misrepresents that cross-sex hormones improve mental health.

(5)    WPATH misrepresents that performing breast amputations on children is safe, effective, and consistently results in better health and quality of life.

(6)    WPATH misrepresents SOC-8 to be the result of unbiased, evidence-based expert consensus.

(7)    WPATH misrepresents that pediatric medical transition is the "standard of care" for children who express dissatisfaction with or report distress about their sex traits.

(8)    WPATH fails in SOC-8 to adequately disclose certain side effects of puberty blockers including hot flashes, lethargy, and cognitive problems.

(9)    WPATH fails in SOC-8 to adequately disclose certain side effects of cross-sex hormones including mood disturbances, vocal pain, pelvic pain, pelvic floor dysfunction, clitoral discomfort, vaginal pain, persistent sexual dysfunction continuing after cessation of use, and erectile pain.

(10)    WPATH fails in SOC-8 to adequately disclose certain side effects of breast amputations including inability to breastfeed, nerve damage, and necrosis of the nipples.

379.    WPATH made each of these ten misrepresentations or omissions expressly or by implication, WPATH knew they were false or misleading, and WPATH further knew—and intended—that they would provide WPATH members and other providers of medical transition

services with the means to mislead consumers. Each of these ten misrepresentations was, and is, important to WPATH members and other providers of transition services. Each of these representations were, and are, important to the children, who receive, and parents, who pay for, those services. As a result of these ten central misrepresentations and omissions, and as pleaded herein, unlawful deception occurred and continues to occur.

380.    Each of these ten misrepresentations or omissions occurred at least in certain specific instances detailed herein. In particular:

**Misrepresentation (1):  WPATH misrepresents that pediatric medical transition is medically necessary to prevent suicide in children who express dissatisfaction with or report distress about their sex traits.**

381.    WPATH asserts that medical transition is "lifesaving" despite the lack of evidence to substantiate the claim that medical transition is necessary and effective at preventing suicide.[148]

382.    In 2008, WPATH misleadingly asserted that medical transition is "not 'cosmetic' or 'elective' or for the mere convenience of the patient," but instead was "understood to be medically necessary."[149]

---

[148] See, *e.g.*, SOC-8 at S126 ("[I]n many cases, hormone therapy is considered a lifesaving intervention."); WPATH, Inc. & USPATH, WPATH and USPATH comment on the Cass Review at 2 (May 17, 2024), https://wpath.org/wp-content/uploads/2024/11/17.05.24-Response-Cass-Review-FINAL-with-ed-note.pdf (last visited June 16, 2026) (hereinafter "WPATH Cass Review Comment") (referring to administering puberty blockers to children as "widely recognized as medically necessary, and often reported as lifesaving"); WPATH, Inc. & USPATH, Statement of Opposition to Legislation Banning Access to Gender-Affirming Health Care in the US (Mar. 8, 2023), https://wpath.org/wp-content/uploads/2024/11/USPATH_WPATH-Statement-re_-GAHC-march-8-2023.pdf (last visited June 16, 2026) (characterizing medical transition as "lifesaving care") ; GLAAD *et al*., New York Times Sign On Letter at 1–3, https://glaad.org/nytimes (last visited June 16, 2026) (WPATH signing a letter characterizing medical transition as "lifesaving"); WPATH, Inc. & USPATH, USPATH and WPATH Respond to NY Times Article "They Paused Puberty, But Is There a Cost?" (Nov. 22, 2022) https://media.glaad.org/wp-content/uploads/2023/02/10142224/USPATHWPATH-Statement-re-Nov-14-2022-NYT-Article-Nov-22-2022.pdf (last visited June 16, 2026) (repeating claims that puberty blockers administered to children "can be a life-changing and lifesaving treatment").

[149] WPATH, Inc., WPATH Clarification on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A. at 3 (June 17, 2008).

