# EXHIBIT 12

**DECLARATION OF** ▮▮▮▮▮▮▮▮
**Pursuant to 28 U.S.C. § 1746**

I have personal knowledge of the facts set forth below and am competent to testify about them. If called as a witness, I could and would testify as follows:

1.  I am over 18 years old and reside in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

2.  From July 2018 until November 2022, I worked as a case manager at the Washington University Transgender Center (the "Center") at St. Louis Children's Hospital. In that role, I met with minor patients two to three days a week in the clinic setting to provide medical case management and completed (with parents) the screening, triage, and intake for minor patients who were referred to the Center.

3.  I began keeping track of the Center's patients in a spreadsheet in 2020. In the two-year period from 2020 to 2022, by my count the Center "transitioned" more than 600 minors. By "transition," I mean physicians prescribed puberty blockers or cross-sex hormones to modify the patient's sex traits.

4.  I sought a job at the Center because I wanted to serve gender-nonconforming[1] children and teenagers who were in distress. At the time I thought of this cohort as "transgender kids" and "members of the LGBTQ community."[2] I am a lesbian who was a tomboy growing up and I married a "transgender man" (a woman who identified as a man)[3] so I felt I was part of that same community. I thought the Center would help "transgender kids" become their true selves.

---

[1] By "gender-nonconforming" I mean they defy stereotypes for their sex.
[2] The acronym changed over time. Later we would say "LGBTQIA+."
[3] She has since stopped identifying as male.

1

5. At my interview for the job in 2018, many of the questions were about my spouse's transgender identity and my connection to the "LGBTQ" community.

6. Most of the Center's staff either identified as "LGBTQ" or had a close relative who identified as transgender. For example, the founding director, Dr. Christopher Lewis, was a gay man; another physician, Dr. Sharon Vermont, transitioned her child; and the psychiatrist, Dr. Andrea Marie Giedinghagen, was a lesbian. Dr. Lewis was only a few years out of training when the hospital appointed him to lead the Center.

7. When I participated in a hiring committee for an educational liaison, we refused to interview anyone who did not identify as transgender (but they did not need to use cross-sex hormones or get surgery).

8. In my role at the Center, I personally witnessed physicians and other clinical staff provide misleading information about puberty blockers, cross-sex hormones, and surgery to the public, to minor patients, and to parents of minor patients.

### How Patients Arrived at the Center

9. As part of my role at the Center, I trained local pediatricians to ask children for their gender identity and refer certain patients to the Center.

10. We experienced a spike in new patients during the time I worked at the Center. Many reported they had been referred by primary care physicians.

11. Once I trained clinicians who worked in the St. Louis Children's Hospital cystic fibrosis ward. Within three months the Center received a referral for one of the girls on that ward. After I trained doctors who saw children with sickle cell anemia, I heard that one of the patients asked to see Dr. Lewis.

12. Parents often told me they wanted their child to be assessed by a mental health professional to determine if they were transgender, or that they wanted to explore a non-medical pathway (like therapy) to address their children's gender dysphoria.

13. The Center did not offer such assessments or non-medical treatment pathways.

14. Nearly all minors who sought treatment at the Center presented with serious comorbidities, including autism, ADHD, depression, anxiety, PTSD, trauma histories, OCD, and serious eating disorders.

## The Center's Services

15. The Center had four practice areas: Endocrinology, Adolescent Medicine, Psychiatry, and Psychology. I almost exclusively scheduled patients for Endocrinology or Adolescent Medicine because there was rarely space available to refer to Psychiatry or Psychology. The standard practice was not to book a patient for more than two visits with a psychologist.

16. Endocrinology would prescribe puberty blockers to children and young teenagers as soon as they started puberty. It would also prescribe cross-sex hormones to kids as young as 13. When Dr. Lewis implanted puberty blockers, he booked a surgical suite for the procedure, which let Endocrinology bill insurance companies at a higher rate.

