# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, INC., a Texas corporation, et al.,<br><br>*Defendants*. | Case No. 4:26-cv-00748-O<br><br>**DEFENDANT WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS** |

Sarah Cummings Stewart
**REED SMITH LLP**
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Tel: (469) 680-4200
Fax: (469) 680-4299
sarah.stewart@reedsmith.com


R. Jeffrey Layne
**REED SMITH LLP**
401 Congress Avenue, Suite 1800
Austin, TX 78701
Tel: (512) 623-1801
Fax: (512) 623-1802
jlayne@reedsmith.com

Caleb Hayes-Deats*
Abbe David Lowell [DC Bar No. 358651]
Schuyler J. Standley*
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowellandassociates.com
CHayes-Deats@lowellandassociates.com
SStandley@lowellandassociates.com

*\*Pro hac vice* motion pending

*Attorneys for Defendant WPATH*

## TABLE OF CONTENTS

INTRODUCTION......................................................................................................... 1

PROCEDURAL AND FACTUAL BACKGROUND ................................................... 4

    **I.**    **WPATH Engages in Protected Speech on Matters of Public Concern............ 4**

    **II.**    **WPATH's Suit in the District Court for the District of Columbia .................. 7**

    **III.**    **Filing of the FTC/States' Complaint in the Northern District of Texas .......... 8**

ARGUMENT................................................................................................................ 10

    **I.**    **Legal Standard .................................................................................................. 11**

    **II.**    **The FTC Fails to Identify Any Deceptive Act or False Advertisement ......... 12**

        A.    WPATH's Statements in SOC-8 Are Not Actionable .............................. 15

        B.    SOC-8 Is Not a "Means and Instrumentality" for Fraud .......................... 23

        C.    The FTC Cannot Attribute Non-SOC-8 Statements to WPATH.............. 23

    **III.**    **The FTC's Claims Violate Basic Principles of Federalism ............................ 25**

    **IV.**    **Plaintiffs' Claims Constitute Viewpoint-Based Restrictions in Violation of WPATH's First Amendment Rights .................................................................. 30**

    **V.**    **The States' Claims Must Be Dismissed for Lack of Jurisdiction .................. 36**

        A.    Iowa, Nebraska, and Texas Lack Standing................................................ 36

        B.    The Court Should Decline to Exercise Supplemental Jurisdiction Over the State Law Claims Following Dismissal of the FTC's Federal Law Claims ................................................................................................................... 38

CONCLUSION ........................................................................................................... 39

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adlerstein v. Cooper Aerobics Enters., Inc.*,
No. 3:25-cv-2228-D, 2026 WL 820861 (N.D. Tex. Mar. 25, 2026) .......................................39

*Am. For Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)...............................................................................................................31

*AMG Cap. Mgmt. LLC v. FTC*,
593 U.S. 67 (2021)..................................................................................................................30

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
576 U.S. 787 (2015).................................................................................................................28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................................................11, 37

*Barsky v. Bd. of Regents*,
347 U.S. 442 (1954).................................................................................................................26

*Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*,
554 F.3d 595 (5th Cir. 2009) ..................................................................................................39

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026)...................................................................................................... *passim*

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)...................................................................................................................37

*Clark v. Amoco Prod. Co.*,
794 F.2d 967 (5th Cir. 1986) ..................................................................................................31

*Cobb v. Cent. States*,
461 F.3d 632 (5th Cir. 2006) ..................................................................................................36

*Cochran v. Astrue*,
No. 3:11-CV-1257-D, 2011 WL 5604024 (N.D. Tex., Nov. 17, 2011) ..................................31

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993).................................................................................................................15

*Dent v. West Virginia*,
129 U.S. 114 (1889)..............................................................................................................2, 26

*Eastman Chemical Co. v. Plastipure, Inc.*,
   775 F.3d 230 (5th Circ. 2014)................................................................................13, 23

*Elson v. Black*,
   56 F.4th 1002 (5th Cir 2023) .................................................................................11, 12

*Endocrine Soc'y v. FTC*,
   No. CV 26-512 (JEB), 2026 WL 1257289 (D.D.C. May 7, 2026)..............................8

*Fed. Trade Comm'n v. Peyroux*,
   723 F. Supp. 3d 1209 (N.D. Ga. 2024) ...........................................................12, 13, 15

*FTC v. Cantkier*,
   767 F. Supp. 2d 147 (D.D.C. 2011) ...........................................................................11

*FTC v. D-Link Systems, Inc.*,
   No. 3:17-CV-00039-JD, 2017 WL 4150873 (N.D. Cal. Sept. 19, 2017) ..................11

*FTC v. Evans Prods. Co.*,
   775 F.2d 1084 (9th Cir. 1985) ...................................................................................25

*FTC v. Lights of Am., Inc.*,
   760 F. Supp. 2d 848 (C.D. Cal. 2010) .......................................................................11

*FTC v. National Casualty Co.*,
   357 U.S. 560 (1958).....................................................................................................29

*FTC v. Neora LLC*,
   No. 3:20-CV-01979-M, 2023 WL 8446166 (N.D. Tex. Sept. 28, 2023) ..............15, 23

*FTC v. Shire ViroPharma, Inc.*,
   917 F.3d 147 (3d Cir. 2019)...................................................................................25, 30

*FTC v. Tashman*,
   318 F.3d 1273 (11th Cir. 2003) .............................................................................12, 13

*FTC v. Winsted Hosiery Co.*,
   258 U.S. 483 (1922).....................................................................................................15

*Hillsborough Cnty., Fla. v. Auto. Med. Labs., Inc.*,
   471 U.S. 707 (1985)..................................................................................................2, 26

*Intuit, Inc. v. FTC*,
   170 F.4th 411 (5th Cir. 2026) ...............................................................................12, 13

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ......................................................................................12

*Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*,
 238 F.3d 363 (5th Cir. 2001) ........................................................................................11

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992)...............................................................................................37, 38

*Mass. Med. Soc'y v. Dukakis*,
 815 F.2d 790 (1st Cir. 1987)........................................................................................26

*Medtronic, Inc. v. Lohr*,
 518 U.S. 470 (1996).....................................................................................................26

*New State Ice Co. v. Liebmann*,
 285 U.S. 262 (1932) (Brandeis, J., dissenting) ..........................................................28

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
 720 F.3d 490 (2d Cir. 2013).............................................................................13, 16, 22

*Oregon v. Ashcroft*,
 368 F.3d 1118 (9th Cir. 2004), *aff'd sub nom. Gonzales v. Oregon*, 546 U.S.
 243 (2006).......................................................................................................................2

*Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,
 63 F.4th 240 (3d Cir. 2023) .................................................................................. *passim*

*Payne v. Harris Methodist H-E-B*,
 2000 U.S. Dist. LEXIS 21776 (N.D. Tex. Nov. 20, 2000)........................................39

*Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*,
 784 F.2d 674 (5th Cir. 1986) ..............................................................13, 18, 19, 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007).....................................................................................................12

*Torrey v. Infectious Diseases Soc'y of Am.*,
 86 F.4th 701 (5th Cir. 2023) ................................................................................ *passim*

*United States v. Alvarez*,
 567 U.S. 709 (2012).....................................................................................................32

*United States v. Skrmetti*,
 605 U.S. 495 (2025)............................................................................................. *passim*

*W. Va. State Bd. of Educ. v. Barnette*,
 319 U.S. 624 (1943).......................................................................................................3

*Waltham Watch Co. v. FTC*,
 318 F.2d 28 (7th Cir. 1963) .............................................................................14, 15, 23

*Watson v. Maryland,*
    218 U.S. 173 (1910)...............................................................................................26

*Whitney v. California,*
    274 U.S. 357 (1927) (Brandeis, J., concurring), *overruled on other grounds by*
    *Brandenburg v. Ohio*, 395 U.S. 444 (1969)...........................................................35

*WPATH v. FTC*
    (D.D.C. Feb. 18, 2026) (No. 1:26-cv-00532), Dkt. No. 1 .........................................7

*WPATH v. FTC*
    (D.D.C Feb. 25, 2026) (No. 1:26-cv-00532), Dkt. No. 3 .......................................7, 9

*WPATH v. FTC,*
    No. 26-cv-532 (JEB), 2026 WL 1257321 (D.D.C. May 7, 2026) ................................. *passim*

**Statutes**

15 U.S.C. § 53(b) .......................................................................................................30

28 U.S.C. § 1367(a) ...................................................................................................39

42 U.S.C. § 1395.......................................................................................2, 26, 29, 30

215 Ill. Comp. Stat. Ann. 5/356z.60(b).....................................................................27

Cal. Code Regs. tit. 10, § 2561.2(a)...........................................................................27

Cal. Welf. & Inst. Code § 14197.09 ..........................................................................27

Del. Code Ann. tit. 18, § 2304 ...................................................................................27

Iowa Code § 147.164 ..................................................................................................28

Iowa Code § 714H.5(5)...............................................................................................37

Mass. Gen. Laws Ann. ch. 272, §§ 92A, 98 .............................................................27

Md. Code Ann. Com. Law § 14-2902 ........................................................................30

Md. Code Ann., Health-Gen. § 15-151.......................................................................27

Md. Code Ann., Ins. § 15-1A-22 ...............................................................................27

Me. Rev. Stat. Ann. tit. 22, § 3174-MMM ................................................................27

Minn. Stat. § 62Q.585.................................................................................................27

Minn. Stat. § 256B.0625, subd. 3a.............................................................................27

N.J. Stat. Ann. § 17:48-6oo..............................................................................................27

Neb. Rev. Stat. § 71-7301 *et seq.*....................................................................................28

Neb. Rev. Stat. § 87-303.10.............................................................................................37

Tex. Bus. & Com. Code § 17.565.....................................................................................37

Tex. Health & Safety Code Ann. § 161.702 *et seq.*.........................................................28

Vt. Stat. Ann. tit. 8, § 4071 ............................................................................................27

Vt. Stat. Ann. tit. 8, §§ 4071, 4724 ...............................................................................27

**Rules**

Fed. R. Civ. P. 9(b) ..................................................................................................11, 12

Fed. R. Civ. P. 12(b)(1).....................................................................................................36

**Regulations**

3 Colo. Code Regs. § 702-4:4-2-42(5)(A)(1)(o)................................................................27

Ill. Admin. Code tit. 50, § 2603.35 .................................................................................27

Ill. Admin. Code tit. 89, §§ 140.413(a)(16), 140.440(h) .................................................27

N.Y. Comp. Codes R. & Regs. tit. 11, § 52.75................................................................27

N.Y. Comp. Codes R. & Regs. tit. 18, § 505.2(*l*) ...........................................................27

Or. Admin. R. 836-053-0441............................................................................................27

**Other Authorities**

AM. COLL. OF CARDIOLOGY, *Clinical Practice Guidelines*, J. AM. COLL. OF
    CARDIOLOGY  https://www.jacc.org/guidelines ......................................................19

AM. COLL. OF OBSTETRICIANS & GYNECOLOGISTS, *Guidelines for Perinatal Care*
    (2017)....................................................................................................................20

Andreas Wolter et al., *Subcutaneous mastectomy in female-to-male transsexuals:
    Optimizing perioperative and operative management in 8 years clinical
    experience*, 71 J. OF PLASTIC RECONSTRUCTIVE AESTHETIC & SURGERY 344
    (2018).....................................................................................................................22

