# EXHIBIT 5

**DECLARATION OF ELISABETH BOURNE**
**Pursuant to 28 U.S.C. § 1746**

I have personal knowledge of the facts set forth below and am competent to testify about them. If called as a witness, I could and would testify as follows:

1. I am over 18 years old and reside in Davis, California.
2. My ex-husband and I moved back to Davis in 2007 to raise our daughter and son because we felt at home in its progressive, college-town culture. We sent our kids to public schools. In 2011, we divorced and began sharing custody.
3. When my daughter was in the sixth grade, she started cutting herself. She seemed to have been traumatized by a sexual assault and emergency-room visit experienced by a close friend. She was put on an anti-depressant, Lexapro.
4. Near the end of the sixth grade, my daughter announced that she was bisexual.
5. My daughter started reading books about transgenderism. Several of her female friends declared themselves "transgender" at school. Later I found out that my daughter did too.
6. Around the beginning of the eighth grade, my daughter was cutting herself severely, which required a trip to an emergency room in or around October 2018.
7. In or around November 2018, when she was 13 years old, my daughter sent me a letter declaring that she was transgender, had adopted a new male first name, wished to have male pronouns used when referring to her, and wanted to socially transition at school. She also requested a chest binder but not medical-transition treatments.
8. By this time, in or around late 2018, my ex-husband and I were sharing custody of our children 50/50.
9. After we all learned the potential side-effects of puberty blockers and cross-sex hormones, my daughter, my ex-husband (who consistently affirmed our daughter's transgenderism), and I agreed that she could socially transition at school but would not medically transition until after she turned 18. I referred to her as "Ian," which was the male name she adopted. I also later consented for her to take Depo-Provera to stop her periods, which she requested, to feel more like a boy.
10. My daughter's teachers and counselors "affirmed" her new "gender identity" and put a "support plan" in place—in other words, they socially transitioned my daughter by using male pronouns and her new male first name. I felt that I did not have a choice but to consent to my daughter's social transition at school because I was worried that she might want to live with her father if I didn't. At the time, I did not want to appear unsupportive of my

daughter's transgenderism to the California schools or courts, out of fear of losing my custody rights.

11. In January 2019, my daughter emailed her father and me saying that she wanted puberty-blocking drugs. She said she knew such drugs are safe, citing Planned Parenthood and the Endocrine Society.

12. I was shocked by all of my daughter's announcements about her transgenderism. The situation was surreal and bewildering to me and challenged by ability to parent my own daughter because none of it made any sense to me.

13. My ex-husband affirmed our daughter's transgender identity, as did his extended family. They told me that she needed "gender-affirming care," by which they meant medical-transition interventions like puberty blockers and testosterone. But I soon discovered that this phenomenon—minors, most often teen girls, suddenly adopting transgender identities—was becoming increasingly widespread. This made me think I should learn more about gender dysphoria and the treatments for it.

14. In or around November 2019, when my daughter was around age 14, she started experiencing dizziness spells, so my ex-husband and I took her to a pediatrician at Kaiser. Following the practice of my ex-husband, the pediatrician used male pronouns when speaking to my daughter and referred to her using a male name. The pediatrician also enthusiastically asked my daughter if she wanted to change her medical records to indicate her sex as male. She agreed, so her medical records were altered to indicate that my daughter was now my son. The pediatrician then asked my daughter if she wanted a consultation appointment with the Kaiser Oakland gender clinic, which the pediatrician described as a "one-stop shop" for gender-affirming care. My daughter seemed excited about the invitation.

15. I was soon connected with a Kaiser endocrinologist, Francis Hoe, M.D., at Kaiser Permanente Roseville Medical Center, in Roseville, California.

16. Dr. Hoe told me that science shows medical transition reduces the risk of suicide and diminishes suicidal ideation among pediatric patients. He did not disclose to me any specific side effects of puberty blockers or testosterone.

17. Dr. Hoe claimed that my daughter likely would "feel better" if she stopped having periods and started attaining masculine physical traits through cross-sex hormone therapy.

18. Dr. Hoe stated that Kaiser had no handbook or standardized procedures for treating children or adolescents with hormones and that he follows the recommendations of WPATH and the Endocrine Society in his medical practice.

19. I asked Dr. Hoe for citations to supporting studies and other evidence. Shortly after our call, he sent me an electronic message that included, among other information, links to transition

guidelines from WPATH and the Endocrine Society. I clicked the links in this message and read through the information. A true and correct copy of Dr. Hoe's message to me, dated November 19, 2019, is attached hereto as **EXHIBIT A**, with my daughter's first name redacted for privacy. (The yellow highlighting was added by me.)

20. I asked my children's Kaiser pediatrician, Who would you refer a parent of a gender-dysphoric child to? The pediatrician mentioned PFLAG and other parent support groups, such as Gender Spectrum. All these groups advocate for medical transition to treat gender dysphoria in kids.

21. My ex-husband and I disputed for years over whether to let our daughter medically transition. We wound up litigating the issue. I won and retained my rights, so Kaiser could not medically transition my daughter without my consent. The legal battle cost me approximately $10,000 in attorney fees and costs.

22. My daughter seemed to view me as the bad guy. Following her 17th birthday celebration, near the beginning of her senior year in high school, my daughter sent me a written letter stating that she was cutting off all contact with me. That was devastating. But I was still able to see her at school events over the next year, for example, by serving as a chaperone for her choir class. I saw that she started putting on makeup, growing her hair long, and wearing dresses and feminine clothes. I am tremendously relieved, in part because some of my daughter's classmates had double mastectomies and, based on my understanding from communications I received from Kaiser, I believe that my daughter had contacted Kaiser about possibly having "top surgery."

23. Now my daughter is 20 years old, identifies as genderqueer, and as far as I know has never used testosterone or undergone transition surgery. On Instagram, she says her pronouns are they/them. She has chosen a new name for herself since beginning college (her fourth name overall). She seems to be flourishing. I believe I did the right thing by standing between her and medical transition when she was underage.

24. My own research and our family's experience made me suspicious of pediatric medical transition. At least two of my daughter's adolescent friends had double mastectomies as treatment for gender dysphoria. I wonder, Were the surgeries necessary? What if these young women have children one day and want to breastfeed?

25. Over the last few years, I have spoken at school board meetings and rallies, and testified before state legislatures, to challenge the belief that some kids are born in the wrong body and should medically transition.

26. My activism has cost me friends. Most painfully, I think it is why my daughter remains distant from me. But I can't just be quiet. I hope my daughter will understand and forgive me someday.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on Jun 6, 2026, 2026.

Elisabeth Bourne (Jun 6, 2026 23:13:53 PDT)

Elisabeth Bourne

**EXHIBIT A**



From: FRANCIS MYATUKASAE HOE MD
To: BETH BOURNE
Sent: Tuesday, November 19, 2019

Message body: Dear Ms. Bourne,

I appreciate the conversation we had recently about [redacted]

As you requested, here's the online links for some guidelines from different professional medical organizations for providing transgender care:
Endocrine Society: https://academic.oup.com/jcem/article/102/11/3869/4157558
WPATH: https://wpath.org/media/cms/Documents/SOC%20v7/Standards%20of%20Care_V7%20Full%20Book_English.pdf

In addition, here is a link for Gender Spectrum, a very good organization in the bay area that advocates for transgender youth.

If you have any additional questions, feel free to email me or call me at (916) 474-2250.

FRANCIS MYATUKASAE HOE MD
Pediatric Endocrinology
Kaiser Roseville