**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

FEDERAL TRADE COMMISSION, *et al.*,

Plaintiffs,

v.

WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, INC., a Texas corporation, *et al.*,

Defendants

Case No. 4:26-cv-00748-O

**BRIEF IN OPPOSITION TO MOTION TO DISMISS**

# Table of Contents

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 2

ARGUMENT ........................................................................................................ 2

I. Legal Standard ........................................................................................................ 2

II. The Amended Complaint adequately pleads violations of the FTC Act and State consumer protection laws ........................................................................................................ 3

A. WPATH makes deceptive establishment claims ........................................................ 5

B. WPATH's deceptive statements are not legitimate scientific debate ........................ 8

C. WPATH provides the means and instrumentalities of deception ........................ 15

D. The Amended Complaint states a claim for each deceptive statement ........................ 17

III. WPATH's constitutional arguments fail ........................................................ 26

A. The Amended Complaint pleads that WPATH is engaged in misleading commercial speech, which enjoys no First Amendment protection ........................................ 26

B. The Tenth Amendment does not exempt medical organizations from the FTC Act .... 36

IV. Texas, Nebraska, and Iowa have standing ........................................................ 39

CONCLUSION ........................................................................................................ 43

# Table of Authorities

**Cases**

*Abboud v. Lotta Dough, LLC*, 2025 U.S. Dist. LEXIS 35547 (W.D. Tex. Feb. 27, 2025) ............ 1

*American Med. Ass'n v. FTC*, 638 F.2d 443 (2d Cir. 1980)........................................................ 37

*Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644 (Tex. 1996) .................................................. 17, 41

*Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107 (9th Cir. 2021).......................................... *passim*

*Avila v. State*, 252 S.W.3d 632 (Tex. App.—Tyler 2008, no pet.)............................................... 40

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) ..................................................... 28, 29

*Bristol-Myers Co. v. FTC*, 738 F.2d 554 (2d Cir. 1984) .............................................................. 7

*California Dental Association v. FTC*, 526 U.S. 756 (1999)............................................... *passim*

*Chiles v. Salazar*, 146 S. Ct. 1010 (2026)................................................................................ 33, 34

*Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472 (Tex. 1995).................................... 40

*Doe v. X Corp.*, 821 F. Supp. 3d 632 (N.D. Tex. 2026) ............................................................ 2, 3

*Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333 (5th Cir. 2008) ............................................ 3, 33

*Eastman Chem. Co. v. PlastiPure, Inc.*, 775 F.3d 230 (5th Cir. 2014) ............................ 12, 15, 35

*Eastman Chem. Co. v. PlastiPure, Inc.*, 969 F. Supp. 2d 756 (W.D. Tex. 2013)......................... 12

*ECM Biofilms, Inc. v. FTC*, 851 F.3d 599 (6th Cir. 2017) .................................................. *passim*

*Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007 (3d Cir. 2008).................................................11, 30

*Fanning v. FTC*, 821 F.3d 164 (1st Cir. 2016).............................................................................. 4

*Fennelly v. A-1 Mach. & Tool Co.*, 728 N.W.2d 163 (Iowa 2006)........................................ 39, 40

*Flenniken v. Longview Bank and Trust Co.*, 661 S.W3d 705 (Tex. 1983)............................. 40, 41

*FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35 (D.C. Cir. 1985) ............................... 24

*FTC v. Corpay, Inc.*, 164 F.4th 807 (11th Cir. 2026) ........................................................... 23, 25

*FTC v. Freecom Communs., Inc.*, 401 F.3d 1192 (10th Cir. 2005) ........................................... 4, 9

*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986)........................................................... 37

*FTC v. Nat'l Cas. Co.*, 357 U.S. 560 (1958)........................................................................ 39

*FTC v. Nat'l Com'n on Egg Nutrition*, 517 F.2d 485 (7th Cir. 1975).................................. *passim*

*FTC v. Pacific States Paper Trade Ass'n*, 273 U.S. 52 (1927) .................................................. 27

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994)................................................................. 7

*FTC v. Peyroux*, 723 F. Supp. 3d 1209 (N.D. Ga. 2024) ...................................................... 15, 17

*FTC v. QT, Inc.*, 448 F. Supp. 2d 908 (N.D. Ill. 2006)................................................................. 7

*FTC v. Sabal*, 32 F. Supp. 2d 1004 (N.D. Ill. 1998) ................................................................... 7

*FTC v. Winsted Hosiery Co.*, 258 U.S. 483 (1922)..................................................................... 15

*Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264 (4th Cir. 2013)............................................................................................ 31

*Holzman v. State*, 2013 WL 398935 (Tex. App.—Corpus Christi, Jan. 31, 2013, pet. denied*)* .... 40

*In re 2014 Radioshack ERISA Litig.*, 165 F. Supp. 3d 492 (N.D. Tex. 2016)............................... 3

*In re Ernst's Guardianship*, 62 N.W.2d 110, 111 (Neb. 1954).................................................... 40

*Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509 (7th Cir. 2014).................................... 10, 30, 31

*Knight v. International Harvester Credit Corp.*, 627 S.W.2d 382 (Tex. 1982)...................... 17, 41

*Kraft, Inc. v. FTC*, 970 F.2d 311 (7th Cir. 1992)........................................................................ 3

*Lackey v. Stinnie*, 604 U.S. 192 (2025)...................................................................................... 33

*Matthews, on behalf of M.M v. Kountze Indep. Sch. Dist.*, 484 S.W.3d 416 (Tex. 2016)............ 41

*Molano v. State*, 262 S.W.3d 554 (Tex. App.—Corpus Christi 2008, no pet.) ............................ 41

*New York v. United States*, 505 U.S. 144 (1992)........................................................................ 36

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015).... 13

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2d Cir. 2013)..................9, 11, 15, 21

*P&G Co. v. Amway Corp.*, 242 F.3d 539 (5th Cir. 2001) .......... 29

*Pacira Biosciences, Inc. v. American Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240 (3d Cir. 2023) .......... 11, 20

*POM Wonderful, LLC v. FTC*, 777 F.3d 478 (D.C. Cir. 2015) .......... *passim*

*Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674 (5th Cir. 1986) .......... 8

*Regina Corporation v. FTC*, 322 F.2d 765 (3d Cir. 1963) .......... 15, 16, 17

*Rountree v. Dyson*, 892 F.3d 681 (5th Cir. 2018) .......... 1

*State ex rel. Douglas v. Ledwith*, 281 N.W.2d 729 (Neb. 1979) .......... 43

*Thomas v. State*, 226 S.W.3d 710 (Tex. App.—Corpus Christi 2007, pet. dism'd) .......... 40

*Torrey v. Infectious Diseases Society of America,* 86 F.4th 701 (5th Cir. 2023) .......... *passim*

*United States v. AseraCare, Inc.*, 938 F.3d 1278 (11th Cir. 2019) .......... 13

*United States v. Darby*, 312 U.S. 100 (1941) .......... 36

*Waltham Watch Co. v. FTC*, 318 F.2d 28 (7th Cir. 1963) .......... 15, 16

*World Pro. Ass'n for Transgender Health v. FTC*, 2026 WL 1257321 (D.D.C. May 7, 2026) .... 33

*World Pro. Ass'n for Transgender Health v. FTC*, 2026 WL 1999008 (D.D.C. July 10, 2026) ... 33

**Agency Actions**

*Empire State Pharm. Soc'y*, 114 F.T.C. 152 (1991) .......... 37

*Forbes Health Sys. Med. Staff*, 94 F.T.C. 1042 (1979) .......... 37

*Indiana Dental Ass'n*, 93 F.T.C. 392 (1979) .......... 37

*FTC v. Association of Flag Mfrs.*, 1 F.T.C. 55 (1918) .......... 26, 27

*Medical Serv. Corp.*, 88 F.T.C. 906 (1976) .......... 37

*Michigan State Med. Soc'y*, 101 F.T.C. 191 (1983) .......... 37

*National Housewares, Inc.*, 90 F.T.C. 512 (1977) .......... 15, 17

**Statutes**

AS § 45.50.471 ........ 28

Competitive Health Insurance Reform Act of 2020, Pub. L. No. 116-327 (2021) ........ 39

Iowa Code § 714.16 ........ 28, 46

15 U.S.C. § 44 ........ 26, 27

15 U.S.C. § 45 ........ 27, 37, 38

42 U.S.C. § 1395 ........ 38, 39

Neb. Rev. Stat. § 87-302 ........ 28, 41, 42

Neb. Rev. Stat. § 87-303 ........ 42

Neb. Rev. Stat. § 87-303.05 ........ 41

Neb. Rev. Stat. § 87-303.11 ........ 41, 42

Tex. Bus. & Com. Code § 17.46 ........ 28, 40

Tex. Bus. & Com. Code § 17.47 ........ 41

Tex. Health & Safety Code § 161.702 ........ 41

**Rules**

Federal Rule of Civil Procedure 9 ........ 4

Federal Rule of Civil Procedure 12 ........ 1, 2

**Other Authorities**

Black's Law Dictionary (12th ed. 2024) ........ 20

## INTRODUCTION

There is nothing novel about this case. Plaintiffs protect consumers by bringing enforcement actions against organizations making misleading claims to profit themselves or their members. Courts have long upheld that authority, including with respect to misrepresentations by medical organizations, *see California Dental Association v. FTC*, 526 U.S. 756 (1999), insufficiently substantiated claims about a disputed scientific question, *see ECM Biofilms, Inc. v. FTC*, 851 F.3d 599 (6th Cir. 2017), or inadequately substantiated representations about a product's medical effectiveness, *see POM Wonderful, LLC v. FTC*, 777 F.3d 478 (D.C. Cir. 2015). The Amended Complaint alleges that WPATH has made misleading claims and omissions to profit its members, bringing this case within that longstanding authority.[1] That should end the inquiry.

WPATH's arguments misunderstand the nature of this case and the law. The Amended Complaint's requested relief would neither interfere with legitimate scientific debate nor regulate the practice of medicine. Instead, it would prevent WPATH from misleading consumers about dangerous and experimental treatments, thereby profiting its members. Moreover, the Constitution neither protects WPATH's deceptive representations and omissions nor immunizes WPATH from the FTC Act simply because it is promoting medical treatments to profit its members. Because the

[1] This Court has the discretion to resolve the Motion as "being addressed to the" Plaintiffs' Amended Complaint, ECF 70, and it should do so. *Rountree v. Dyson*, 892 F.3d 681, 683 (5th Cir. 2018). The Amended Complaint does not materially alter the 12(b)(6) question because the amendments do not differ from the fundamental theories of the Complaint. *See Abboud v. Lotta Dough, LLC*, 2025 U.S. Dist. LEXIS 35547 at *2 n.2 (W.D. Tex. Feb. 27, 2025) (declining to hold that a motion to dismiss was moot when an amended complaint that "relie[d] on the same . . . theory as" the original complaint was filed during the pendency of that motion). Instead, because WPATH's arguments apply to the Amended Complaint, this Court should exercise its discretion to "consider the motion as being addressed to the amended pleading" rather than delay resolving it. *Rountree*, 892 F.3d at 683–84.

Amended Complaint alleges significant violations of the consumer protection laws that the Plaintiffs enforce, the Motion should be denied.

## BACKGROUND

The Plaintiffs filed a 123-page Complaint alleging that WPATH,[2] an organization that operates for the profit of its members, promotes pediatric medical transition products and services through false, misleading, and unsubstantiated representations and omissions, including by providing the means and instrumentalities for those representations and omissions to be repeated to consumers, in violation of State and federal consumer protection laws. ECF 1. WPATH moved to dismiss the Complaint. ECF 42. Plaintiffs filed an Amended Complaint containing the same causes of action and asserting the same theories as the Complaint. ECF 70 ("Am. Compl.").