383.    WPATH asserts in SOC-8 that not providing medical transitioning services can lead to depression and anxiety.[150]

384.    When WPATH released SOC-7 it added new language dubbing cross-sex hormones and transition surgery "medically necessary."[151] And when WPATH published SOC-8 it further urged "health care systems to provide these medically necessary treatments and eliminate any exclusions from their policy documents and medical guidelines that preclude coverage for any medically necessary procedures or treatments"[152]

385.    The "medical necessity statement" spans several pages of SOC-8 and begins by recommending that "health care systems should provide medically necessary gender-affirming health care for transgender and gender diverse people."[153] It quotes the American Medical Association's definition of "medical necessity" and then declares that roughly 30 medical transition interventions are medically necessary.[154]

386.    In SOC-8, WPATH labeled as "medically necessary" virtually every pediatric medical transition service that a transition doctor could perform for a fee, including administering puberty blockers, "voice surgery," "counseling,"[155] and "hair removal from . . . genital areas for gender affirmation," among many other transition services.[156]

387.    WPATH also posts statements on its website falsely claiming that pediatric

---

[150] *See*, *e.g.*, SOC-8 at S66 (stating that "chest dysphoria" correlates to "anxiety, depression, and distress," which can be treated by mastectomy), S106 (claiming that those who experience distress about their sex traits not undergoing medical transition leads to "depression, anxiety, [and] suicidality"), S126 (claiming that cross-sex hormones "positively impact the mental health and quality of life of" patients).

[151] *See* Eli Coleman, *et al.*, Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People at 5, 8, 33, 54 (2012) (hereinafter "SOC-7").

[152] SOC-8 at S18.

[153] SOC 8 at S16.

[154] SOC-8 at S16–S18.

[155] So long as the counseling is not intended to encourage a child to feel comfortable with their natal sex traits. *See* SOC-8 at S53.

[156] SOC-8 at S18.

medical transition is "medically necessary."[157]

**Misrepresentation (2):  WPATH misrepresents that pediatric medical transition is effective at preventing suicide in children who express dissatisfaction with or report distress about their sex traits.**

388.    SOC-8 claims that "hormone therapy is considered a lifesaving intervention,"[158]

and that medical transition "is associated with a substantial reduction in the risk of suicide

attempt[s]."[159]

389.    WPATH asserts in SOC-8 that medical transition treatments reduce "suicidality"

and "suicidal ideation."[160]

390.    WPATH also makes public statements falsely claiming that medical transition is

"lifesaving."[161]

**Misrepresentation (3): WPATH misrepresents that puberty blockers are fully reversible.**

391.    WPATH represents in SOC-8 that puberty blockers are "fully reversible."[162]

**Misrepresentation (4):  WPATH misrepresents that cross-sex hormones improve mental health.**

392.    WPATH claims in SOC-8 that the administration of cross-sex hormones "has

been shown to improve quality of life and to decrease depression and anxiety."[163]

393.    WPATH asserts in SOC-8 that hormone therapy "positively impact[s] the mental

health and quality of life of [children]."[164]

---

[157] WPATH Cass Review Comment at 1–2.
[158] SOC-8 at S126.
[159] SOC-8 at S174.
[160] *E.g.*, SOC-8 at S47, S106, S126.
[161] See *supra* n.148.
[162] SOC-8 at S43, S112.
[163] SOC-8 at S174.
[164] SOC 8 at S126.