17. The Center booked initial Endocrinology visits for sixty minutes. Toward the beginning of the hour, Dr. Lewis would deliver a lecture to the family about the science behind hormones, during which he would draw a diagram of the human body.

18. Some parents expressed afterward that they felt impressed by the amount of attention their children received at the initial Endocrinology appointment. But typically, none of the clinicians who met with the child were mental health providers.

19. Most of our patients paid using private insurance. I heard a physician state that after opening the Center, Endocrinology was now running "in the black." He said it had previously operated at a loss for years.

20. Adolescent Medicine prescribed cross-sex hormones to post-pubescent teenagers.

21. Adolescent Medicine also prescribed Depo-Provera to girls. Typically that medication is injected every 12 weeks to prevent pregnancy. The Center would administer it every 10-11 weeks. We advised the girls that this way, it would suppress menstruation and they would not get a period. We touted the treatment's lack of estrogen (in contrast to other types of birth control) as "gender-affirming."

22. Almost all parents would agree to let their daughter take Depo-Provera, even if they would not consent to testosterone. When they returned with their daughter for the next injection 10-11 weeks later, we would try to persuade them to consent to testosterone.

23. Typically, patients' health insurance covered Depo-Provera visits.

**The Center's Criteria for Transitioning Minors**

24. The Center relied on specific criteria that must be met before it medically transitioned a child. Based on my observations as an employee, including those that I describe below, the Center derived those specific criteria from Standards of Care version 7 ("SOC7") until September of 2022, at which point they were replaced by version 8 ("SOC8"). These documents were published by the World Professional Association for Transgender Health (WPATH).

25. First, the minor must have a history of gender nonconformity or gender dysphoria, which could mean discomfort with being a girl or a boy or identifying as something like "gender queer." Patients reported their own history. I never observed the Center challenge them.

4

26. The second criterion for the Center to medically transition a minor was a referral letter from a therapist.

27. The Center maintained a list of therapists to whom we sent patients for referral letters. At the Center's instruction, I co-drafted a template letter that most of the therapists on the Center's pre-approved list used. They would fill in blanks on the template, sign, and return the document to us.

28. The third criterion for the Center to medically transition a minor was one parent or legal guardian's consent. There were no other criteria or requirements.

### How the Center Sought Consent from Parents

29. Center staff used certain tactics to obtain parental consent. I learned them by "shadowing" colleagues who were employing the tactics, which was the main way that the Center trained people. The "shadowing" model could be described as, "you watch, you do, you teach."

30. I observed Center staff, including physicians, express the following to parents many times:

   a.  Puberty blockers are "fully reversible."

   b.  Strongly implying the child would kill himself or herself if not medically transitioned. For example, dozens of times, I heard Center clinicians, including physicians, explicitly state either "would you rather have a living daughter or a dead son?" or "would you rather have a living son or a dead daughter?"

   c.  Medical transition is the "standard of care" for kids with gender dysphoria.

   d.  Transition is "medically necessary" or "transgender people need this care." We said this routinely at intakes.

5

  e. Cross-sex hormones are safe. I routinely observed Center staff characterize the risks and side effects as similar to that of being the opposite sex. So, for example, I observed Center staff represent that a boy's risk of breast cancer would become the same as a girl's if he used cross-sex hormones.

31. I recited those same lines to parents because I had heard my colleagues say them. Sometimes I had social work students shadowing me when I said them, meaning they were supposed to repeat what I said to future patients.

32. We routinely said these things in front of the child, including the suggestion that he or she might commit suicide if not allowed to medically transition.

33. I created most of the handouts that the Center gave parents with the Center's nurse. I wrote that puberty blockers were "reversible," and Center physicians approved that language.

34. When a parent withheld consent, the physicians and other staff would typically disparage that person to each other. Dr. Lewis called them "assholes," "deadbeats," and "stupid." My colleagues at the Center expressed to me that these parents had weak relationships with their children and were neglecting their medical needs.