Cal. Dept. of Health Care Services, *Medically Necessary Gender-Affirming Care Services Covered for Medi-Cal Members* (May 7, 2025), https://mcweb.apps.prd.cammis.medi-cal.ca.gov/news/33457................................................27

Chris Noone *et al.*, *Critically appraising the Cass report: methodological flaws and unsupported claims*, 25 BMC MED. RES. METHODOLOGY 128 (2025), *available at* https://doi.org/10.1186/s12874-025-02581-7 ..........................................6

E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 International Journal of Transgender Health 51, (Sept. 15, 2022)........................................................................................................4

Erin Reed*, New German, Swiss, and Austrian Guidelines Recommend Trans Youth Care, Slam Cass Review*, ERIN IN THE MORNING (Mar. 9, 2025), https://www.erininthemorning.com/p/new-german-swiss-and-austria-guidelines ................................................................................................................6

GOV'T OF CANADA, MINISTERIAL TRANSITION BINDER: MAY 2025, § 13 (mandating consideration of WPATH's Standards of Care for gender diverse prisoners), *available at* https://www.canada.ca/en/correctional-service/corporate/transparency/proactive-disclosure/briefing-materials/transition-binder-2025-04.html; n. 2-3, *infra*..............................................6

HEALTH N.Z*, Gender Affirming Surgery and Speech Language Therapy* https://www.healthnz.govt.nz/health-topics/keeping-healthy/gender-health/gender-affirming-surgery-and-therapy...............................................................6

INT'L J. OF TRANSGENDER HEALTH, *About this Journal*, TAYLOR & FRANCIS https://www.tandfonline.com/journals/wijt21/about-this-journal#aims-and-scope ...............................................................................................................4, 5, 6

KFF, *Policy Tracker: Youth Access to Gender Affirming Care and State Policy Restrictions* (Last updated May 19, 2026) https://www.kff.org/lgbtq/gender-affirming-care-policy-tracker/.....................................................................28

Mass. Div. of Ins., *Bulletin No. 2014-03: Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Gender Dysphoria Including Medically Necessary Transgender Surgery and Related Health Care Services* (June 20, 2014), https://www.mass.gov/lists/doi-bulletins.......................................27

Mass. Div. of Ins., *Bulletin No. 2021-11: Prohibited Discrimination on the Basis of Gender Identity or Gender Dysphoria Including Medically Necessary Gender Affirming Care and Related Services* (Sept. 9, 2021), https://www.mass.gov/lists/doi-bulletins.............................................................27

MassHealth, *Gender- Affirming Care Covered by MassHealth*, https://perma.cc/YC87-7ZPH (last visited July 28, 2026)......................................27

Meredithe McNamara *et al.*, *Combatting Scientific Disinformation on Gender Affirming Care* (2023) 152(3), *available at* https://doi.org/10.1542/peds.2022-060943................................................................................................................................6

Mich. Dep't of Health & Human Servs., *Med. Servs. Admin. Bull. No. 19-06: Compliance with Federal Nondiscrimination Provisions* (Mar. 1, 2019), https://perma.cc/38YL-FWUQ ...............................................................................27

Mich. Dep't of Health & Human Servs., *Med. Servs. Admin. Bull. No. 21-28: Coverage of Gender Affirmation Services* (Sept. 30, 2021), https://perma.cc/96GE-9GFZ...............................................................................27

Nev. Medicaid Servs. Manual § 608 (Nov. 1, 2023), https://perma.cc/B634-8HLU ....................27

R.I. Gender Dysphoria/Gender Nonconformity Coverage Guidelines (Oct. 28, 2015), https://perma.cc/E9DH-KYV4 ..................................................................27

R.I. Off. of the Health Ins. Comm'r, *Bulletin No. 2015-3: Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Expression* (Nov. 23, 2015), https://perma.cc/MB57-YNBZ....................................................27

U.S. Const. amend. X.................................................................................................................25

YOUTH.GOV, FEDERAL DATA https://youth.gov/youth-topics/adolescent-health/federal-data........................................................................................................24

**INTRODUCTION**

This lawsuit seeks to radically expand the power of the Federal Trade Commission ("FTC") to regulate policy and opinion work of non-profit organizations which do not participate in the trade and commerce Congress empowered that agency to address. The authority the FTC asserts in this case is assigned by the Constitution and statutes to states. The FTC has authority to regulate "deceptive" statements that mislead consumers. Defendant the World Professional Association for Transgender Health ("WPATH") does not make statements to consumers at all. The FTC identifies none. WPATH publishes a set of non-binding Standards of Care for *doctors*. The current version of those Standards of Care ("SOC-8") has a sixty-nine-page bibliography citing over 1,500 scientific studies to support its guidance. The fundamental premise of Plaintiffs' lawsuit is that doctors cannot review this evidence for themselves. It alleges highly educated and trained medical professionals have been "duped." ECF 1 ("Compl.") ¶ 11. Plaintiffs ask this Court to believe that their attorneys understand medical science better than doctors and the state medical boards that govern them. To state that assertion is to refute it.

Dismissal is required for several reasons. First, Plaintiffs fail to allege a single deceptive statement by WPATH, much less a statement to consumers. The "core deceptive statements" the Complaint purports to identify from SOC-8 are non-actionable opinions about subjects on which there is "medical and scientific uncertainty." *United States v. Skrmetti*, 605 U.S. 495, 524 (2025). The Fifth Circuit has held that "merely publishing a medical opinion—even a hotly debated one— in a peer-reviewed journal cannot give rise to a misrepresentation claim." *Torrey v. Infectious Diseases Soc'y of Am.*, 86 F.4th 701, 704 (5th Cir. 2023). All statements Plaintiffs identify have extensive citations to peer-reviewed scientific studies that Plaintiffs simply ignore. Plaintiffs further ignore that WPATH expresses these scientific opinions not to consumers, but to the professionals best able to evaluate them: doctors. The United States District Court for the District

1

of Columbia ("D.C. District Court") previously found that the FTC lacked a "legitimate" basis to even *investigate* WPATH about statements in SOC-8 because "concerns about verifying WPATH's public statements can be addressed by consulting the lengthy bibliography accompanying its Standards of Care." *WPATH v. FTC*, No. 26-cv-532 (JEB), 2026 WL 1257321, at *4 (D.D.C. May 7, 2026). Plaintiffs do not even try to show that WPATH's citations do not support its statements or that doctors could not evaluate them in the framework in which they are offered—guidelines. Plaintiffs seek to brand one side of a scientific debate as "deceptive" without even considering the science. No court has ever permitted that. For good reason: The government does not get to silence one half of a scientific debate.

Second, the FTC's claims violate basic principles of federalism. The Tenth Amendment reserves traditional state police powers for states. The Supreme Court has recognized states' authority to regulate the type of health and safety work in which doctors engage from "time immemorial." *Dent v. West Virginia*, 129 U.S. 114, 122 (1889); *see also Hillsborough Cnty., Fla. v. Auto. Med. Labs., Inc.*, 471 U.S. 707, 719 (1985) ("[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern.") (citing *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). This is not a historic relic—it remains the operative rule today: "state lawmakers, not the federal government, are the primary regulators of professional medical conduct." *Oregon v. Ashcroft*, 368 F.3d 1118, 1124 (9th Cir. 2004), *aff'd sub nom. Gonzales v. Oregon*, 546 U.S. 243 (2006) (cleaned up). Congress has codified this allocation. 42 U.S.C. § 1395 (expressly prohibiting federal officers from "exercise[ing] any supervision or control over the practice of medicine"). The Supreme Court has reviewed the same evidence the FTC now cites, such as the "Cass Review," and concluded that it "underscore[s] the need for [state] legislative flexibility," *not* FTC action that seeks to usurp states' longstanding authority. *Skrmetti*, 605 U.S.

at 524–25. Many states have enacted statutes that expressly adopt WPATH's clinical Standards of Care as the basis for medically necessary treatment determinations. The FTC's claims, which brand as "deceptive" the very standards these states have codified into law, represent precisely the kind of unauthorized federal intrusion into the regulation of medicine that the Tenth Amendment, longstanding precedent, and federal law all forbid. The FTC's assertion of such authority—seeking a court in Texas to make a ruling against one side of a scientific discussion—would similarly allow a court in another state which approves of the opinion dictate what should happen in Texas. That is the very reason restraints on encroaching federalism exist.

Third, Plaintiffs' claims violate the First Amendment, as the D.C. District Court has already found. *WPATH*, 2026 WL 1257321, at *4–5. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Plaintiffs' disagreement with WPATH's speech does not make it "deceptive." The Supreme Court has recently rejected the proposition that state governments can prohibit professional medical speech they regard as "substandard care." *Chiles v. Salazar*, 146 S. Ct. 1010, 1027 (2026). That is what Plaintiffs seek to do: prohibit WPATH from expressing scientific opinions with which Plaintiffs disagree. If the government wishes to refute the science underlying WPATH's Standards of Care, its remedy must be more speech, not censorship.

Fourth, Plaintiff States' claims must be dismissed for lack of jurisdiction. Prospective injunctive relief against Defendants cannot redress purely historical injuries, particularly where those injuries have already been remedied by state legislation. Although Plaintiffs seek injunctive relief to prevent injury to consumers, WPATH's SOC-8 speech cannot cause future injury in Iowa,

3

Nebraska, or Texas because any future provision of such care would constitute an independent violation of state law by third-party clinicians, not action traceable to Defendants.

PROCEDURAL AND FACTUAL BACKGROUND

### I.    WPATH Engages in Protected Speech on Matters of Public Concern

"WPATH is a nonprofit organization 'dedicated to promoting science-based medical care, education, research, and public policy in transgender health.'" *WPATH*, 2026 WL 1257321, at *1. "As part of its educational and academic activities, it publishes and updates the Standards of Care, which 'articulate a professional consensus about the psychiatric, psychological, medical, and surgical management of transgender people.'" *Id.* The latest version of the Standards of Care was published in the *International Journal of Transgender Health* in 2022. *See* E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 International Journal of Transgender Health 51, (Sept. 15, 2022) ("SOC-8"), attached as Ex. A; *see also* Compl. ¶¶ 6–7 & n.1 (discussing same). The *International Journal of Transgender Health* is a peer-reviewed journal published by a British publishing company, in partnership with WPATH. *See* INT'L J. OF TRANSGENDER HEALTH, *About this Journal*, TAYLOR & FRANCIS https://www.tandfonline.com/journals/wijt21/about-this-journal#aims-and-scope.

To compile SOC-8, WPATH assembled a "multidisciplinary" committee of "subject matter experts, health care professionals, researchers and stakeholders with diverse perspectives and geographic representation." SOC-8 at S247. WPATH's Board initially selected a Guideline Steering Committee, which identified the topics that SOC-8's chapters would cover. *Id.* at 248. The Guideline Steering Committee then solicited applications to lead or serve on the committees that would formulate each chapter. *Id.* WPATH's board separately engaged an outside "Evidence Review Team" at Johns Hopkins University under the leadership of Dr. Karen Robinson. *Id.* at S249. Dr. Robinson provided additional guidance on the procedures of developing and drafting

4

SOC-8, "as well as undertaking a very rigorous systematic literature review where direct evidence was available." *Id.* After chapter committees posed research questions, the Evidence Review Team searched for all publications that addressed those questions, extracted the data those publications contained, and graded the overall quality of the evidence. *Id.* at S249-50.