## ARGUMENT

### I. Legal Standard

"In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff." *Doe v. X Corp.*, 821 F. Supp. 3d 632, 636 (N.D. Tex. 2026) (O'Connor, J.) (citation omitted). Although the Court need not "accept legal conclusions as true," it "assumes the[] veracity" of "well-pleaded factual

---

[2] This brief refers to all Defendants collectively as "WPATH." The extent to which Defendants are independent entities remains unclear. *Compare* Defendant World Professional Association for Transgender Health, Inc.'s Memorandum in Support of Its Motion to Dismiss, or, in the Alternative, Transfer Venue, ECF No. 55 at 1 (asserting that WPATH is a single "organization incorporated in Illinois and Texas") *with* Mem. at 8 (describing Defendants as "WPATH and two affiliated entities") *and* Defendant World Professional Association for Transgender Health, Inc.'s Opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction, ECF No. 38 at 20 n.6 (discounting WPATH's Texas incorporation and portraying WPATH as two entities incorporated in different States).

allegations" and "determines whether they plausibly give rise to an entitlement to relief." *Id.* at 637 (citations omitted).

The Court "may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," as well as documents "referred to" in the complaint and "central to the plaintiff's claims." *In re 2014 Radioshack ERISA Litig.*, 165 F. Supp. 3d 492, 496 (N.D. Tex. 2016) (O'Connor, J.) (quotation omitted). But the Court otherwise "may not consider new factual allegations made outside the complaint." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008).[3]

## II. The Amended Complaint adequately pleads violations of the FTC Act and State consumer protection laws

To establish a violation of the FTC Act, the FTC must show that there was a material representation or omission that was likely to mislead consumers acting reasonably under the circumstances. *POM Wonderful*, 777 F.3d at 490; *Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir. 1992). WPATH's deceptive claims and omissions fit these criteria as they are likely to mislead reasonable consumers. Moreover, "claims that significantly involve health," like those alleged here, trigger "a presumption of materiality." *Kraft*, 970 F.2d at 322 (citation omitted). Plaintiffs likewise allege facts which satisfy the State law counts. *See* Am. Compl. ¶¶ 418–50.

[3] Both WPATH and WPATH's *amici* attempt to introduce facts beyond those this Court may consider on a motion to dismiss. *E.g.*, Defendant World Professional Association for Transgender Health, Inc.'s Memorandum in Support of Its Motion to Dismiss, ECF No. 53, at 4, 6 (hereinafter "Mem."); Brief of the Commonwealth of Massachusetts, *et al.*, As Amici Curiae in Support of Defendant's Motion to Dismiss, ECF No. 68, at 8–10 (hereinafter "WPATH Amici Br."). This Court should disregard them.

Rule 9(b) does not apply to FTC Act claims,[4] but the Amended Complaint satisfies it in any event. *See* Am. Compl. § XV. For some of these claims, WPATH responds that it has not used the exact words alleged in the Amended Complaint. *See* Mem. 16–20. But "[c]laims can either be expressed or implied." *Fanning v. FTC*, 821 F.3d 164, 170 (1st Cir. 2016) (quotation omitted). Courts ask how "consumers acting reasonably under the circumstances" would interpret a statement, including a statement relayed in substance through an intermediary, *infra* II.C, and what "overall net impression" it conveys. *POM Wonderful*, 777 F.3d at 490 (quotations omitted). "Liability may be imposed" for an implied claim if "at least a significant minority of reasonable consumers [would be] likely to take away the misleading claims." *Fanning*, 821 F.3d at 171. (quotation omitted). And "if a claim conveys more than one meaning, only one of which is misleading, a seller is liable for the misleading interpretation even if nonmisleading interpretations are possible." *Ibid*. (cleaned up). Although courts "may look at extrinsic evidence of consumer perceptions to" determine whether a claim is implied, they are "not required" to do so and can employ "common sense." *Id.* at 170 (citation omitted).[5]

---

[4] As WPATH acknowledges, the Fifth Circuit has not resolved this question. Mem. 11. But at least one Court of Appeals explained that it is error to apply Rule 9(b) to a Section 5 claim, because "[a] § 5 claim simply is not a claim of fraud as that term is commonly understood or as contemplated by Rule 9(b)." *FTC v. Freecom Comm., Inc.*, 401 F.3d 1192, 1203 n.7 (10th Cir. 2005). "Unlike the elements of common law fraud," the action which Rule 9(b) contemplates, "the FTC need not prove scienter, reliance, or injury to establish a § 5 violation," among other dissimilarities. *Ibid*. Regardless, WPATH itself treats Rule 9(b) as irrelevant to this action, referencing Rule 9(b) solely in the "Legal Standard" portion of its Motion. *See* Mem. vi, 11–12. Indeed, WPATH never argues that any specific allegation fails to satisfy Rule 9(b).

[5] WPATH's argument that there is no ongoing violation of the FTC Act based on the timing of the harm described in declarations attached to the Complaint, Mem. 25, attempts to answer the wrong question. The question on WPATH's Motion is whether the Amended Complaint *alleges* ongoing harm, and it does. *E.g.* Am. Compl. ¶ 22; *id.* ¶ 64 (alleging that SOC-8 is "the current version" of WPATH's deceptive publication). The declarations simply provide firsthand accounts of the harm that consumers suffer because of WPATH's misrepresentations and omissions.

### A. WPATH makes deceptive establishment claims

Many of WPATH's core deceptive statements are misrepresentations about the strength of the evidence supporting its treatment recommendations and characterizations. *See infra* II.D. The FTC brings enforcement actions when an entity makes a misleading claim which "suggests that a product's effectiveness or superiority has been scientifically established," *i.e.*, "[a]n establishment claim." *POM Wonderful*, 777 F.3d at 490. Establishment claims can be "specific" or "non-specific." *Id.* at 491 (quotation marks omitted). Defendants make specific establishment claims if they "state[] a specific type of substantiation" for a claim, such as that it is supported by randomized controlled trials, in which case they "must possess the specific substantiation claimed." *Ibid.* (quotation omitted). Defendants make non-specific establishment claims by, for example, representing that "evidence" or "studies" support a claim, including by asserting the strength or other attributes of that evidence. *Ibid.* (quotation omitted). In that case, defendants "must possess evidence sufficient to satisfy the relevant scientific community of the claim's truth." *Ibid.* (quotation omitted).

WPATH's establishment claims are non-specific. SOC-8 makes recommendations regarding drugs, surgeries, and other treatments, but these are not "recommendations" in the colloquial sense. SOC-8 defines "we recommend" as "a 'strong recommendation' which indicates that: 'the evidence is of high quality,' that 'there is a high degree of certainty'" that the treatment's putative "'effects will be achieved in practice,'" "'there are few downsides of [the] therapy/intervention/strategy,'" and "'there is a high degree of acceptance among providers and patients or those for whom the recommendation applies.'" Am. Compl. ¶ 103. For example, SOC-8 issues a strong recommendation for surgeries including "breast augmentation" and "vaginoplasty" for children. *Id.* ¶ 104. SOC-8's recommendations are thus non-specific

establishment claims about the strength of evidence, *POM Wonderful*, 777 F.3d at 490–91, and they are the centerpiece of WPATH's core deceptive statements, *see id.* ¶¶ 391–405, 409–11.

It is irrelevant at the motion to dismiss stage whether SOC-8 cites studies. *Contra* Mem. 16–22. The question in cases concerning non-specific establishment claims is not whether the defendant has *any* evidence to support its claim, but whether it has evidence "sufficient to satisfy the relevant scientific community of the claim's truth." *POM Wonderful*, 777 F.3d at 491 (quotation omitted). And that is not a question amenable to resolution on a motion to dismiss. *See id.* at 484 (addressing the issue after "extensive administrative proceedings," including factfinding); *ECM Biofilms*, 851 F.3d at 607 (recounting a "three-week trial" as part of the case's procedural history). Plaintiffs have alleged that WPATH has made misleading establishment claims, including by rendering "strong recommendations." That WPATH points to various studies could matter at summary judgment or trial, but not here.

Aside from using defined terms in SOC-8 that themselves constitute non-specific establishment claims, WPATH repeatedly represents in general terms that particular treatments are "safe" or effective, for example. Am. Compl. ¶ 200. That, too, is a non-specific establishment claim because, in context, it conveys that WPATH has sufficient substantiation to support these claims, not that a particular "type of substantiation" supports the treatment. *POM Wonderful*, 777 F.3d at 491 (quotation omitted). And SOC-8 does not explain the type of substantiation provided by its sources, as would be required—though it would be insufficient alone—for a specific establishment claim. *See* Mem. 16–22. Further, once these claims reach consumers, whether repeated by clinicians or by WPATH itself in public statements, they are often stripped even of these references to other publications. *See* Am. Compl. ¶ 330; *id.* at 106 n.152. Accordingly, WPATH must "possess

evidence sufficient to satisfy the relevant scientific community of the claim's truth." *POM Wonderful*, 777 F.3d at 491 (quotation omitted).

In the medical context, the proper level of substantiation is typically at least one "well-conducted, placebo-controlled, randomized, double-blind study," particularly where a defendant asserts a "strong[] medical claim." *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 962 (N.D. Ill. 2006), *aff'd*, 512 F.3d 858 (7th Cir. 2008); *see POM Wonderful*, 777 F.3d at 501 (affirming a Commission order "insofar as the Commission's order imposes a general [randomized controlled trial]-substantiation requirement for disease claims"); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1092 (9th Cir. 1994) (noting expert testimony establishing that a "randomized, double-blind, and placebo-controlled" test is "the generally-accepted scientific standard[]"); *Bristol-Myers Co. v. FTC*, 738 F.2d 554, 564 (2d Cir. 1984) (affirming a Commission order that future representations about analgesic's efficacy be made only after a double-blind placebo-controlled test); *FTC v. Sabal*, 32 F. Supp. 2d 1004, 1007 (N.D. Ill. 1998) (granting preliminary injunction where the Commission argued that "well-controlled, double-blind clinical tests" were required to support efficacy of hair-loss product (quotation omitted)). This requirement is especially critical where the claims concern children's health and medical needs, given the heightened risks and potentially irreversible consequences of pediatric medical transition. But as the Amended Complaint alleges, "SOC-8's guidelines and recommendations for providing transition services to children are unsupported by competent and reliable scientific evidence." Am. Compl. ¶ 145.

To the extent the Court considers any of WPATH's claims to be specific establishment claims, they are likewise unsubstantiated. As the Amended Complaint alleges, "WPATH's assertions about the necessity, safety, and efficacy of pediatric medical transition drugs, surgeries, and other interventions are not supported by competent and reliable scientific evidence."

Am. Compl. ¶ 69. For example, in addition to asserting that "strong evidence" backs many of its claims, WPATH asserts that its recommendations represent "expert consensus." *Id.* ¶¶ 393–94. But this expert consensus does not exist, both because WPATH disregarded the conclusions of its own expert-consensus process, *Id.* ¶ 84, and because there is no such consensus—indeed, Finnish and Swedish guidelines sharply restrict the pediatric procedures that WPATH promote. *Id.* ¶ 158. Even WPATH's members privately acknowledge this lack of consensus. *See id.* ¶ 95.