107

**Misrepresentation (5): WPATH misrepresents that performing breast amputations on children is safe, effective, and consistently results in better health-related quality of life.**

394.    WPATH represents in SOC-8 that breast amputations are safe, effective, and result in better health and quality of life for girls experiencing dissatisfaction with or distress about their sex traits.[165] SOC-8 claims that "[t]he efficacy of [breast amputation] has been demonstrated in multiple domains, including a consistent and direct increase in health-related quality of life."[166] Thus, WPATH concludes that "the evidence demonstrates [breast amputation] to be a safe and effective intervention."[167]

395.    SOC-8 makes "strong recommendations" with respect to surgical interventions for children, thereby asserting that "the evidence [for the intervention] is of high quality," "there are few downsides," and "there is a high degree of acceptance among providers" for the treatment.[168]

**Misrepresentation (6): WPATH misrepresents SOC-8 to be the result of unbiased, evidence-based expert consensus.**

396.    WPATH misrepresents that SOC-8 is "consensus-based expert opinion."[169]

397.    WPATH makes public statements falsely claiming that medical transition is backed by "expert consensus[.]"[170]

---

[165] SOC-8 at S18 (asserting that all "[g]ender-affirming interventions . . . are safe and effective"), S43 (noting that SOC-7 recommended breast amputation beginning at age 16), S128 (declaring breast amputations to be "a safe and effective intervention").
[166] SOC-8 at S128.
[167] SOC-8 at S128.
[168] SOC-8 at S111, S129, S250.
[169] SOC-8 at S247; WPATH, WPATH and USPATH response to the HHS report on gender dysphoria (May 2, 2025), https://wpath.org/wp-content/uploads/2025/05/WPATH-USPATH-Response-to-HHS-Report-02May2025-3.pdf (describing SOC-8's recommendations regarding hormone therapy and puberty blockers as "research and consensus-based").
[170] WPATH, WPATH and USPATH response to the HHS report on gender dysphoria (May 2, 2025), https://wpath.org/wp-content/uploads/2025/05/WPATH-USPATH-Response-to-HHS-Report-02May2025-3.pdf (last visited June 16, 2026); WPATH Cass Review Comment (claiming "professional consensus").

398. WPATH falsely claims that SOC-8 follows WHO and NAM standards on managing conflicts of interest.[171]

399. WPATH falsely represents that it complied with these standards when it reviewed "[c]onflicts of interests . . . as part of the [SOC-8 committee member] selection process" and concluded that "[n]o conflicts of interest were . . . significant or consequential."[172]

400. WPATH falsely claims that SOC-8 used the "Delphi process," which is a formal method of developing recommendations based on expert consensus.[173]

401. WPATH falsely claims that SOC-8 followed the "GRADE" system.[174]

402. SOC-8 makes "strong recommendations" with respect to cross-sex hormones, puberty blockers, and surgical interventions for children, thereby asserting that "there is a high degree of acceptance among providers" for the treatment.[175]

**Misrepresentation (7): WPATH misrepresents that pediatric medical transition is the "standard of care" for children who express dissatisfaction with or report distress about their sex traits.**

403. Despite the low-quality evidence supporting pediatric medical transition, WPATH represents that pediatric medical transition is the "standard[] of care" for children who express dissatisfaction with or distress about their sex traits.[176]

404. In SOC-8, WPATH represents that cross-sex hormones are medically necessary for children who express discomfort with or distress about their sex traits, and that cross-sex hormone use is an appropriate treatment as early as the onset of puberty.[177]

---

[171] SOC-8 at S8, S247; see *supra* ¶ 76.
[172] SOC-8 at S177.
[173] SOC-8 at S250.
[174] SOC-8 at S250.
[175] SOC-8 at S111, S129, S250.
[176] SOC-8 at S1.
[177] SOC-8 at S110–11, S114–15, S256–57.