35. When a patient's parents disagreed, my coworkers and I would sometimes help the pro-transition parent find a family law attorney. We discussed their ongoing family court cases, including divorces, and Center staff told me they testified against parents who would not consent to medical transition.

36. Sometimes parents would challenge the Center's doctors by citing studies, which they said showed most kids naturally desisted from transgender identity. Dr. Lewis would

become visibly angry when that happened. I witnessed him tell these parents they didn't know how to read scientific research.

37. One father said he held a PhD in a scientific field. After he brought in studies to show us, Dr. Lewis barred him from attending appointments with his child. We had to meet with this father downstairs from our suite in a non-clinical room while hospital security guards stood by. I was not aware of any aggressive behavior by this father.

38. Many times, parents stated in my presence that they felt they were being pressured to consent to puberty blockers or cross-sex hormones.

**The Center Relied on WPATH Standards of Care**

39. The Center based its treatments on WPATH SOC7 until SOC8 replaced it in September 2022. The Center referenced SOC7 on its website.

40. Doctors regularly cited WPATH or the SOC by name, or in shorthand as "the guidelines," when talking to each other and to parents.

41. I was assigned the task of drafting a "standard operating procedures" document based on SOC7 and our administrative practices (e.g., how to schedule an appointment). There were no other written protocols at the Center.

42. I trained social work students who were training in the Center that WPATH's Standards of Care were the authoritative guidelines for them to follow.

43. The Center's physicians discussed reaching out to WPATH when they had questions about treating a patient. Individuals we associated with WPATH included Dr. Stephen Rosenthal and Dr. Johanna Olson-Kennedy. At least one of our doctors was herself a WPATH member.

7

44. The Center's doctors and nurse practitioner belonged to a listserv that they said was affiliated with WPATH and run by Dr. Olson-Kennedy. I observed that they read the listserv regularly and seemed interested in the answers provided by experts, including Dr. Olson-Kennedy. I saw some of the listserv traffic.

45. Staff at the Center used the listserv to learn strategies for securing insurance reimbursement. For example, staff would ask how to code a procedure that had previously been rejected for coverage. Dr. Vermont, who was a WPATH member, would relay information from the listserv on how to code procedures to get them approved for coverage and circumvent certain insurance requirements. This included changing the sex in the patient's records to the opposite sex and claiming that the patient suffered from abnormally low levels of the cross-sex hormone; and using "spaghetti codes," meaning, write down a variety of codes to see what sticks.

46. Dr. Rosenthal led a training on insurance coding. That included a slide deck shared with staff at the Center (including me) which cited WPATH regarding billing procedures for insurance coverage.

47. When WPATH published SOC8 in 2022, the Center held at least three Zoom meetings, each over an hour, about its changes from SOC7. Physicians and other staff were trying to understand what SOC8 meant and debating how to implement it. Getting it right was important because SOC8 was the guidebook for transitioning minors. I thought of it as the "standard of care" – the primary standard we had to set rules on the Center's practice.

**The Center Harmed Children**

48. As part of my job, I routinely gave out the names and contact information of surgeons to patients under the age of 18 so they could seek double mastectomy, facial feminization

surgery, hysterectomy, and vaginoplasty. I believed the individuals on the list were willing to perform transition surgery on minors.

49. I thought these surgeries were appropriate for our minor patients because the physicians at the Center said so.

50. Patients we referred did in fact obtain mastectomies as minors. I saw it documented in their charts.

51. I observed that the Center's female patients who were prescribed cross-sex hormones (testosterone) often experienced significant increases in blood pressure, cholesterol, hemoglobin, hematocrit, and body weight. Sleep apnea – which is linked to obesity – became so common that we began screening all girls on testosterone for it.

52. Some girls on testosterone experienced near-constant abdominal pain. They reported painful urination and frequent urination.