After the chapter committees drafted their respective chapters, they subjected their drafts to multiple external reviews. First, a "group of independent clinical academics working in the field of transgender health reviewed the references used in every chapter in order to validate that the references were appropriately used to support the text." SOC-8 at 251. Then, a draft of SOC-8 was published for public comment. *Id.* More than 1,200 individuals submitted over 2,600 comments. *Id.* The chapter leads and the Guideline Steering Committee revised SOC-8 based on this feedback, and the chapters were reviewed and approved again by the chapter committees and, ultimately, WPATH's Board of Directors. *Id.*

SOC-8 rejects a "'one-size-fits-all' approach" and states that individual transgender patients "may need to undergo all, some, or none of these interventions" depending on their unique circumstances. SOC-8 at S7. SOC-8's "guidelines" are intended to be "flexible," and SOC-8 explicitly encourages physicians to "modify" them in response to a patient's "unique anatomic, social, or psychological situation." *Id.* at S256. Regarding adolescents, SOC-8 states:

> Given the emerging nature of knowledge regarding adolescent gender identity development, an individualized approach to clinical care is considered both ethical and necessary. As is the case in all areas of medicine, each study has methodological limitations, and conclusions drawn from research cannot and should not be universally applied to all adolescents.

SOC-8 at S45. SOC-8 emphasizes the need to "individualize" care to each adolescent's "unique needs" no fewer than seven times. *Id.* at S50, S53, S55, S56, S58, S64, S66; *see also id.* at S68, S71, S72, S74, S77. "[P]repubescent gender diverse children," however, "are not eligible to access

medical intervention" at all. SOC-8 at S67.

The published version of SOC-8 is signed by over 100 co-authors who are affiliated with institutions such as Columbia University, the Mayo Clinic, the University of Houston, Children's National Hospital, University of Texas Southwestern Medical Center, and Harvard Medical School. SOC-8 at S1-S3. It cites more than 1,500 scholarly publications as support for its recommendations, all of which went through the evidentiary review process described above. *Id.* at S178-S246. To be sure, SOC-8 has faced criticism. Compl. ¶¶ 145–60. But such criticism is part of "fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments in an evolving field." *Skrmetti*, 605 U.S. at 525. Notably, reports on both sides of the debate have had their methodologies criticized. *See, e.g.*, Erin Reed, *New German, Swiss, and Austrian Guidelines Recommend Trans Youth Care, Slam Cass Review*, ERIN IN THE MORNING (Mar. 9, 2025), https://www.erininthemorning.com/p/new-german-swiss-and-austria-guidelines; Meredithe McNamara *et al.*, *Combatting Scientific Disinformation on Gender Affirming Care,* (2023) 152(3): e2022060943, *available at* https://doi.org/10.1542/peds.2022-060943. The Cass Review itself was the subject of substantial critique of its methodology. *See*, *e.g.*, Chris Noone *et al.*, *Critically appraising the Cass report: methodological flaws and unsupported claims*, 25 BMC MED. RES. METHODOLOGY 128 (2025), *available at* https://doi.org/10.1186/s12874-025-02581-7. Many governments and organizations, including New Zealand, Canada, some U.S. States, and the American Academy of Pediatrics, agree that the evidence supports SOC-8. *See* HEALTH N.Z*, Gender Affirming Surgery and Speech Language Therapy* https://www.healthnz.govt.nz/health-topics/keeping-healthy/gender-health/gender-affirming-surgery-and-therapy; GOV'T OF CANADA, MINISTERIAL TRANSITION BINDER: MAY 2025, § 13 (mandating consideration of WPATH's Standards of Care for gender diverse prisoners), *available at*

https://www.canada.ca/en/correctional-service/corporate/transparency/proactive-disclosure/briefing-materials/transition-binder-2025-04.html; n. 2–3, *infra*.

## II.   WPATH's Suit in the District Court for the District of Columbia

On January 16, 2026, the FTC served a Civil Investigative Demand ("CID") on WPATH. *WPATH*, 2026 WL 1257321, at *2. Per the CID, the FTC sought to determine whether WPATH had "'made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of Pediatric Gender Dysphoria Treatment' and demanded a swath of documents reflecting internal and external communications from the recipients." *Id.* On February 18, 2026, WPATH sued the FTC in the D.C. District Court and "sought preliminary relief in part on the ground that the FTC was retaliating against [WPATH] for its protected speech in support of gender-affirming care." *Id.* WPATH's complaint alleged that the CID constituted unconstitutional retaliation against WPATH for exercising its First Amendment rights to speak, associate, and petition. Complaint at ¶¶ 113–53, *WPATH v. FTC* (D.D.C. Feb. 18, 2026) (No. 1:26-cv-00532), Dkt. No. 1. The complaint further alleged that the FTC's investigation represented viewpoint discrimination and violated WPATH's associational rights and Fourth Amendment protections. *Id.* at ¶¶ 138–44. On February 25, 2026, WPATH moved for a preliminary injunction in the D.C. action, seeking to enjoin the FTC from implementing or enforcing the CID. Motion for Preliminary Injunction, *WPATH v. FTC* (D.D.C Feb. 25, 2026) (No. 1:26-cv-00532), Dkt. No. 3.

On May 7, 2026, Chief Judge James E. Boasberg granted WPATH's motion for a preliminary injunction, enjoining the FTC "from implementing or enforcing its issued CID." *WPATH*, 2026 WL 1257321, at *5. The D.C. District Court found that WPATH was likely to succeed on its First Amendment retaliation claim. The FTC did not contest that WPATH had engaged in protected speech, and the D.C. District Court found that the CID had a "chilling effect"

7

on that protected speech. *Id.* at \*3. It further found that the FTC had a "retaliatory motive" for issuing the CID. *Id.* Agency leadership had displayed a "range and depth of animus . . . toward gender-affirming care." *Id.* at \*1; *see also Endocrine Soc'y v. FTC*, No. CV 26-512 (JEB), 2026 WL 1257289, at \*11 (D.D.C. May 7, 2026).

The D.C. District Court went on to explain that the FTC's "attempted demonstration of a legitimate purpose" for the CID fell "flat." *WPATH*, 2026 WL 1257321. at \*4. It found that the FTC "failed to offer a logical justification connecting WPATH to *commercial* representations," *i.e.*, statements made directly to consumers or connecting it to "supposed violators" of laws the FTC has authority to enforce. *Id.* The court observed that WPATH is a nonprofit organization that does not make statements directly to patients; rather, it publishes reviews of scientific studies and recommendations for physicians to read and consider. *Id.* at \*1. It found that "concerns about verifying WPATH's public statements can be addressed by consulting the lengthy bibliography accompanying its Standards of Care." *Id.*

## III.    Filing of the FTC/States' Complaint in the Northern District of Texas

Rather than seeking additional relief in the D.C. District Court or appealing the injunction, on June 17, 2026, just six weeks after the D.C. District Court's preliminary injunction, the FTC and four states (Alaska, Iowa, Nebraska, and Texas) filed the instant enforcement action in the Northern District of Texas against WPATH and two affiliated entities. ECF 1. The 123-page Complaint, accompanied by sixteen declarations, alleges that WPATH's "Standards of Care" had "duped" doctors and other "[m]edical professionals." Compl. ¶ 11. Plaintiffs allege that doctors informed the FTC that the "WPATH standards of care does an excellent job providing recommendations and guidelines for practices that are evidence based and expert reviewed." *Id.* Plaintiffs believe, however, that "this is not the case." *Id.*

Plaintiffs admit that the "experience of every child and parent is unique," but nonetheless

8

contend that "clinicians follow WPATH's script." Compl. ¶ 317. Plaintiffs do not identify that supposed "script" with any specificity. Instead, they allege that "[c]linicians directly invoke WPATH's 'Standards of Care' in encouraging their patients to purchase transition services." *Id.* ¶ 325. They then purport to identify ten "Core Deceptive Statements." *Id.* ¶¶ 378–408. These "Core Deceptive Statements" are the same statements about which the FTC sought information in the enjoined CID. *See* ECF 38 at 12; Motion for Preliminary Injunction Exhibit 1, *WPATH v. FTC* (D.D.C Feb. 25, 2026) (No. 1:26-cv-00532), Dkt. No. 3 (Copy of CID). The Core Deceptive Statements do not appear in SOC-8. Instead, Plaintiffs purport to distill them from other quotes in SOC-8 that WPATH bases on specific citations to published academic research. For example, Plaintiffs assert that "WPATH misrepresents that pediatric medical transition is medically necessary to prevent suicide in children who express dissatisfaction with or report distress about their sex traits," because SOC-8 states that, "in many cases, hormone therapy is considered a lifesaving intervention." *Id.* ¶ 381 & n.148. That statement in SOC-8, which differs significantly from the "Core Deceptive Statement" alleged by Plaintiffs, is supported by three citations: "Allen et al., 2019; Grossman & D'Augelli, 2006; Moody et al., 2015." SOC-8 at S126, S179, S201, S219. Plaintiffs do not explain why those citations do not support WPATH's statement, why doctors would be "duped" by those accurate citations, or why Plaintiffs believe doctors would repeat SOC-8's statement as a "script" without evaluating its evidence and making their own patient-specific decisions.

Plaintiffs assert seven claims. Claims I-III allege that WPATH violated Sections 5 and 12 of the FTC Act because WPATH has provided doctors with "guidance, materials, and training containing false, misleading, or unsubstantiated representations" that constitute the "means and instrumentalities for the commission of deceptive acts." Compl. ¶¶ 412-420. Claims IV-VII allege

9

that SOC-8 constitutes "deceptive trade practices" in violation of the Alaska Consumer Protection Act, the Iowa Consumer Fraud Act, the Nebraska Uniform Deceptive Trade Practices Act, and the Texas Deceptive Trade Practices Act. *Id.* ¶¶ 421-453.

Just five days after filing the Texas complaint, on June 22, 2026, the FTC withdrew the CID it had served on WPATH, stating that it "no longer regards compliance with the CID issued to WPATH as necessary to its investigation." ECF 43-1 (D.D.C.).

## ARGUMENT

Plaintiffs' claims should be dismissed for four independent reasons. First, the Fifth Circuit has long held that statements of opinion are not actionable. The statements in SOC-8 are opinions about what conclusions existing scientific research supports. Plaintiffs cannot transform their disagreement with WPATH's opinions into allegations of deception, much less without even considering the scientific research WPATH cites in support of its statements. Second, under our federal system, states regulate guidance provided for the practice of medicine. The FTC does not. The Supreme Court has recently addressed the "medical and scientific uncertainty" regarding transgender healthcare for minors and concluded that it "underscore[s] the need" for *states* to have "legislative flexibility." *Skrmetti*, 605 U.S. at 524–25. The FTC cannot erase that "flexibility" by declaring deceptive certain statements about care that states not only permit but deem necessary. Third, the First Amendment bars the FTC from prohibiting medical organizations from expressing their scientific opinions, even if the FTC regards those opinions as "substandard care." *Chiles*, 146 S. Ct. at 1027. "History is littered with examples of official efforts to manipulate and control professional speech—including 'the content of doctor-patient discourse.'" *Id.* The First Amendment prohibits Plaintiffs' efforts to do so here. Fourth, Iowa, Nebraska, and Texas also lack standing to bring their claims because WPATH's SOC-8 speech cannot cause future injury.