### B. WPATH's deceptive statements are not legitimate scientific debate

WPATH cannot avail itself of case law that protects good-faith scientific debate, as WPATH's activities fall outside of that category. WPATH asserts that it engages in "academic activities" by publishing "academic papers" in "a peer-reviewed scientific journal" in an act of good-faith "scientific debate." Mem. 2, 4, 15, 23. But that is not the activity that the Amended Complaint alleges. Instead, Plaintiffs allege that WPATH operates for the profit of its members by publishing information that it knows to be deceptive, knowingly misstating the strength of the evidence supporting its assertions, and willfully failing to disclose significant conflicts of interest in violation of the policies it purports to follow. This conduct is intended to convince consumers to purchase the medical transition services that WPATH's members sell. Such deception is actionable and preventing it falls within the Plaintiffs' authority.

WPATH argues that its misrepresentations are pure opinions that are not actionable. *See* Mem. 13 (quoting *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679, 686 (5th Cir. 1986)). But under those cases, each of WPATH's claims is a factual claim, not an opinion, as each claim "(1) admits of being adjudged true or false in a way that (2) admits of empirical verification." *Presidio Enters.*, 784 F.2d at 679; *see infra* II.D (discussing claims). WPATH also cites cases that shield medical opinions that are part of legitimate scientific debate. *See* Mem. 13–14. Those cases do not apply here. They follow the logic that "[m]ost conclusions contained in a

scientific journal article are, in principle, 'capable of verification or refutation by means of objective proof,'" and thus would ordinarily be considered factual. *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 496 (2d Cir. 2013) (quotation omitted). And "it is the essence of the scientific method that the conclusions of empirical research are tentative and subject to revision" and so these cases deem these factual statements as scientific or medical opinions worthy of enhanced protection. *Ibid*. But that is the case only where "a statement is made as part of an ongoing scientific discourse," "directed to the relevant scientific community," "demonstrates at least some degree of basic scientific competence," and is "based on accurate descriptions of the data and methodology underlying those conclusions." *Id.* at 496–98. WPATH's statements satisfy none of those conditions.

*Torrey v. Infectious Diseases Society of America* does not control here. There, private plaintiffs brought fraud-based tort and RICO claims against a specialist society, and the Fifth Circuit held the guidelines at issue to be nonactionable medical opinion. 86 F.4th 701, 703–07 (5th Cir. 2023). This case differs in kind. It is a government enforcement action under the FTC Act, which requires no proof of scienter, reliance, or injury, *see Freecom Comms.*, 401 F.3d at 1203 n.7, and which reaches establishment claims—representations about the state of the evidence itself—that the common-law theories in *Torrey* did not involve, as well as State consumer protection laws. The four features that place WPATH's statements outside any protection for scientific debate were likewise absent there: (1) WPATH is a commercial enterprise organized for its members' profit; (2) WPATH's statements are directed at consumers, not the scientific community; (3) WPATH

knows or should know its statements are false; and (4) WPATH deceived its audience about its conflicts and the very methodology that makes scientific discourse self-correcting.[6]

**1. WPATH is an organization devoted to the profit of its members, not a scientific enterprise**

First, WPATH's attempt to paint itself as an "educational and academic" group is contrary to Plaintiffs' allegations. *See* Mem. 4. WPATH may argue at trial that it, like the group sued in *Torrey*, is "a professional society specializing in the study and treatment of . . . diseases." 86 F.4th at 702. But the Amended Complaint alleges no such thing. Instead, WPATH is an organization that "predominantly consists of clinicians who profit from" medical transition services, Am. Compl. ¶ 6, while "[o]ther members earn income in related work," *id.* ¶ 248. WPATH in turn "operates for the profit of its members by promoting the medical transition services that its members provide to children" and by lobbying for insurance coverage for those services. *Id.* ¶ 6; *see id.* ¶ 16. Indeed, "transition doctors formed the organization that would become WPATH" after "losing the support of insurance providers," which threatened to undo the medical transition industry's "decade of growth." *Id.* ¶ 55. WPATH's efforts are not primarily scientific, nor is WPATH engaged in legitimate scientific debate. Instead, it is engaged in advertising. *See id.* ¶ 123.[7]

---

[6] *Torrey* also reserved the question on which WPATH's argument depends. Because the plaintiff there "d[id] not contest" that publishing a medical opinion in an academic journal forecloses liability, the court "need not determine when, if ever, the mere publication of a medical or other scientific opinion might form the basis for a cause of action for misrepresentation or any other tort." 86 F.4th at 705 & n.4. Plaintiffs do contest that proposition. But the Court need not reach it, because WPATH did not publish an independent academic opinion at all.

[7] As explained in more detail *infra* III.A.2, WPATH's public efforts to promote medical transition are advertisements. Speech need not be "in the traditional form of an advertisement," or even list "price or availability" to be an advertisement. *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1116 (9th Cir. 2021). And "[a]n advertisement is no less 'commercial' because it promotes brand awareness or loyalty rather than explicitly proposing a transaction in a specific product or

Moreover, Plaintiffs do not allege that SOC-8 was published in a "peer-reviewed journal." *See* Mem. 4 (referencing material beyond the Amended Complaint). To the contrary, Plaintiffs allege that WPATH self-publishes SOC-8 in its own journal. Am. Compl. ¶ 7; *id.* at 74 n.64. And to the extent SOC-8 is "peer-reviewed," Plaintiffs allege that WPATH ignore and obstructed such review. *See id.* ¶¶ 85–88, 117–21. WPATH did not "publish[] guidelines in an article in a scientific journal" in any meaningful sense, and in any event *Torrey* did "not determine" whether such conduct "might form the basis for a cause of action." *Torrey*, 86 F.4th at 705 n.4.

**2. WPATH's deception has non-scientific goals**

Plaintiffs do not seek to regulate debate between academics and experts. Instead, Plaintiffs allege that WPATH's has made false advertisements to consumers and intentionally caused consumers to be misled about the necessity, effectiveness, and safety of irreversible medical treatments. Such conduct falls outside the authority cited by WPATH related to "non-actionable opinions" directed at the relevant scientific community. Mem. 1. This is a bread-and-butter enforcement action against a corporation that is deceiving consumers.

WPATH cannot hide behind a façade of academia. "[S]tatements are not protected solely because they appear in a peer-reviewed journal." *Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 242 (3d Cir. 2023). Legitimate "scientific discourse" is protected in part because the statement is directed towards "other members of the relevant discipline or specialty" who are well-positioned to critically evaluate scientific statements. *ONY*, 720 F.3d at 497–98.

service." *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 518 (7th Cir. 2014). Even informational speech can be an advertisement where, for example, it discusses a product or service "all in a positive tone." *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1017 (3d Cir. 2008).

But "statements made to consumers, not scientists" do not receive this protection. *Eastman Chem. Co. v. PlastiPure, Inc.*, 775 F.3d 230, 236 (5th Cir. 2014) (*quoting Eastman Chem. Co. v. PlastiPure, Inc.*, 969 F. Supp. 2d 756, 764 (W.D. Tex. 2013)). Consumers are ill-positioned to see through WPATH's deceptive statements, and deceiving consumers does not further scientific discourse. Thus, courts do not sit idly by when corporations make deceptive statements regarding science, and in fact regularly affirm enforcement actions against such offenders. *E.g.*, *FTC v. Nat'l Com'n on Egg Nutrition*, 517 F.2d 485, 487 (7th Cir. 1975) (affirming an FTC order against a "private, not-for-profit corporation" that "published and broadcast statements . . . that there is no scientific evidence that eating eggs increases the risk of heart disease or a heart attack."); *ECM Biofilms*, 851 F.3d at 606 (affirming an FTC order against misrepresentations regarding whether a product was biodegradable, despite that "[s]cientists disagree on the precise definition of the term 'biodegradable'" and that the defendant cited studies to support its claims). *Torrey* thus made clear that it was addressing communications directed at "the relevant scientific communities," not at communications "in connection with any advertising" "directed at consumers." *Torrey*, 86 F.4th at 706–07 (quotations omitted). Statements directed at consumers may be actionable. *Id.* at 707.

That WPATH intends its statements to be considered by consumers is at the core of the Amended Complaint. Am. Compl. ¶¶ 307, 411, 414, 417. WPATH's members "provid[e] parents with the SOC or other material containing WPATH's deceptive claims" and "directly invoke WPATH's 'Standard of Care' in encouraging their patients to purchase transition services." *Id.* ¶¶ 323, 325. And WPATH cannot now disclaim its own statement in SOC-8 urging "individuals" and "their families" to consider SOC-8 when making healthcare decisions. *Id.* ¶ 307. WPATH addresses insurance companies, too, urging them "to provide these medically necessary treatments and eliminate any exclusions from their policy documents . . . that preclude coverage." *Id.* ¶ 261.

Moreover, WPATH makes deceptive claims beyond SOC-8 that drop all pretense of academic discourse and are instead directed at convincing the public that its claims are true. *See* Am. Compl. ¶ 308 ("WPATH also posts statements on its website deceptively claiming that medical transition is 'safe,' 'lifesaving,' backed by 'rigorous research' and 'expert consensus,' 'evidence-based,' and 'medically necessary.'"). When the Cass Review detailed SOC-8's failings, WPATH responded with press releases declaring pediatric medical transition to be "medically necessary" and "lifesaving." *Id*. at 106 n.152. When States passed legislation restricting pediatric medical transition and when the New York Times published articles revealing some of WPATH's deceptions, WPATH responded with public advocacy statements repeating its deceptive claims. *Ibid.* The public, including parents and children, is the target of WPATH's advertising.

**3. WPATH knows that its statements are false and misleading**

WPATH cannot protect itself by labeling its knowingly deceptive statements as medical opinion. Even a statement of pure opinion "explicitly affirms one fact: that the speaker actually holds the stated belief." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184 (2015). Thus, when a speaker makes "pure statements of opinion" that are not "honestly held," the speaker engages in "deception." *Id.* at 186. Even a physician's expression of a medical opinion is unprotected where "the speaker does not actually hold that opinion," where the physician "rubber-stamp[s]" an opinion without exercising true clinical judgment, or where "it is based on information that the physician knew, or had reason to know, was incorrect." *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1302 (11th Cir. 2019). *Torrey* did not consider this argument as the plaintiffs had abandoned it in the district court. *Torrey*, 86 F.4th at 707 n.6.

That principle applies with full force here. "WPATH knows that its recommendations are not supported by scientific evidence or medical consensus." Am. Compl. VII.B, ¶¶ 117–144. Plaintiffs do not allege that WPATH furnished the means and instrumentalities of deception

inadvertently, but that it did so "intentional[ly]." *Id.* ¶ 26. For example, WPATH willfully disregarded the conclusions of *its own expert review* when it removed age limits from its recommendations. *Id.* ¶ 18. As to WPATH's material omissions, WPATH now argues that it either disclosed the side effects (or at least similar side effects), or that it cited studies that disclose the side effects. But it does not dispute that it was aware of them. *See infra* II.D. WPATH cannot escape liability under the guise of scientific debate where, as here, it willfully misleads consumers.

Moreover, WPATH defines SOC-8's strong recommendations as indicating that "the evidence is of high quality," that "there is a high degree of certainty [that the intervention's] effects will be achieved in practice," that "there are few downsides of [the] therapy/intervention/strategy," and that "there is a high degree of acceptance among providers and patients or those for whom the recommendation applies." Am. Compl. ¶ 103. But "privately, SOC-8 drafters knew they did not have sufficient medical evidence to support their recommendations." *Id.* ¶ 90. Instead, "WPATH's SOC-8 authors had prejudged that SOC-8 would ultimately make strong recommendations in favor of pediatric medical transition regardless of whether the quality of the evidence supported such recommendations." *Id.* ¶ 93. WPATH can dispute those allegations at trial, but it cannot ignore them here. And those allegations preclude WPATH from claiming that its deceptive statements were made as part of a legitimate scientific debate.