405.    SOC-8 makes "strong recommendations" with respect to cross-sex hormones, puberty blockers, and surgical interventions for children, thereby asserting that "the evidence [for the intervention] is of high quality," "there are few downsides," and "there is a high degree of acceptance among providers" for the treatment.[178]

**Omission (8):  WPATH fails in SOC-8 to disclose or to adequately disclose certain side effects of puberty blockers.**

406.    SOC-8 provides a "strong recommendation" that clinicians administer puberty blockers to children, thereby asserting that "the evidence [for the intervention] is of high quality," "there are few downsides," and "there is a high degree of acceptance among providers" for the treatment.[179] But SOC-8 fails to disclose or to adequately disclose risks and side effects like hot flashes, lethargy, and cognitive issues when puberty blockers are used for pediatric medical transition.[180]

**Omission (9):  WPATH fails in SOC-8 to disclose or to adequately disclose certain side effects of cross-sex hormones.**

407.    SOC-8 makes "strong recommendations" with respect to administering cross-sex hormones to children, thereby asserting that "the evidence [for the intervention] is of high quality," "there are few downsides," and "there is a high degree of acceptance among providers" for the treatment.[181] But SOC-8 fails to disclose or to adequately disclose the existence and severity of risks and side effects associated with cross-sex hormones, including mood disturbances, vocal pain, pelvic pain, pelvic floor dysfunction, clitoral discomfort, vaginal pain, persistent sexual dysfunction continuing after cessation of use, and erectile pain.[182]

---

[178] SOC-8 at S111, S129, S250.
[179] SOC-8 at S111, S250.
[180] See generally SOC-8.
[181] SOC-8 at S111, S129 S250.
[182] SOC-8 at S254; see generally SOC-8.

**Omission (10):  WPATH fails in SOC-8 to disclose or to adequately disclose certain side effects of breast amputations.**

408.    SOC-8 makes "strong recommendations" with respect to surgical interventions for children, including breast amputation, thereby asserting that "the evidence [for the intervention] is of high quality," "there are few downsides," and "there is a high degree of acceptance among providers" for the treatment.[183] But SOC-8 fails to disclose or to adequately disclose risks and side effects associated with breast amputations, like its effects on non-erogenous sensation, inability to breastfeed, nerve damage, and necrosis of the nipples.[184]

## XVI.    VIOLATIONS OF THE FTC ACT, AK CPA, IOWA CONSUMER PROTECTION ACT, NE UDTPA, AND TEXAS DTPA

409.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

410.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

411.    Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, services, or cosmetics. For the purposes of Section 12 of the FTC Act, 15 U.S.C. § 52, puberty blockers and cross-sex hormones are a "drug" as defined in Section 15(c) of the FTC Act, 15 U.S.C. § 55(c).

### Count I: Means and Instrumentalities to Engage in Deception—Deceptive Establishment and Efficacy Claims

412.    Defendants have created, disseminated, and furnished to medical providers selling pediatric medical transition services false, misleading, or unsubstantiated representations,

---

[183] SOC-8 at S111, S129, S250.
[184] See generally SOC-8.

guidance, materials, training, and other content that represent, directly or indirectly,

    A.  Pediatric medical transition is medically necessary to prevent suicide in children who express dissatisfaction with or report distress about their sex traits.

    B.  Pediatric medical transition is effective at preventing suicide in such children who express dissatisfaction with or report distress about their sex traits.

    C.  Puberty blockers are fully reversible.

    D.  Cross-sex hormones improve mental health.

    E.  Performing breast amputations on children is safe, effective, and consistently results in better health and quality of life.

413.    By furnishing this guidance, materials, and training containing false, misleading, or unsubstantiated representations describe in Paragraph 412, Defendants have provided the means and instrumentalities for the commission of deceptive acts and practices.

414.    Therefore, Defendants' representations as described in Paragraph 412 constitute deceptive acts or practices and the making of false advertisements in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a), 52.

**Count II: Means and Instrumentalities to Engage in Deception— Misrepresentations Regarding the Standards of Care**

415.    Defendants have created and furnished medical providers who sell pediatric medical transition services with guidance, materials, and training containing false or misleading representations which claim, directly or indirectly, expressly or by implication, that:

    A.  Defendants' SOC-8 represents unbiased, evidence-based expert consensus.

    B.  Pediatric medical transition is the "standard of care" for children who express dissatisfaction with or report distress about their sex traits.