53. Some girls who had been prescribed testosterone told me their clitoris had grown in a way that made clothing uncomfortable. I gave them advice about what sort of underwear and pants to wear to avoid chafing. At least two girls had trouble walking normally. They told me they could not wear jeans anymore. They seemed very embarrassed and did not want to talk about it with their parents or anyone else.

54. One time we received a referral letter that said the patient, a girl, identified as transgender but wanted to avoid "bottom growth." Her unease stemmed from being a survivor of sexual abuse, according to the letter. Dr. Lewis prescribed her testosterone despite seeing the letter.

55. Acne is an expected side effect of testosterone. But I saw cases that were extreme: deep, cratering cysts all over girls' faces. We referred these patients to dermatologists.

56. Girls complained about genital pain that seemed to be caused by vaginal atrophy. The Center prescribed a topical estrogen cream.

57. The Center typically prescribed testosterone by injection. Patients and their parents reported that this caused site reactions like pain, swelling, and irritation. Sometimes the Center would switch these patients to testosterone gel, at least temporarily.

58. Some girls reported that testosterone changed their sexual orientation – they had been exclusively attracted to girls before using their prescription, but then were attracted to boys afterward. Some were upset by that and said they wished they had been warned.

59. I noticed that patients of both sexes often became withdrawn and anxious after they began using puberty blockers.

60. As part of my role, I took notice of patients' personal hygiene, engagement level, and eye contact when they came in for appointments. I would also ask them questions about how often they were getting out of the house or socializing. I routinely observed patients on puberty blockers decline on these measures.

61. Some patients began reporting suicidal ideation after receiving puberty blockers, when they had not done so before.

62. After one girl's mental health deteriorated so badly while on puberty blockers that she stopped attending school and was hospitalized for mental health issues, Dr. Lewis's response was to prescribe testosterone earlier than planned.

63. Boys on cross-sex hormones sometimes complained of testicular and genital pain. They said they could not sustain erections or reach orgasm.

64. I understood that boys who used puberty blockers followed by cross-sex hormones might not be able to achieve orgasm, ever. I heard the Center's clinicians rationalize this by

10

saying transgender people do not want to use their genitals for sex. Once when a patient's mother raised the issue, my colleague later expressed disgust that she had done so.

65. Some boys on cross-sex hormones reported that their nipples were leaking.

66. I consistently noticed that boys on cross-sex hormones were missing milestones like learning to drive and getting jobs. (We saw patients into early adulthood.) It seemed like they were not maturing.

67. I never observed a Center physician or nurse warn patients or their parents about the issues I describe above (¶¶ 51-66), aside from erectile dysfunction.

68. Even when a patient's physical health suffered, or the patient had a mental health crisis, the Center continued his or her medical transition.

69. The patterns of physical and psychological deterioration that I observed among the Center's patients alarmed me. I raised concerns about our practice to authorities within the Center.

70. The Center did not meaningfully respond to my concerns, so I sought a new job. In November 2022 I left the Center.

71. In February 2023 I became a whistleblower. I reported what I had witnessed at the Center to the government, testified at the Missouri state legislature, and began speaking with the media.

72. When I started working at the Center, I expected to serve patients who had appeared gender-nonconforming since childhood. But over time I began seeing more girls who had only recently expressed gender-nonconformity or declared discomfort with their sex. Some even presented in typically feminine ways – for example, they wore pink and had

long hair. I also saw a growing number of boys who did not appear particularly feminine. The Center medically transitioned these girls and boys.

73. Anyway, I now think it is harmful to medically alter a healthy minor's sex traits regardless of whether they have masculine or feminine personalities.

74. As a result of my experience at the Center, I founded a 501(c)(3) nonprofit organization ██████████████. We are a lesbian and gay advocacy group committed to promoting evidence-based medical care, ending the medicalization of gender nonconformity, safeguarding homosexual rights, and building a pathway back for LGB individuals who have undergone medicalization.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 15, 2026.



12