10

### I.      Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, Rule 9(b) requires a plaintiff to allege "what representations were actually made, when those representations were made, who made the representations, and where those representations occurred." *Elson v. Black*, 56 F.4th 1002, 1009–10 (5th Cir 2023). The Fifth Circuit's rule is categorical. Rule 9(b) "applies by its plain language to all averments of fraud, whether they are part of a claim of fraud or not." *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d 363, 368 (5th Cir. 2001). A complaint that gathers general assertions of falsity without tying them to particular deceptive events does not satisfy Rule 9(b). *Cf. FTC v. Lights of Am., Inc.*, 760 F. Supp. 2d 848, 854 (C.D. Cal. 2010).

District courts outside the Fifth Circuit have applied Rule 9(b) directly to FTC Section 5 deception claims. *See Lights of Am., Inc.*, 760 F. Supp. at 853–54; *FTC v. D-Link Systems, Inc.*, No. 3:17-CV-00039-JD, 2017 WL 4150873, at *1–2 (N.D. Cal. Sept. 19, 2017). WPATH acknowledges that district courts have divided on whether Rule 9(b) applies to Section 5 claims. *See FTC v. Cantkier*, 767 F. Supp. 2d 147, 154 (D.D.C. 2011) ("Courts have reached differing views on whether Rule 9(b) applies to claims under Section 5 of the FTC Act."). But even courts skeptical of a categorical rule recognize the force of applying Rule 9(b) where the government levels accusations of dishonesty. As *Cantkier* explained, "where . . . an agency of the federal government, with all of its concomitant force, brings an accusation of implicit dishonesty against an individual, . . . the heightened pleading requirements of Rule 9(b) may serve an important safeguarding function." *Id.* at 155. That reasoning applies with full force where, as here, Plaintiffs level sweeping accusations of a deliberate, years-long deceptive campaign.

While this Circuit has not yet directly decided whether Rule 9(b) applies to FTC Section 5

11

claims, it has characterized the nature of FTC deceptive-advertising claims. *Intuit, Inc. v. FTC*, 170 F.4th 411, 417, 419, 422 (5th Cir. 2026) (such claims "operate[] pursuant to similar principles" as, and "invoke[] recognized terms of art" from, traditional fraud and deceit actions, concluding that "claims of fraud, deceit, and deceptive advertising share a common core."). Although *Intuit* resolved a separation-of-powers question, its reasoning is directly on point: a traditional fraud and deceit action is a claim that sounds in fraud for Rule 9(b) purposes.[1]

In deciding a motion to dismiss, the Supreme Court has instructed that "courts *must* consider . . . documents incorporated into the complaint by reference and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (emphasis added). Such assessment is necessary to prevent "plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). A pleaded "pattern" is the antithesis of the particularity Rule 9(b) commands. Under *Elson*, generalized reliance on a course of conduct, without the who, what, when, and where of specific representations, does not suffice. 56 F.4th at 1009–10.

## II.    The FTC Fails to Identify Any Deceptive Act or False Advertisement

Plaintiffs' complaint fails to set forth the core element of their claims: an actionable omission or representation. *See FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003) (setting forth the elements of a Section 5 claim); *Fed. Trade Comm'n v. Peyroux*, 723 F. Supp. 3d 1209,

---

[1] The absence of a scienter element does not exempt a claim from Rule 9(b). The Fifth Circuit applied Rule 9(b) to state consumer-protection statutes that, like the statutes here, require no proof of fraudulent intent. The gravamen of the pleading controls the analysis: because the plaintiffs' claims "rel[ied] entirely on [the] defendants' allegedly fraudulent conduct," Rule 9(b) governed, and the complaint failed because it did not allege "what representations were actually made, when those representations were made, who made the representations, and where those representations occurred." *Elson*, 56 F.4th at 1009–10.

1240 (N.D. Ga. 2024) (finding that Section 12 claims have similar elements). "[E]xpressions of opinion" are "not actionable" as the basis for fraud or misrepresentation under any of Plaintiffs' claims. *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679, 686 (5th Cir. 1986) (collecting cases). A "challenged statement must make a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Eastman Chemical Co. v. Plastipure, Inc.*, 775 F.3d 230, 235 (5th Circ. 2014).

"Deceptive advertising claims brought under Section 5 require proof that a material representation 'was likely to mislead customers acting reasonably under the circumstances.'" *Intuit*, 170 F.4th at 418. "[T]he FTC must establish that (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003); *Fed. Trade Comm'n v. Peyroux*, 723 F. Supp. 3d 1209, 1240 (N.D. Ga. 2024) (as to Section 12 claims).

In the Fifth Circuit, "expressions of opinion" are "not actionable" as the basis for fraud or misrepresentation under either the DTPA or the FTC Act. *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679, 686 (5th Cir. 1986) (collecting cases). A "challenged statement must make a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Eastman Chemical Co. v. Plastipure, Inc.*, 775 F.3d 230, 235 (5th Circ. 2014). Where a speaker "draws conclusions from non-fraudulent data, based on accurate descriptions of the data and methodology underlying those conclusions, on subjects about which there is legitimate ongoing scientific disagreement, those statements are not grounds for a claim of false advertising[.]" *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 (2d Cir. 2013). Articles in a "peer-reviewed journal," in particular, are "directed to the relevant scientific community," whose "readers are specialists in their fields and are best positioned to

13

identify opinions and choose to accept or reject them on the basis of an independent evaluation of the facts." *Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 248 (3d Cir. 2023) (cleaned up). "[M]ere disputes about the reliability of a scientific study's disclosed methodology," *i.e.*, whether the basis for its statements is "capable of being trusted," "cannot create an actionable falsehood." *Id.* at 247.

In reviewing misrepresentation claims against a medical society for the promulgation of treatment guidelines, the Fifth Circuit has expressly distinguished between "non-actionable medical opinions" and "actionable factual representations." *Torrey*, 86 F.4th at 704. Rooting its favorable reliance on the same authorities to which Defendants cite, the Court held that both "the First Amendment and common sense" counsel that guidelines, which "set forth explanations of medical research, experiments and knowledge based on citations to other published studies and clinical trials," are non-actionable medical opinions, not "naked assertions of fact." *Id.* (citing *Pacira*, 63 F.4th at 249; *ONY*, 720 F.3d at 498). "Just because Plaintiffs disagree with those opinions does not mean that [defendant] is somehow liable because doctors or insurance providers found the opinions persuasive." *Id.* at 706. Merely, "cit[ing] other studies or statements that have reached different conclusions or formed different opinions than those expressed [by the defendant's] Guidelines" is insufficient to render those opinions actionable. *Id.*

The FTC concedes that WPATH does not make "representations" to consumers. It instead alleges that SOC-8 provided doctors the "means and instrumentalities" to engage in deception. Compl. ¶¶ 412-420. "Means and instrumentality" liability attaches to companies that do not deal with the public directly, but instead "put into the hands of others the means by which they may mislead the public." *Waltham Watch Co. v. FTC*, 318 F.2d 28, 32 (7th Cir. 1963). Historically, courts have applied this theory in two scenarios. First, it applies to manufacturers who falsely label

14

products sold by third-party retailers, such as a watchmaker that falsely claimed to be affiliated with a "famous 150-year-old company" that had gone out of business. *Id.* at 31–32; *see FTC v. Winsted Hosiery Co.*, 258 U.S. 483, 490–92 (1922) (false description of "cotton" products as "wool"). Second, courts impose "means and instrumentality liability" on promoters who prepare and disseminate a deceptive "advertising scheme" to others. *See Peyroux*, 723 F. Supp. 3d at 1247 (promoters provided "sample postcard, newspaper, magazine ads; sample patient forms; sample sales agreements; information about stem cell products and how to administer them; and more"); *FTC v. Neora LLC*, No. 3:20-CV-01979-M, 2023 WL 8446166, at *31 (N.D. Tex. Sept. 28, 2023) ("the FTC has identified no deceptive marketing and training materials created or promulgated by Defendants."). No court has ever imposed "means and instrumentality" liability based on an organization's publication of an article in a peer-reviewed scientific journal.

### A.  WPATH's Statements in SOC-8 Are Not Actionable

Plaintiffs purport to identify ten "core deceptive statements" in SOC-8. Compl. ¶¶ 378–408. Those statements do not appear in SOC-8, but instead paraphrase otherwise nuanced and well-cited scientific discussions to reflect Plaintiffs' preferred interpretation of SOC-8.

The statements Plaintiffs paraphrase are not presented in SOC-8 as bare assertions of fact, but rather opinions about what the specific scientific studies cited in SOC-8 support. Such statements are "nonactionable opinions," because it is the "essence of the scientific method that the conclusions of empirical research are tentative and subject to revision." *Pacira*, 63 F.4th at 246 (quoting *ONY*, 720 F.3d at 496); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) ("Scientific conclusions are subject to perpetual revision.").

It is not deceptive to present evidence to professionals who are "specialists in their fields and are best positioned to identify opinions and choose to accept or reject them on the basis of an independent evaluation of the facts." *Pacira*, 63 F.4th at 248 (cleaned up). These medical

15

professionals can understand the nuances of SOC-8's recommendations, read the cited studies, analyze their evidence, and draw their own conclusions. Each of the alleged "core deceptive statements" is a non-actionable opinion, if it appears in SOC-8 at all.

1.    *Pediatric medical transition is medically necessary to prevent suicide*. Compl. ¶¶ 381-387. That supposedly "deceptive statement" does not appear in SOC-8. SOC-8 does not support "pediatric" transition at all, much less deem it "medically necessary." It clearly states that "prepubescent gender diverse children are not eligible to access medical intervention." SOC 8 at S67. Nor does SOC-8 deem transition "medically necessary" for gender diverse adolescents seeking treatment. It rejects a "'one-size-fits-all' approach" and states that transgender patients may need "none of these interventions" depending on their unique circumstances. *Id.* at S7.

The actual statements in SOC-8 that the FTC cites are qualified and have citations. For example, the FTC alleges that SOC-8 asserts that "in many cases, hormone therapy is considered a lifesaving intervention." Compl. ¶ 381 n.148. But that statement in SOC-8 is supported by three citations: "Allen et al., 2019; Grossman & D'Augelli, 2006; Moody et al., 2015." SOC8 at S126, S179, S201, S219. A statement in a scientific journal that cites published studies expresses an opinion that the studies support the claim. *Pacira*, 63 F.4th at 246–48. Here, the citations are not just evidentiary support for SOC-8's statement; they are necessary to even understand the "many cases" to which SOC-8 refers. The FTC never mentions those studies, much less explains why they do not support SOC-8's statement. An expression of scientific opinion that cites the "data taken into account and the methods used" is not deceptive, because the "conclusions may be assessed on their face by other members of the relevant discipline." *ONY*, 720 F.3d at 498.

2.    *Pediatric medical transition is effective at preventing suicide*. Compl. ¶¶ 388–90. Again, the statement that the FTC posits does not appear in SOC-8. The FTC cites SOC-8's

16

statement that "[a]ccess to gender-affirming medical treatment is associated with a substantial reduction in the risk of suicide attempt." *Id.* at S174; Compl. ¶ 388. But that statement (which is not specific to pediatric or even adolescent patients) cites to "Bauer et al., 2015." SOC-8 at S174. The FTC does not address Bauer or even allege that it does not support SOC-8's statement.