#### 4. WPATH has made deceptive statements about its methodology and conflicts

Protections for scientific debate require the statements to be directed at the relevant scientific community, but that alone is not sufficient. If the speaker is dishonest about how it arrived at those conclusions, then the scientific community cannot evaluate the claims on their merits, and they offer no value to scientific debate. They conceal the truth rather than reveal it. Protected statements must include "accurate descriptions of the data and methodology underlying

those conclusions," *ONY*, 720 F.3d at 498, as well as other "necessary context," like disclosure of "potential conflicts of interest," *Eastman Chem. Co.*, 775 F.3d at 236 (quotation omitted).

WPATH's false statements regarding its methodology and conflicts would thwart even a scientist seeking to evaluate the validity of WPATH's statements. As discussed below, "WPATH disregarded established guideline-development standards," despite claiming to follow them. Am. Compl. ¶ 18; *see infra* II.D. This would prevent even the scientific community from "analyzing or refuting the soundness of the experimental design or the validity of the inferences drawn from [WPATH's] results" as WPATH was dishonest regarding the methodology and conflicts of interest that led to its deceptive recommendations. *ONY*, 720 F.3d at 497. WPATH's conduct is outside of *Torrey*'s scientific debate protections.

**C. WPATH provides the means and instrumentalities of deception**

The drugs and procedures that WPATH promotes are sold and performed by WPATH's members (and other clinicians), not WPATH itself. But "[t]hose who put into the hands of others the means by which they may mislead the public, are themselves guilty of a violation of Section 5 of the Federal Trade Commission Act." *Waltham Watch Co. v. FTC*, 318 F.2d 28, 32 (7th Cir. 1963); *see FTC v. Winsted Hosiery Co.*, 258 U.S. 483, 494 (1922). Thus, courts have held medical-industry defendants liable when they "furnished client clinics with the means and instrumentalities to violate the act by providing them with false and misleading ads that had a tendency to deceive the public" into believing that an advertised medical treatment was efficacious. *FTC v. Peyroux*, 723 F. Supp. 3d 1209, 1245 (N.D. Ga. 2024). In *Peyroux*, the defendant provided "information about stem cell products and how to administer them" and "conducted trainings with sample presentations and coaching on how to deliver lectures to the public." *Ibid*. The means and instrumentalities doctrine similarly applies in cases where the defendant provides information or a sales technique for an intermediary to use in deceiving consumers. For example, in *Regina*

*Corporation v. FTC*, a company violated Section 5 where it provided "list prices" to intermediaries and misrepresented that these prices were the going rates. 322 F.2d 765, 767 (3d Cir. 1963). The intermediaries then used those prices when charging consumers for the goods in question, often advertising that their goods were discounted from the fictitious list price. *Id.* at 767–68.; *see National Housewares, Inc.*, 90 F.T.C. 512, ¶ 208 (1977) (finding liability where wholesalers "developed a sales technique which encourage[d] its practitioners to deceive consumers").

Here, WPATH is liable because it "put[s] into the hands of others" the SOC, which is "the means by which" pediatric medical transition providers "may mislead the public." *Waltham Watch Company*, 318 F.2d at 32. WPATH offers its SOC as a tool to insurers and clinicians. *See* Am. Compl. ¶ 261. The SOC represents that pediatric transition is medically necessary. *Id.* ¶¶ 262–65. Providers rely on the SOC to represent to consumers that pediatric transition is medically necessary, often repeating the substance of WPATH's claims. *Id.* § X. Even where medical transition providers do not repeat *verbatim* the misleading statements contained in the SOC, WPATH provides them with the means and instrumentalities of deception. *Id.* ¶ 330. Providers are constrained by their medical licenses and liability concerns. They cannot sell their expensive medical procedures without a scientific basis to do so. And few, if any, parents would consent to such dangerous and life-altering drugs and procedures if providers did not represent—consistent with WPATH's deceptive statements—that pediatric medical transition will save their children's lives. WPATH's deceptive statements thus supply the justification for providers' treatment recommendations. Consumers need not ever hear the deceptive statements that form the basis for the recommendation—although many do—to be deceived because those misrepresentations are embedded in the clinical advice they receive. *See id* § X. When consumers receive advice from a medical provider, they reasonably assume that these recommendations reflect reliable scientific

evidence, and they are deceived when their doctors' recommendations are instead based on deceptive statements concocted by WPATH. *See Peyroux*, 723 F. Supp. 3d at 1230–31 (discussing providing "training" and "lectures"); *id.* at 1245 (discussing "coaching" clinicians).

Thus, like the company in *Regina Corporation*, WPATH provides the informational predicate for the deception that providers ultimately inflict upon consumers. Means and instrumentalities cases do not turn on whether the defendant disseminates physical marketing items; what matters is that the defendant conveys deceptive claims to intermediaries with the intent and expectation that those intermediaries will use its claims to deceive consumers. *Regina Corporation*, 322 F.2d at 767–68 (not discussing any provision by the manufacturer of physical price lists to consumers); *see also National Housewares*, 90 F.T.C. at ¶ 208 (finding liability where wholesalers "developed a sales technique which encourage[d] its practitioners to deceive consumers," so "[i]t [wa]s not surprising, then," that those practitioners engaged in deceptive practices). WPATH intended that here. Moreover, WPATH expressly states in SOC-8 that it intends for "individuals" and "their families" to review SOC-8. Am. Compl. ¶ 307. It cannot now argue that it did not intend them to consider the misleading statements contained therein.[8]

### D. The Amended Complaint states a claim for each deceptive statement

**Counts I.A. and I.B.** Counts I.A. and I.B. assign liability to WPATH's claims that pediatric medical transition is necessary to prevent and effective at preventing suicide in children.

[8] Plaintiffs' State law claims similarly provide for liability via indirect interaction between WPATH and consumers. For example, under Texas law, a defendant's deceptive act or trade practice can be actionable under the Deceptive Trade Practices Act based on a mere connection with a consumer's transaction in goods or services. *See Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649–50 (Tex. 1996); *Knight v. International Harvester Credit Corp.*, 627 S.W.2d 382, 388–89 (Tex. 1982) (concluding that a consumer had a DTPA claim for the defendant's deceptive acts "connected with" a sale).

Am. Compl. ¶ 409(A)–(B). Plaintiffs allege where and when WPATH made these claims. *Id.* ¶¶ 378–87. They are contained in SOC-8 itself. *See id.* ¶¶ 161–170. WPATH also conveys these statements to the public in other ways. *See id.* at 106 n.152; *id.* ¶ 387. These include claims that pediatric medical transition is "lifesaving," "medically necessary," and "reduce[s] suicidality." *Ibid.*; *id.* ¶¶ 385–86. Reasonable consumers hearing these claims will "understand those claims to mean that medical consensus and scientific evidence establish that medical transition is necessary and effective to prevent suicide." *Id.* ¶ 167. Indeed, clinicians "often repeat" these "deceptive phrases or concepts from SOC-8," including by "stating or strongly implying that if parents do not consent to medical transition, their children will commit suicide" and "the parents will be to blame." *Id.* ¶¶ 330–31; *see also id.* ¶ 19.

WPATH makes these claims despite an "absence of evidence that these interventions reduce the incidence of suicide." Am. Compl. ¶ 18; *see also id.* ¶ 69 ("WPATH's assertions about the necessity, safety, and efficacy of pediatric medical transition drugs, surgeries, and other interventions are not supported by competent and reliable scientific evidence."). WPATH responds by essentially denying this allegation. *See* Mem. 16. But the place for WPATH to deny allegations is in its answer and at trial, not in a motion to dismiss.

**Count I.C.** Count I.C. adequately alleges that WPATH's claim that puberty blockers are "fully reversible" is deceptive. Am. Compl. ¶ 409(C). Plaintiffs allege that WPATH makes this claim in SOC-8. *Id.* ¶¶ 9, 64, 171–95, 388. WPATH repeats this claim on its website. *Id.* ¶ 178. Providers repeat this claim to patients. *Id.* ¶¶ 19, 326, 339. But it is false. *Id.* ¶¶ 69, 171–95, 338. And "WPATH knows that its representations about the reversibility of puberty blockers are deceptive," with a co-author of the relevant SOC-8 chapter stating that this claim "should have an 'asterisk' next to it." *Id.* ¶¶ 18, 195. Indeed, WPATH concedes that it is aware of "the connection

between the use of puberty blockers and poor bone health later in life." Mem. 17. It is deceptive to communicate to consumers that a procedure is "fully reversible" while knowing of its connection to permanent harm.

**Count I.D.** Count I.D. assigns liability to WPATH's deceptive claim that cross-sex hormones improve mental health. Am. Compl. ¶ 409(D). This includes claims that the administration of cross-sex hormones "positively impact[s] the mental health and quality of life of [children]." *Id.* ¶ 390. WPATH also claims that "hormone therapy is considered a lifesaving intervention." *Id.* ¶ 385. Plaintiffs allege that WPATH lacks sufficient evidence for these claims. *E.g.*, *Id.* ¶ 145. WPATH responds that it cites studies after at least some of these statements. Mem. 17. But citing another publication does not insulate WPATH from liability for deceptive statements, much less show that WPATH has the level of proof necessary to make such establishment claims. *See supra* II.A. Again, this is a dispute for trial.

**Count I.E.** Count I.E. assigns liability to WPATH's deceptive claim that performing breast amputations on children is safe, effective, and consistently beneficial. Am. Compl. ¶ 409(E). This includes a "strong recommendation" with respect to surgical interventions for children, which indicates that "the evidence is of high quality" and that "there are few downsides of [the] therapy/intervention/strategy." *Id.* ¶¶ 391–92. Not so. *See id.* § VIII.D.iv.

WPATH argues that its strong recommendation for this procedure, and its other statements in Chapter 13 of SOC-8, apply only "*for adults.*" Mem. 18. Not so. The second sentence of Chapter 13 reads: "This chapter describes surgery and postoperative care recommendations for TGD adults *and adolescents*." SOC-8 at S128 (emphasis added).[9] WPATH could be correct that the evidence

[9] WPATH uses a capacious definition of "adolescent" which applies to children as young as 8 or 9 years old. Am. Compl. at 5 n.1. Here, as in the Amended Complaint, Plaintiffs use "child"

it cites relates to mastectomies on adults, not children. But SOC-8's statements still apply to both adults and children.[10] WPATH could also be correct that Chapter 13 and its recommendations were originally drafted to apply only to adults. But WPATH contradicted its expert consensus process and removed age limits from those recommendations. Am. Compl. ¶ 114. Thus, SOC-8 contains a "strong recommendation" for breast amputation despite an "absence of competent and reliable scientific evidence" supporting that procedure for children. *Id.* ¶ 160; *see id.* ¶ 395.

**Count II.A.** Count II.A assigns liability to WPATH's deceptive claims that "SOC-8 represents unbiased, evidence-based expert consensus." Am. Compl. ¶ 412(A). WPATH represents that SOC-8 is "consensus based expert opinion" and is backed by "expert consensus." *Id.* ¶¶ 393–99. But WPATH disregarded the results of its own process for obtaining expert consensus, and in any event "there is no consensus concerning pediatric medical transition services." *Id.* ¶ 159; *see id.* ¶¶ 131, 397. WPATH further represents that it follows certain conflict of interest standards, when in fact it disregards them. *See id.* ¶ 395–96.

WPATH responds that "disputes about the reliability of a scientific study's disclosed methodology cannot create an actionable falsehood." Mem. 18–19 (quoting *Pacira BioSciences*, 63 F.4th at 247). That authority is inapplicable for several reasons, *see supra* II.B, but most relevant

---

to describe an "unemancipated person under the age of majority," *i.e.*, the term's ordinary meaning. Child, Black's Law Dictionary (12th ed. 2024); *see* Am. Compl. at 5 n.1.