416.    By furnishing the guidance, materials, and training containing the false or

misleading representations described in Paragraph 415, Defendants have provided the means and instrumentalities for the commission of deceptive acts and practices.

417. Therefore, Defendants' representations as described in Paragraph 415 constitute deceptive acts or practices and the making of false advertisements in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a), 52.

**Count III: Means and Instrumentalities to Engage in Deception—Failure to Disclose Side Effects**

418. Defendants have created and furnished medical providers who sell pediatric medical transition services with guidance, materials, and training that fails to disclose the existence or extent of detrimental effects of drugs, surgeries, or other pediatric medical transition treatments, including that:

A. The side effects of puberty blockers include hot flashes, lethargy, and cognitive problems.

B. The side effects of cross-sex hormones include mood disturbances, vocal pain, pelvic pain, pelvic floor dysfunction, clitoral discomfort, vaginal pain, persistent sexual dysfunction continuing after cessation of use, and erectile pain.

C. The side effects of breast amputations include inability to breastfeed, nerve damage, and necrosis of the nipples.

419. In furnishing guidance, materials, and training that fail to disclose the material information described in Paragraph 418, Defendants have provided the means and instrumentalities for the commission of deceptive acts or practices.

420. Therefore, Defendants' practices as set forth in Paragraph 411 constitute deceptive acts or practices and the making of false advertisements in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a), 52.

**Count IV: Violations of the Alaska Consumer Protection Act (By Plaintiff State of Alaska)**

421.     Alaska repeats and realleges the facts above and incorporates them herein by reference.

422.     Alaska brings this action for Defendants' violations of the Alaska Consumer Protection Act ("AK CPA"), AS § 45.50.471 *et. seq*. For these violations, Alaska seeks relief, including a permanent injunction, civil penalties, attorney's fees, costs and other appropriate relief as authorized by AS §§ 45.50.501, 45.50.551(b), and 45.50.537(d).

423.     AK CPA specifies multiple acts or practices which, when conducted in the course of business, constitute deceptive trade practices. AS § 45.50.471(b).

424.     Defendants engaged in and continue to engage in deceptive trade practices in violation of AS § 45.50.471.

425.     Defendants' false or misleading representations have affected the people of the State of Alaska causing harm.

426.     Each deceptive act or practice as alleged herein constitutes a separate violation of AK CPA.

427.     The Court should award injunctive relief and make all other orders or judgments necessary to prevent Defendants' deceptive trade practices or restore to any person any money or property acquired by means of such practices as authorized by AS § 45.50.501.

428.     The Court should award civil penalties for each violation of AK CPA as authorized by AS 45.50.551(b).

429.     The Court should award costs and attorneys fees as authorized by AS § 45.50.537.

**Count V: Violations of the Iowa Consumer Fraud Act (By Plaintiff State of Iowa)**

430.    Iowa repeats and realleges the facts above and incorporates them by reference.

431.    Iowa brings this action for Defendants' violations of the Iowa Consumer Fraud Act. Iowa Code § 714.16. For these violations, Iowa seeks relief including: a permanent injunction, civil penalties, disgorgement, attorney's fees, costs, and other appropriate relief as authorized by Iowa Code.

432.    The Iowa Consumer Fraud Act specifies multiple acts or practices which, when conducted in the course of business, are deceptive trade practices.

433.    Defendants engaged in and continue to engage in deceptive practices in violation of Iowa law.

434.    Defendants' false or misleading representations have affected the people of Iowa, causing harm.

435.    Each deceptive act or practice or course of conduct as alleged constitutes a separate violation of Iowa Code.

436.    The Court should award injunctive relief and make all other orders or judgments necessary to prevent Defendants' deceptive trade practices and restore to any person any money or property acquired by means of such practices authorized by Iowa law.