3.    *Puberty blockers are fully reversible.* Compl. ¶ 391. SOC-8's description of puberty blockers as "fully reversible" cites to "Ashley, 2019e," SOC-8 at S112, an article in *Clinical Child Psychology and Psychiatry*, *id.* at S181. The FTC neither discusses Ashley nor alleges the article does not support WPATH's statement. Disagreements about Ashley's "reliability" cannot plausibly show deception. *Pacira*, 63 F.4th at 247. Further, SOC-8 communicates caution with respect to the initiation of treatment using puberty blockers, particularly with respect to their use during earlier versus later pubertal stages and warns about the connection between the use of puberty blockers and poor bone health later in life. SOC-8 at S114.

4.    *Cross-sex hormones improve mental health.* Compl. ¶¶ 392–93. SOC-8's statement that "[h]ormone treatment has been shown to improve quality of life and to decrease depression and anxiety" cites five studies as support: "Aldridge et al., 2020; Nguyen et al., 2018; Nobili et al., 2018; Owen-Smith et al., 2018, Rowniak et al., 2019." Its statement that "[h]ormone therapy has been found to positively impact the mental health and quality of life of [transgender/gender diverse] youth" cites six studies: "Aldridge et al., 2020; Allen et al., 2019; Bauer et al., 2015; Nobili et al., 2018; Russell et al., 2018; Ryan, 2009." The FTC does not address any of those studies, much less allege that they do not support SOC-8's statements.

5.    *Mastectomy is safe and effective for children.* Compl. ¶¶ 394–95. This statement does not appear in SOC-8. The statements the FTC cites are from Chapter 13, which concerns "Surgery and Postoperative Care" generally and primarily focuses on adults. SOC-8 at S128. The

17

paragraph that describes mastectomy as "safe and effective" *for adults* references seventeen studies, including "prospective," "retrospective," and "cross-sectional" studies. *Id.* The FTC does not address these studies and does not allege that they fail to support WPATH's statements. Moreover, the introduction to Chapter 13 specifies that the current literature supports the benefits of surgery only for "appropriately selected [transgender] individuals" and acknowledges that complications can occur at rates consistent with similar procedures performed for non-gender related reasons. SOC-8 at S128. Section 13.7, in turn, highlights the need for a multidisciplinary approach to adolescents that includes "mental health" professionals. SOC-8 at S133. SOC-8's chapter on adolescents, Chapter 6, mentions "mastectomy" only once, when it explains that "certain European countries" do not permit "'masculinizing' mastectomy" on patients younger than sixteen. *Id.* at S43. SOC-8 separately states, in Appendix D, that adolescents should not have *any* surgery unless, among other criteria, (1) they demonstrate the "emotional and cognitive maturity required to provide informed consent" and (2) any "[m]ental health concerns" have been addressed. *Id.* at S257. While Plaintiffs may "take issue" with this guidance, it is nonetheless "medical opinion" and thus "non-actionable." *Torrey*, 86 F.4th at 706.

6.      *SOC-8 is the result of unbiased, evidence-based expert consensus*. Compl. ¶¶ 396–402. The FTC faults SOC-8 because its methodology section states that its guidance is "not only based on the published literature," but also "consensus-based expert opinion." SOC-8 at S247. But SOC-8 discloses the identity of all authors and their affiliations, *id.* at S1, allowing readers to assess whether they are "experts." SOC-8's methodology section devotes five pages to describing how the authors developed their "consensus" opinions. *Id.* at S247-S251. Even if the FTC disagrees that SOC-8's authors are experts or that its methodology culminated in consensus-based opinions, such statements are "expressions of opinion" and "not actionable." *Presidio*, 784 F.2d at

679; *Pacira*, 63 F.4th at 247 ("[M]ere disputes about the reliability of a scientific study's disclosed methodology cannot create an actionable falsehood[.]"). Whether a doctor is an expert or a statement reflects a group's consensus cannot be shown "true or false" by "empirical verification." *Presidio*, 784 F.2d at 679. Even if such verification were possible, it would be established by the fact that more than 110 doctors, affiliated with institutions such as Columbia University, the Mayo Clinic, the University of Houston, Children's National Hospital, University of Texas Southwestern Medical Center, and Harvard Medical School all signed on as SOC-8 authors. SOC-8 at S1-S3.

The FTC alleges that WPATH departed from one part of its methodology, the "Delphi process," when removing age-based minimums from a draft of SOC-8 in response to a request from the American Academy of Pediatrics. Compl. ¶ 400; *id.* ¶ 114. But that is consistent with SOC-8's own description of its methodology, under which the "Delphi process" occurred *before* the "public comment period" and *before* "Revision of Final Draft based on comments." SOC-8 at S247. SOC-8 thus explicitly acknowledges that it included changes due to public comments after the Delphi process. *Id.* Regardless, acceptance of recommendations from the American Academy of Pediatrics—an organization families across the country trust for its expertise—does not render it deceptive to describe SOC-8 as "consensus-based expert opinion."

The FTC alleges that SOC-8's authors have "conflicts of interests." Compl. ¶ 398. But the only conflict it purports to identify is that SOC-8's authors support and receive compensation for providing transgender healthcare. *Id.* ¶¶ 78-79. That is absurd, and dangerous. The FTC's understanding of conflicts of interest would require standards of care to be drafted by doctors who do not actually provide the care in question (or who do so only for free). No medical association adopts that approach. Cardiologists draft standards of care for cardiology, *see* AM. COLL. OF CARDIOLOGY, *Clinical Practice Guidelines*, J. AM. COLL. OF CARDIOLOGY

https://www.jacc.org/guidelines, obstetricians for obstetrics, *see* AM. COLL. OF OBSTETRICIANS & GYNECOLOGISTS, *Guidelines for Perinatal Care* (2017), and so forth. Indeed, although the FTC purports to rely on guidance from the National Academy of Medicine ("NAM"), Compl. ¶ 68, its allegations would create an internal conflict in NAM's guidance. NAM instructs that medical guidelines must be "developed by a knowledgeable, multidisciplinary panel of experts." INST. OF MED. (US), CLINICAL PRACTICE GUIDELINES WE CAN TRUST 5 (2011, Robin Graham et al. eds.). No specialty could assemble a "panel of experts" if any doctor practicing that specialty was disqualified for purported "conflicts of interest." Moreover, SOC-8 discloses the very affiliations the FTC alleges are conflicts of interest, eliminating any possibility that readers will be deceived. For example, the FTC alleges that Dr. Eli Coleman has a conflict of interest as "director of the University of Minnesota's Institute for Sexual and Gender Health," Compl. ¶ 80, but SOC-8's cover page explicitly identifies Dr. Coleman as affiliated with the "Institute for Sexual and Gender Health" at the "University of Minnesota Medical School." SOC-8 at S1.

7.      *Pediatric medical transition is the "standard of care."* Compl. ¶¶ 403–05. The use of the term "pediatric medical transition" is a misnomer because medical transition is never recommended for children; medical transition may be considered for individuals once they reach adolescence. The FTC alleges that the evidence is not sufficiently strong to justify SOC-8's recommendations. *Id.* But SOC-8 indisputably identifies its evidence—over 1,500 studies. SOC-8 at S178-S246. Doctors can review those citations for themselves and decide whether they support SOC-8's recommendations or establish a "standard of care." *Pacira*, 63 F.4th at 248. And even if the FTC disagrees, statements about whether scientific studies support a statement are "opinions" that are "not actionable." *Presidio*, 784 F.2d at 679; *Torrey*, 86 F.4th at 706.

8.      *SOC-8 does not disclose the side effects of puberty blockers*. Compl. ¶ 406. The

20

FTC alleges that SOC-8 does not disclose the risk of unspecified "cognitive issues" and "hot flashes" associated with "puberty blockers." *Id.* But that allegation is simply wrong. SOC-8 specifically discloses that the "potential neurodevelopmental impact of extended pubertal suppression in gender diverse youth has been specifically identified as an area in need of continued study" and refers doctors to "Chen et al., 2020" for further discussion. SOC-8 at S65. It also discloses "hot flushes" as a potential consequence of puberty blockers (*i.e.*, GnRH agonists) when discussing "Langley et al., 2021." *Id.* at S91. Additionally, SOC-8 explicitly addresses the harms of a prolonged hypogonadal state, *see* SOC-8 at S114, and recommends maintaining a multidisciplinary team and an ongoing clinical relationship with the adolescent patient and family when initiating GnRH treatment, *see* SOC-8 at S48.

9.     *SOC-8 does not disclose the side effects of "cross-sex hormones."* Compl. ¶ 407. The FTC alleges that SOC-8 does not "adequately disclose" side effects of "cross-sex hormones." *Id.* But Appendix C contains an extensive disclosure of the "physical changes" and "risks" associated with testosterone-based and estrogen-based hormone therapy. SOC-8 at S254. While the FTC alleges that SOC-8 does not disclose "mood disturbances, vocal pain, pelvic pain, pelvic floor dysfunction, clitoral discomfort, [and] vaginal pain" as potential side effects of testosterone-based therapy, Compl. ¶ 407, SOC-8 in fact discloses "Clitoral enlargement," "Vaginal atrophy," "Deepening of voice," and "Infertility" among a list of other expected effects or risks of testosterone, SOC-8 at S254. While the FTC alleges that SOC-8 fails to disclose "persistent sexual dysfunction" and "erectile pain" as side effects of estrogen-based hormone therapy, Compl. ¶ 407, SOC-8 in fact discloses "Infertility," "Erectile Dysfunction," and many other conditions as risks of estrogen, SOC-8 at S254. Appendix C to SOC-8 also refers doctors to the "Endocrine Society Guidelines" and "Hembree et al., 2017," an article from the *Journal of Clinical Endocrinology &*

*Metabolism*. *Id.* at S204, S254.

10.    *SOC-8 does not disclose the side effects of mastectomy*. Compl. ¶ 408. The FTC alleges that SOC-8 fails to disclose that mastectomy may cause "effects on non-erogenous sensation, inability to breastfeed, nerve damage, and necrosis of the nipples." *Id.* But SOC-8 cites articles that discuss these side effects (and others). SOC-8 at S128. For example, SOC-8 cites "Wolter et al., 2018," *id.*, which discloses a "risk for total or partial nipple graft necrosis," *see* Andreas Wolter et al., *Subcutaneous mastectomy in female-to-male transsexuals: Optimizing perioperative and operative management in 8 years clinical experience*, 71 J. OF PLASTIC RECONSTRUCTIVE AESTHETIC & SURGERY 344 (2018). The FTC's allegation boils down to an assertion that doctors will not read SOC-8's citations (as the FTC apparently did not).

Doctors bear ultimately responsibility to disclose and discuss side effects, which are highly individualized based on treatment and patient. *See* SOC-8 at S123 ("Each testosterone-lowering medication has a different side-effect profile."); *id.* at S144 ("all PCPs should be familiar with the medications, suggested monitoring, and potential side effects associated with" hormone therapy); *id.* at S61 ("reversible and irreversible effects of the treatment, as well as fertility preservation options (when applicable), and all potential risks and benefits of the intervention . . . are required when obtaining informed consent/assent.").

In sum, each statement or omission the FTC challenges is a conclusion that SOC-8 draws from "non-fraudulent data, based on accurate descriptions of the data and methodology underlying those conclusions, on subjects about which there is legitimate ongoing scientific disagreement." *ONY*, 720 F.3d at 498. The FTC does not claim that SOC-8's citations are "fraudulent." Its "allegations boil down to disagreements about the reliability of the methodology and data underlying the statements." *Pacira*, 63 F.4th at 247. Such disagreements cannot be reduced to a

"measurable claim," and are not actionable. *Eastman*, 775 F.3d at 235.