[10] WPATH also misstates SOC-8's prerequisites for operating on children, asserting that SOC-8 permits such surgeries only after "any '[m]ental health concerns' have been addressed." Mem 18. But SOC-8 does not require that children's mental health concerns be resolved or meaningfully mitigated before surgery. Instead, it only requires that they be addressed to the extent that they "could negatively impact the outcome of" the "surgical intervention" such as by impeding "medication adherence" or "attending follow-up appointments." SOC-8 at S63, S256. This "does not mean all mental health challenges can or should be resolved completely" before surgery under WPATH's recommendations. SOC-8 at S63. Regardless, even if mental health conditions were resolved, the evidence does not support a recommendation that children's breasts be amputated.

here is that WPATH misrepresented that it followed a particular methodology when it in fact did not. And the case law upon which WPATH relies applies only where claims are "based on accurate descriptions of the data and methodology underlying those conclusions." *ONY*, 720 F.3d at 498. The Amended Complaint assigns liability not to SOC-8's disclosed methodology, but to WPATH's repeated disregard of the methodology that it claimed to follow. It is deceptive for WPATH to state that it arrived at its recommendations through a Delphi expert consensus process when in fact it disregarded the results of that process with respect to pediatric medical transition procedures. Am. Compl. ¶ 114. Nor can WPATH tell SOC-8's readers that it followed conflict of interest rules that it flouted, or falsely represent that its authors were unconflicted. *See id*. ¶ 395–96. And it cannot tell consumers that its recommendations reflect expert consensus when its conclusions are sharply debated at best and represent the consensus only of those who profit from selling these services at worst. *See id*. ¶¶ 131, 159–60.

To begin with, WPATH falsely asserts that "[c]onsensus of the final recommendations was attained using a Delphi process," when in fact its removal of age limits did not obtain consensus through that process. Am. Compl. ¶ 88–89. WPATH argues that readers should have known that its representation regarding consensus was untrue, as SOC-8's methodology section stated generally that there was a "Revision of Final Draft based on comments." Mem. 19. But that does not put readers on notice that those comments and revisions were excluded from the Delphi process, or that WPATH disregarded an attempt to arrive at an expert consensus on performing medical transition procedures on children in response to political pressure and to protect its members' profits. *See* Am. Compl. § VIII.A.ii–iv. And a reasonable reader could understand WPATH's representation that "the *final* recommendations" were "attained using a Delphi process" to include that the *final* product of SOC-8 followed the Delphi process. *Id*. ¶¶ 88–89 (emphasis

added). A one-line disclaimer, which itself is unclear, does not preclude that reasonable net impression.

Next, WPATH claims that the conflict-of-interest rules that it purports to follow are "absurd" and improperly asserts facts outside the pleadings in arguing that no other medical association follows them. Mem 19–20. But what matters is that WPATH stated it was following them, but did not. *See* Am. Compl. § VIII.A.i. Conflicts of interest under these standards include "professional affiliations and practice specialization, reimbursement incentives, intellectual preconceptions and previously stated positions." *Id.* ¶ 70. Most, if not all, relevant SOC-8 authors had such conflicts. *Id.* ¶ 83. WPATH falsely represents that SOC-8 complied with WHO and NAM standards in reviewing "[c]onflicts of interests . . . as part of the selection process," *id.* ¶ 82, when WPATH did not disclose or manage conflicts prior to the selection of guideline members. *Id.* ¶ 81. Whether WPATH believes the guidelines that it professed to follow are absurd is irrelevant. Moreover, regardless of which standards were used, SOC-8 should have disclosed that its authors profited from the procedures they were recommending and had additional reputational and intellectual conflicts. *See id.* ¶¶ 78–80, 83. WPATH thus misled consumers both by representing that it followed certain standards (when it did not) and by stating that its authors had "[n]o" significant conflicts of interest (when they did). *Id.* ¶ 82.

**Count II.B.** Count II.B. assigns liability to WPATH's representation that pediatric medical transition is the "standard of care" for children who express dissatisfaction with or distress about their sex traits. Am. Compl. ¶ 412(B). WPATH claims that these procedures are "medically necessary" and "makes 'strong recommendations' with respect to cross-sex hormones, puberty blockers, and surgical interventions for children, thereby asserting that 'the evidence [for the intervention] is of high quality,' 'there are few downsides,' and 'there is a high degree of acceptance

among providers' for the treatment." *Id.* ¶¶ 400–02. This is "[d]espite the low-quality evidence" supporting its recommendations. *Id.* ¶ 400. And it deceptively calls these recommendations the "standard of care," invoking the legal standard for competent and adequate medical treatment, even though these recommendations are not the "standard of care." *Id.* ¶¶ 128–131, 400.

WPATH responds that it cites to "over 1,500 studies" in SOC-8. Mem. 20. But, to the extent WPATH is not attempting to improperly introduce these studies on a motion to dismiss, the number of studies that SOC-8 cites is beside the point. WPATH's recommendations are unsupported by reliable and competent scientific evidence. *E.g.*, Am. Compl. ¶ 145. WPATH is free to dispute the allegation that its evidence is not sufficiently competent or reliable, but that is a matter for trial, not a motion to dismiss. WPATH also argues that "[d]octors can review those citations themselves and decide whether they support SOC-8's recommendations or establish a 'standard of care.'" Mem. 20 (quotation omitted). This again ignores that WPATH intends for SOC-8 to be reviewed and considered by "individuals" and "their families," not just doctors, and that WPATH created SOC-8 as a tool for WPATH members to use to mislead consumers. *See supra* II.C.

**Count III.** The Amended Complaint alleges that WPATH failed to disclose several material side effects of the treatments it recommends to children. Am. Compl. ¶ 415–17. WPATH provides four main responses. *See* Mem. 20–22. First, it identifies one side effect that is disclosed in an entirely different chapter. *See id.* Second, it points to similar side effects that it does disclose. *See id*. Third, it argues that it cites studies that disclose these side effects. *See id.* Fourth, it argues that it has no duty to disclose side effects at all. *See id.* Each argument fails.

First, as to the allegation that it fails to disclose hot flashes as a side effect of puberty blockers when administered to children, WPATH notes that it discloses this side effect elsewhere in SOC-8. Mem. 21 (citing SOC-8 at S91). Specifically, WPATH devotes a chapter of SOC-8 to

"eunuchs." SOC-8 Chapter 9. This term, in WPATH's usage, refers to a "distinct gender identity"—that is, a person might identify not as a man or woman but as a eunuch. SOC-8 at S88. In WPATH's view, these individuals may need "medically necessary gender-affirming medical and/or surgical treatments" such as puberty blockers or "surgical castration." SOC-8 at S88–90. WPATH warns that eunuchs prescribed puberty blockers may experience "hot flashes, fatigue, metabolic effects, and loss of bone mineral density." SOC-8 at S91. But where children are concerned, WPATH makes no such disclosure. Am. Compl. ¶ 403. Thus, when doctors, children, or their parents look to the relevant chapters for guidance on treatment, they will not find this disclosure. *Id.* ¶ 307. Further, a disclosure of accurate information in a separate document, fine print, or an otherwise inconspicuous location is not enough to cure an "otherwise deceptive" representation. *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 44 n.7 (D.C. Cir. 1985); *see id.* at 42–43; *FTC v. Corpay, Inc.*, 164 F.4th 807, 836 (11th Cir. 2026). If WPATH considers a side effect of puberty blockers material enough to warn eunuchs, then it is material enough to warn children and their parents. WPATH's failure to do so is deceptive.

Second, WPATH then notes that it warns of side effects that are similar to, but generally less serious than and distinct from, undisclosed side effects. *See* Mem. 20–22. For example, instead of "vocal pain" WPATH warns of "[d]eepening of voice." *Id.* 21. Instead of "vaginal pain" WPATH warns of "[v]aginal atrophy." *Ibid.* Instead of "erectile pain" WPATH warns of "[e]rectile [d]ysfunction." *Ibid.* It does not warn that such dysfunction may be "persistent" long after hormones cease. *See ibid*; Am. Compl. ¶ 205. Instead of "cognitive problems" related to puberty blockers, WPATH notes that "potential neurodevelopmental impact" is "an area in need of continued study." Mem. 21. These are different side effects, and to the extent WPATH believes them to be the same it has willfully concealed their true nature to deceive consumers. Parents

deciding on treatment for their children—especially after being told their children may commit suicide—may not be especially concerned if their child experiences "erectile dysfunction" while undergoing treatment. If they are instead told the truth that their child might "experience[] erections that [are] excruciatingly painful in a way" that feels like "broken glass or stabbing needles," parents may rethink that decision. Complaint, Ex. 7 ¶ 49, ECF No 1-7; *see* Am. Compl. ¶ 193. And the possibility that erectile dysfunction may persist long after treatment ends might dissuade parents from consenting to these procedures. *Id.* ¶¶ 205, 207. Thus, omitting these side effects is deceptive. And although WPATH may think that its warnings are adequate, that is a dispute for trial.

Third, WPATH alleges that it cites studies that reveal these symptoms. *See* Mem. 21–22. This Court should disregard that argument as it relies on material outside of the Amended Complaint. But it is also incorrect. Failing to include those symptoms in SOC-8, along with representing that "there are few downsides" to the procedures, deceives consumers who review SOC-8, have its claims repeated to them by clinicians, or receive treatment recommendations from clinicians relying on SOC-8. Am. Compl. ¶ 96. Again, if these sources disclose side effects, a disclosure of accurate information in a separate document is not enough. *See Corpay*, 164 F.4th at 836 (discussing case law holding that disclaimers must be sufficiently prominent and unambiguous, among other requirements). WPATH's argument demonstrates only that WPATH knew that these side effects existed and should have disclosed them.

Fourth, WPATH similarly argues that doctors bear the responsibility for disclosing side effects, while it bears none. Mem. 22. Clinicians—including most of WPATH's members—do have a responsibility to inform their patients of the likely side effects of medical transition treatments. But that does not give WPATH *carte blanche* to make deceptive statements without

accountability. In essence, WPATH's argument creates a game of hot potato. WPATH passes responsibility to doctors, while doctors, if sued, would pass responsibility to WPATH by claiming to merely follow WPATH's "Standards of Care." But WPATH cannot hide behind doctors.

Likewise, WPATH encourages "individuals" and "their families" to consider SOC-8 in making healthcare decisions, Am. Compl. ¶ 307—but it does not warn them that they must read the "over 1,500 scientific studies" to learn of significant side effects. Mem. 1. WPATH is responsible for its own deceptive statements and omissions.

## III. WPATH's constitutional arguments fail

### A. The Amended Complaint pleads that WPATH is engaged in misleading commercial speech, which enjoys no First Amendment protection

WPATH's argument that this enforcement action violates the First Amendment mischaracterizes this dispute and ignores precedent. The First Amendment does not protect deceptive commercial speech, and it is routine for State and federal governments to bring enforcement actions seeking to enjoin such speech. Nor does the Amended Complaint and the relief it seeks constitute viewpoint discrimination. Plaintiffs allege that each of WPATH's deceptive statements was made to "generate significant profit" for its members. Am. Compl. ¶ 246. The First Amendment does not protect such conduct.