437.    The Court should award civil penalties for each violation and attorneys' fees as authorized by Iowa law.

**Count VI: Violations of the Nebraska Uniform Deceptive Trade Practices Act (By Plaintiff State of Nebraska)**

438.    Nebraska repeats and realleges the facts above and incorporates them herein by reference.

439.    Nebraska brings this action for Defendants' violations of the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301 *et. seq*. For these violations, Nebraska seeks relief, including a permanent injunction, civil penalties, attorney's fees, costs and other appropriate relief as authorized by Neb. Rev. Stat. §§ 87-303(b), 87-303.05, and 87-303.11.

440.    The NE UDTPA specifies multiple acts or practices which, when conducted in the course of business, constitute deceptive trade practices. Neb. Rev. Stat. § 87-302.

441.    Defendants engaged in and continue to engage in deceptive trade practices in violation of Neb. Rev. Stat. § 87-302(a).

442.    Defendants' false or misleading representations have affected the people of the State of Nebraska, causing harm.

443.    Each deceptive act or practice as alleged herein constitutes a separate violation of the NE UDTPA.

444.    The Court should award injunctive relief and make all other orders or judgments necessary to prevent Defendants' deceptive trade practices and restore to any person any money or property acquired by means of such practices as authorized by Neb. Rev. Stat. § 87-303.05(1).

445.    The Court should award civil penalties for each violation of the NE UDTPA as authorized by Neb. Rev. Stat. § 87-303.11(1). The Court should award costs and attorney's fees as authorized by Neb. Rev. Stat. § 87-303(b).

### Count VII: Violations of the Texas Deceptive Trade Practices Act (By Plaintiff State of Texas)

446.    Texas repeats and realleges the facts above and incorporates them herein by reference.

447.    Texas brings this action in the public interest for Defendants' violations of the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code §§ 17.41-17.63. For these

116

violations, Texas seeks relief, including a permanent injunction, civil penalties, restitution, attorneys' fees, costs, and all other appropriate relief provided by Texas law. *See e.g.* Tex. Bus. & Com. Code § 17.47.

448. The Texas Deceptive Trade Practices Act specifies multiple acts or practices which, when conducted in the conduct of any trade or commerce, are deceptive trade practices. Tex. Bus. & Com. Code § 17.46(a), (b).

449. Defendants engaged in and continue to engage in deceptive trade practices in violation of the Texas DTPA.

450. Defendants' false, misleading, and deceptive acts and practices have affected the people of Texas, causing harm.

451. Each deceptive act or practice as alleged herein constitutes a separate violation of the Texas DTPA.

452. The Court should award injunctive relief and make all other orders or judgments necessary to prevent Defendants' deceptive trade practices and restore to any person any money or property acquired by means of such practices as authorized by Tex. Bus. & Com. Code § 17.47.

453. The Court should award civil penalties for each violation and costs and attorneys' fees as authorized by Tex. Bus. & Com. Code § 17.47 and Tex. Gov't Code § 402.006.

## XVII. CONSUMER INJURY

454. Children and parents have suffered, are suffering, and will continue to suffer substantial injury because of the Defendants' violations of the FTC Act, the AK CPA, the Iowa Consumer Fraud Act, the NE UDTPA, and the Texas DTPA. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

117

## XVIII. PRAYER FOR RELIEF

Wherefore, the Plaintiffs request that the Court:

A.  Enter a permanent injunction to prevent future violations of the FTC Act, the AK CPA, the Iowa Consumer Fraud Act, the NE UDTPA, and the Texas DTPA;

B.  Award Alaska civil penalties, restitution, attorneys' fees and costs, and other appropriate relief as authorized by AS §§ 45.50.501, 45.50.551(b), and 45.50.537;

C.  Award Iowa civil penalties, disgorgement, attorney's fees, costs, and other appropriate relief as authorized by Iowa Code;

D.  Award Nebraska civil penalties and/or forfeiture for each violation of state law, and attorneys' fees and costs as provided under state law;