### B.  SOC-8 Is Not a "Means and Instrumentality" for Fraud

Even if the FTC could establish that SOC-8 contained a "deceptive" statement, dismissal would still be required because SOC-8 is not a "means by which [doctors] may mislead the public." *Waltham Watch Co.*, 318 F.2d at 32. SOC-8 is not a product that WPATH has falsely labeled. Nor does it provide doctors with "deceptive marketing and training materials." *Neora*, 2023 WL 8446166, at *31. SOC-8 is not a "script." Compl. ¶ 317. Far from it. SOC-8 emphasizes that an "individualized approach to clinical care is considered both ethical and necessary." SOC-8 at S45. Its "guidelines" are "flexible" and must be "modif[ied]" by doctors to fit a patient's "unique anatomic, social, or psychological situation." *Id.* at S256. SOC-8 does not tell doctors what to say, much less how to mislead. It tells them to tailor any recommendations to individual patients, some of whom will require "none of these interventions." *Id.* at S7.

To hold that publication of "flexible" scientific "guidelines" provides the "means" to "mislead the public" would give the FTC limitless power to police speech. Any scientific or scholarly publication can be misquoted to deceive consumers in connection with some transaction. It cannot be the case that the FTC can sue any author based on the prospect that third parties may misread or misuse their publications. The Fifth Circuit has allowed lawsuits over academic papers only where the defendants, not third parties, "transform[ed] snippets" into misleading "commercial advertisements" or "promotional materials." *Eastman*, 775 F.3d at 237; *see also Neora*, 2023 WL 8446166, at *31. The FTC never alleges that WPATH transformed SOC-8 into "commercial advertisements" or "promotional materials" aimed at consumers. That is fatal to its "means and instrumentalities" claims.

### C.  The FTC Cannot Attribute Non-SOC-8 Statements to WPATH

The sixteen declarations the FTC attaches to its Complaint confirm that WPATH does not

23

make statements directly to patients. Those sixteen declarations represent a vanishingly small proportion of the tens of thousands of adolescents who identify as transgender. Compl. ¶ 67 ("42,000 in 2021"); SOC-8 at S25-S26 (1.2%-2.7% of adolescents identify as transgender); *see also* YOUTH.GOV, FEDERAL DATA https://youth.gov/youth-topics/adolescent-health/federal-data (42 million adolescents in the U.S.). Seven of the FTC's declarations—almost half—do not mention WPATH at all. ECF 1-4, 1-8, 1-9, 1-13 to 1-16. Another declaration, from Soren Aldaco, states that she learned from an unidentified person at a "support group" that "WPATH said medical transition was the only way to go for kids like me." ECF 1-1 ¶ 16; *see also* ECF 1-11 ¶ 7 (unidentified "social worker" cited WPATH as "standard of care"). But that unidentified person, who is not even alleged to have been a healthcare professional, was simply wrong. SOC-8 explicitly states that an "individualized approach to clinical care is considered both ethical and necessary" for adolescents. SOC-8 at S45. WPATH cannot be accused of deception based on an unidentified third party's hearsay-repeated misinterpretation of its guidance.

The remaining declarants state that their doctors or other healthcare professionals informed them that "WPATH recommended" certain care. ECF 1-2 ¶ 18 ("Dr. Kuper"); ECF 1-3 ¶ 6 ("Dr. Roberts"); ECF 1-5 ¶ 19 ("Dr. Hoe"); ECF 1-6 ¶ 35 ("Dr. Olson-Kennedy and Landon"); ECF 1-7 ¶ 22 (counselor named "Sara E. Wiener"); ECF 1-10 ¶ 20 ("Dr. Berg"); ECF 1-12 ¶ 24 ("Washington University Transgender Center" "derived" treatment criteria from SOC-8). Those declarations only confirm that patients receive medical advice from doctors and other professionals, not WPATH. Doctors' statements cannot be imputed to WPATH, because doctors bear independent responsibility for their own advice. WPATH recommends an "individualized" approach suited to each patient's "unique needs." SOC-8 at S45, S50, S53, S55, S56, S58, S64, S66; *see also id.* at S68, S71, S72, S74, S77. No declarant states that WPATH advised on, much

24

less endorsed, their course of treatment. For example, one declarant states that her doctor "never asked" about her "past trauma of sexual abuse." ECF 1-6 ¶ 13; *see also* ECF 1-10 ¶¶ 10–11 (declarant had "several psychiatric hospitalizations" and diagnoses before encountering "idea of 'being transgender'"). But that contradicts SOC-8's guidance, which states "it is critical to differentiate gender incongruence from specific mental health presentations," including past "trauma." SOC-8 at S63. WPATH cannot be sued for statements it never made, much less when those statements contradict its guidance.

The declarations also suffer from a host of other flaws that prevent them from supporting the FTC's claims. Most describe care that occurred more than five years ago, with some as far back as 2012. ECF 1-10; ECF 1-1; ECF 1-2; ECF 1-5; ECF 1-6; ECF 1-7; ECF 1-8; ECF 1-13; ECF 1-14; ECF 1-15; ECF 1-16. Of the three declarations that describe statements in 2024 (the most recent), two come from parents who did not allow their children to transition (and thus cannot have been deceived). ECF 1-9; ECF 1-11. The FTC cannot plausibly allege that WPATH is "violating" or "about to violate" Section 5, 15 U.S.C. § 53(b), when it has not identified a single allegedly "deceptive" statement by *doctors*, much less WPATH, in the past two years, *see FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156 (3d Cir. 2019) ("Section 13(b) does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant 'is' committing or 'is about to' commit another violation."); *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985) ("Congress only contemplated ongoing or future violations.").

### III.   The FTC's Claims Violate Basic Principles of Federalism

The FTC's claims also infringe upon states' police powers by interfering with their ability to regulate the practice of medicine within their borders. The Tenth Amendment reserves to states all "powers not delegated to the United States." U.S. Const. amend. X. "Throughout our history the several States have exercised their police powers to protect the health and safety of their

citizens." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996); *Barsky v. Bd. of Regents*, 347 U.S. 442, 449 (1954) ("It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there. It is a vital part of a state's police power."). Since at least 1889, the Supreme Court has recognized that states' police powers include the power to regulate the practice of medicine. *Dent*, 129 U.S. at 122 ("The power of the state to provide for the general welfare of its people authorizes it to prescribe ... [t]he nature and extent of qualifications required" to practice medicine within its borders); *Watson v. Maryland*, 218 U.S. 173, 176 (1910) ("There is perhaps no profession more properly open to such regulation [under State police power] than that which embraces the practitioners of medicine."). Indeed, "the regulation of health and safety matters is primarily, and historically, a matter of local concern," *Hillsborough Cnty., Fla. v. Auto. Med. Labs., Inc.*, 471 U.S. 707, 715 (1985), and licensing and regulation is a state function. *Barsky*, 347 U.S. at 451.

Congress has reinforced this constitutional allocation through explicit statutory text in the healthcare context most analogous here. The Medicare statute provides, in a provision entitled "Prohibition against any Federal interference," that "[n]othing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395. Courts have recognized that this provision reflects Congress's clear intent "to minimize federal intrusion" into state healthcare regulation. *Mass. Med. Soc'y v. Dukakis*, 815 F.2d 790, 791 (1st Cir. 1987). Section 1395 is powerful evidence of the background constitutional principle animating this entire area of the law: that Congress does not lightly—and does not silently through an enforcement statute like Section 5—authorize federal displacement of state authority over medical practice. The FTC's authority to police "deceptive" trade practices in the marketplace generally

26

cannot be stretched, absent any clear statement from Congress, into an assertion of jurisdiction over what qualifies as an accepted clinical standard of care in the practice of medicine—a subject Congress has never suggested the FTC has any special competence or mandate to adjudicate.

States have divided on how to regulate transgender healthcare, particularly for minors. Some states fund transgender healthcare for minors and require insurers to do so, while others prohibit or restrict it. Ten states deem transgender healthcare "medically necessary" and cover it through their State Medicaid programs.[2] Fourteen states prohibit insurance companies from withholding coverage based on a patient's gender identity or diagnosis of gender dysphoria.[3] Twenty-seven other states, including Texas, Iowa, and Nebraska, have enacted laws that prohibit

---

[2] *See, e.g.*, Cal. Welf. & Inst. Code § 14197.09; Cal. Dept. of Health Care Services, *Medically Necessary Gender-Affirming Care Services Covered for Medi-Cal Members* (May 7, 2025), https://mcweb.apps.prd.cammis.medi-cal.ca.gov/news/33457; Ill. Admin. Code tit. 89, §§ 140.413(a)(16), 140.440(h); Md. Code Ann., Health-Gen. § 15-151; MassHealth, *Gender-Affirming Care Covered by MassHealth*, https://perma.cc/YC87-7ZPH (last visited July 28, 2026); Mich. Dep't of Health & Human Servs., *Med. Servs. Admin. Bull. No. 19-06: Compliance with Federal Nondiscrimination Provisions* (Mar. 1, 2019), https://perma.cc/38YL-FWUQ; Mich. Dep't of Health & Human Servs., *Med. Servs. Admin. Bull. No. 21-28: Coverage of Gender Affirmation Services* (Sept. 30, 2021), https://perma.cc/96GE-9GFZ; Minn. Stat. § 256B.0625, subd. 3a; Nev. Medicaid Servs. Manual § 608 (Nov. 1, 2023), https://perma.cc/B634-8HLU; N.Y. Comp. Codes R. & Regs. tit. 18, § 505.2(*l*); R.I. Gender Dysphoria/Gender Nonconformity Coverage Guidelines (Oct. 28, 2015), https://perma.cc/E9DH-KYV4; Vt. Stat. Ann. tit. 8, § 4071.

[3] *See, e.g.*, Cal. Code Regs. tit. 10, § 2561.2(a); 3 Colo. Code Regs. § 702-4:4-2-42(5)(A)(1)(o); Del. Code Ann. tit. 18, § 2304; 215 Ill. Comp. Stat. Ann. 5/356z.60(b); Ill. Admin. Code tit. 50, § 2603.35; Me. Rev. Stat. Ann. tit. 22, § 3174-MMM; Md. Code Ann., Ins. § 15-1A-22; Mass. Gen. Laws Ann. ch. 272, §§ 92A, 98; Mass. Div. of Ins., *Bulletin No. 2021-11: Prohibited Discrimination on the Basis of Gender Identity or Gender Dysphoria Including Medically Necessary Gender Affirming Care and Related Services* (Sept. 9, 2021), https://www.mass.gov/lists/doi-bulletins; Mass. Div. of Ins., *Bulletin No. 2014-03: Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Gender Dysphoria Including Medically Necessary Transgender Surgery and Related Health Care Services* (June 20, 2014), https://www.mass.gov/lists/doi-bulletins; Minn. Stat. § 62Q.585; N.J. Stat. Ann. § 17:48-6oo; N.Y. Comp. Codes R. & Regs. tit. 11, § 52.75; Or. Admin. R. 836-053-0441; R.I. Off. of the Health Ins. Comm'r, *Bulletin No. 2015-3: Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Expression* (Nov. 23, 2015), https://perma.cc/MB57-YNBZ; Vt. Stat. Ann. tit. 8, §§ 4071, 4724.