#### 1. It is routine for the FTC to bring enforcement actions against organizations that engage in misleading commercial speech

Congress wrote WPATH's business model into the FTC Act. The Act reaches any "association, incorporated or unincorporated, which is organized to carry on business for its own profit *or that of its members*." 15 U.S.C. § 44 (emphasis added). That is precisely what the Amended Complaint alleges WPATH to be. Am. Compl. ¶¶ 6, 16, 246–350. Whether the Act applies turns on whom the organization is designed to profit, not on its tax status. And the FTC has enforced the Act against organizations like WPATH from the agency's earliest days. *See, e.g.*, *FTC*

*v. Association of Flag Mfrs.*, 1 F.T.C. 55, 57–58 (1918).[11] And for just as long, courts have affirmed FTC enforcement actions against organizations that act for the profit of their members, regardless of corporate form. *See, e.g.*, *FTC v. Pacific States Paper Trade Ass'n*, 273 U.S. 52, 59 (1927).

"The FTC Act directs the Commission to 'prevent' the broad set of entities under its jurisdiction 'from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.'" *California Dental Ass'n*, 526 U.S. at 768 (quoting 15 U.S.C. § 45(a)(2)). That congressional directive extends to putative "[n]onprofit entities organized on behalf of for-profit members" as those entities "have the same capacity" and "incentives" to violate the FTC Act. *California Dental Ass'n*, 526 U.S. at 768 (addressing an enforcement action against "a voluntary nonprofit association of local dental societies to which some 19,000 dentists belong," *id.* at 759); *see* 15 U.S.C. § 44. And, as the unanimous Supreme Court explained,[12] a putative nonprofit may "have certain advantages" in violating the FTC Act as it "would enjoy the screen of superficial disinterest while devoting itself to serving the interests of its members without concern for doing more than breaking even." *Id.* at 768.

It is often these organizations' speech that brings them under the FTC's jurisdiction. "[L]obbying, litigation, marketing, and public relations for the benefit of" an organization's "members' interests" are "activities" that create "economic benefits" which satisfy the FTC Act's "jurisdictional touchstone." *California Dental Ass'n*, 526 U.S. at 767. That the FTC gains jurisdiction over such organizations based on their speech establishes that such speech is "in or affecting commerce." 15 U.S.C. § 45(a)(1); *California Dental Ass'n*, 526 U.S. at 767–68

---

[11] FTC decisions are published in volumes, accessible on the FTC's website at https://www.ftc.gov/legal-library/browse/cases-proceedings/commission-decision-volumes.

[12] The Court unanimously agreed on the FTC's jurisdiction over such organizations but split on an unrelated question regarding "rule of reason" analysis.

(explaining that such speech satisfies the FTC Act's jurisdictional provision). Similarly, the State causes of action apply to commercial speech like WPATH's. *See* AS § 45.50.471; Iowa Code § 714.16; Neb. Rev. Stat. § 87-302; Tex. Bus. & Com. Code § 17.46.[13]

**2. The Amended Complaint alleges that WPATH has engaged in misleading commercial speech**

The Amended Complaint alleges facts that establish WPATH's speech to be commercial. *E.g.*, Am. Compl. ¶¶ 253–59 (explaining insurance-related market dynamics), 260–70 (recounting WPATH's response to those dynamics in SOC-7 and SOC-8), 271–88 (explaining the success and profitability of WPATH's efforts). WPATH's speech is foundational to its members' profitability. *See id*. ¶¶ 6–7, 13–14, 16, 246–350. It is therefore not a close question whether WPATH's speech is commercial, and this Court need not go further. *See Ariix*, 985 F.3d at 1115 (explaining that the *Bolger* factors for commercial speech apply when "the facts present a close question").

Even assuming it is necessary to apply the *Bolger* factors, WPATH's speech is commercial. The Supreme Court has provided three "no[n-]dispositive" factors to guide the commercial speech analysis when "the facts present a close question." *Ariix*, 985 F.3d at 1115–16 (discussing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983)). They ask whether "[1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation." *Ariix*, 985 F.3d at 1116 (quotation omitted). Additional principles guide the analysis. Even speech that is not itself a "proposal[] to engage in commercial transactions" may be

---

[13] The deceptive omission claims, Am. Compl. ¶¶ 403–405, derive from affirmative statements. Specifically, the omission of various risks and side effects is pertinent because WPATH affirmatively represents, via a "strong recommendation," that various treatments have "few downsides," among other things. *Id.*, *see supra* II.A (explaining the meaning of a "strong recommendation"). The failure to disclose a substantial downside to a treatment is a deceptive omission in the context of such a "strong recommendation."

commercial speech. *Bolger*, 463 U.S. at 66. Nor does speaking about a product or service which is the topic of debate, scientific or otherwise, render speech "entitled to the constitutional protection afforded noncommercial speech." *Id.* at 68. To hold otherwise would allow organizations "to immunize false or misleading product information from government regulation simply by including references to public issues." *Ibid*. *Bolger* itself involved a drug company that manufactured contraceptives and primarily sold them to wholesalers. *Id.* at 62. The company's speech included "informational pamphlets discussing the desirability and availability of prophylactics in general." *Ibid*. But the Court held that such speech was commercial "notwithstanding" the company's discussion of public health issues. *Id*. at 67–68.

WPATH's speech is commercial under the *Bolger* factors. As discussed in more detail below, WPATH's speech meets the first two prongs as it promotes specific medical transition services. But courts often find the third factor, which examines the motivation of the speaker, to be outcome-determinative. *See Ariix*, 985 F.3d at 1116–18; *see also P&G Co. v. Amway Corp.*, 242 F.3d 539, 552 (5th Cir. 2001) (remanding for consideration of the "determinative" third factor).

Plaintiffs allege that WPATH was founded "to promote the transition service industry's financial interests" following a decline in insurance coverage for medical transition drugs and surgeries, Am. Compl. § VII.A; *id.* ¶¶ 51–56, 246–59, that each of WPATH's deceptive statements was made to "generate significant profit" for its members, *id*. ¶ 246, and that WPATH's efforts are lucrative, *id*. ¶ 271–315.

Put simply, WPATH speaks with economic motive. *Ariix* is instructive. It did not matter that the company in *Ariix*, like WPATH, self-published a document "that compares and reviews nutritional supplements sold in the direct marketing industry," "portray[ed] itself as an independent company that presents only objective data and scientific analyses to the public," disclaimed any

bias, and represented that it "simply documents recent findings in the scientific literature." 985 F.3d at 1111–12. In *Ariix*, as here, the plaintiffs alleged that the company was not independent but was instead seeking profit by skewing its purportedly neutral scientific commentary. *Id*. at 1118–19. And the defendant in *Ariix*, like WPATH, failed to disclose conflicts of interest. *Id*. at 1118. Plaintiffs allege that WPATH "conceived [SOC-8] to juice sales of [medical transition] products [and services], actively misled the public about [its] supposed independence, and fiddled with [its] own [methodology] to boost" its members' profits. *Id*. at 1119. The Amended Complaint thus alleges the same pattern that the Ninth Circuit held sufficient in *Ariix*: a self-published guide conceived to drive sales, a false claim of independence, and a methodology bent to serve members' profits. *Cf. id.* at 1111. WPATH speaks with economic motive, so its speech is commercial.

WPATH's speech meets the remaining two factors because it is an advertisement and it refers to specific products—medical transition drugs, surgeries, and related services. Speech need not be "in the traditional form of an advertisement," or even list "price or availability" to be an advertisement. *Ariix*, 985 F.3d at 1116. Instead, "today's sophisticated and subtle marketing campaigns" often conceal advertisements within other media. *Id.* at 1116. That is why a self-published document "that compares and reviews nutritional supplements sold in the direct marketing industry" was commercial speech, even though the author "portray[ed] itself as an independent company that presents only objective data and scientific analyses to the public," including by claiming to rely "on scientific criteria" in reviewing products, disclaiming any bias, and representing that it "simply documents recent findings in the scientific literature." *Id.* at 1111–12. Similarly, informational speech can be commercial when it discusses a product or service "all in a positive tone." *Facenda*, 542 F.3d at 1017. Moreover, "[a]n advertisement is no less 'commercial' because it promotes brand awareness or loyalty rather than explicitly proposing a

transaction in a specific product or service." *Jordan*, 743 F.3d at 518. Thus, speech that "enhance[s] the [speaker's chosen] brand in the minds of consumers" performs "an unmistakable commercial function." *Ibid*.

WPATH's speech fits the bill. WPATH has systematically overemphasized the benefits of pediatric medical transition while deemphasizing or omitting the downsides. Am. Compl. ¶¶ 68–245. It has made bold proclamations of medical necessity and strong recommendations in favor of specific products—*i.e.*, drugs, surgeries, and related treatments—without the necessary scientific foundation to support such recommendations. *Ibid*. And it did this both to secure insurance coverage and to provide its members with ammunition to sell pediatric medical transition products and services to parents. *Id*. ¶¶ 6–20, 253–88, 316–50. In short, SOC-8 "enhance[s] the [pediatric medical transition] brand in the minds of consumers" by creating the net impression that pediatric medical transition is safe, effective, and medically necessary, and it does so by discussing specific drugs, surgeries, and related treatments. *Jordan*, 743 F.3d at 518. That WPATH purports to "enjoy the screen of superficial disinterest while devoting itself to serving the interests of its members" does not excuse it from the FTC Act or the States' consumer protection laws. *California Dental Ass'n*, 526 U.S. at 768. WPATH's speech is commercial.

Because the Amended Complaint alleges that WPATH's commercial speech is misleading, that speech falls outside of the First Amendment's protections. "For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading." *POM Wonderful*, 777 F.3d at 499 (quotation omitted).[14]

[14] At minimum, restrictions on "misleading commercial speech need only survive rational basis scrutiny, by being 'reasonably related to the State's interest in preventing deception of consumers.'" *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (quotation omitted). Plaintiffs allege that WPATH is

### 3. This enforcement action does not constitute viewpoint discrimination

WPATH asserts that the claims in this action are "improper viewpoint-based restrictions," but that argument fails for three reasons. *See* Mem. 30–35.

*First*, WPATH misunderstands the nature of this dispute. Plaintiffs do not seek to "prevent individuals and organizations like WPATH from" participating in scientific debate. Mem. 31. Nor are the Plaintiffs "attempting to insert themselves into the middle of this medical debate and silence those with whom they disagree." Mem. 33. Plaintiffs are not, through this action, taking a side in any genuine scientific debate. Courts have consistently held that the First Amendment does not protect misleading establishment claims, as such statements do not merely "espouse one side of a genuine controversy." *National Com'n on Egg Nutrition*, 517 F.2d at 489. Misleading statements, even those which purport to weigh in on "a medical controversy," *id.* at 487, or on matters where "[s]cientists disagree," *ECM Biofilms*, 851 F.3d at 606, are tainted by deception such that they are "unprotected by the First Amendment," *POM Wonderful*, 777 F.3d at 500 (addressing misleading claims about whether medical science established the efficacy of a product). WPATH will presumably dispute whether its statements are, in fact, misleading or that it was, in fact, economically motivated in making them. But those are matters for summary judgment or trial, not a motion to dismiss.