E.  Award Texas civil penalties, restitution, attorneys' fees, costs, and all other appropriate relief authorized by Texas law;

F.  Award any additional relief as the Court determines to be just and proper.

Dated: June 17, 2026                                    Respectfully submitted,


**FOR THE FEDERAL TRADE COMMISSION:**


Of Counsel                                              */s/ R. Cooper Vaughan*
                                                        R. Cooper Vaughan
Christopher G. Mufarrige                                  *Senior Counsel to the Director*
  *Director,*                                              Virginia State Bar No. 92580
  *Bureau of Consumer Protection*                       Glenna Goldis (pro hac vice forthcoming)
                                                          *Assistant Director for Special Projects*
Lucas Croslow                                             New York Reg. No. 4868600
  *General Counsel*                                     Michael Dingman (pro hac vice
                                                        forthcoming)
Katherine White                                           *Senior Counsel to the Director*
  *Principal Deputy Director*                             District of Columbia Bar No. 90001474
  *Bureau of Consumer Protection*                       Hans Clausen (pro hac vice forthcoming)
                                                          *Attorney*
Douglas C. Geho                                           Georgia Bar No. 153250
  *Deputy Director,*
  *Bureau of Consumer Protection*                       Federal Trade Commission
                                                        Bureau of Consumer Protection
Levi W. Swank                                           600 Pennsylvania Avenue, NW
  *Deputy Director for Litigation,*                     Washington, DC 20580
  *Bureau of Consumer Protection*                       Fax: (214) 953-3079
                                                        E-mail: RVaughan@FTC.gov
Annie Chiang
  *Deputy Director,*                                    Jonathan Cohen (pro hac vice forthcoming)
  *Bureau of Consumer Protection*                         *Chief Litigation Counsel*,
                                                          *Bureau of Consumer Protection*
                                                          District of Columbia Bar No. 483454

                                                        Attorneys for Plaintiff
                                                        FEDERAL TRADE COMMISSION


119

**FOR THE STATE OF ALASKA**:

CORI M. MILLS
Acting Attorney General of Alaska

Charles J. Gartland (pro hac vice
forthcoming)
Civil Division Director
Alaska Bar No. 2509064
Alaska Dept. of Law
1031 W. 4th Ave.
Suite #200
Anchorage, AK 99501
Telephone: (907) 269-5100
Fax: (907) 269-5100
E-mail: charles.gartland@alaska.gov

Attorney for Plaintiff
STATE OF ALASKA

120

**FOR THE STATE OF IOWA**:


BRENNA BIRD
Attorney General of Iowa




_Eric Wessan_
_____
Eric H. Wessan
Solicitor General
Iowa Attorney General's Office
Iowa Bar Pin: AT0014313
1305 E. Walnut St.
2d Floor
Des Moines, IA 50263
Telephone: (515) 823-9117
E-mail: eric.wessan@ag.iowa.gov

Attorney for Plaintiff
*STATE OF IOWA*

**FOR THE STATE OF NEBRASKA**:


MICHAEL T. HILGERS
Attorney General of Nebraska


Erik W. Fern (pro hac vice forthcoming)
Deputy Bureau Chief
Nebraska Bar No. 23733
Benjamin J. Swanson (pro hac vice forthcoming)
Nebraska Bar No. 27675
Assistant Attorney General
Consumer Protection Bureau
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, Nebraska 68508
Telephone: (402) 471-3811
Fax: (402) 471-4725
E-mail: erik.fern@nebraska.gov
E-mail: benjamin.swanson@nebraska.gov

Attorneys for Plaintiff
STATE OF NEBRASKA

122

FOR THE STATE OF TEXAS

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

ROB FARQUHARSON
Deputy Attorney General for Legal Strategy

_____

ROB FARQUHARSON
Deputy Attorney General for Legal Strategy
Rob.Farquharson@oag.texas.gov
Texas Bar No. 24100550

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Consumer Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548