27

physicians from offering transgender healthcare to minors or limit their ability to do so. Compl. ¶ 360 (Iowa Code § 147.164 "prohibits pediatric medical transition related procedures for children"); *id.* ¶ 363 (Neb. Rev. Stat. § 71-7301 *et seq.* "protect children under the age of nineteen from pediatric medical transition"); *id.* ¶ 376 (Tex. Health & Safety Code Ann. § 161.702 *et seq*. "prohibits physicians and healthcare providers from providing medical transition treatment to minors"); *see also* KFF, *Policy Tracker: Youth Access to Gender Affirming Care and State Policy Restrictions* (Last updated May 19, 2026) https://www.kff.org/lgbtq/gender-affirming-care-policy-tracker/ (describing restrictive laws in other states). Alaska has neither enacted a law prohibiting transgender healthcare for minors nor adopted a position that such care is categorically medically necessary. Thus, even among the Plaintiff States in this action, variation exists among views on transgender healthcare for youth.

Such policy disagreements are federalism in action. The Supreme Court has "'long recognized the role of the States as laboratories for devising solutions to difficult legal problems.'" *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015); *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). "Deference to state lawmaking allows local policies more sensitive to the diverse needs of a heterogeneous society, permits innovation and experimentation, enables greater citizen involvement in democratic processes, and makes government more responsive by putting the States in competition for a mobile citizenry." *Ariz. State Legislature*, 576 U.S. at 817 (cleaned up). The Supreme Court has recently recognized the need for such deference and "legislative flexibility" in the context of transgender healthcare for minors, citing "open questions regarding basic factual issues before medical authorities and other regulatory bodies." *Skrmetti*, 605 U.S. at 524.

The FTC's claims would interfere with states' regulation of the practice of medicine within

their own borders. For example, the FTC alleges that it is "deceptive" for WPATH to state that "medical transition is 'medically necessary.'" Compl. ¶¶ 384–87 (citing SOC-8 at S18). Many states not only agree with that statement but have enacted it into law. Maryland, for example, has codified its "intent" that its Medicaid program "provide gender-affirming treatment to all Program recipients for whom gender-affirming treatment is medically necessary." Md. Code Ann., Health-Gen. § 15-151(b). Such care "shall be assessed according to . . . current clinical standards of care." *Id.* § 15-151(c)(2). And the statutory definition of "gender-affirming treatment" specifically references "the current clinical standards of care for gender-affirming treatment published by" WPATH. *Id.* § 15-151(a)(2)(iii); *see also supra* nn. 2-3; Compl. ¶ 271 ("[M]any U.S. public and private health insurers and regulatory bodies rely on SOC-8 when making coverage determinations."). The FTC's claims would thus brand as deceptive the same "clinical standards" that Maryland's legislature has endorsed, frustrating Maryland's requirement that care "shall be assessed" in accordance with those standards.

The Constitution does not permit that result. Section 5 actions are not a backdoor through which the FTC can seek to preempt states' ability to exercise their historical power to regulate the practice of medicine. *FTC v. National Casualty Co.* makes that clear. 357 U.S. 560, 561–63 (1958). In that case, the Supreme Court set aside a cease-and-desist order the FTC had issued under Section 5 barring purportedly "deceptive" insurance practices, because Congress provided that federal law should not be construed to affect "any law enacted by any State for the purpose of regulating the business of insurance." *Id.* That same rationale applies equally here, because Congress has forbidden "any Federal officer," including the FTC, from "any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395. Prohibiting certain statements by medical associations and doctors unquestionably supervises the

29

"manner in which medical services are provided."

Moreover, states equally prohibit "deceptive" statements to consumers. *See, e.g.*, Md. Code Ann. Com. Law § 14-2902. The discrepancy between the FTC's claims and some states' laws reflects a *policy* disagreement over what statements are deceptive. Section 1395 explicitly disapproves of any effort by the FTC to "exercise supervision" over state judgments about the practice of medicine. And the Supreme Court has reiterated the need to "afford States 'wide discretion to pass legislation in areas where there is medical and scientific uncertainty.'" *Skrmetti*, 605 U.S. at 524 (quoting *Gonzales* v. *Carhart*, 550 U. S. 124, 163 (2007)); *see also id.* at 540 (same) (Thomas, J., concurring). "[T]he fact the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." *Id.* (quoting *Railroad Retirement Bd.* v. *Fritz*, 449 U. S. 166, 179 (1980)). "[S]econd-guessing legislative choices in this area should set off alarm bells." *Id.* at 552 (Barrett, J., concurring).

The FTC's claims would serve no purpose other than to override the policy decisions of states that have come to a different conclusion than the FTC on transgender healthcare. In states that have prohibited transgender healthcare for minors, like Texas, Iowa, and Nebraska, the FTC has no ongoing "deception" to enjoin under 15 U.S.C. § 53(b). *See Shire ViroPharma*, 917 F.3d at 156. And the FTC cannot seek any "monetary relief" for past violations. *See AMG Cap. Mgmt. LLC v. FTC*, 593 U.S. 67, 70 (2021). The FTC's claims thus, as a practical matter, have effects only in states that have decided to continue to permit transgender healthcare for youth (and to require insurers to cover it). That is a classic exercise of the police powers reserved by the Tenth Amendment, with which the FTC cannot interfere.

## IV.    Plaintiffs' Claims Constitute Viewpoint-Based Restrictions in Violation of WPATH's First Amendment Rights

Plaintiffs' claims constitute improper viewpoint-based restrictions on WPATH's First

Amendment right to free speech. The FTC's claims are aimed at preventing WPATH from publishing materials developed through a collaborative process with clinicians and providers regarding transgender healthcare for adolescents. That transgender healthcare is an area of intense medical debate does not entitle Plaintiffs to prevent individuals and organizations like WPATH from speech aimed at contributing to that debate. To the contrary, participation in such a debate is exactly the type of speech the First Amendment is intended to protect. The Court should dismiss Plaintiffs' claims on First Amendment grounds for the reasons described below.

"Although dismissal under Rule 12(b)(6) is ordinarily determined by whether the facts alleged in the complaint, if true, give rise to a cause of action, a claim may also be dismissed if a successful affirmative defense appears clearly on the face of the pleadings." *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986); *accord Cochran v. Astrue*, No. 3:11-CV-1257-D, 2011 WL 5604024, at *1 (N.D. Tex., Nov. 17, 2011). Because the FTC pleads facts that establish WPATH's affirmative defense under the First Amendment, this Court should dismiss.

"The First Amendment prohibits government from 'abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.'" *Am. For Prosperity Found. v. Bonta*, 594 U.S. 595, 605–06 (2021). The Supreme Court recently explained that "professional speech" receives no less First Amendment protection than other speech:

> The Constitution does not protect the right of some to speak freely; it protects the right of all. It safeguards not only popular ideas; it secures, even and especially, the right to voice dissenting views. Consistent with these principles, our precedents have expressly rejected the . . . notion that "professional speech" represents some "separate category of speech" subject to "diminished constitutional protection." History is littered with examples of official efforts to manipulate and control professional speech—including "the content of doctor-patient discourse"— in ways designed "to increase state power," "suppress minorities," and muzzle "unpopular ideas." And the "dangers associated with" censorship, we have recognized, are no less acute "in the fields of medicine and public health" than they

31

are anywhere else.

*Chiles*, 146 S. Ct. at 1024-25 (2026) (internal citations omitted). WPATH, as a professional organization that makes public statements regarding suggested guidelines and standards for patient care, is entitled to the same First Amendment protections as individuals.

Courts "appl[y] the 'most exacting scrutiny'" when "assessing content-based restrictions on protected speech[.]" *United States v. Alvarez*, 567 U.S. 709, 724 (2012) (citations omitted). Plaintiffs' claims here are subjected to this "most exacting scrutiny" because their claims constitute viewpoint-based restriction on WPATH's speech.

Plaintiffs' Complaint seeks to restrict WPATH's exercise of its First Amendment right to free speech by attempting to prevent and punish WPATH for making statements regarding its guidelines and recommendations for provision of transgender healthcare to adolescents, including primarily WPATH's statements in SOC-8. *See, e.g.*, Compl. ¶¶ 7, 9, 15, 84, 250, 308, 311. The FTC has previously conceded that WPATH "engages in some protected First Amendment conduct." *WPATH*, 2026 WL 1257321, at \*3.[4] Importantly, Plaintiffs acknowledge that "[t]he procedures [for transgender healthcare] are the subject of significant medical debate as to their appropriateness and effectiveness . . . ." Compl. ¶ 131. The Supreme Court has also acknowledged that this is a topic of intense public debate. *Chiles*, 146 S. Ct. at 1029 ("We do not doubt that the question 'how best to help minors' struggling with issues of gender identity or sexual orientation is presently a subject of 'fierce public debate.'") (quoting *Tingley* v. *Ferguson*, 144 S. Ct. 33 (2023) (Thomas, J., dissenting from denial of certiorari)). And, Plaintiffs also acknowledge,

---

[4] Notably, the D.C. District Court also found "evidence of animus [by FTC] towards WPATH," which included a "'pattern of litigation and information demands,' along with articulated hostility towards proponents of gender-affirming care." *Id.* at 7. The court there also found that the FTC "attempted demonstration of a legitimate purpose" for its investigation of WPATH "fell flat" and that it had "failed to offer a logical justification connecting WPATH to commercial representations and the supposed violators." *Id.* at 8.

"'[t]here is currently no international consensus about best practices for the care of children and adolescents with gender dysphoria.'" Compl. ¶ 131.

WPATH engages in this "significant medical debate" by publishing academic and clinical guidelines for healthcare providers for the provision of transgender healthcare. Plaintiffs acknowledge that there are parties on both sides of this medical debate. WPATH is on one side of that debate and provides guidelines on how to best provide transgender healthcare. Others, such as Dr. Hilary Cass, Compl. ¶¶ 145–59, fall on the other side of the debate and disagree with how to, or if one should, provide transgender healthcare to adolescents. Plaintiffs are government entities that agree with those in the latter category, and Plaintiffs are now improperly attempting to insert themselves into the middle of this medical debate and silence those with whom they disagree. Plaintiffs' claims are attempted "viewpoint restrictions" and thus "represent 'an egregious form of content discrimination' where First Amendment concerns are at their most 'blatant.'" *Chiles*, 146 S. Ct. at 1024 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

Plaintiffs' likely response is that their claims do not violate WPATH's First Amendment rights because Plaintiffs have alleged that "WPATH has made false, misleading, or unsubstantiated statements" in SOC-8 regarding medical consensus and medical necessity, as well as the safety and efficacy of medical transition. Compl. ¶ 17. But "for purposes of the First Amendment," "statements about contested and contestable scientific hypotheses" are treated as "matters of opinion, and [were] so understood by the relevant scientific communities." *Torrey*, 86 F.4th at 706 (quoting *ONY*, 720 F.3d at 498). They are thus "non-actionable." *Id.* "To conclude otherwise would risk 'chilling' the natural development of scientific research and discourse." *Pacira*, 63 F.4th at 248. The First Amendment prohibits Plaintiffs from attempting to enjoin one side of a "fierce public debate" as deceptive, even if Plaintiffs view such an injunction as "essential to public health

33

and safety." *Chiles*, 146 S. Ct. at 1029. Indeed, the Supreme Court recently explained in *Chiles* the importance of the government not intruding into the realm of speech related to medical treatment for persons experiencing "issues of gender identity or sexual orientation[.]" *Chiles*, 146 S. Ct. at 1029. There, the Court struck down a law prohibiting a therapist from providing talk-based conversion therapy. *Id.* at 1020. The Court explained:

> [Colorado's law] censors speech based on viewpoint. Colorado may regard its policy as essential to public health and safety. Certainly, censorious governments throughout history have believed the same. But the First Amendment stands as a shield against any effort to enforce orthodoxy in thought or speech in this country. It reflects instead a judgment that every American possesses an inalienable right to think and speak freely, and a faith in the free marketplace of ideas as the best means for discovering truth. However well-intentioned, any law that suppresses speech based on viewpoint represents an "egregious" assault on both of those commitments. *Rosenberger*, 515 U. S., at 829, 115 S. Ct. 2510, 132 L. Ed. 2d 700.