Instead, Plaintiffs are seeking to enjoin WPATH from making deceptive statements and deceptively omitting information in order to promote pediatric medical transition and secure insurance payments for its members, and to obtain monetary relief for such deceptive conduct under the appropriate State laws. Am. Compl. ¶¶ 406–51; *id.* § XVIII. This action therefore targets

---

engaged in such deception and seek to enjoin it (amongst other relief), so this action is reasonably related to addressing that deception.

deceptive commercial speech, not speech based on a particular viewpoint, so it is not a viewpoint-based restriction. *See, e.g.*, *id.* ¶ 409 (asserting that several of WPATH's claims are unlawful not because they express a particular viewpoint, but because the statements are "false, misleading, or unsubstantiated"). In other words, WPATH is free to argue whatever side of the debate it wishes, but it may not mislead consumers, including by providing the means and instrumentalities to deceive consumers, in doing so. And because deceptive commercial speech does not "come within [the First Amendment]," WPATH's unlawful speech falls outside the First Amendment's protection. *POM Wonderful*, 777 F.3d at 499 (affirming FTC ruling that certain advertisements were "entitled to no First Amendment protection").[15]

*Chiles v. Salazar* does not help WPATH. There, the Court held that a Colorado law triggered strict scrutiny because it was an "egregious" restriction on "what views" a licensed counselor "may and may not express" during talk therapy. *Chiles v. Salazar*, 146 S. Ct. 1010, 1024 (2026). Three central features of that case are absent here. To begin with, *Chiles* concerned a statute that barred an entire category of speech according to the viewpoint expressed. In contrast, Plaintiffs challenge specific statements as deceptive; WPATH remains free to make other claims about pediatric medical transition, including about purported benefits, provided it does so honestly. Next, the speech in *Chiles* was noncommercial speech. *Chiles* did not address commercial speech, did not

---

[15] WPATH relies on a preliminary ruling in a different case concerning a now-withdrawn civil investigative demand. Mem. 35 (suggesting that the court in *World Pro. Ass'n for Transgender Health v. FTC*, 2026 WL 1257321 (D.D.C. May 7, 2026) agreed with "this" *i.e.*, WPATH's, "conclusion" regarding asserted viewpoint discrimination). That reliance is misplaced. WPATH's "transient" result in a now-moot case in a different jurisdiction raising different legal theories on a factual record not before this Court is inapplicable here. *Lackey v. Stinnie*, 604 U.S. 192, 201 (2025); *see Dorsey*, 540 F.3d at 338. In any event, the D.C. court later rejected WPATH's argument that this case overlaps with the D.C. action. *World Pro. Ass'n for Transgender Health v. FTC*, 2026 WL 1999008, at *1–3 (D.D.C. July 10, 2026).

apply commercial-speech precedent, and did not disturb the settled rule that misleading commercial speech is unprotected. Finally, nobody alleged that the counselor in *Chiles* deceived anyone; deception is the entirety of this case. Justice Kagan's concurrence proves the point—she and Justice Sotomayor joined the majority precisely because the law discriminated based on viewpoint, observing that "a content-based but viewpoint-neutral law . . . would raise a different and more difficult question." *Id.* at 1029 (Kagan, J., concurring). Liability here turns on whether WPATH's statements are deceptive, not on the position it advances.

*Second*, WPATH again argues that its statements are non-actionable "opinion." That argument is no stronger the second time around. As explained in more detail above, WPATH does not express bona fide scientific opinions of the sort that case law protects. WPATH drafted SOC-8 to maximize insurance coverage for its members, not to convey tentative, testable conclusions to the scientific community. *Supra* II.B; *see* Am. Compl. ¶¶ 246–88. And the statements that Plaintiffs challenge are establishment claims—factual representations "suggest[ing] that a product's effectiveness or superiority has been scientifically established." *POM Wonderful*, 777 F.3d at 490; *see supra* II.A. WPATH's establishment claims turn on whether it possesses "the level of evidence required to convince the relevant scientific community of the claim's truthfulness," *POM Wonderful*, 777 F.3d at 498 (quotation omitted), *i.e.*, whether sufficient competent and reliable scientific evidence supports WPATH's *factual* assertions, express or implied.

Courts have consistently rejected similar First Amendment challenges to enforcement actions against misleading establishment claims. For example, the Seventh Circuit rejected a First Amendment argument when the FTC sought to enjoin an organization's misleading statements relating to the scientific evidence linking "eating eggs" to "the risk of heart disease or a heart attack." *National Com'n on Egg Nutrition*, 517 F.2d at 487. Despite there being "a medical

controversy about the subject," *id.*, the court held that there was no "First Amendment problem" because issuing "misleading" statements is categorically different than "espous[ing] one side of a genuine controversy," *id*. at 489; *see POM Wonderful*, 777 F.3d 499–500 (substantially rejecting a First Amendment challenge to an FTC order because the statements at issue were misleading, despite that petitioners cited studies to support their claims).

And in *ECM Biofilms*, the FTC alleged that a company's representations regarding a product that purportedly "accelerate[d] the biodegradation of plastics manufactured with the additive" were inadequately substantiated and, therefore, misleading. 851 F.3d at 605. The Sixth Circuit noted that "[s]cientists disagree on the precise definition of the term 'biodegradable.'" *Id.* at 606. And the company pointed "to nineteen laboratory tests that, it claims," showed that its biodegradability representations were not misleading, while the FTC argued that "thirteen [other] tests" instead demonstrated that those claims were misleading. *Ibid*. Despite the scientific nature of the dispute, the court rejected the company's First Amendment challenge to the FTC's order because the FTC had not abridged the company's "right to disseminate truthful scientific information." *Id*. at 614. Instead of treating such speech as expressing non-actionable opinion or viewpoint, the court affirmed the FTC's remedy: requiring that the company possess "competent and reliable" scientific evidence proving its claims before labeling its products as "biodegradable," or provide a disclaimer accompanying any claim of biodegradability. *Id*. at 615–17. Thus, a scientific dispute does not immunize misleading or inadequately substantiated statements from consumer protection laws. *See also Eastman Chem. Co.*, 775 F.3d at 236 (explaining that statements "open to scientific or public debate" are not "immune" under the First Amendment).

*Third*, as these cases demonstrate, the proper locus for a First Amendment dispute in a case regarding establishment claims is at the remedy stage, not on a motion to dismiss. *See ECM*

*Biofilms*, 851 F.3d at 615–17 (rejecting First Amendment challenge to an FTC order governing future speech); *POM Wonderful*, 777 F.3d at 500–05 (rejecting First Amendment challenge to FTC findings and rejecting in part First Amendment challenge to the scope of an injunctive order); *National Comm'n on Egg Nutrition*, 517 F.2d at 489–90 (rejecting First Amendment argument against "issuance of an injunction" and defining the scope of the injunction to cover the types of statements found misleading). WPATH is free to raise such arguments at that stage, but this Court should not allow WPATH to circumvent the normal course of litigation by misapprehending the nature of this action.

This Court should reject WPATH's First Amendment argument and hold that "when someone falsely claims to be independent," *e.g.*, Am. Compl. ¶¶ 68–89, "rigs" medical guidelines to maximize its members' "compensation," *e.g.*, *id*. ¶¶ 90–270, "and then" its members "profit[] from that perceived objectivity," *e.g.*, *id*. ¶¶ 271–350, "that speaker has drowned the public trust for economic gain," and "[s]ociety has little interest in protecting such conduct under the mantle of the First Amendment," *Ariix*, 985 F.3d at 1118–19.

**B. The Tenth Amendment does not exempt medical organizations from the FTC Act**

WPATH's Tenth Amendment argument fares no better because it never engages with the only question that the Tenth Amendment poses. The Amendment "states but a truism that all is retained which has not been surrendered," *United States v. Darby*, 312 U.S. 100, 124 (1941), and so "[i]f a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States," *New York v. United States*, 505 U.S. 144, 156 (1992). The FTC Act is an exercise of Congress's commerce power, and WPATH does not contend otherwise. Nor does that action commandeer any State or state officer; Plaintiffs seek relief against a private corporation. That ends the Tenth Amendment inquiry. What remains is

WPATH's actual argument—that some background principle exempts medical organizations from the FTC Act. But there is no such principle.

The FTC has a long history of enforcing the FTC Act against medical organizations that engage in deceptive acts or practices. *E.g.*, *California Dental Ass'n.*, 526 U.S. at 759; *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 448–49 (1986); *American Med. Ass'n v. FTC*, 638 F.2d 443, 446–47 (2d Cir. 1980) (discussed with approval by *California Dental Ass'n*, 526 U.S. at 765 n.6); *Empire State Pharm. Soc'y*, 114 F.T.C. 152 (1991); *Michigan State Med. Soc'y*, 101 F.T.C. 191 (1983); *Forbes Health Sys. Med. Staff*, 94 F.T.C. 1042 (1979); *Indiana Dental Ass'n*, 93 F.T.C. 392 (1979); *Medical Serv. Corp.*, 88 F.T.C. 906 (1976). If these enforcement actions violated the Tenth Amendment, courts would have said so rather than affirming time and again that the FTC Act applies to medical organizations. *See California Dental Ass'n.*, 526 U.S. at 766–68; *Indiana Fed'n of Dentists*, 476 U.S. at 448 (holding that the FTC Act applied to a dispute concerning "commercial relations among certain Indiana dentists, their patients, and the patients' dental health care insurers"); *American Med. Ass'n*, 638 F.2d at 448 (affirming that "business aspects" of a medical organization's "activities" are still "within the scope of the" FTC Act—which applies to activities "in or affecting commerce," 15 U.S.C. § 45.). Indeed, neither WPATH nor its State *amici* cite a case holding that the Tenth Amendment bars the FTC Act from applying to medical organizations. *See* Mem. 25–30, *see generally* WPATH Amici Br.

Nevertheless, WPATH and its *amici* fight a straw man. As explained above, the FTC and the State Plaintiffs are not seeking to usurp State authority to regulate medicine, preempt State law, or take part in the substantive debate around medical transition through this action. *Contra* WPATH Amici Br. at 2, Mem. 25–30. This case only concerns WPATH's deceptive statements and omissions. Am. Compl. ¶¶ 375–403. If the Plaintiffs win, the resulting order will not remove the

State laws of WPATH's *amici* from the books and those *amici* will remain free to determine what treatments are (in their view) medically necessary. But WPATH will be prohibited from making misleading establishment claims and other deceptive statements and omissions, and it will be required to pay compensation and penalties under the State Plaintiffs' laws. *Id.* § XVIII. In other words, the debate will continue, but it will do so on honest terms.

WPATH also misrepresents the law, claiming that 42 U.S.C. § 1395 "*explicitly* disapproves of any effort by the FTC to 'exercise supervision' over state judgments about the practice of medicine." Mem. 30 (emphasis added). Not so. Instead, that statute provides that "[n]othing *in this subchapter* shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine." 42 U.S.C. § 1395 (emphasis added). The statute thus poses three fatal problems for WPATH's interpretation. *First*, the subchapter to which the statute applies governs Medicare, which WPATH appears to realize, Mem. 26, but soon forgets, Mem. 29–30.[16] If the statutory basis for this action was a statute within that subchapter, then WPATH might have a point. It is fortunate, then, that the FTC brings this action under the FTC Act, Am. Compl. ¶¶ 406–17, which is not the subchapter to which 42 U.S.C. § 1395 applies. Indeed, the FTC Act is not even in the same *title* of the United States Code. *See* 15 U.S.C. § 45. *Second*, 42 U.S.C. § 1395 does not "*explicitly* disapprove[] of any effort by the FTC" to do anything at all. Mem. 30 (emphasis added). Indeed, the statute does not mention the FTC. *Third*, 42 U.S.C. § 1395 does not "forbid[]" anything. Mem. 29. Instead, it clarifies that the Medicare statutes do not "authorize" certain actions. 42 U.S.C. § 1395.

---

[16] WPATH asserts that the Medicare statutes are "most analogous here," Mem. 26, but does not explain how a statute governing administration of a federal health insurance program is analogous to consumer protection law. It is not.

WPATH's invocation of *FTC v. National Casualty Company* proves the point. Mem. 29. In that case, the McCarran-Ferguson Act provided that the Sherman Act, Clayton Act, and FTC Act "shall be applicable to the business of insurance to the extent that such business is not regulated by State law." *FTC v. National Cas. Co.*, 357 U.S. 560, 562 n.2 (1958).[17] Thus, unlike 42 U.S.C. § 1395, the McCarran-Ferguson Act explicitly barred the FTC from enforcing its statutes if State law regulated insurance. *Id.* at 562–63. If anything, this case demonstrates that when Congress seeks to bar the FTC Act from applying to an industry in certain circumstances, it says so explicitly. But here, there is no statute that bars the FTC from applying the FTC Act to misleading commercial speech by a medical organization.