*Chiles*, 146 S. Ct. at 1029. So too here. Plaintiffs' claims seek to silence the side of the medical debate regarding transgender healthcare that Plaintiffs regard as improper. Plaintiffs, through their claims, are attempting to bully WPATH into agreeing with Plaintiffs' viewpoints on this highly debated issue. This is precisely what the First Amendment protects against.

Another passage from *Chiles* further demonstrates why this Court must prevent Plaintiffs' attempt to silence the side of the medical debate with which Plaintiffs disagree. There, the Court acknowledged that Colorado regarded conversion therapy as "substandard care," but rejected the proposition that Colorado could bar speech that advocated for that "substandard care." *Chiles*, 146 S. Ct. at 1029. The Court reasoned:

> Today, tomorrow, and forever, too, any professional speech that deviates from "current beliefs about the safety and efficacy of various medical treatments" could be silenced with relative ease. . . . So what if that kind of reflexive deference to currently prevailing professional views may not always end well?

> Fortunately, that is not the world the First Amendment envisions for us. Licensed professionals "have a host of good-faith disagreements" about the "prudence" and "ethics" of various practices in their fields. Medical consensus, too, is not static; it

34

evolves and always has. A prevailing standard of care may reflect what most practitioners believe today, but it cannot mark the outer boundary of what they may say tomorrow. Far from a test of professional consensus, the First Amendment rests instead on a simple truth: "[T]he people lose" whenever the government transforms prevailing opinion into enforced conformity.

*Id.* (internal citations omitted).

If Plaintiffs are permitted to silence WPATH's free speech because they disagree with the care that WPATH recommends, "[t]he people lose." *Id.* WPATH is contributing to the public medical debate regarding transgender healthcare. If Plaintiffs disagree with WPATH, the "remedy to be applied is more speech," not enforced silence. *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring), *overruled on other grounds by Brandenburg v. Ohio*, 395 U.S. 444 (1969). The federal government has already engaged in such speech. As Plaintiffs allege, in "November 2025, the U.S. Department of Health and Human Services published a 400-page report titled 'Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices' ('The HHS Report'), which assessed the evidence base for the medical interventions on children that WPATH recommends and concluded that it is exceptionally weak." Compl. ¶ 25. The federal government has thus already alerted doctors and the public to what it views as the problems with WPATH's speech. That is the exact remedy the First Amendment envisions: "the free marketplace of ideas as the best means for discovering truth." *Chiles*, 146 S. Ct. at 1029. Any injunction that "suppresses speech based on viewpoint represents an 'egregious' assault" on First Amendment principles. *Id.* This Court should dismiss each of Plaintiffs' claims because they each violate WPATH's constitutional First Amendment right.

The D.C. District Court has already reached this conclusion. It reviewed the FTC's effort to investigate the same statements from SOC-8, based on much of the same evidence, and concluded that "WPATH has shown it is likely to succeed on its First Amendment retaliation claim against the FTC." *WPATH*, 2026 WL 1257321, at *1. The D.C. District Court found that the FTC

35

had "articulated hostility towards proponents of gender-affirming care," and that the FTC lacked a "legitimate purpose" to even investigate WPATH because "concerns about verifying WPATH's public statements can be addressed by consulting the lengthy bibliography accompanying its Standards of Care." *Id.* at \*3–4. But the FTC never consulted that bibliography. Instead, it filed suit in this Court six weeks later seeking to enjoin WPATH from speaking without even considering, much less rebutting, SOC-8's scientific support. Such censorship, by a government agency that has expressed hostility towards a viewpoint, is exactly what the First Amendment prohibits. *Chiles*, 146 S. Ct. at 1029.

## V.      The States' Claims Must Be Dismissed for Lack of Jurisdiction

### A.      Iowa, Nebraska, and Texas Lack Standing

The claims brought by Plaintiffs Iowa, Nebraska, and Texas should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of Article III standing. *See Cobb v. Cent. States*, 461 F.3d 632, 635 (5th Cir. 2006).

Plaintiffs allege that WPATH's representations "have caused substantial consumer injury... to children experiencing dissatisfaction with or distress about their sex traits," and that WPATH "has injured these children's parents who paid for" transgender healthcare. Compl. ¶¶ 6, 316. Yet Iowa, Nebraska, and Texas each concede that its respective legislature years ago enacted a comprehensive ban on pediatric transgender healthcare—precisely the type of healthcare the Complaint alleges WPATH's speech promoted. *See* Compl. ¶¶ 357–361 (citing Iowa Code § 147.164); Compl. ¶¶ 362–372 (citing Neb. Rev. Stat. § 71-7301 *et seq.***)**, and Compl. ¶¶ 373–377 (citing Tex. Health & Safety Code § 161.702 *et seq.*). Though Plaintiffs allege that "[a]bsent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest," Compl. ¶ 454, it cannot be that WPATH's SOC-8 speech could cause future injury or harm in Iowa, Nebraska, or Texas because any future provision of such care would constitute

36

an independent violation of state law by third-party clinicians—not action fairly traceable to Defendants. Each state's own allegations confirm that the injuries alleged are exclusively retrospective. But prospective injunctive relief against Defendants cannot redress purely historical injuries, particularly where those injuries have already been remedied by state legislation. And while Iowa, Nebraska, and Texas purport to seek civil penalties, such relief is similarly unavailable because the only conduct in those states identified with specificity—whether through declarations or otherwise—occurred outside the statutes of limitations. *See* Tex. Bus. & Com. Code § 17.565 (two-year statute of limitations); Neb. Rev. Stat. § 87-303.10 (four-year statute of limitations); Iowa Code § 714H.5(5) (two-year statute of limitations).

To establish injury-in-fact, a plaintiff must allege harm that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted). Texas alleges that its ban "came too late to protect many Texas children from the harms caused by Defendants' deceptive trade practices," Compl. ¶ 377, and Iowa alleges the identical defect with respect to its ban, which likewise "came too late to protect many Iowa children," Compl. ¶ 361. These admissions establish, as a matter of the states' own pleading, that any cognizable injury predates the effective bans and that no comparable injury can recur, since the very conduct WPATH's SOC-8 addresses is now unlawful for any clinician to perform in either state on minors. Conclusory recitations that a state "has sustained or will sustain injury," untethered to any specific future transaction, patient, or provider, are precisely the kind of "labels and conclusions" that cannot substitute for well-pleaded facts establishing standing. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Past harm, standing alone, does not satisfy Article III's "requirement of an injury that is actual or imminent at the time the complaint is filed." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).

37

Nebraska's attempt to allege continuing injury fares no better, notwithstanding two theories not raised by Iowa or Texas. First, Nebraska's ban grandfathers children already receiving treatment before October 1, 2023—a closed, historical, and necessarily shrinking population that cannot supply the "actual or imminent" future injury *Lujan* requires, 504 U.S. at 560, since it describes no prospective class of patients. Second, the allegation that organizations assist Nebraska minors in traveling out of state to obtain now-prohibited procedures in Nebraska fails for want of traceability: any resulting injury flows from the independent, extraterritorial conduct of a third-party organization not before this Court, not from WPATH's speech, and standing cannot rest on injury caused by "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560–61 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)).

Even setting aside the absence of imminent injury, none of the three states can plausibly trace any future harm to WPATH's conduct rather than to the unlawful acts of third-party clinicians. Once Iowa, Nebraska, and Texas each prohibited the care described in SOC-8, the proximate legal cause of any future violation necessarily became the treating clinician's independent decision to defy state law—not WPATH's publication of guidance that no lawful provider in any of the three states may follow. This break in the causal chain is fatal under *Lujan*'s traceability requirement, and it correspondingly forecloses redressability: because the states already possess the ultimate remedy for the conduct they fear, an injunction against WPATH's speech would not make any future rogue clinician's unlawful conduct less likely to occur.

### B. The Court Should Decline to Exercise Supplemental Jurisdiction Over the State Law Claims Following Dismissal of the FTC's Federal Law Claims

If this Court dismisses the FTC's claims, the States' claims should be dismissed for lack of jurisdiction. A federal court may exercise supplemental jurisdiction over state claims over which it would otherwise lack subject matter jurisdiction, so long as those state claims "are so related to

claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). "The general rule is that a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial[.]" *Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009); *Adlerstein v. Cooper Aerobics Enters., Inc.*, No. 3:25-cv-2228-D, 2026 WL 820861, at *3 (N.D. Tex. Mar. 25, 2026). Exceptions to this rule are limited to "judicial economy, convenience, fairness, and comity." *Payne v. Harris Methodist H-E-B*, 2000 U.S. Dist. LEXIS 21776, at *48 (N.D. Tex. Nov. 20, 2000) (citing *Batiste v. Island Records, Inc.*, 179 F.3d 217, 227 (5th Cir. 1999)). Where "[a]ll parties have expended considerable resources in the present action, the discovery deadline has passed, and numerous discovery disputes and pretrial matters have been heard and disposed of," the principles of "judicial economy, convenience, and fairness" may favor retaining supplemental jurisdiction over a state law claim. *Id.*

No such factors are present here. This case is in its infancy. No discovery has taken place. This Court has not developed significant familiarity with the merits of the action or the parties. Thus, this Court should follow the dictates of the Fifth Circuit and decline to exercise supplemental jurisdiction over the remaining state claims.

## CONCLUSION

For these reasons, the Court should grant WPATH's motion to dismiss Plaintiffs' claims.

Dated: July 28, 2026                                  Respectfully Submitted,


/s/ Sarah Cummings Stewart                        /s/ Caleb Hayes-Deats*

Sarah Cummings Stewart                            Caleb Hayes-Deats*
**REED SMITH LLP**                                Abbe David Lowell [DC Bar No. 358651]
2850 N. Harwood Street, Suite 1500                Schuyler J. Standley*
Dallas, TX 75201                                  LOWELL & ASSOCIATES, PLLC
Tel: (469) 680-4200                               1250 H Street, N.W., Suite 250
Fax: (469) 680-4299                               Washington, DC 20005
sarah.stewart@reedsmith.com                       T: (202) 964-6110
                                                  F: (202) 964-6116
                                                  ALowellpublicoutreach@lowellandassociates.com
R. Jeffrey Layne                                  CHayes-Deats@lowellandassociates.com
**REED SMITH LLP**                                SStandley@lowellandassociates.com
401 Congress Avenue, Suite 1800
Austin, TX 78701                                  *Pro hac vice* motion pending
Tel: (512) 623-1801
Fax: (512) 623-1802
jlayne@reedsmith.com


*Attorneys for Defendant WPATH*

40

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on July 28, 2026, a true and correct copy of the foregoing document was filed with the Clerk of Court via the CM/ECF system, causing it to be served electronically on all counsel of record.

/s/ DRAFT_____
Sarah Cummings Stewart