The logical conclusion of WPATH's argument would provide any entity that engages in medical discourse *de facto* immunity from the FTC Act. That is not the law.

**IV. Texas, Nebraska, and Iowa have standing**

WPATH's argument that Texas, Nebraska, and Iowa lack standing is incorrect. WPATH's argument is twofold. First, WPATH argues that these States lack standing to seek injunctive relief because "the injuries alleged are exclusively retrospective." Mem. 36–38. Second, WPATH argues that these States lack standing to seek monetary relief the statutes of limitations have run. Mem. 37. Both arguments fail.

WPATH's statute-of-limitations argument lacks merit. Mem. 37. "[O]ne of the incidents of sovereignty" is that "*nullum tempus occurrit regi*," that is, "no time runs against the King." *Fennelly v. A-1 Mach. & Tool Co.*, 728 N.W.2d 163, 168 (Iowa 2006). Because "[l]imitations

---

[17] The latest amendment to the McCarran-Ferguson Act, which reinstates the application of federal antitrust and competition law to health insurance companies, further demonstrates that the division between federal and State regulation of medicine is one of policy, not constitutional law. *See* Competitive Health Insurance Reform Act of 2020, Pub. L. No. 116-327 (2021).

derive their authority from statutes," the sovereign "was held never to be included, unless expressly named." *Ibid.* Thus, States are "immune from the statute of limitations in order to preserve public rights." *Ibid*; *see Avila v. State*, 252 S.W.3d 632, 647 (Tex. App.—Tyler 2008, no pet.); *Thomas v. State*, 226 S.W.3d 697, 710 (Tex. App.—Corpus Christi 2007, pet. dism'd); *In re Ernst's Guardianship*, 62 N.W.2d 110, 111 (Neb. 1954). WPATH does not identify any applicable exception to this rule, so its argument fails. *See* Mem. 37. The States have standing to seek monetary relief.

WPATH's argument on injunctive relief fares no better. Start with Texas. The Deceptive Trade Practices Act ("DTPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46(a) (hereinafter DTPA § 17.46(a). The DTPA "shall be liberally construed." *Id*. § 17.44(a). Deceptive trade practices include "causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services," *id*. § 17.46(b)(2); "representing that goods or services have . . . uses, [or] benefits" "which they do not have," *id*. § 17.46(b)(5); and inducing consumers to enter transactions by "failing to disclose information concerning goods or services which was known at the time of the transaction," *id*. § 17.46(b)(24).

Texas is not required to prove that any consumer was deceived. An act is "false, misleading, or deceptive if it has the *capacity* to deceive an ignorant, unthinking, or credulous person." *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 479–80 (Tex. 1995) (emphasis added, quotation omitted). "Moreover, it is not necessary for the State to allege any injury to a patient" or other consumer. *Holzman v. State*, 2013 WL 398935, at *3 (Tex. App.—Corpus Christi, Jan. 31, 2013, pet. denied). And Texas need not prove that WPATH directly engaged in the provision of the goods or services because "[p]rivity . . . is not a consideration . . . . The only requirement is that

the goods or services sought or acquired by the consumer form the basis of his complaint." *Flenniken v. Longview Bank and Trust Co.*, 661 S.W.2d 705, 707 (Tex. 1983). Thus, all that is required for a defendant's deceptive act or trade practice to be actionable under the DTPA is a mere connection with a consumer's transaction in goods or services. *Amstadt*, 919 S.W.2d at 649–50; *Knight*, 627 S.W.2d at 388–89 (concluding that a consumer had a DTPA claim for the defendant's deceptive acts "connected with" a sale).

Texas' ban on pediatric medical transition, Tex. Health & Safety Code § 161.702, *et seq.*, has no bearing on Texas' entitlement to injunctive and other available relief. Under Texas law, an injunction under the DTPA remains available despite that another statute prohibits the same conduct. *See Molano v. State*, 262 S.W.3d 554, 563 (Tex. App.—Corpus Christi 2008, no pet.) (explaining that the statute broadly provides for restitution of funds "acquired by unlawful means"). And the DTPA contains an anti-mootness provision for Attorney General enforcement actions, such that the "[c]essation of unlawful conduct" does not deprive the court of jurisdiction "under any circumstances." Tex. Bus. & Com. Code § 17.47(a); *see also Matthews, on behalf of M.M. v. Kountze Indep. Sch. Dist.*, 484 S.W.3d 416, 418 (Tex. 2016) (holding the cessation of challenged conduct does not "deprive a court of the power to hear or determine claims for prospective relief.").

Nebraska's claims are also not barred by a lack of standing. First, Nebraska is not required to allege or prove any consumer was deceived or otherwise harmed by WPATH's deceptive trade practices. *See* Neb. Rev. Stat. §§ 87-302(a), 87-303.05(1), 87-303.11. Nebraska's Uniform Deceptive Trade Practices Act ("NE UDTPA") authorizes the Attorney General to seek injunctive relief "[w]henever the Attorney General has cause to believe a person has engaged in or is engaging in any deceptive trade practice . . . listed in section 87-302." Neb. Rev. Stat. § 87-303.05.

Similarly, § 87-303.11(1) subjects any person who violates § 87-302 to civil penalties and explicitly authorizes the Attorney General to seek recovery of those civil penalties. Notably absent from these sections is any language requiring the Attorney General to allege or prove the deceptive trade practice has harmed or will harm any consumer. This absence is made more conspicuous when these sections are contrasted with that authorizing private action: "A person *likely to be damaged* by a deceptive trade practice of another may bring an action for, and the court may grant, an injunction." Neb. Rev. Stat. § 87-303(a) (emphasis added). Further, the deceptive trade practices listed in § 87-302 only describe each deceptive act or practice without any reference to any effect the act or practice may have on a consumer. For example, § 87-302(a)(2) prohibits "caus[ing] likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services" (emphasis added), and § 87-302(a)(5) prohibits "represent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have." The violation is causing confusion or misunderstanding likely or making a false representation. Therefore, Nebraska does not need to allege future harm to consumers from WPATH's deceptive trade practices. Nebraska is only required to allege the deceptive trade practices themselves, which it has done. *See supra* II.D.

That the conduct WPATH promotes is illegal in Nebraska does not defeat Nebraska's claims and, in fact, bolsters Nebraska's interest in prohibiting WPATH's misleading representations and omissions. As demonstrated by WPATH's *amici*, several states have few restrictions on adolescents obtaining puberty blockers, hormone therapy, or pediatric medical transition surgery. Although WPATH's prior and ongoing representations continue to dictate the purported standard of care for medical providers outside of Nebraska, adolescents in Nebraska are still at risk of harm. That risk presents specific and concrete harm giving rise to Nebraska's *parens*

*patriae* interest. WPATH's reliance on Nebraska's current law prohibiting certain procedures for adolescents is misplaced, as it goes against the grain of when injunctive relief may be appropriate. *See State ex rel. Douglas v. Ledwith*, 281 N.W.2d 729, 736 (Neb. 1979) ("An injunction is a remedy designed to control future behavior, and whether that behavior is occurring at the time of the decree granting the injunction is generally irrelevant to the propriety of its issuance.").

Nor are Iowa's claims are barred by a lack of standing. Iowa is entitled to seek a preliminary or permanent injunction if "it appears to the attorney general that a person has engaged in, is engaging in, or is about to engage in a practice declared to be unlawful by this section." Iowa Code § 714.16(7). Under the Iowa Consumer Fraud Act, it is "deceptive advertising within the meaning of the" statute to advertise "certain services are performed on behalf of clients or customers" that do not provide the benefit claimed. Iowa Code § 714.16(2)(a). Thus, because WPATH "has engaged in" conduct that violates the Iowa Consumer Fraud Act, Iowa has standing to seek a permanent injunction. Iowa Code § 714.16(7).

## CONCLUSION

This Court should deny WPATH's Motion to Dismiss.

Dated: August 18, 2026

Respectfully submitted,


*Of Counsel*

Jonathan Cohen
*Chief Litigation Counsel*
District of Columbia Bar No. 483454*

*/s/ Michael Dingman*
*Senior Counsel to the Director*
District of Columbia Bar No. 90001474*
R. Cooper Vaughan
*Senior Counsel to the Director*
Virginia State Bar No. 92580
Glenna Goldis
*Assistant Director for Special Projects*
New York Reg. No. 4868600*
Hans Clausen
*Attorney*
Georgia Bar No. 153250*

Federal Trade Commission
Bureau of Consumer Protection
600 Pennsylvania Avenue, NW
Washington, DC 20580
Fax: (214) 953-3079
E-mail: MDingman@FTC.gov


*Admitted *pro hac vice*

**FOR THE STATE OF ALASKA**:

CORI M. MILLS
*Acting Attorney General of Alaska*

Charles J. Gartland
*Civil Division Director*
Alaska Bar No. 2509064*
Alaska Dept. of Law
1031 W. 4th Ave.
Suite #200
Anchorage, AK 99501
Telephone: (907) 269-5100
Fax: (907) 269-5100
E-mail: charles.gartland@alaska.gov

*Admitted *pro hac vice*

Attorney for Plaintiff
STATE OF ALASKA

**FOR THE STATE OF IOWA**:

BRENNA BIRD
*Attorney General of Iowa*

Eric Wessan
______________________

Eric H. Wessan
*Solicitor General*
Iowa Attorney General's Office
Iowa Bar Pin: AT0014313
1305 E. Walnut St.
2d Floor
Des Moines, IA 50263
Telephone: (515) 823-9117
E-mail: eric.wessan@ag.iowa.gov

Attorney for Plaintiff
STATE OF IOWA

**FOR THE STATE OF NEBRASKA**:

MICHAEL T. HILGERS
*Attorney General of Nebraska*

Benjamin J. Swanson (pro hac vice forthcoming)
Nebraska Bar No. 27675
*Assistant Attorney General*
Erik W. Fern
*Deputy Bureau Chief*
Nebraska Bar No. 23733*
Consumer Protection Bureau
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, Nebraska 68508
Telephone: (402) 471-3811
Fax: (402) 471-4725
E-mail: erik.fern@nebraska.gov
E-mail: benjamin.swanson@nebraska.gov

*Admitted *pro hac vice*

Attorneys for Plaintiff
STATE OF NEBRASKA

**FOR THE STATE OF TEXAS:**

KEN PAXTON
*Attorney General of Texas*

Brent Webster
*First Assistant Attorney General*

Ralph Molina
*Deputy First Assistant Attorney General*

Austin Kinghorn
*Deputy Attorney General for Civil Litigation*

Johnathan Stone
*Chief, Consumer Protection Division*

David Bizar
*Assistant Attorney General*
Texas State Bar No. 24110737
Office of the Attorney General of Texas
Consumer Protection Division
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 463-2185
Fax: (512) 473-8301
E-mail: David.Bizar@oag.texas.gov

**CERTIFICATE OF COMPLIANCE**

I, Michael Dingman, hereby certify that this document complies with the length limits specified in this Court's Order of August 14, 2026, ECF 66, because it and Plaintiffs' concurrently filed Brief in Opposition to Defendants' Motion to Dismiss or, in the Alternative, Transfer Venue do not exceed 55 pages, excluding the items listed in Federal Rule of Appellate Procedure 32(f) and Local Rule (Civil) 7.2(c).

*/s/ Michael Dingman*
Michael Dingman