# Exhibit 1

# DECLARATION OF FTC INVESTIGATOR JONATHAN BUGBEE PURSUANT TO 28 U.S.C. § 1746

I, Jonathan Bugbee, have personal knowledge of the facts stated below and am competent to testify about them:

1. I am a citizen of the United States and am over eighteen (18) years of age. I am employed as an Investigator assigned to the Federal Trade Commission's ("FTC") Bureau of Consumer Protection. My mailing address is 600 Pennsylvania Avenue, NW, Washington, D.C. 20580.

2. I have been an Investigator with the FTC since October 2023. Prior to working at the FTC, I was a Labor-Law Investigator with the Department of Labor and Industry, Commonwealth of Pennsylvania from 2021 to 2023, and an Investigator/Special Agent with the United States Army Criminal Investigation Command from 2008 to 2017, assigned to conduct investigations into violations of Title 18 U.S.C. and the Uniform Code of Military Justice.

3. I served for about 12 years on active duty in the United States Army and deployed several times to Iraq and Afghanistan where I served in combat operations, and then I left the Army 2017 as a Non-Commissioned Officer.

4. Since November of 2025 I have been a Certified Fraud Examiner ("CFE"). The CFE certification is awarded by the Association of Certified Fraud Examiners. To become a CFE, I had to pass an exam which tested four

subject areas: (1) fraud prevention and deterrence; (2) fraudulent financial transactions; (3) fraud investigations; and (4) legal elements of fraud.

5. I have earned several IT and cybersecurity certifications from CompTIA, which is the Computing Technology Industry Association. I also attended the Department of Defense Cyber Investigations training academy and I'm a Certified Crisis Negotiator, and a Certified Child Forensic Interviewer.

6. I hold a Bachelor of Science in Computer Forensics and Digital Investigation from Champlain College, VT and a Certificate in Blockchain Technology also from that institution.

7. I am the Investigator assigned to *Federal Trade Commission v. WPATH*, No. 4:26-cv-00748-O.

8. In this capacity, I conducted research onto Federal Court statistics for the Northern District of Texas, the Northern District of Illinois, and the District of Columbia using the online Federal Court Management Statistics website published by the Administrative Office of the U.S. Courts.[1]

9. ***Table 1*** below shows median months from filing to trial, for civil cases only, for the twelve-month periods ending March 31 of each year. The entry N/R ("not reported") indicates that no median was reported for that period.

---

[1] https://www.uscourts.gov/data-news/reports/statistical-reports/federal-court-management-statistics

***Table 1. Filing to Trial Median Time Chart***

| **District** | **2021** | **2022** | **2023** | **2024** | **2025** | **2026** |
|---|---|---|---|---|---|---|
| Northern District of Texas | N/R | 25.1 | 26.9 | 22.7 | 23.7 | 28.6 |
| All U.S. District Courts | 26.1 | 32.6 | 35.0 | 35.4 | 33.1 | 34.8 |
| Northern District of Illinois | 35.5 | 53.8 | 53.5 | 55.4 | 58.6 | 49.0 |
| District of Columbia | N/R | 45.3 | 53.5 | 52.9 | N/R | 59.2 |

10. I reviewed WPATH's Tax Year 2024 Form 990 filing on the publicly available Internal Revenue Service website[2] which revealed WPATH made the required regulatory 990 filing with a state of legal domicile of Texas reflected in box M. Ms. Sue O'Sullivan was the signatory on the form and the signature is dated 2025-06-17. A true and accurate copy of the WPATH Tax Year 2024 Form 990 is appended hereto as ***Attachment A***.

11. I reviewed the Third-Party Defendant World Professional Association for Transgender Health's Brief in Support of Motion to Dismiss from Case No. ADV-25-2024-0000261-CR wherein WPATH represents that (it) "is

[2] https://apps.irs.gov/app/eos/

incorporated in Texas and headquartered in Illinois." A true and accurate copy of the Third-Party Defendant World Professional Association for Transgender Health's Brief in Support of Motion to Dismiss from Case No. ADV-25-2024-0000261-CR is appended hereto as ***Attachment B***.

12. Veritas Association Management (Veritas) is an Association Management company headquarters in Illinois. According to Veritas' website, their organization manages WPATH along with 51 other medical organizations and is headquartered at 1061 East Main Street, Suite 300 East Dundee, Illinois 60118. ***Table 2*** below lists the organizations managed according to Veritas' website.

***Table 2. Organization List from Veritas' Website***

| **Organization:** |
|---|
| American Academy of Clinical Toxicology (AACT) |
| American Association of Clinical Urology (AACU) |
| American Pediatric Surgical Association (APSA) |
| American Society of Andrology |
| American Venous Forum (AVF) |
| Big XII Team Physicians |

| |
|---|
| Celebrate Champions (Institute for Surgical Excellence / Healthcare Explorers Day) |
| Chicago Dermatological Society |
| Developments in Ureteroscopic Stone Treatment (DUST) |
| Endoscopic Cardiac Surgeons Club (ECSC) |
| The Fleischner Society |
| Frontiers in Oncologic Prostate Care and Ablative Local Therapy (FOCAL) |
| The Heartland Endocrine Roundtable |
| Illinois Dermatological Society (IDS) |
| International Fetal Medicine and Surgery Society (IFMSS) |
| Integrating Functional Reconstructive Urology & Endourology |
| International Functional & Reconstructive Urology Update |
| ISS (Musculoskeletal Science & Education group) |
| International Society for the Study of Sleep (ISSS) |
| International Symposium on Urolithiasis |
| INM (Nuclear Medicine group) |
| Mid-Atlantic Section of the American Urological Association (MAAUA) |
| Musculoskeletal (MSK) courses program |

| |
|---|
| North American Robotic Urologic Surgery (NARUS) |
| North American Society of Cardiovascular Imaging (NASCI) |
| New York Radiological Society (NYRS) |
| North American Society for Pediatric and Adolescent Gynecology (NASPAG) |
| OUS (Urologic Society) |
| Pediatric Colorectal and Pelvic Learning Consortium (PCPLC) |
| Pediatric Pharmacy Practice initiative |
| Ponte Vedra Beach Women's Health and Robotics Symposium |
| Rheumatology Nurses Society (RNS) |
| Society for the Advancement of Patient Blood Management (SABM) |
| Society for Basic Urologic Research (SBUR) |
| Society for Abdominal Radiology (SAR) |
| Society of Academic Urologists (SAU) |
| Society of Cardiovascular Anesthesiologists (SCA) |
| Society of Genitourinary Reconstructive Surgeons |
| Society for Minimally Invasive and Incisionless Surgery |
| Society of OB/GYN Hospitalists (SOGH) |
| Society for Robotic Surgery (SRS) |

| |
|---|
| Society for Skeletal Radiology (SSR) |
| Society of Thoracic Radiology (STR) |
| Society for Vascular Medicine (SVM) |
| Strategic Alliance for Intercultural Advocacy in GI (SAIA) |
| United States Professional Association for Transgender Health (USPATH) |
| UAB Medicine |
| Vanderbilt Urology Society (VUS) |
| Western Pediatric Trauma Conference (WPTC) |
| Women in Endoscopy (WIE) |
| Women in Surgery (WIS) |
| World Professional Association for Transgender Health (WPATH) |

13. Skiptracing is a form of public data aggregation offered by various vendors such as Thomson-Reuters. The FTC subscribes to a number of these web-based applications which typically contain voluminous amounts of information on individuals and businesses. Available data for businesses includes DUNS numbers, addresses, company officers, dates of incorporation, among other data types.

14. A query of available skiptracing databases revealed 30 different medical organizations which are registered under the Veritas headquarters address.

I state under penalty of perjury that the foregoing is true and correct. Executed on this 17th day of August, 2026 in St Augustine, FL.

Jonathan Bugbee
Investigator

# ATTACHMENT A

Form **990**

# Return of Organization Exempt From Income Tax

**Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)**

Do not enter social security numbers on this form as it may be made public.

**Go to *www.irs.gov/Form990* for instructions and the latest information.**

Department of the Treasury
Internal Revenue Service

OMB No. 1545-0047

**2024**

**Open to Public Inspection**

**A** For the 2024 calendar year, or tax year beginning 01-01-2024 , and ending 12-31-2024

**B** Check if applicable:
☐ Address change
☐ Name change
☐ Initial return
☐ Final return/terminated
☐ Amended return
☐ Application pending

**C** Name of organization
WORLD PROF ASSN FOR TRANSGENDER HEALTH

Doing business as

Number and street (or P.O. box if mail is not delivered to street address) | Room/suite
1061 E MAIN ST STE 300

City or town, state or province, country, and ZIP or foreign postal code
EAST DUNDEE, IL 60118

**D Employer identification number**
94-2675140

E Telephone number
(847) 532-6245

**G** Gross receipts $ 2,360,387

**F** Name and address of principal officer:
ASA RADIX MD PHD MPH

**H(a)** Is this a group return for subordinates? ☐ Yes ☑ No
**H(b)** Are all subordinates included? ☐ Yes ☐ No
If "No," attach a list. See instructions.
**H(c)** Group exemption number

**I** Tax-exempt status: ☑ 501(c)(3) ☐ 501(c) ( ) (insert no.) ☐ 4947(a)(1) or ☐ 527

**J** **Website:** WWW.WPATH.ORG

**K** Form of organization: ☑ Corporation ☐ Trust ☐ Association ☐ Other

**L** Year of formation: 1979

**M** State of legal domicile: TX

## Part I Summary

**Activities & Governance**

**1** Briefly describe the organization's mission or most significant activities:
TO PROMOTE, EDUCATE AND ADVOCATE THE UNDERSTANDING AND TREATMENT OF GENDER IDENTITY DISORDERS.

| | | | |
|---|---|---|---|
| 2 | Check this box ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets. | | |
| 3 | Number of voting members of the governing body (Part VI, line 1a) | 3 | 17 |
| 4 | Number of independent voting members of the governing body (Part VI, line 1b) | 4 | 17 |
| 5 | Total number of individuals employed in calendar year 2024 (Part V, line 2a) | 5 | 0 |
| 6 | Total number of volunteers (estimate if necessary) | 6 | 17 |
| 7a | Total unrelated business revenue from Part VIII, column (C), line 12 | 7a | 0 |
| b | Net unrelated business taxable income from Form 990-T, Part I, line 11 | 7b | |

| | | | Prior Year | Current Year |
|---|---|---|---|---|
| Revenue | 8 | Contributions and grants (Part VIII, line 1h) | 834,664 | 765,649 |
| | 9 | Program service revenue (Part VIII, line 2g) | 1,362,559 | 1,544,328 |
| | 10 | Investment income (Part VIII, column (A), lines 3, 4, and 7d ) | 19,966 | 22,662 |
| | 11 | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | | 27,748 |
| | 12 | Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 2,217,189 | 2,360,387 |
| Expenses | 13 | Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) | | 0 |
| | 14 | Benefits paid to or for members (Part IX, column (A), line 4) | | 0 |
| | 15 | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | | 0 |
| | 16a | Professional fundraising fees (Part IX, column (A), line 11e) | | 0 |
| | b | Total fundraising expenses (Part IX, column (D), line 25) 0 | | |
| | 17 | Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) | 2,434,679 | 2,522,090 |
| | 18 | Total expenses. Add lines 13–17 (must equal Part IX, column (A), line 25) | 2,434,679 | 2,522,090 |
| | 19 | Revenue less expenses. Subtract line 18 from line 12 | -217,490 | -161,703 |
| Net Assets or Fund Balances | | | Beginning of Current Year | End of Year |
| | 20 | Total assets (Part X, line 16) | 1,717,149 | 1,996,007 |
| | 21 | Total liabilities (Part X, line 26) | 383,094 | 718,603 |
| | 22 | Net assets or fund balances. Subtract line 21 from line 20 | 1,334,055 | 1,277,404 |

## Part II Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

**Sign Here**

******
Signature of officer | Date 2025-06-17

SUE O'SULLIVAN MANAGING DIRECTOR
Type or print name and title

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| | | 2025-06-18 | | P00286059 |

Firm's name MILLER VERCHOTA INC CPAS | Firm's EIN 36-4387304

Firm's address 444 N IL ROUTE 31 STE 104
CRYSTAL LAKE, IL 60012 | Phone no. (815) 477-8000

May the IRS discuss this return with the preparer shown above? See Instructions. ☑ Yes ☐ No

Case 4:26-cv-00748-O Document 72-1 Filed 08/18/26 Page 12 of 71 PageID 2198

**Part III** **Statement of Program Service Accomplishments**

Check if Schedule O contains a response or note to any line in this Part III . . . . . . . . . . . . . ☑

**1** Briefly describe the organization's mission:

AS AN INTERNATIONAL MULTIDISCIPLINARY PROFESSIONAL ASSOCIATION, THE MISSION OF THE WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH (WPATH) IS TO PROMOTE EVIDENCE-BASED CARE, EDUCATION, RESEARCH, ADVOCACY, PUBLIC POLICY AND RESPECT IN TRANSGENDER HEALTH.

**2** Did the organization undertake any significant program services during the year which were not listed on the prior Form 990 or 990-EZ? . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

If "Yes," describe these new services on Schedule O.

**3** Did the organization cease conducting, or make significant changes in how it conducts, any program services? . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

If "Yes," describe these changes on Schedule O.

**4** Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses. Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others, the total expenses, and revenue, if any, for each program service reported.

**4a** (Code: ) (Expenses $ 1,288,654 including grants of $ ) (Revenue $ 1,068,472 )

Description: See Additional Data

**4b** (Code: ) (Expenses $ 198,513 including grants of $ ) (Revenue $ 381,271 )

Description: See Additional Data

**4c** (Code: ) (Expenses $ 55,000 including grants of $ ) (Revenue $ 88,055 )

Description: See Additional Data

**4d** Other program services (Describe in Schedule O.)

(Expenses $ 8,615 including grants of $ ) (Revenue $ 6,530 )

(Code: ) (Expenses $ 8,615 including grants of $ ) (Revenue $ 6,530 )

THE ORGANIZATION PROVIDES ADDITIONAL BENEFITS TO THE MEMBERSHIP THROUGH DEVELOPMENT EFFORTS, MAINTAINING PROFESSIONAL MEMBERSHIPS WITH OTHER ORGANIZATIONS, PROVIDING RESEARCH GRANT OPPORTUNITIES, AND BY PROVIDING AN EDUCATIONAL JOURNAL TO THE MEMBERSHIP.

**4e** **Total program service expenses** 1,550,782

**Part IV Checklist of Required Schedules**

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? *If "Yes," complete Schedule A* | 1 | Yes | |
| 2 | Is the organization required to complete *Schedule B, Schedule of Contributors*? See instructions. | 2 | | No |
| 3 | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? *If "Yes," complete Schedule C, Part I* | 3 | | No |
| 4 | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year? *If "Yes," complete Schedule C, Part II* | 4 | | No |
| 5 | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or similar amounts as defined in Rev. Proc. 98-19? *If "Yes," complete Schedule C, Part III* | 5 | | No |
| 6 | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? *If "Yes," complete Schedule D,*Part I | 6 | | No |
| 7 | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? *If "Yes," complete Schedule D, Part II* | 7 | | No |
| 8 | Did the organization maintain collections of works of art, historical treasures, or other similar assets? *If "Yes," complete Schedule D,* Part III | 8 | | No |
| 9 | Did the organization report an amount in Part X, line 21 for escrow or custodial account liability; serve as a custodian for amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services? *If "Yes," complete Schedule D, Part IV* | 9 | | No |
| 10 | Did the organization, directly or through a related organization, hold assets in temporarily restricted endowments, permanent endowments, or quasi endowments? *If "Yes," complete Schedule D, Part V* | 10 | | No |
| 11 | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X, as applicable. | | | |
| a | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? *If "Yes," complete Schedule D,* Part VI. | 11a | | No |
| b | Did the organization report an amount for investments—other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VII* | 11b | | No |
| c | Did the organization report an amount for investments—program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VIII* | 11c | | No |
| d | Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part IX* | 11d | | No |
| e | Did the organization report an amount for other liabilities in Part X, line 25? *If "Yes," complete Schedule D, Part X* | 11e | | No |
| f | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? *If "Yes," complete Schedule D, Part X* | 11f | | No |
| 12a | Did the organization obtain separate, independent audited financial statements for the tax year? *If "Yes," complete Schedule D, Parts XI and XII* | 12a | Yes | |
| b | Was the organization included in consolidated, independent audited financial statements for the tax year? *If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional* | 12b | | No |
| 13 | Is the organization a school described in section 170(b)(1)(A)(ii)? *If "Yes," complete Schedule E* | 13 | | No |
| 14a | Did the organization maintain an office, employees, or agents outside of the United States? | 14a | | No |
| b | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 or more? *If "Yes," complete Schedule F, Parts I and IV* | 14b | | No |
| 15 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization? *If "Yes," complete Schedule F, Parts II and IV* | 15 | | No |
| 16 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals? *If "Yes," complete Schedule F, Parts III and IV* | 16 | | No |
| 17 | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? *If "Yes," complete Schedule G, Part I.* See instructions. | 17 | | No |
| 18 | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? *If "Yes," complete Schedule G, Part II* | 18 | | No |
| 19 | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? *If "Yes," complete Schedule G, Part III* | 19 | | No |
| 20a | Did the organization operate one or more hospital facilities? *If "Yes," complete Schedule H* | 20a | | No |
| b | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? | 20b | | |
| 21 | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or domestic government on Part IX, column (A), line 1? *If "Yes," complete Schedule I, Parts I and II* | 21 | | No |

**Part IV Checklist of Required Schedules** *(continued)*



| | | Line | Yes | No |
|---|---|---|---|---|
| 22 | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* | 22 | | No |
| 23 | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5, about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* | 23 | | No |
| 24a | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K. If "No," go to line 25a* | 24a | | No |
| b | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? | 24b | | |
| c | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? | 24c | | |
| d | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? | 24d | | |
| 25a | **Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L,* Part I | 25a | | No |
| b | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L,* Part I | 25b | | No |
| 26 | Did the organization report any amount on Part X, line 5 or 22 for receivables from or payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons? *If "Yes," complete Schedule L, Part II* | 26 | | No |
| 27 | Did the organization provide a grant or other assistance to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or employee thereof, a grant selection committee member, or to a 35% controlled entity (including an employee thereof) or family member of any of these persons? *If "Yes," complete Schedule L,*Part III | 27 | | No |
| 28 | Was the organization a party to a business transaction with one of the following parties (see the Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions): | | | |
| a | A current or former officer, director, trustee, key employee, creator or founder, or substantial contributor? *If "Yes," complete Schedule L, Part IV* | 28a | | No |
| b | A family member of any individual described in line 28a? *If "Yes," complete Schedule L, Part IV* | 28b | | No |
| c | A 35% controlled entity of one or more individuals and/or organizations described in line 28a or 28b? *If "Yes," complete Schedule L, Part IV* | 28c | | No |
| 29 | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* | 29 | | No |
| 30 | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* | 30 | | No |
| 31 | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* | 31 | | No |
| 32 | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* | 32 | | No |
| 33 | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? *If "Yes," complete Schedule R, Part I* | 33 | | No |
| 34 | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* | 34 | | No |
| 35a | Did the organization have a controlled entity within the meaning of section 512(b)(13)? | 35a | | No |
| b | If 'Yes' to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* | 35b | | |
| 36 | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* | 36 | | No |
| 37 | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI* | 37 | | No |
| 38 | Did the organization complete Schedule O and provide explanations on Schedule O for Part VI, lines 11b and 19? **Note.** All Form 990 filers are required to complete Schedule O. | 38 | Yes | |

**Part V Statements Regarding Other IRS Filings and Tax Compliance**

Check if Schedule O contains a response or note to any line in this Part V ☐

| | | | | Line | Yes | No |
|---|---|---|---|---|---|---|
| 1a | Enter the number reported in box 3 of Form 1096. Enter -0- if not applicable | 1a | 27 | | | |
| b | Enter the number of Forms W-2G included on line 1a. Enter -0- if not applicable | 1b | 0 | | | |
| c | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? | | | 1c | | |

**Part V Statements Regarding Other IRS Filings and Tax Compliance** *(continued)*

Case 4:26-cv-00748-O Document 72-1 Filed 08/18/26 Page 15 of 71 PageID 2201

| | | | | | |
|---|---|---|---|---|---|
| **2a** | Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return | 2a | 0 | | |
| **b** | If at least one is reported on line 2a, did the organization file all required federal employment tax returns? | | | 2b | |
| **3a** | Did the organization have unrelated business gross income of $1,000 or more during the year? | | | 3a | No |
| **b** | If "Yes," has it filed a Form 990-T for this year? *If "No" to line 3b, provide an explanation in Schedule O* | | | 3b | |
| **4a** | At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? | | | 4a | No |
| **b** | If "Yes," enter the name of the foreign country: ___ See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). | | | | |
| **5a** | Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? | | | 5a | No |
| **b** | Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | | | 5b | No |
| **c** | If "Yes," to line 5a or 5b, did the organization file Form 8886-T? | | | 5c | |
| **6a** | Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? | | | 6a | No |
| **b** | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? | | | 6b | |
| **7** | **Organizations that may receive deductible contributions under section 170(c).** | | | | |
| **a** | Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? | | | 7a | No |
| **b** | If "Yes," did the organization notify the donor of the value of the goods or services provided? | | | 7b | |
| **c** | Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? | | | 7c | No |
| **d** | If "Yes," indicate the number of Forms 8282 filed during the year | 7d | | | |
| **e** | Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | | | 7e | No |
| **f** | Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? | | | 7f | No |
| **g** | If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? | | | 7g | No |
| **h** | If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? | | | 7h | No |
| **8** | **Sponsoring organizations maintaining donor advised funds.** Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? | | | 8 | |
| **9** | **Sponsoring organizations maintaining donor advised funds.** | | | | |
| **a** | Did the sponsoring organization make any taxable distributions under section 4966? | | | 9a | |
| **b** | Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? | | | 9b | |
| **10** | **Section 501(c)(7) organizations.** Enter: | | | | |
| **a** | Initiation fees and capital contributions included on Part VIII, line 12 | 10a | | | |
| **b** | Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities | 10b | | | |
| **11** | **Section 501(c)(12) organizations.** Enter: | | | | |
| **a** | Gross income from members or shareholders | 11a | | | |
| **b** | Gross income from other sources. (Do not net amounts due or paid to other sources against amounts due or received from them.) | 11b | | | |
| **12a** | **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? | | | 12a | |
| **b** | If "Yes," enter the amount of tax-exempt interest received or accrued during the year. | 12b | | | |
| **13** | **Section 501(c)(29) qualified nonprofit health insurance issuers.** | | | | |
| **a** | Is the organization licensed to issue qualified health plans in more than one state? **Note.** See the instructions for additional information the organization must report on Schedule O. | | | 13a | |
| **b** | Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans | 13b | | | |
| **c** | Enter the amount of reserves on hand | 13c | | | |
| **14a** | Did the organization receive any payments for indoor tanning services during the tax year? | | | 14a | No |
| **b** | If "Yes," has it filed a Form 720 to report these payments? *If "No," provide an explanation in Schedule O* | | | 14b | |
| **15** | Is the organization subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment(s) during the year? If "Yes," see the instructions and file Form 4720, Schedule N. | | | 15 | No |
| **16** | Is the organization an educational institution subject to the section 4968 excise tax on net investment income? If "Yes," complete Form 4720, Schedule O. | | | 16 | No |
| **17** | **Section 501(c)(21) organizations.** Did the trust, or any disqualified or other person engage in any activities that would result in the imposition of an excise tax under section 4951, 4952, or 4953? If "Yes," complete Form 6069. | | | 17 | |

Case 4:25-cv-00748-O Document 72-1 Filed 08/18/25 Page 16 of 71 PageID 2202

**Part VI Governance, Management, and Disclosure.** *For each "Yes" response to lines 2 through 7b below, and for a "No" response to lines 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O. See instructions.*

Check if Schedule O contains a response or note to any line in this Part VI . . . ☑

## Section A. Governing Body and Management

| | | | | Yes | No |
|---|---|---|---|---|---|
| 1a | Enter the number of voting members of the governing body at the end of the tax year | 1a | 17 | | |
| | If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O. | | | | |
| b | Enter the number of voting members included in line 1a, above, who are independent | 1b | 17 | | |
| 2 | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? | | 2 | | No |
| 3 | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? | | 3 | Yes | |
| 4 | Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? | | 4 | | No |
| 5 | Did the organization become aware during the year of a significant diversion of the organization's assets? | | 5 | | No |
| 6 | Did the organization have members or stockholders? | | 6 | | No |
| 7a | Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? | | 7a | | No |
| b | Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? | | 7b | | No |
| 8 | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | | |
| a | The governing body? | | 8a | Yes | |
| b | Each committee with authority to act on behalf of the governing body? | | 8b | Yes | |
| 9 | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses in Schedule O* | | 9 | | No |

## Section B. Policies (*This Section B requests information about policies not required by the Internal Revenue Code.*)

| | | | Yes | No |
|---|---|---|---|---|
| 10a | Did the organization have local chapters, branches, or affiliates? | 10a | | No |
| b | If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | 10b | | |
| 11a | Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? | 11a | Yes | |
| b | Describe on Schedule O the process, if any, used by the organization to review this Form 990. | | | |
| 12a | Did the organization have a written conflict of interest policy? *If "No," go to line 13* | 12a | | No |
| b | Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? | 12b | | |
| c | Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe on Schedule O how this was done* | 12c | | |
| 13 | Did the organization have a written whistleblower policy? | 13 | | No |
| 14 | Did the organization have a written document retention and destruction policy? | 14 | | No |
| 15 | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| a | The organization's CEO, Executive Director, or top management official | 15a | | No |
| b | Other officers or key employees of the organization | 15b | | No |
| | If "Yes" to line 15a or 15b, describe the process on Schedule O. See instructions. | | | |
| 16a | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? | 16a | | No |
| b | If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? | 16b | | |

## Section C. Disclosure

17 List the states with which a copy of this Form 990 is required to be filed

IL

18 Section 6104 requires an organization to make its Form 1023 (1024 or 1024-A, if applicable), 990, and 990-T (section 501(c)(3)s only) available for public inspection. Indicate how you made these available. Check all that apply.

☐ Own website ☐ Another's website ☑ Upon request ☐ Other (explain in Schedule O)

19 Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year.

20 State the name, address, and telephone number of the person who possesses the organization's books and records:

VERITAS ASSOCIATION MANAGEMENT 1601 E MAIN ST STE 300 EAST DUNDEE, IL 60118 (847) 752-6245

**Part VII Compensation of Officers, Directors,Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors**



Check if Schedule O contains a response or note to any line in this Part VII . . . . . . . . . . . . . . ☐

**Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

- List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.
- List all of the organization's **current** key employees, if any. See the instructions for definition of "key employee."
- List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (box 5 of Form W-2, box 6 of Form 1099-MISC, and/or box 1 of Form 1099-NEC) of more than $100,000 from the organization and any related organizations.
- List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.
- List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

See the instructions for the order in which to list the persons above.

☑ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A) Name and title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position: Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | (D) Reportable compensation from the organization (W-2/1099-MISC/1099-NEC) | (E) Reportable compensation from related organizations (W-2/1099-MISC/1099-NEC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) ASA RADIX MD PHD MPH<br>PRESIDENT | 4.00 | X | | X | | | | 0 | 0 | 0 |
| (2) MARCI BOWERS MD<br>IMM PAST PRE | 4.00 | X | | X | | | | 0 | 0 | 0 |
| (3) LOREN SCHECHTER MD<br>PRESIDENT EL | 4.00 | X | | X | | | | 0 | 0 | 0 |
| (4) CHRIS MCLACHLAN MA<br>SECRETARY | 4.00 | X | | X | | | | 0 | 0 | 0 |
| (5) STEPHEN ROSENTHAL MD<br>TREASURER | 4.00 | X | | X | | | | 0 | 0 | 0 |
| (6) KAMILLA KAMARUDDIN MD<br>DIRECTOR | 1.00 | X | | | | | | 0 | 0 | 0 |
| (7) SCOTT LEIBOWITZ MD<br>DIRECTOR | 1.00 | X | | | | | | 0 | 0 | 0 |
| (8) SARI REISNER SCD<br>DIRECTOR | 1.00 | X | | | | | | 0 | 0 | 0 |
| (9) JOSHUA SAFER MD<br>DIRECTOR | 1.00 | X | | | | | | 0 | 0 | 0 |
| (10) JAVIER BELINKY MD<br>DIRECTOR | 1.00 | X | | | | | | 0 | 0 | 0 |
| (11) BETH MCELREA MBCHB<br>DIRECTOR | 1.00 | X | | | | | | 0 | 0 | 0 |
| (12) TONIA POTEAT<br>DIRECTOR | 1.00 | X | | | | | | 0 | 0 | 0 |
| (13) JOZ MOTMANS PHD MA<br>EPATH REP | 1.00 | X | | | | | | 0 | 0 | 0 |
| (14) CARL STREED JR MD MPH FACP<br>USPATH REP | 1.00 | X | | | | | | 0 | 0 | 0 |
| (15) FLORENCE CHENEL<br>WSI REP | 1.00 | X | | | | | | 0 | 0 | 0 |
| (16) SUE O'SULLIVAN<br>MANAGING DIR | 8.00 | X | | | | | | 0 | 0 | 0 |
| (17) JAMIE HICKS<br>ASSOC EXEC D | 1.00 | X | | | | | | 0 | 0 | 0 |

**Part VII** **Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees** *(continued)*

| (A) Name and title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee): Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | (D) Reportable compensation from the organization (W-2/1099-MISC/1099-NEC) | (E) Reportable compensation from related organizations (W-2/1099-MISC/1099-NEC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| | | | |
|---|---|---|---|
| **1b Sub-Total** . . . . . . . . . . . . . . | | | |
| **c Total from continuation sheets to Part VII, Section A** . . | | | |
| **d Total (add lines 1b and 1c)** . . . . . . . . . | | | |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization

| | | Yes | No |
|---|---|---|---|
| **3** Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . . | 3 | | No |
| **4** For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | | No |
| **5** Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization?*If "Yes," complete Schedule J for such person* . . . . . . . . | 5 | | No |

**Section B. Independent Contractors**

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization. Report compensation for the calendar year ending with or within the organization's tax year.

| (A) Name and business address | (B) Description of services | (C) Compensation |
|---|---|---|
| VERITAS ASSOCIATION MANAGEMENT<br><br>1601 E MAIN ST<br>STE 300<br>EAST DUNDEE, IL 60118 | MANAGEMENT | 601,481 |
| | | |
| | | |
| | | |
| | | |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization 1

**Part VIII** **Statement of Revenue**



Check if Schedule O contains a response or note to any line in this Part VIII . . . . . . ☐

| | | | (A) Total revenue | (B) Related or exempt function revenue | (C) Unrelated business revenue | (D) Revenue excluded from tax under sections 512 - 514 |
|---|---|---|---|---|---|---|
| **Contributions, Gifts, Grants and Other Similar Amounts** | | | | | | |
| 1a Federated campaigns | 1a | | | | | |
| b Membership dues | 1b | 728,259 | | | | |
| c Fundraising events | 1c | | | | | |
| d Related organizations | 1d | | | | | |
| e Government grants (contributions) | 1e | | | | | |
| f All other contributions, gifts, grants, and similar amounts not included above | 1f | 37,390 | | | | |
| g Noncash contributions included in lines 1a - 1f:$ | 1g | | | | | |
| h **Total.** Add lines 1a-1f | | | 765,649 | | | |
| **Program Service Revenue** | | Business Code | | | | |
| 2a CONFERENCE REVENUE | | 611430 | 1,068,472 | 1,068,472 | | |
| b GLOBAL EDUCATION INSTITUTE | | 611430 | 381,271 | 381,271 | | |
| c HEALTH PLAN PROVIDER TRAINING | | 611430 | 88,055 | 88,055 | | |
| d REVENUE SHARE | | 611430 | 6,530 | 6,530 | | |
| e | | | | | | |
| f All other program service revenue. | | | | | | |
| g **Total.** Add lines 2a–2f. | | | 1,544,328 | | | |
| **Other Revenue** | | | | | | |
| 3 Investment income (including dividends, interest, and other similar amounts) | | | 22,662 | | | 22,662 |
| 4 Income from investment of tax-exempt bond proceeds | | | | | | |
| 5 Royalties | | | | | | |
| | | (i) Real / (ii) Personal | | | | |
| 6a Gross rents | 6a | | | | | |
| b Less: rental expenses | 6b | | | | | |
| c Rental income or (loss) | 6c | | | | | |
| d Net rental income or (loss) | | | | | | |
| | | (i) Securities / (ii) Other | | | | |
| 7a Gross amount from sales of assets other than inventory | 7a | | | | | |
| b Less: cost or other basis and sales expenses | 7b | | | | | |
| c Gain or (loss) | 7c | | | | | |
| d Net gain or (loss) | | | | | | |
| 8a Gross income from fundraising events (not including $ ______ of contributions reported on line 1c). See Part IV, line 18 | 8a | | | | | |
| b Less: direct expenses | 8b | | | | | |
| c Net income or (loss) from fundraising events | | | | | | |
| 9a Gross income from gaming activities. See Part IV, line 19 | 9a | | | | | |
| b Less: direct expenses | 9b | | | | | |
| c Net income or (loss) from gaming activities | | | | | | |
| 10a Gross sales of inventory, less returns and allowances | 10a | | | | | |
| b Less: cost of goods sold | 10b | | | | | |
| c Net income or (loss) from sales of inventory | | | | | | |
| **Miscellaneous Revenue** | | Business Code | | | | |
| 11a MANAGEMENT REIMBURSEMENTS | | 611430 | 27,748 | 27,748 | | |
| b | | | | | | |
| c | | | | | | |
| d All other revenue | | | | | | |
| e **Total.** Add lines 11a–11d | | | 27,748 | | | |
| 12 **Total revenue.** See instructions | | | 2,360,387 | 1,572,076 | | 22,662 |

**Part IX** **Statement of Functional Expenses**



Section 501(c)(3) and 501(c)(4) organizations must complete all columns. All other organizations must complete column (A).

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . . . ☑

| **Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII.** | (A) Total expenses | (B) Program service expenses | (C) Management and general expenses | (D) Fundraising expenses |
|---|---|---|---|---|
| 1 Grants and other assistance to domestic organizations and domestic governments. See Part IV, line 21 | | | | |
| 2 Grants and other assistance to domestic individuals. See Part IV, line 22 | | | | |
| 3 Grants and other assistance to foreign organizations, foreign governments, and foreign individuals. See Part IV, lines 15 and 16. | | | | |
| 4 Benefits paid to or for members | | | | |
| 5 Compensation of current officers, directors, trustees, and key employees | | | | |
| 6 Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) | | | | |
| 7 Other salaries and wages | | | | |
| 8 Pension plan accruals and contributions (include section 401 (k) and 403(b) employer contributions) | | | | |
| 9 Other employee benefits | | | | |
| 10 Payroll taxes | | | | |
| 11 Fees for services (non-employees): | | | | |
| a Management | 601,481 | 55,000 | 546,481 | |
| b Legal | 71,713 | | 71,713 | |
| c Accounting | 13,073 | | 13,073 | |
| d Lobbying | | | | |
| e Professional fundraising services. See Part IV, line 17 | | | | |
| f Investment management fees | | | | |
| g Other (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Schedule O) | 278,526 | 129,116 | 149,410 | |
| 12 Advertising and promotion | | | | |
| 13 Office expenses | 26,866 | 9,540 | 17,326 | |
| 14 Information technology | 588,227 | 512,450 | 75,777 | |
| 15 Royalties | | | | |
| 16 Occupancy | | | | |
| 17 Travel | 92,254 | 89,590 | 2,664 | |
| 18 Payments of travel or entertainment expenses for any federal, state, or local public officials | | | | |
| 19 Conferences, conventions, and meetings | 509,080 | 508,452 | 628 | |
| 20 Interest | | | | |
| 21 Payments to affiliates | | | | |
| 22 Depreciation, depletion, and amortization | | | | |
| 23 Insurance | 13,442 | | 13,442 | |
| 24 Other expenses. Itemize expenses not covered above (List miscellaneous expenses in line 24e. If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O.) | | | | |
| a DIRECT PROGRAM EXPENSE | 160,438 | 157,742 | 2,696 | |
| b BANK AND CREDIT CARD FEES | 75,682 | 275 | 75,407 | |
| c CME EXPENSE | 72,362 | 72,362 | | |
| d DUES AND SUBSCRIPTIONS | 18,946 | 16,255 | 2,691 | |
| e All other expenses | | | | |
| 25 **Total functional expenses.** Add lines 1 through 24e | 2,522,090 | 1,550,782 | 971,308 | 0 |
| 26 **Joint costs.** Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation. Check here ☐ if following SOP 98-2 (ASC 958-720). | | | | |

**Part X Balance Sheet**

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . ☐

| Section | Line | Description | | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|---|---|---|
| Assets | 1 | Cash–non-interest-bearing | | | 572,638 | 1 | 262,828 |
| | 2 | Savings and temporary cash investments | | | | 2 | |
| | 3 | Pledges and grants receivable, net | | | | 3 | |
| | 4 | Accounts receivable, net | | | 62,675 | 4 | 491,314 |
| | 5 | Loans and other receivables from any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons | | | | 5 | |
| | 6 | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), and persons described in section 4958(c)(3)(B) | | | | 6 | |
| | 7 | Notes and loans receivable, net | | | | 7 | |
| | 8 | Inventories for sale or use | | | | 8 | |
| | 9 | Prepaid expenses and deferred charges | | | 34,755 | 9 | 106,852 |
| | 10a | Land, buildings, and equipment: cost or other basis. Complete Part VI of Schedule D | 10a | | | | |
| | b | Less: accumulated depreciation | 10b | | | 10c | |
| | 11 | Investments—publicly traded securities | | | 1,047,081 | 11 | 1,135,013 |
| | 12 | Investments—other securities. See Part IV, line 11 | | | | 12 | |
| | 13 | Investments—program-related. See Part IV, line 11 | | | | 13 | |
| | 14 | Intangible assets | | | | 14 | |
| | 15 | Other assets. See Part IV, line 11 | | | | 15 | |
| | 16 | **Total assets.** Add lines 1 through 15 (must equal line 33) | | | 1,717,149 | 16 | 1,996,007 |
| Liabilities | 17 | Accounts payable and accrued expenses | | | 115,701 | 17 | 67,298 |
| | 18 | Grants payable | | | | 18 | |
| | 19 | Deferred revenue | | | 267,393 | 19 | 651,305 |
| | 20 | Tax-exempt bond liabilities | | | | 20 | |
| | 21 | Escrow or custodial account liability. Complete Part IV of Schedule D | | | | 21 | |
| | 22 | Loans and other payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons | | | | 22 | |
| | 23 | Secured mortgages and notes payable to unrelated third parties | | | | 23 | |
| | 24 | Unsecured notes and loans payable to unrelated third parties | | | | 24 | |
| | 25 | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17 - 24). Complete Part X of Schedule D | | | | 25 | |
| | 26 | **Total liabilities.** Add lines 17 through 25 | | | 383,094 | 26 | 718,603 |
| Net Assets or Fund Balances | | **Organizations that follow FASB ASC 958, check here** ☑ **and complete lines 27, 28, 32, and 33.** | | | | | |
| | 27 | Net assets without donor restrictions | | | 1,324,714 | 27 | 1,268,063 |
| | 28 | Net assets with donor restrictions | | | 9,341 | 28 | 9,341 |
| | | **Organizations that do not follow FASB ASC 958, check here ▶** ☐ **and complete lines 29 through 33.** | | | | | |
| | 29 | Capital stock or trust principal, or current funds | | | | 29 | |
| | 30 | Paid-in or capital surplus, or land, building or equipment fund | | | | 30 | |
| | 31 | Retained earnings, endowment, accumulated income, or other funds | | | | 31 | |
| | 32 | Total net assets or fund balances | | | 1,334,055 | 32 | 1,277,404 |
| | 33 | Total liabilities and net assets/fund balances | | | 1,717,149 | 33 | 1,996,007 |

Case 4:26-cv-00748-O Document 72-1 Filed 08/18/26 Page 22 of 71 PageID 2208

## Part XI Reconcilliation of Net Assets

Check if Schedule O contains a response or note to any line in this Part XI . . . . . . . . . ☐

| | | | |
|---|---|---|---|
| **1** | Total revenue (must equal Part VIII, column (A), line 12) | **1** | 2,360,387 |
| **2** | Total expenses (must equal Part IX, column (A), line 25) | **2** | 2,522,090 |
| **3** | Revenue less expenses. Subtract line 2 from line 1 | **3** | -161,703 |
| **4** | Net assets or fund balances at beginning of year (must equal Part X, line 32, column (A)) | **4** | 1,334,055 |
| **5** | Net unrealized gains (losses) on investments | **5** | 90,843 |
| **6** | Donated services and use of facilities | **6** | |
| **7** | Investment expenses | **7** | 7,074 |
| **8** | Prior period adjustments | **8** | 7,135 |
| **9** | Other changes in net assets or fund balances (explain in Schedule O) | **9** | |
| **10** | Net assets or fund balances at end of year. Combine lines 3 through 9 (must equal Part X, line 32, column (B)) | **10** | 1,277,404 |

## Part XII Financial Statements and Reporting

Check if Schedule O contains a response or note to any line in this Part XII . . . . . . . . . . . . . ☐

| | | | Yes | No |
|---|---|---|---|---|
| **1** | Accounting method used to prepare the Form 990: ☐ Cash ☑ Accrual ☐ Other<br>If the organization changed its method of accounting from a prior year or checked "Other," explain on Schedule O. | | | |
| **2a** | Were the organization's financial statements compiled or reviewed by an independent accountant? | **2a** | | No |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both:<br>☐ Separate basis ☐ Consolidated basis ☐ Both consolidated and separate basis | | | |
| **b** | Were the organization's financial statements audited by an independent accountant? | **2b** | Yes | |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both:<br>☑ Separate basis ☐ Consolidated basis ☐ Both consolidated and separate basis | | | |
| **c** | If "Yes," to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? | **2c** | Yes | |
| | If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O. | | | |
| **3a** | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Uniform Guidance, 2 C.F.R. Part 200, Subpart F? | **3a** | | No |
| **b** | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits. | **3b** | | |

## Additional Data

**Software ID:**

**Software Version:**

**EIN:** 94-2675140

**Name:** WORLD PROF ASSN FOR TRANSGENDER HEALTH

Form 990 (2024)

**Form 990, Part III, Line 4a:**

WPATH PROVIDES OPPORTUNITIES FOR PROFESSIONALS FROM VARIOUS SUB-SPECIALTIES TO COMMUNICATE WITH EACH OTHER IN THE CONTEXT OF RESEARCH AND TREATMENT OF GENDER DYSPHORIA INCLUDING SPONSORING BIENNIAL SCIENTIFIC SYMPOSIA.

## Form 990, Part III, Line 4b:

THE GLOBAL EDUCATION INITIATIVE (GEI) PROVIDES COURSES TO A VARIETY OF AUDIENCES. ATTENDEES FROM MANY COUNTRIES ARE ENCOURAGED TO PROVIDE CONSTRUCTIVE FEEDBACK, WHICH THE BOARD REVIEWS THOROUGHLY. IN ATTENDANCE AT GEI COURSES ARE PSYCHOLOGISTS, PSYCHIATRISTS, THERAPISTS, SOCIAL WORKERS, FAMILY PRACTICE PROVIDERS, NURSES, NURSE PRACTITIONERS, PHYSICIAN ASSISTANTS, ENDOCRINOLOGISTS, UROLOGISTS, GYNECOLOGISTS, PLASTIC SURGEONS AND PROFESSIONAL EDUCATORS. ALSO IN ATTENDANCE ARE SPIRITUAL LEADERS, STUDENTS, ADDICTION COUNSELORS, HIV CASE MANAGERS, AND RESEARCHERS. ATTENDEES HAVE WORKED AT MILITARY BASES, THE PENTEGON, FEDERAL AND STATE CORRECTIONAL INSTITUTIONS, MEDICAL SCHOOLS, PRIVATE PRACTICES, PUBLIC HEALTH DEPARTMENTS, CLINICS AND COMMUNITY HOSPITALS. MORE THAN ANYTHING ELSE, WE HAVE REALIZED THAT THERE IS MUCH MORE TO BE DONE. WE ARE CURRENTLY FORMING TASK FORCES TO ASSIST IN CREATING TARGETED TRAINING TO MEET THE VARIED EDUCATIONAL NEEDS OF PROVIDERS AND IMPROVE ACCESS TO CARE.

**Form 990, Part III, Line 4c:**

THE ORGANIZATION PROMOTES THE HIGHEST STANDARDS OF HEALTH CARE FOR INDIVIDUALS THROUGH THE ARTICULATION OF STANDARDS OF CARE (SOC) FOR THE HEALTH OF TRANSSEXUAL, TRANSGENDER, AND GENDER NONCONFORMING PEOPLE. THE SOC ARE BASED ON THE BEST AVAILABLE SCIENCE AND EXPERT PROFESSIONAL CONSENSUS. VOLUME 7 OF THE STANDARDS OF CARE IS AVAILABLE IN 18 DIFFERENT LANGUAGES. VOLUME 8 IS IN PROCESS.

**SCHEDULE A (Form 990)**

Department of the Treasury
Internal Revenue Service

# Public Charity Status and Public Support

**Complete if the organization is a section 501(c)(3) organization or a section 4947(a)(1) nonexempt charitable trust.**
**▶ Attach to Form 990 or Form 990-EZ.**
**▶ Go to *www.irs.gov/Form990* for instructions and the latest information.**

OMB No. 1545-0047

**2024**

**Open to Public Inspection**

**Name of the organization**
WORLD PROF ASSN FOR TRANSGENDER HEALTH

**Employer identification number**
94-2675140

## Part I Reason for Public Charity Status (All organizations must complete this part.) See instructions.

The organization is not a private foundation because it is: (For lines 1 through 12, check only one box.)

1 ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i).**

2 ☐ A school described in **section 170(b)(1)(A)(ii).** (Attach Schedule E (Form 990).)

3 ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

4 ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii).** Enter the hospital's name, city, and state:

5 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170 (b)(1)(A)(iv).** (Complete Part II.)

6 ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

7 ☐ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

8 ☐ A community trust described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

9 ☐ An agricultural research organization described in **170(b)(1)(A)(ix)** operated in conjunction with a land-grant college or university or a non-land grant college of agriculture. See instructions. Enter the name, city, and state of the college or university:

10 ☑ An organization that normally receives: (1) more than 33 1/3% of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions—subject to certain exceptions, and (2) no more than 33 1/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See **section 509(a)(2).** (Complete Part III.)

11 ☐ An organization organized and operated exclusively to test for public safety. See **section 509(a)(4).**

12 ☐ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in **section 509(a)(1)** or **section 509(a)(2).** See **section 509(a)(3).** Check the box on lines 12a through 12d that describes the type of supporting organization and complete lines 12e, 12f, and 12g.

a ☐ **Type I.** A supporting organization operated, supervised, or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization. **You must complete Part IV, Sections A and B.**

b ☐ **Type II.** A supporting organization supervised or controlled in connection with its supported organization(s), by having control or management of the supporting organization vested in the same persons that control or manage the supported organization(s). **You must complete Part IV, Sections A and C.**

c ☐ **Type III functionally integrated.** A supporting organization operated in connection with, and functionally integrated with, its supported organization(s) (see instructions). **You must complete Part IV, Sections A, D, and E.**

d ☐ **Type III non-functionally integrated.** A supporting organization operated in connection with its supported organization(s) that is not functionally integrated. The organization generally must satisfy a distribution requirement and an attentiveness requirement (see instructions). **You must complete Part IV, Sections A and D, and Part V.**

e ☐ Check this box if the organization received a written determination from the IRS that it is a Type I, Type II, Type III functionally integrated, or Type III non-functionally integrated supporting organization.

f Enter the number of supported organizations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ______

g Provide the following information about the supported organization(s).

| (i) Name of supported organization | (ii) EIN | (iii) Type of organization (described on lines 1- 10 above (see instructions)) | (iv) Is the organization listed in your governing document? Yes | No | (v) Amount of monetary support (see instructions) | (vi) Amount of other support (see instructions) |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| **Total** | | | | | | |

**Part II** **Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi)**
(Complete only if you checked the box on line 5, 7, or 8 of Part I or if the organization failed to qualify under Part III. If the organization failed to qualify under the tests listed below, please complete Part III.)

**Section A. Public Support**

| **Calendar year (or fiscal year beginning in)** ▶ | **(a)** 2020 | **(b)** 2021 | **(c)** 2022 | **(d)** 2023 | **(e)** 2024 | **(f)** Total |
|---|---|---|---|---|---|---|
| 1 Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grant.") . . | | | | | | |
| 2 Tax revenues levied for the organization's benefit and either paid to or expended on its behalf . . . . | | | | | | |
| 3 The value of services or facilities furnished by a governmental unit to the organization without charge.. | | | | | | |
| 4 **Total.** Add lines 1 through 3 | | | | | | |
| 5 The portion of total contributions by each person (other than a governmental unit or publicly supported organization) included on line 1 that exceeds 2% of the amount shown on line 11, column (f) . . | | | | | | |
| 6 **Public support.** Subtract line 5 from line 4. | | | | | | |

**Section B. Total Support**

| **Calendar year (or fiscal year beginning in)** ▶ | **(a)** 2020 | **(b)** 2021 | **(c)** 2022 | **(d)** 2023 | **(e)** 2024 | **(f)** Total |
|---|---|---|---|---|---|---|
| 7 Amounts from line 4. . | | | | | | |
| 8 Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources. . . | | | | | | |
| 9 Net income from unrelated business activities, whether or not the business is regularly carried on. . | | | | | | |
| 10 Other income. Do not include gain or loss from the sale of capital assets (Explain in Part VI.). . | | | | | | |
| 11 **Total support.** Add lines 7 through 10 | | | | | | |

12 Gross receipts from related activities, etc. (see instructions) . . . . . . . . . . . . . . . . . . . . . | **12** |

13 **First 5 years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**Section C. Computation of Public Support Percentage**

14 Public support percentage for 2024 (line 6, column (f) divided by line 11, column (f)) . . . . . . . . . . | **14** |

15 Public support percentage for 2023 Schedule A, Part II, line 14 . . . . . . . . . . . . . . . . . | **15** |

16a **33 1/3% support test—2024.** If the organization did not check the box on line 13, and line 14 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

b **33 1/3% support test—2023.** If the organization did not check a box on line 13 or 16a, and line 15 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

17a **10%-facts-and-circumstances test—2024.** If the organization did not check a box on line 13, 16a, or 16b, and line 14 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part VI how the organization meets the "facts-and-circumstances" test. The organization qualifies as a publicly supported organization . . . . . . . . . . . . . ▶ ☐

b **10%-facts-and-circumstances test—2023.** If the organization did not check a box on line 13, 16a, 16b, or 17a, and line 15 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part VI how the organization meets the "facts-and-circumstances" test. The organization qualifies as a publicly supported organization . . . . . . . . . . . . . ▶ ☐

18 **Private foundation.** If the organization did not check a box on line 13, 16a, 16b, 17a, or 17b, check this box and see instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**Part III** **Support Schedule for Organizations Described in Section 509(a)(2)**

(Complete only if you checked the box on line 10 of Part I or if the organization failed to qualify under Part II. If the organization fails to qualify under the tests listed below, please complete Part II.)

**Section A. Public Support**

| | Calendar year (or fiscal year beginning in) ▶ | (a) 2020 | (b) 2021 | (c) 2022 | (d) 2023 | (e) 2024 | (f) Total |
|---|---|---|---|---|---|---|---|
| 1 | Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grants.") . | 639,736 | 650,374 | 731,898 | 834,664 | 765,649 | 3,622,321 |
| 2 | Gross receipts from admissions, merchandise sold or services performed, or facilities furnished in any activity that is related to the organization's tax-exempt purpose | 654,981 | 796,218 | 1,802,330 | 1,362,559 | 1,572,076 | 6,188,164 |
| 3 | Gross receipts from activities that are not an unrelated trade or business under section 513 . . . . . . | | | | | | |
| 4 | Tax revenues levied for the organization's benefit and either paid to or expended on its behalf . . . | | | | | | |
| 5 | The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| 6 | **Total.** Add lines 1 through 5 | 1,294,717 | 1,446,592 | 2,534,228 | 2,197,223 | 2,337,725 | 9,810,485 |
| 7a | Amounts included on lines 1, 2, and 3 received from disqualified persons | | | | | | |
| b | Amounts included on lines 2 and 3 received from other than disqualified persons that exceed the greater of $5,000 or 1% of the amount on line 13 for the year. | | | | | | |
| c | Add lines 7a and 7b. . | | | | | | |
| 8 | **Public support.** (Subtract line 7c from line 6.) | | | | | | 9,810,485 |

**Section B. Total Support**

| | Calendar year (or fiscal year beginning in) ▶ | (a) 2020 | (b) 2021 | (c) 2022 | (d) 2023 | (e) 2024 | (f) Total |
|---|---|---|---|---|---|---|---|
| 9 | Amounts from line 6. . . | 1,294,717 | 1,446,592 | 2,534,228 | 2,197,223 | 2,337,725 | 9,810,485 |
| 10a | Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources. . | 4,127 | 11,735 | 19,860 | 19,966 | 22,662 | 78,350 |
| b | Unrelated business taxable income (less section 511 taxes) from businesses acquired after June 30, 1975. | | | | | | |
| c | Add lines 10a and 10b. | 4,127 | 11,735 | 19,860 | 19,966 | 22,662 | 78,350 |
| 11 | Net income from unrelated business activities not included on line 10b, whether or not the business is regularly carried on. | | | | | | |
| 12 | Other income. Do not include gain or loss from the sale of capital assets (Explain in Part VI.) . . | | | | | | |
| 13 | **Total support.** (Add lines 9, 10c, 11, and 12.). . | 1,298,844 | 1,458,327 | 2,554,088 | 2,217,189 | 2,360,387 | 9,888,835 |

14 **First 5 years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here.** . . . . . . . ▶ ☐

**Section C. Computation of Public Support Percentage**

| | | | |
|---|---|---|---|
| 15 | Public support percentage for 2024 (line 8, column (f) divided by line 13, column (f)) . . . . . . . . . | 15 | 99.210 % |
| 16 | Public support percentage from 2023 Schedule A, Part III, line 15 . . . . . . . . . . . . . . . | 16 | 99.320 % |

**Section D. Computation of Investment Income Percentage**

| | | | |
|---|---|---|---|
| 17 | Investment income percentage for **2024** (line 10c, column (f) divided by line 13, column (f)) . . . . . . . | 17 | 1.000 % |
| 18 | Investment income percentage from **2023** Schedule A, Part III, line 17 . . . . . . . . . . . . . . | 18 | 1.000 % |

19a **33 1/3% support tests-2024.** If the organization did not check the box on line 14, and line 15 is more than 33 1/3%, and line 17 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . ▶ ☑

b **33 1/3% support tests—2023.** If the organization did not check a box on line 14 or line 19a, and line 16 is more than 33 1/3% and line 18 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . ▶ ☐

20 **Private foundation.** If the organization did not check a box on line 14, 19a, or 19b, check this box and see instructions . . . . ▶ ☐

## Part IV Supporting Organizations

(Complete only if you checked a box on line 12 of Part I. If you checked box 12a, of Part I, complete Sections A and B. If you checked box 12b, of Part I, complete Sections A and C. If you checked box 12c, of Part I, complete Sections A, D, and E. If you checked box 12d, of Part I, complete Sections A and D, and complete Part V.)

### Section A. All Supporting Organizations

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Are all of the organization's supported organizations listed by name in the organization's governing documents? *If "No," describe in **Part VI** how the supported organizations are designated. If designated by class or purpose, describe the designation. If historic and continuing relationship, explain.* | 1 | | |
| 2 | Did the organization have any supported organization that does not have an IRS determination of status under section 509 (a)(1) or (2)? *If "Yes," explain in **Part VI** how the organization determined that the supported organization was described in section 509(a)(1) or (2).* | 2 | | |
| 3a | Did the organization have a supported organization described in section 501(c)(4), (5), or (6)? *If "Yes," answer lines 3b and 3c below.* | 3a | | |
| b | Did the organization confirm that each supported organization qualified under section 501(c)(4), (5), or (6) and satisfied the public support tests under section 509(a)(2)? *If "Yes," describe in **Part VI** when and how the organization made the determination.* | 3b | | |
| c | Did the organization ensure that all support to such organizations was used exclusively for section 170(c)(2)(B) purposes? *If "Yes," explain in **Part VI** what controls the organization put in place to ensure such use.* | 3c | | |
| 4a | Was any supported organization not organized in the United States ("foreign supported organization")? *If "Yes" and if you checked box 12a or 12b in Part I, answer lines 4b and 4c below.* | 4a | | |
| b | Did the organization have ultimate control and discretion in deciding whether to make grants to the foreign supported organization? *If "Yes," describe in **Part VI** how the organization had such control and discretion despite being controlled or supervised by or in connection with its supported organizations.* | 4b | | |
| c | Did the organization support any foreign supported organization that does not have an IRS determination under sections 501(c)(3) and 509(a)(1) or (2)? *If "Yes," explain in **Part VI** what controls the organization used to ensure that all support to the foreign supported organization was used exclusively for section 170(c)(2)(B) purposes.* | 4c | | |
| 5a | Did the organization add, substitute, or remove any supported organizations during the tax year? *If "Yes," answer lines 5b and 5c below (if applicable). Also, provide detail in **Part VI,** including (i) the names and EIN numbers of the supported organizations added, substituted, or removed; (ii) the reasons for each such action; (iii) the authority under the organization's organizing document authorizing such action; and (iv) how the action was accomplished (such as by amendment to the organizing document).* | 5a | | |
| b | **Type I or Type II only.** Was any added or substituted supported organization part of a class already designated in the organization's organizing document? | 5b | | |
| c | **Substitutions only.** Was the substitution the result of an event beyond the organization's control? | 5c | | |
| 6 | Did the organization provide support (whether in the form of grants or the provision of services or facilities) to anyone other than (i) its supported organizations, (ii) individuals that are part of the charitable class benefited by one or more of its supported organizations, or (iii) other supporting organizations that also support or benefit one or more of the filing organization's supported organizations? *If "Yes," provide detail in **Part VI.*** | 6 | | |
| 7 | Did the organization provide a grant, loan, compensation, or other similar payment to a substantial contributor (defined in section 4958(c)(3)(C)), a family member of a substantial contributor, or a 35% controlled entity with regard to a substantial contributor? *If "Yes," complete Part I of Schedule L (Form 990) .* | 7 | | |
| 8 | Did the organization make a loan to a disqualified person (as defined in section 4958) not described on line 7? *If "Yes," complete Part I of Schedule L (Form 990).* | 8 | | |
| 9a | Was the organization controlled directly or indirectly at any time during the tax year by one or more disqualified persons, as defined in section 4946 (other than foundation managers and organizations described in section 509(a)(1) or (2))? *If "Yes," provide detail in **Part VI.*** | 9a | | |
| b | Did one or more disqualified persons (as defined on line 9a) hold a controlling interest in any entity in which the supporting organization had an interest? *If "Yes," provide detail in **Part VI.*** | 9b | | |
| c | Did a disqualified person (as defined on line 9a) have an ownership interest in, or derive any personal benefit from, assets in which the supporting organization also had an interest? *If "Yes," provide detail in **Part VI.*** | 9c | | |
| 10a | Was the organization subject to the excess business holdings rules of section 4943 because of section 4943(f) (regarding certain Type II supporting organizations, and all Type III non-functionally integrated supporting organizations)? *If "Yes," answer line 10b below.* | 10a | | |
| b | Did the organization have any excess business holdings in the tax year? *(Use Schedule C, Form 4720, to determine whether the organization had excess business holdings).* | 10b | | |

**Part IV Supporting Organizations** (continued)



| | | | Yes | No |
|---|---|---|---|---|
| **11** | Has the organization accepted a gift or contribution from any of the following persons? | | | |
| **a** | A person who directly or indirectly controls, either alone or together with persons described on lines 11b and 11c below, the governing body of a supported organization? | **11a** | | |
| **b** | A family member of a person described on 11a above? | **11b** | | |
| **c** | A 35% controlled entity of a person described on line 11a or 11b above? *If "Yes" to 11a, 11b, or 11c, provide detail in **Part VI**.* | **11c** | | |

**Section B. Type I Supporting Organizations**

| | | | Yes | No |
|---|---|---|---|---|
| **1** | Did the officers, directors, trustees, or membership of one or more supported organizations have the power to regularly appoint or elect at least a majority of the organization's directors or trustees at all times during the tax year? *If "No," describe in **Part VI** how the supported organization(s) effectively operated, supervised, or controlled the organization's activities. If the organization had more than one supported organization, describe how the powers to appoint and/or remove directors or trustees were allocated among the supported organizations and what conditions or restrictions, if any, applied to such powers during the tax year.* | **1** | | |
| **2** | Did the organization operate for the benefit of any supported organization other than the supported organization(s) that operated, supervised, or controlled the supporting organization? *If "Yes," explain in **Part VI** how providing such benefit carried out the purposes of the supported organization(s) that operated, supervised or controlled the supporting organization.* | **2** | | |

**Section C. Type II Supporting Organizations**

| | | | Yes | No |
|---|---|---|---|---|
| **1** | Were a majority of the organization's directors or trustees during the tax year also a majority of the directors or trustees of each of the organization's supported organization(s)? *If "No," describe in **Part VI** how control or management of the supporting organization was vested in the same persons that controlled or managed the supported organization(s).* | **1** | | |

**Section D. All Type III Supporting Organizations**

| | | | Yes | No |
|---|---|---|---|---|
| **1** | Did the organization provide to each of its supported organizations, by the last day of the fifth month of the organization's tax year, (i) a written notice describing the type and amount of support provided during the prior tax year, (ii) a copy of the Form 990 that was most recently filed as of the date of notification, and (iii) copies of the organization's governing documents in effect on the date of notification, to the extent not previously provided? | **1** | | |
| **2** | Were any of the organization's officers, directors, or trustees either (i) appointed or elected by the supported organization (s) or (ii) serving on the governing body of a supported organization? *If "No," explain in **Part VI** how the organization maintained a close and continuous working relationship with the supported organization(s).* | **2** | | |
| **3** | By reason of the relationship described in line 2 above, did the organization's supported organizations have a significant voice in the organization's investment policies and in directing the use of the organization's income or assets at all times during the tax year? *If "Yes," describe in **Part VI** the role the organization's supported organizations played in this regard.* | **3** | | |

**Section E. Type III Functionally-Integrated Supporting Organizations**

**1** Check the box next to the method that the organization used to satisfy the Integral Part Test during the year **(see instructions)**:

- **a** ☐ The organization satisfied the Activities Test. Complete **line 2** below.
- **b** ☐ The organization is the parent of each of its supported organizations. Complete **line 3** below.
- **c** ☐ The organization supported a governmental entity. Describe in **Part VI** how you supported a government entity (see instructions)

**2** Activities Test. **Answer lines 2a and 2b below.**

| | | | Yes | No |
|---|---|---|---|---|
| **a** | Did substantially all of the organization's activities during the tax year directly further the exempt purposes of the supported organization(s) to which the organization was responsive? *If "Yes," then in **Part VI identify those supported organizations and explain** how these activities directly furthered their exempt purposes, how the organization was responsive to those supported organizations, and how the organization determined that these activities constituted substantially all of its activities.* | **2a** | | |
| **b** | Did the activities described on line 2a, above constitute activities that, but for the organization's involvement, one or more of the organization's supported organization(s) would have been engaged in? *If "Yes," explain in **Part VI** the reasons for the organization's position that its supported organization(s) would have engaged in these activities but for the organization's involvement.* | **2b** | | |

**3** Parent of Supported Organizations. **Answer lines 3a and 3b below.**

| | | | Yes | No |
|---|---|---|---|---|
| **a** | Did the organization have the power to regularly appoint or elect a majority of the officers, directors, or trustees of each of the supported organizations?*If "Yes" or "No", provide details in **Part VI.*** | **3a** | | |
| **b** | Did the organization exercise a substantial degree of direction over the policies, programs and activities of each of its supported organizations? *If "Yes," describe in **Part VI.** the role played by the organization in this regard.* | **3b** | | |

Case 4:26-cv-00748-O Document 72-1 Filed 08/18/26 Page 31 of 71 PageID 2217

**Part V Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations**

1 ☐ Check here if the organization satisfied the Integral Part Test as a qualifying trust on Nov. 20, 1970 (*explain in **Part VI***). **See instructions.** All other Type III non-functionally integrated supporting organizations must complete Sections A through E.

| | **Section A - Adjusted Net Income** | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|---|
| 1 | Net short-term capital gain | 1 | | |
| 2 | Recoveries of prior-year distributions | 2 | | |
| 3 | Other gross income (see instructions) | 3 | | |
| 4 | Add lines 1 through 3 | 4 | | |
| 5 | Depreciation and depletion | 5 | | |
| 6 | Portion of operating expenses paid or incurred for production or collection of gross income or for management, conservation, or maintenance of property held for production of income (see instructions) | 6 | | |
| 7 | Other expenses (see instructions) | 7 | | |
| 8 | **Adjusted Net Income** (subtract lines 5, 6 and 7 from line 4) | 8 | | |

| | **Section B - Minimum Asset Amount** | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|---|
| 1 | Aggregate fair market value of all non-exempt-use assets (see instructions for short tax year or assets held for part of year): | 1 | | |
| a | Average monthly value of securities | 1a | | |
| b | Average monthly cash balances | 1b | | |
| c | Fair market value of other non-exempt-use assets | 1c | | |
| d | **Total** (add lines 1a, 1b, and 1c) | 1d | | |
| e | **Discount** claimed for blockage or other factors (*explain in detail in **Part VI***): | | | |
| 2 | Acquisition indebtedness applicable to non-exempt use assets | 2 | | |
| 3 | Subtract line 2 from line 1d | 3 | | |
| 4 | Cash deemed held for exempt use. Enter 0.015 of line 3 (for greater amount, see instructions). | 4 | | |
| 5 | Net value of non-exempt-use assets (subtract line 4 from line 3) | 5 | | |
| 6 | Multiply line 5 by 0.035 | 6 | | |
| 7 | Recoveries of prior-year distributions | 7 | | |
| 8 | **Minimum Asset Amount** (add line 7 to line 6) | 8 | | |

| | **Section C - Distributable Amount** | | | Current Year |
|---|---|---|---|---|
| 1 | Adjusted net income for prior year (from Section A, line 8, Column A) | 1 | | |
| 2 | Enter 85% of line 1 | 2 | | |
| 3 | Minimum asset amount for prior year (from Section B, line 8, Column A) | 3 | | |
| 4 | Enter greater of line 2 or line 3 | 4 | | |
| 5 | Income tax imposed in prior year | 5 | | |
| 6 | **Distributable Amount.** Subtract line 5 from line 4, unless subject to emergency temporary reduction (see instructions) | 6 | | |

7 ☐ Check here if the current year is the organization's first as a non-functionally-integrated Type III supporting organization (see instructions)

Case 4:26-cv-00748-O Document 72-1 Filed 08/18/26 Page 32 of 71 PageID 2218

**Part V** **Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations** (continued)

| Section D - Distributions | | Current Year |
|---|---|---|
| **1** Amounts paid to supported organizations to accomplish exempt purposes | 1 | |
| **2** Amounts paid to perform activity that directly furthers exempt purposes of supported organizations, in excess of income from activity | 2 | |
| **3** Administrative expenses paid to accomplish exempt purposes of supported organizations | 3 | |
| **4** Amounts paid to acquire exempt-use assets | 4 | |
| **5** Qualified set-aside amounts (*prior IRS approval required - provide details in **Part VI***) | 5 | |
| **6** Other distributions (*describe in **Part VI***). See instructions | 6 | |
| **7** **Total annual distributions.** Add lines 1 through 6. | 7 | |
| **8** Distributions to attentive supported organizations to which the organization is responsive (*provide details in **Part VI***). See instructions | 8 | |
| **9** Distributable amount for 2024 from Section C, line 6 | 9 | |
| **10** Line 8 amount divided by Line 9 amount | 10 | |

| **Section E - Distribution Allocations** (see instructions) | **(i) Excess Distributions** | **(ii) Underdistributions Pre-2024** | **(iii) Distributable Amount for 2024** |
|---|---|---|---|
| **1** Distributable amount for 2024 from Section C, line 6 | | | |
| **2** Underdistributions, if any, for years prior to 2024 (reasonable cause required-- *explain in **Part VI***). See instructions. | | | |
| **3** Excess distributions carryover, if any, to 2024: | | | |
| **a** From 2019. . . . . . . | | | |
| **b** From 2020. . . . . . . | | | |
| **c** From 2021. . . . . . . | | | |
| **d** From 2022. . . . . . . | | | |
| **e** From 2023. . . . . . . | | | |
| **f** **Total** of lines 3a through e | | | |
| **g** Applied to underdistributions of prior years | | | |
| **h** Applied to 2024 distributable amount | | | |
| **i** Carryover from 2019 not applied (see instructions) | | | |
| **j** Remainder. Subtract lines 3g, 3h, and 3i from line 3f. | | | |
| **4** Distributions for 2024 from Section D, line 7: $ | | | |
| **a** Applied to underdistributions of prior years | | | |
| **b** Applied to 2024 distributable amount | | | |
| **c** Remainder. Subtract lines 4a and 4b from line 4. | | | |
| **5** Remaining underdistributions for years prior to 2024, if any. Subtract lines 3g and 4a from line 2. If the amount is greater than zero, *explain in **Part VI***. See instructions. | | | |
| **6** Remaining underdistributions for 2024. Subtract lines 3h and 4b from line 1. If the amount is greater than zero, *explain in **Part VI***. See instructions. | | | |
| **7** **Excess distributions carryover to 2025.** Add lines 3j and 4c. | | | |
| **8** Breakdown of line 7: | | | |
| **a** Excess from 2020. . . . . | | | |
| **b** Excess from 2021. . . . . | | | |
| **c** Excess from 2022. . . . . | | | |
| **d** Excess from 2023. . . . . | | | |
| **e** Excess from 2024. . . . . | | | |

Case 4:26-cv-00748-O Document 72-1 Filed 08/18/26 Page 33 of 71 PageID 2219

**Part VI** **Supplemental Information.** Provide the explanations required by Part II, line 10; Part II, line 17a or 17b; Part III, line 12; Part IV, Section A, lines 1, 2, 3b, 3c, 4b, 4c, 5a, 6, 9a, 9b, 9c, 11a, 11b, and 11c; Part IV, Section B, lines 1 and 2; Part IV, Section C, line 1; Part IV, Section D, lines 2 and 3; Part IV, Section E, lines 1c, 2a, 2b, 3a and 3b; Part V, line 1; Part V, Section B, line 1e; Part V Section D, lines 5, 6, and 8; and Part V, Section E, lines 2, 5, and 6. Also complete this part for any additional information. (See instructions).

| Facts And Circumstances Test |
| --- |
| |

**SCHEDULE D** (Form 990) (Rev. January 2025) Department of the Treasury Internal Revenue Service

# Supplemental Financial Statements

▶ Complete if the organization answered "Yes," on Form 990, Part IV, line 6, 7, 8, 9, 10, 11a, 11b, 11c, 11d, 11e, 11f, 12a, or 12b.
▶ Attach to Form 990.
▶ Go to *www.irs.gov/Form990* for instructions and the latest information.

OMB No. 1545-0047

**Open to Public Inspection**

**Name of the organization**
WORLD PROF ASSN FOR TRANSGENDER HEALTH

**Employer identification number**
94-2675140

## Part I Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts.
Complete if the organization answered "Yes" on Form 990, Part IV, line 6.

| | | (a) Donor advised funds | (b) Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year | | |
| 2 | Aggregate value of contributions to (during year) | | |
| 3 | Aggregate value of grants from (during year) | | |
| 4 | Aggregate value at end of year | | |

5 Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds are the organization's property, subject to the organization's exclusive legal control? ☐ Yes ☐ No

6 Did the organization inform all grantees, donors, and donor advisors in writing that grant funds can be used only for charitable purposes and not for the benefit of the donor or donor advisor, or for any other purpose conferring impermissible private benefit? ☐ Yes ☐ No

## Part II Conservation Easements.
Complete if the organization answered "Yes" on Form 990, Part IV, line 7.

1 Purpose(s) of conservation easements held by the organization (check all that apply).

☐ Preservation of land for public use (e.g., recreation or education)
☐ Preservation of an historically important land area
☐ Protection of natural habitat
☐ Preservation of a certified historic structure
☐ Preservation of open space

2 Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation easement on the last day of the tax year.

| | | | Held at the End of the Year |
|---|---|---|---|
| a | Total number of conservation easements | 2a | |
| b | Total acreage restricted by conservation easements | 2b | |
| c | Number of conservation easements on a certified historic structure included in (a) | 2c | |
| d | Number of conservation easements included in (c) acquired after July 25, 2006, and not on a historic structure listed in the National Register | 2d | |

3 Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the tax year ▶

4 Number of states where property subject to conservation easement is located ▶

5 Does the organization have a written policy regarding the periodic monitoring, inspection, handling of violations, and enforcement of the conservation easements it holds? ☐ Yes ☐ No

6 Staff and volunteer hours devoted to monitoring, inspecting, handling of violations, and enforcing conservation easements during the year ▶

7 Amount of expenses incurred in monitoring, inspecting, handling of violations, and enforcing conservation easements during the year ▶ $

8 Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i) and section 170(h)(4)(B)(ii)? ☐ Yes ☐ No

9 In Part XIII, describe how the organization reports conservation easements in its revenue and expense statement, and balance sheet, and include, if applicable, the text of the footnote to the organization's financial statements that describes the organization's accounting for conservation easements.

## Part III Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets.
Complete if the organization answered "Yes" on Form 990, Part IV, line 8.

1a If the organization elected, as permitted under FASB ASC 958, not to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide, in Part XIII, the text of the footnote to its financial statements that describes these items.

b If the organization elected, as permitted under FASB ASC 958, to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide the following amounts relating to these items:

(i) Revenue included on Form 990, Part VIII, line 1 ▶ $

(ii) Assets included in Form 990, Part X ▶ $

2 If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide the following amounts required to be reported under FASB ASC 958 relating to these items:

a Revenue included on Form 990, Part VIII, line 1 ▶ $

b Assets included in Form 990, Part X ▶ $

Case 4:26-cv-00748-O Document 72-1 Filed 08/18/26 Page 35 of 71 PageID 2221

**Part III** **Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets** *(continued)*

3 Using the organization's acquisition, accession, and other records, check any of the following that are a significant use of its collection items (check all that apply):

a ☐ Public exhibition

b ☐ Scholarly research

c ☐ Preservation for future generations

d ☐ Loan or exchange programs

e ☐ Other ..........

4 Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIII.

5 During the year, did the organization solicit or receive donations of art, historical treasures or other similar assets to be sold to raise funds rather than to be maintained as part of the organization's collection?. . . ☐ **Yes** ☐ **No**

**Part IV** **Escrow and Custodial Arrangements.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21.

1a Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included on Form 990, Part X? . . . ☐ **Yes** ☐ **No**

| | | | Amount |
|---|---|---|---|
| b | If "Yes," explain the arrangement in Part XIII and complete the following table: | | |
| c | Beginning balance . . . | 1c | |
| d | Additions during the year . . . | 1d | |
| e | Distributions during the year . . . | 1e | |
| f | Ending balance . . . | 1f | |

2a Did the organization include an amount on Form 990, Part X, line 21, for escrow or custodial account liability? . . . ☐ **Yes** ☐ **No**

b If "Yes," explain the arrangement in Part XIII. Check here if the explanation has been provided in Part XIII . . . . ☐

**Part V** **Endowment Funds.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 10.

| | **(a)** Current year | **(b)** Prior year | **(c)** Two years back | **(d)** Three years back | **(e)** Four years back |
|---|---|---|---|---|---|
| **1a** Beginning of year balance . . . . | | | | | |
| **b** Contributions . . . | | | | | |
| **c** Net investment earnings, gains, and losses | | | | | |
| **d** Grants or scholarships . . . | | | | | |
| **e** Other expenditures for facilities and programs . . . | | | | | |
| **f** Administrative expenses . . . . | | | | | |
| **g** End of year balance . . . . . . | | | | | |

2 Provide the estimated percentage of the current year end balance (line 1g, column (a)) held as:

a Board designated or quasi-endowment ▶ ..........

b Permanent endowment ▶ ..........

c Term endowment ▶ ..........

The percentages on lines 2a, 2b, and 2c should equal 100%.

3a Are there endowment funds not in the possession of the organization that are held and administered for the organization by:

| | | Yes | No |
|---|---|---|---|
| **(i)** Unrelated organizations . . . | 3a(i) | | |
| **(ii)** Related organizations . . . | 3a(ii) | | |
| b If "Yes" on 3a(ii), are the related organizations listed as required on Schedule R? . . . | 3b | | |

4 Describe in Part XIII the intended uses of the organization's endowment funds.

**Part VI** **Land, Buildings, and Equipment.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 11a. See Form 990, Part X, line 10.

| Description of property | **(a)** Cost or other basis (investment) | **(b)** Cost or other basis (other) | **(c)** Accumulated depreciation | **(d)** Book value |
|---|---|---|---|---|
| **1a** Land . . . . . . | | | | |
| **b** Buildings . . . . . | | | | |
| **c** Leasehold improvements | | | | |
| **d** Equipment . . . . | | | | |
| **e** Other . . . . . . | | | | |
| **Total.** Add lines 1a through 1e. *(Column (d) must equal Form 990, Part X, column (B), line 10(c).)* . . ▶ | | | | |

**Part VII Investments - Other Securities.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 11b.See Form 990, Part X, line 12.

| (a) Description of security or category (including name of security) | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| (1) Financial derivatives | | |
| (2) Closely-held equity interests | | |
| (3)Other | | |
| (A) | | |
| (B) | | |
| (C) | | |
| (D) | | |
| (E) | | |
| (F) | | |
| (G) | | |
| (H) | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col. (B) line 12.)* ▶ | | |

**Part VIII Investments - Program Related.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 11c. See Form 990, Part X, line 13.

| (a) Description of investment | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| (1) | | |
| (2) | | |
| (3) | | |
| (4) | | |
| (5) | | |
| (6) | | |
| (7) | | |
| (8) | | |
| (9) | | |
| (9) | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 13.)* ▶ | | |

**Part IX Other Assets.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 11d. See Form 990, Part X, line 15.

| (a) Description | (b) Book value |
|---|---|
| (1) | |
| (2) | |
| (3) | |
| (4) | |
| (5) | |
| (6) | |
| (7) | |
| (8) | |
| (9) | |
| (9) | |
| **Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 15.)* ▶ | |

**Part X Other Liabilities.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 11e or 11f.See Form 990, Part X, line 25.

| 1. (a) Description of liability | (b) Book value |
|---|---|
| (1) Federal income taxes | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 25.)* ▶ | |

**2.** Liability for uncertain tax positions. In Part XIII, provide the text of the footnote to the organization's financial statements that reports the organization's liability for uncertain tax positions under FIN 48 (ASC 740). Check here if the text of the footnote has been provided in Part XIII ☐

Case 4:26-cv-00748-O Document 72-1 Filed 08/18/26 Page 37 of 71 PageID 2223

**Part XI Reconciliation of Revenue per Audited Financial Statements With Revenue per Return.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 12a.

| | | | | | |
|---|---|---|---|---|---|
| 1 | Total revenue, gains, and other support per audited financial statements | | | 1 | 2,458,305 |
| 2 | Amounts included on line 1 but not on Form 990, Part VIII, line 12: | | | | |
| a | Net unrealized gains (losses) on investments | 2a | 97,918 | | |
| b | Donated services and use of facilities | 2b | | | |
| c | Recoveries of prior year grants | 2c | | | |
| d | Other (Describe in Part XIII.) | 2d | | | |
| e | Add lines **2a** through **2d** | | | 2e | 97,918 |
| 3 | Subtract line **2e** from line **1** | | | 3 | 2,360,387 |
| 4 | Amounts included on Form 990, Part VIII, line 12, but not on line **1**: | | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b | 4a | | | |
| b | Other (Describe in Part XIII.) | 4b | | | |
| c | Add lines **4a** and **4b** | | | 4c | |
| 5 | Total revenue. Add lines **3** and **4c.** (This must equal Form 990, Part I, line 12.) | | | 5 | 2,360,387 |

**Part XII Reconciliation of Expenses per Audited Financial Statements With Expenses per Return.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 12a.

| | | | | | |
|---|---|---|---|---|---|
| 1 | Total expenses and losses per audited financial statements | | | 1 | 2,515,016 |
| 2 | Amounts included on line 1 but not on Form 990, Part IX, line 25: | | | | |
| a | Donated services and use of facilities | 2a | | | |
| b | Prior year adjustments | 2b | | | |
| c | Other losses | 2c | | | |
| d | Other (Describe in Part XIII.) | 2d | | | |
| e | Add lines **2a** through **2d** | | | 2e | |
| 3 | Subtract line **2e** from line **1** | | | 3 | 2,515,016 |
| 4 | Amounts included on Form 990, Part IX, line 25, but not on line **1:** | | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b | 4a | 7,074 | | |
| b | Other (Describe in Part XIII.) | 4b | | | |
| c | Add lines **4a** and **4b** | | | 4c | 7,074 |
| 5 | Total expenses. Add lines **3** and **4c.** (This must equal Form 990, Part I, line 18.) | | | 5 | 2,522,090 |

**Part XIII Supplemental Information**

Provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, lines 2d and 4b; and Part XII, lines 2d and 4b. Also complete this part to provide any additional information.

| Return Reference | Explanation |
|---|---|

Case 4:26-cv-00748-O Document 72-1 Filed 08/18/26 Page 38 of 71 PageID 2224

# SCHEDULE O (Form 990)

(Rev. January 2025)
Department of the Treasury
Internal Revenue Service

## Supplemental Information to Form 990 or 990-EZ

**Complete to provide information for responses to specific questions on Form 990 or 990-EZ or to provide any additional information.**
**Attach to Form 990 or 990-EZ.**
**Go to *www.irs.gov/Form990* for instructions and the latest information.**

OMB No. 1545-0047

**Open to Public Inspection**

Name of the organization
WORLD PROF ASSN FOR TRANSGENDER HEALTH

**Employer identification number**
94-2675140

## 990 Schedule O, Supplemental Information

| Return Reference | Explanation |
|---|---|
| FORM 990 - ORGANIZATION'S MISSION | AS AN INTERNATIONAL MULTIDISCIPLINARY PROFESSIONAL ASSOCIATION, THE MISSION OF THE WORLD P ROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH (WPATH) IS TO PROMOTE EVIDENCE-BASED CARE, EDUCATION, RESEARCH, ADVOCACY, PUBLIC POLICY AND RESPECT IN TRANSGENDER HEALTH. |

## 990 Schedule O, Supplemental Information

| Return Reference | Explanation |
|---|---|
| FORM 990, PAGE 1, PART I, LINE 6 | VOLUNTEERS SERVE ON THE BOARD OF DIRECTORS AND HELP RUN THE ORGANIZATION AND SUPPORT THE E FFORTS OF THE ORGANIZATION TO RAISE AWARENESS AND EDUCATION AROUND TRANSGENDER HEALTH. |

**990 Schedule O, Supplemental Information**

| Return Reference | Explanation |
|---|---|
| FORM 990, PAGE 2, PART III, LINE 4B | THE GLOBAL EDUCATION INITIATIVE (GEI) PROVIDES COURSES TO A VARIETY OF AUDIENCES. ATTENDEE S FROM MANY COUNTRIES ARE ENCOURAGED TO PROVIDE CONSTRUCTIVE FEEDBACK, WHICH THE BOARD REV IEWS THOROUGHLY. IN ATTENDANCE AT GEI COURSES ARE PSYCHOLOGISTS, PSYCHIATRISTS, THERAPISTS , SOCIAL WORKERS, FAMILY PRACTICE PROVIDERS, NURSES, NURSE PRACTITIONERS, PHYSICIAN ASSIST ANTS, ENDOCRINOLOGISTS, UROLOGISTS, GYNECOLOGISTS, PLASTIC SURGEONS AND PROFESSIONAL EDUCA TORS. ALSO IN ATTENDANCE ARE SPIRITUAL LEADERS, STUDENTS, ADDICTION COUNSELORS, HIV CASE M ANAGERS, AND RESEARCHERS. ATTENDEES HAVE WORKED AT MILITARY BASES, THE PENTEGON, FEDERAL A ND STATE CORRECTIONAL INSTITUTIONS, MEDICAL SCHOOLS, PRIVATE PRACTICES, PUBLIC HEALTH DEPA RTMENTS, CLINICS AND COMMUNITY HOSPITALS. MORE THAN ANYTHING ELSE, WE HAVE REALIZED THAT T HERE IS MUCH MORE TO BE DONE. WE ARE CURRENTLY FORMING TASK FORCES TO ASSIST IN CREATING T ARGETED TRAINING TO MEET THE VARIED EDUCATIONAL NEEDS OF PROVIDERS AND IMPROVE ACCESS TO C ARE. |

## 990 Schedule O, Supplemental Information

| Return Reference | Explanation |
| --- | --- |
| FORM 990, PAGE 2, PART III, LINE 4D | THE ORGANIZATION PROVIDES ADDITIONAL BENEFITS TO THE MEMBERSHIP THROUGH DEVELOPMENT EFFORT S, MAINTAINING PROFESSIONAL MEMBERSHIPS WITH OTHER ORGANIZATIONS, PROVIDING RESEARCH GRANT OPPORTUNITIES, AND BY PROVIDING AN EDUCATIONAL JOURNAL TO THE MEMBERSHIP. |

## 990 Schedule O, Supplemental Information

| Return Reference | Explanation |
|---|---|
| FORM 990, PAGE 6, PART VI, LINE 3 | MANAGEMENT DUTIES ARE DELEGATED TO VERITAS ASSOCIATION MANAGEMENT, INC. |

**990 Schedule O, Supplemental Information**

| Return Reference | Explanation |
|---|---|
| FORM 990, PAGE 6, PART VI, LINE 11B | A COPY OF FORM 990 WILL BE DISTRIBUTED VIA SECURE ELECTRONIC MEANS PRIOR TO TRANSMITTING FORM 990 TO THE IRS. |

Case 4:26-cv-00748-O Document 72-1 Filed 08/18/26 Page 44 of 71 PageID 2230

## 990 Schedule O, Supplemental Information

| Return Reference | Explanation |
|---|---|
| FORM 990, PAGE 6, PART VI, LINE 19 | THE ORGANIZATION MAKES ITS GOVERNING DOCUMENTATION AND OTHER INFORMATION AVAILABLE VIA THE WEB OR AVAILABLE UPON REQUEST AT THE ORGANIZATION'S OFFICE LOCATION. |

**990 Schedule O, Supplemental Information**

| Return Reference | Explanation |
| --- | --- |
| FORM 990, PART IX, LINE 11G | HONORARIUM 32,966 0 0 HONORARIUM 79,150 0 0 PUBLIC RELATIONS 0 149,410 0 CONSULTING 17,000 0 0 TOTAL 129,116 149,410 0 |

# ATTACHMENT B

FILED
08/09/2024
Angie Sparks
CLERK
Lewis & Clark County District Court
STATE OF MONTANA
By: Helen Coleman
DV-25-2024-0000261-DK
Menahan, Mike
40.00

Justin D. Kingsolver*
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 624-2500
JKingsolver@crowell.com

Derick D. Dailey*
**CROWELL & MORING LLP**
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: (212) 224-4000
DDailey@crowell.com

Robert Farris-Olsen
**MORRISON SHERWOOD WILSON DEOLA PLLP**
401 North Last Chance Gulch
P.O. Box 557
Helena, MT 59624
Telephone: (406) 442-3261
rfolsen@mswdlaw.com

***** *Pro Hac Vice* Application In Process

**IN THE FIRST JUDICIAL DISTRICT COURT**
**LEWIS & CLARK COUNTY**

| | |
|---|---|
| JESSICA KALARCHIK, an individual, and JANE DOE, an individual, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>STATE OF MONTANA, *et. al.*,<br><br>*Defendants,*<br><br>v.<br><br>WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH,<br><br>*Third-Party Defendant.* | Case No. ADV-25-2024-0000261-CR<br><br>Hon. Mike Menahan<br><br>**THIRD-PARTY DEFENDANT WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH'S BRIEF IN SUPPORT OF MOTION TO DISMISS** |

## I. INTRODUCTION

This case is a transparent attempt to force a non-profit organization to incur hundreds of thousands of dollars in legal fees to defend against baseless, bizarre, and legally-unsupportable claims. It is a thinly-veiled effort to chill speech and to extract an economic toll from an organization the Attorney General's political party wishes didn't exist. The Attorney General's

Third-Party Complaint ("TPC"), which flies in the face of well-settled case law, should be dismissed under Montana Rule of Civil Procedure 12(b)(2) and 12(b)(6) for lack of jurisdiction and its failure to meet even the most basic pleading requirements to state a claim upon which relief can be granted. Moreover, the State's indemnification claim infringes the First Amendment speech and association rights of the World Professional Association for Transgender Health ("WPATH"), an international 501(c)(3) non-profit organization that, among other things, maintains the Standards of Care for the Health of Transgender and Gender Diverse People ("Standards of Care"), so failure to dismiss this case would set a dangerous and unconstitutional precedent. For those reasons, and the reasons described herein, the law requires the Attorney General's ludicrous third-party "indemnification" complaint to be dismissed.

WPATH's Standards of Care "were developed by experts in the field, including clinicians and researchers, who used systematic processes for collecting and reviewing scientific evidence." *Brandt v. Rutledge*, 677 F. Supp. 3d 877, 889 (E.D. Ark. 2023). WPATH's Standards of Care "are widely followed by well-trained clinicians," "are used by insurers," and "have been endorsed by the United States Department of Health and Human Services." *Doe v. Ladapo*, No. 4:23CV114-RH-MAF, 2024 WL 2947123, at *5 (N.D. Fla. June 11, 2024).

Despite the science, dozens of state legislatures (including Montana's) have targeted transgender people in recent years. This legislation spawned substantial litigation as legal services organizations representing the rights of those targeted by these bills have challenged them in court. For LGBTQ+ advocates, that "anti-LGBTQ-state-law-then-litigation" story is a familiar one. What is unfamiliar are the dangerous and unlawful tactics employed here by the Attorney General.

For the first time in the recent history of the LGBTQ+ litigation movement, the Montana Attorney General has chosen to use his prosecutorial discretion to punish his ideological opponent. His complaint purports to ask the Court to order WPATH to indemnify him for costs he incurred

litigating a case that has nothing to do with WPATH and in which WPATH is not a party. In reality, the Attorney General's third-party complaint has nothing to do with indemnity.

The Attorney General claims WPATH should pay the State's litigation costs in a suit the ACLU brought to challenge state laws about gender-marker changes on government documents. The skeletal third-party complaint does not and cannot actually plead causation. Indeed, all the Attorney General pleads is the conclusory allegation that "WPATH has created the factual basis for the suit" against the State by the plaintiffs in the underlying litigation. *See* TPC ¶ 21. But the Attorney General appears to be suggesting that WPATH invented the concept of "gender dysphoria," and that but-for the scientific consensus that has evolved around gender dysphoria and the treatments for it, the State would not have needed to enact laws on gender-marker changes and thus not bear any litigation costs in suits challenging those laws. To do so, he offensively alleges that WPATH "made misrepresentations to Montana medical providers" about the legitimacy of gender dysphoria and the medical treatments for it, despite the scientific community's consensus around it. While the Attorney General may wish transgender and gender-diverse people (and the healthcare they need) did not exist, his erasure efforts cannot – and will not – succeed.

But the (de)merits of the Attorney General's complaint are an issue for another day. That is because his third-party complaint should be dismissed under Montana Rule of Civil Procedure 12(b)(2) and 12(b)(6) for lack of jurisdiction and its complete failure to state a claim upon which relief can be granted.

## II. BACKGROUND

### A. The Underlying Litigation

On April 30, 2021, Montana Governor Greg Gianforte signed Senate Bill 280 ("SB 280") into law. It prohibits anyone from changing their sex designation on their birth certificate without first presenting a court order showing that a surgical procedure changed that person's sex. A year

later, a state court enjoined SB 280's enforcement and ordered the State to reinstate less restrictive pre-SB 280 procedures for processing applications to change sex designations on Montanans' birth certificates. But while the injunction was in place, the State's Department of Public Health and Human Services ("DPHHS") issued an emergency rule, and later a permanent rule, implementing a total ban on changes to sex designations on birth certificates. *See* Mont. Admin. R. 37.8.311(5) (the "2022 Rule"). On June 26, 2023, a court permanently enjoined the enforcement of SB 280 and found DPHHS in contempt for defying the court's preliminary injunction order.

Based on the 2022 Rule, in February 2024, DPHHS announced it would only amend sex designations on birth certificates if the sex identified on the applicant's birth certificate was a result of a scriveners' error, incorrect data entry, or if the sex was misidentified on the original certification. DPHSS declared it would not amend birth certificates based on "gender transition, gender identity, or change of gender." *See* Mont. Admin. Reg. Notice 37-1002, No. 11 (Jun. 10, 2022). DPHHS announced that its amendment process would be subject to provisions in Senate Bill 458 ("SB 458"), signed into law in May 2023, which provides:

> In human beings there are exactly two sexes, male and female, with two corresponding types of gametes. The sexes are determined by the biological and genetic indication of male and female without regard to an individuals' psychological, behavioral, social, or chosen or subjective experience of gender.

Around the same time, the Motor Vehicle Division ("MVD"), via the Montana Department of Justice, adopted a new policy to only issue an amended driver's license with a sex designation reflecting a person's gender identity if the person provided an amended birth certificate. Such an amended birth certificate was made impossible by the 2022 Rule.

On April 18, 2024, Plaintiffs in the underlying litigation filed a class action in Montana state court seeking to block enforcement of the 2022 Rule, the new MVD policy, and SB 458 as unconstitutional. *See Kalarchik, et al., v. State of Montana, et al.*, Case No. DV-25-2024-

0000261-CR (Lewis & Clark Cnty. Dist. Ct. Apr. 18, 2024) (hereinafter "Underlying Litigation").

### B. The Third-Party Complaint

On June 12, 2024, Defendants in the Underlying Litigation (hereinafter "the State") filed an Answer to the Plaintiffs' complaint. Beyond its Answer, the State filed the instant TPC against WPATH. Through its TPC, the State raises a novel (and preposterous) theory that WPATH should indemnify the State for its defense in the Underlying Litigation, including for any "potential liability" to the plaintiffs in the Underlying Litigation "in the form of reimbursement of their attorneys' fees and costs" under the private attorney general doctrine. *See* TPC ¶¶ 17, 20.

## III. LEGAL STANDARD

Montana Rule of Civil Procedure 12(b)(2) requires a defendant to be dismissed if the plaintiff does not establish personal jurisdiction over that defendant. Plaintiffs bear the burden to establish personal jurisdiction over non-resident defendants. *Buckles by & through Buckles v. Cont'l Res., Inc.*, 2017 MT 235, ¶ 11, 388 Mont. 517, 520, 402 P.3d 1213, 1216.

Montana Rule of Civil Procedure 12(b)(6) mandates dismissal of a complaint if the plaintiff "fail[s] to state a claim upon which relief can be granted." The plaintiff carries the burden of adequately pleading a cause of action. *See Jones v. Mont. Univ. Sys.*, 2007 MT 82, ¶ 42, 337 Mont. 1, 12, 155 P.3d 1247, 1256. A plaintiff fails to meet this burden if it "either fails to state a cognizable legal theory for relief or states an otherwise valid legal claim but fails to state sufficient facts that, if true, would entitle the claimant to relief under the claim." *In re Estate of Swanberg*, 2020 MT 153, ¶ 6, 400 Mont. 247, 251, 465 P.3d 1165, 1167. The complaint must state more than facts that "would breed only a suspicion" of entitlement to relief. *Lundeen v. Lake Cnty.*, 2024 MT 120, ¶ 11, 416 Mont. 539, 544 (quoting *Jones*, ¶ 42). "Whether a complaint states a cognizable

claim for relief is a question of substantive law on the merits." *Id*. "Dismissal is proper under 12(b)(6) if the plaintiff would not be entitled to relief based on any set of facts that could be proven to support the claim." *Id.* ¶ 11 (quoting *Puryer v. HSBC Bank USA, N.A.*, 2018 MT 124, ¶ 10, 391 Mont. 361, 366, 419 P.3d 105, 109); *see also Fennessy v. Dorrington*, 2001 MT 204, ¶ 9, 306 Mont. 307, 309, 32 P.3d 1250, 1252. "When considering such a motion, the District Court must consider only the sufficiency of matters raised in the complaint. It must not go beyond the four corners of the complaint, nor may it engage in any fact finding." *Irving v. Sch. Dist. No. 1-1A, Valley Cnty.*, 248 Mont. 460, 464, 813 P.2d 417, 419 (1991) (*quoting Nordlund v. School Distr. No. 14*, 227 Mont. 402, 738 P.2d 1299 (1987)).

## IV. ARGUMENT

### A. The State Cannot Meet Its Burden on Personal Jurisdiction.

The TPC must be dismissed pursuant to Montana Rule 12(b)(2) because the State cannot meet its burden to show that this Court has personal jurisdiction over WPATH. *See Bunch v. Lancair Int'l, Inc.*, No. DV-05-674, 2006 WL 2423267, at *16 (Mont. Dist. July 25, 2006) (explaining "the burden of establishing jurisdiction rests with the Plaintiffs"). In conducting this analysis, the court first determines whether personal jurisdiction (either general or specific) exists pursuant to Rule 4(b)(1) (*Tackett v. Duncan*, 2014 MT 253, ¶ 22, 376 Mont. 348, 354, 334 P.3d 920, 926 (citation omitted)); then, if personal jurisdiction exists, the court applies constitutional due process principles (*id.*), which would require nonresident WPATH to have "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* ¶ 17 (quoting *Walden v. Fiore*, 571 U.S. 277, 282 (2014)). There is no personal jurisdiction in Montana over WPATH, either general or specific, and WPATH has no minimum contacts.

### 1. No General Personal Jurisdiction Exists Over WPATH.

To be subjected to general personal jurisdiction in Montana courts, a person must be "found" within the state of Montana. *Milky Whey, Inc. v. Dairy Partners, LLC*, 2015 MT 18, ¶ 18, 378 Mont. 75, 80, 342 P.3d 13, 17. "To be 'found' within Montana for general jurisdiction purposes, 'it is necessary that the defendants' activities are 'substantial' or 'systematic and continuous.'" *Id*. at 81 (quoting *Edsall Constr. Co. v. Robinson,* 246 Mont. 378, 382, 804 P.2d 1039, 1042 (Mont. 1991)); *see also Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) ("With respect to a corporation, the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction.'" (citation omitted)).

The general personal jurisdiction inquiry is simple: WPATH is incorporated in Texas and headquartered in Illinois, not Montana.[1] Moreover, as detailed below, WPATH is not physically present in Montana, nor does the TPC allege it has ever been. Aside from thirteen Montanans being some of WPATH's thousands of nationwide members, WPATH has no connection *at all* to Montana. There is no general personal jurisdiction over WPATH.

### 2. No Specific Personal Jurisdiction Exists Over WPATH.

There is also no specific jurisdiction over WPATH. A Montana court will not exercise specific personal jurisdiction over an out-of-state defendant unless: (1) "the nonresident defendant purposefully availed itself of the privilege of conducting activities in Montana, thereby invoking Montana's laws"; **and** (2) "the plaintiff's claim arises out of or relates to the defendant's forum-related activities"; **and** (3) "the exercise of personal jurisdiction is reasonable." *Groo v. Montana Eleventh Jud. Dist. Ct.*, 2023 MT 193, ¶ 42, 413 Mont. 415, 428, 537 P.3d 111, 121, *cert. denied sub nom. Groo v. Eddy*, 144 S. Ct. 1062 (2024) (quotation

---

[1] WPATH is incorporated in Texas and headquartered in Illinois. Texas is not Montana, no general jurisdiction exists.

omitted). This analysis focuses on the "'relationship among the [third-party] defendant, the forum, and the litigation.'" *Tackett*, ¶ 19 (quoting *Daimler*, 571 U.S. at 133).

The Complaint makes no allegations sufficient to establish any, much less all three personal jurisdictional requirements. The State's scant jurisdictional allegations are that WPATH allows Montanans (like citizens of every other state) to become WPATH members or obtain a WPATH certification, that WPATH "contracts with" Montanans to provide gender-affirming services and materials to Montana residents, and that WPATH has "made misrepresentations" (at undisclosed times, in undisclosed places, and via undisclosed means) to Montanan medical providers, patients, and parents. *See* TPC ¶¶ 4–6; 15. Putting the falseness of these allegations aside for now given the procedural posture, none of them can warrant the exercise of jurisdiction.

**i. WPATH is Not Subject to Personal Jurisdiction Merely Because Some of Its Members Live in Montana.**

WPATH is a global 501(c)(3) non-profit professional and educational organization that promotes evidence-based care, education, research, public policy and respect in transgender health. Under well-settled law, the State's claim that WPATH "transacts business in Montana" because there are "thirteen members of WPATH who are medical providers within Montana" (TPC ¶ 4) simply does not justify the exercise of jurisdiction.

Courts consistently hold that national organizations are not subject to personal jurisdiction simply because a few of their members reside in a specific state. *See O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1200 (N.D. Cal. 2022) ("National organizations are not subject to jurisdiction in every state where their members live."); *Farrell v. United States Olympic & Paralympic Comm.*, 567 F. Supp. 3d 378, 385 (N.D.N.Y. 2021) (holding that the district court did not have jurisdiction over national nonprofit organization even though the organization maintained dues-paying members and sponsored events in New York); *Mehr v. Fed'n Internationale de Football Ass'n*, 115 F. Supp. 3d 1035, 1052 (N.D. Cal. 2015) (granting motion

to dismiss for lack of personal jurisdiction despite the organization having California members); *see also Friends of Animals, Inc. v. Am. Veterinary Med. Ass'n*, 310 F. Supp. 620, 624 (S.D.N.Y. 1970) ("A professional association does not 'transact business' in a judicial district merely because some of its members reside in the district and receive the association's publications there."). To hold otherwise would subject WPATH, and every other membership organization, to personal jurisdiction in every state in the country. That is not the law.

There are other problems with this part of the State's jurisdictional theory. First, the State's claim that "WPATH transacts business in Montana in that it solicits members in Montana" (TPC ¶ 4) does not support the exercise of personal jurisdiction. But "[i]nterstate communication does not, by itself, constitute the transaction of business in Montana." *See Threlkeld v. Colorado*, 2000 MT 369, ¶ 25, 303 Mont. 432, 439, 16 P.3d 359, 364. Montana courts actually hold *the exact opposite* of the State's argument here. *See Edsall*, 246 Mont. at 382 ("[I]nterstate communication is an almost inevitable accompaniment to doing business in the modern world, and cannot by itself be considered a 'contact' for justifying the exercise of personal jurisdiction.").

Second, the State claims WPATH conducts business in Montana via WPATH's thirteen members in Montana, and that via at least one of those members, that WPATH has provided services to Montanans. TPC ¶ 6. However, the State offers no plausible allegation to show that WPATH (a professional organization that publishes standards of care, akin to the American Medical Association) has any control over what types of services any provider has ever provided to any Montanan. Such allegations are required for this type of showing. *See Rhodes v. Tallarico*, 751 F. Supp. 277, 279 (D. Mass. 1990) (finding no personal jurisdiction over an Ohio organization without allegations that it exercised any influence over any member's decision to perform services). Moreover, in a specific jurisdictional analysis, it is the *defendant's* contacts

that matter – not the contacts of any other person or entity – so the conduct of non-party medical providers has nothing to do with this case. *See Walden*, 571 U.S. at 291 ("[I]t is *the defendant*, not the plaintiff or third parties, who must create contacts with the forum State.") (emphasis added).

**ii. WPATH Does Not Contract with Montanans to Provide Services.**

The State claims that through its members (who happen to reside in Montana) and the Montana providers listed on its website, WPATH "contracts with Montanans to provide services and materials to Montana residents." TPC ¶ 6. Not only is the State's claim totally unsupported by allegations of fact in the Complaint, it is also entirely untrue. Naturally, despite its claim of widespread "contracting" practices, the State does not attach, cite, or even reference *any* contract or *any* contract provision. That is because none exist. The State's claim that WPATH – as opposed to a provider who receives educational or training materials from WPATH – "contracts" with Montanans to do anything must be rejected. *See, e.g.*, *Commonwealth Edison Co. v. State*, 189 Mont. 191, 215, 615 P.2d 847, 860 (1980), *aff'd,* 453 U.S. 609 (1981) ("[a] District Court is not required to accept plaintiffs allegations of law and legal conclusions as true."); *see also Grigg v. Coil*, 2022 MT 151, ¶ 11, 513 P.3d 523 (courts are "not required to take as true any allegations in the complaint that are legal conclusions."). But even if the Court determines it must assume that WPATH did "contract" with Montanans, that fact alone, as a matter of law, could not subject WPATH to personal jurisdiction. It is black-letter law in Montana that "a non-resident does not subject himself to the jurisdiction of Montana by merely entering into a contract with a resident of Montana." *Cimmaron Corp. v. Smith*, 2003 MT 73, ¶ 14, 315 Mont. 1, 4, 67 P.3d 258, 261 (quoting *Edsall*, 246 Mont. at 382).

**iii. The State Fails to Plausibly Plead that WPATH Made Any Misrepresentation, Much Less Any Misrepresentation in Montana.**

The State's claims must also be dismissed because it does not adequately allege that

WPATH acted tortuously in Montana (or, for that matter, outside of Montana). Even read in the light most favorable to the State, the TPC's claim that WPATH has "conspir[ed] to commit misrepresentation and/or negligent misrepresentation with its Montana members and certified providers" is vague and conclusory. TPC ¶ 7. With a complaint that is otherwise devoid of factual allegations, that alone merits dismissal. *Threlkeld*, ¶ 33 ("a court need only take well-pled allegations of fact as true in considering a Rule 12(b) motion to dismiss."); *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (courts "are not bound to accept as true a legal conclusion couched as a factual allegation").

But read more realistically, the State's "misrepresentation" allegations – *i.e.*, that by publishing its Standards of Care for gender dysphoria, WPATH has "made misrepresentations" of some kind (TPC ¶ 15) – is not just patently and obviously false; it is one of the most offensive comments that could be leveled against trans people. The simple fact is the State's complaint does not identify any misrepresentations, because every statement it alleges is a "misrepresentation" ***has already been adjudicated to be true***. For example:

- The State claims WPATH "misrepresented" that minors "<u>can provide informed consent to gender dysphoria treatment</u>" (TPC ¶ 15(a)). But a federal court has already found that WPATH's recommended "informed consent process is adequate to enable minor patients and their parents to make decisions about gender-affirming medical care for adolescents." *Brandt*, 677 F. Supp. 3d at 891.
- The State also claims WPATH "misrepresented" that "<u>gender dysphoria treatment is life-saving treatment for minor/children patients</u>" (TPC ¶ 15(a)). But that same federal court found that "[g]ender dysphoria is a serious condition that, if left untreated, can result in other psychological conditions including depression, anxiety, self-harm, suicidality, and impairment in functioning." *Brandt*, 677 F. Supp. 3d at 888; *see also Doe*, 2024 WL

2947123, at *28 ("[G]ender-affirming care for minors … produces great benefit and avoids unnecessary suffering. Denying this care will cause needless suffering for a substantial number of patients and will increase anxiety, depression, and the risk of suicide.").

It is black-letter law that "for a representation to be actionable[] it must … have been ***untrue*** when made." *See WLW Realty Partners, LLC v. Cont'l Partners VIII, LLC*, 2015 MT 312, ¶ 15, 381 Mont. 333, 338, 360 P.3d 1112, 1115 (emphasis added). Nothing in WPATH's Standards of Care is untrue. On the contrary, they are "widely-accepted clinical practice guidelines for the treatment of gender dysphoria" that "were developed by experts in the field, including clinicians and researchers, who used systematic processes for collecting and reviewing scientific evidence." *Brandt*, 677 F. Supp. at 888–90; *see also Doe*, 2024 WL 2947123, at *28 (describing them as "well-established professional standards of care embraced by all reputable medical associations with relevant expertise.").

The State does not meet its burden to establish personal jurisdiction, either general or specific. Nor can the State, because there is no colorable argument with any actual facts that would show that WPATH has any jurisdictional contacts with Montana. The State's third-party complaint against WPATH should therefore be dismissed for lack of personal jurisdiction.

### B. The State of Montana's Third-Party Complaint Fails to State a Claim for Indemnification.

The State fails to plead a common-law indemnification claim under Montana law. Instead, it merely sets forth conclusory statements untethered to facts or law. To plead a Montana common-law indemnification claim, a plaintiff must "prove that the defendant [was] negligent and that their negligence was a proximate cause of plaintiff's injury." *Rogers v. W. Airline*, 184 Mont. 170, 176, 602 P.2d 171, 174 (Mont. 1979) (quoting *Panasuk v. Seaton*, 277 F. Supp. 979, 985 (D. Mont. 1968)). And if the indemnification plaintiff contributed in any way to the alleged injury (say, by enacting a law that is the subject of litigation for which that plaintiff then seeks

attorney fees), that action by the plaintiff will completely bar recovery. *See Metro Aviation, Inc. v. U.S.*, 2013 MT 193, ¶ 25, 371 Mont. 64, 72, 305 P.3d 832, 837 (Montana courts have "prohibited claims for indemnity between or among joint tortfeasors"). For the reasons set forth below, WPATH respectfully moves to dismiss the Complaint for failure to state a claim upon which relief can be granted.

**1. The State Lacks Standing to Bring a Claim of Indemnification (or Any Claim) because It Does Not Plead It Has Suffered an Injury in Fact.**

Both the U.S. and Montana Constitution impose a threshold justiciability requirement similar to that of federal Article III standing, which requires, at minimum, that there be a true case or controversy at issue between the plaintiff and defendant. *See J.C. v. Eleventh Jud. Dist. Ct.*, 2008 MT 358, ¶ 15, 346 Mont. 357, 361, 197 P.3d 907, 910, *as amended on reh'g* (Dec. 2, 2008); *Schoof v. Nesbit*, 2014 MT 6, ¶ 15, 373 Mont. 226, 230, 316 P.3d 831, 835. The U.S. Supreme Court has observed that:

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976).

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). Courts in this state have held that it is "not enough" to "allege an injury which others may have suffered." *Helena Parents Comm'n v. Lewis and Clark Cnty. Comm'rs.*, 277 Mont. 367, 371, 922 P.2d 1140, 1143 (1996). Ultimately, the plaintiff "must allege some past, present or threatened injury which would be alleviated by successfully maintaining the action." *Matter of Paternity of Vainio*, 284 Mont. 229, 235, 943 P.2d 1282, 1286 (1997). The State's TPC does not do so; it fails to plead how or when it has been injured by WPATH's research or evidence-backed publications, or what that injury actually is. The State's only allegation is that may incur

liability to the First-Party Plaintiffs as its only individual injury (TPC ¶¶ 19–20), which is not a cognizable injury-in-fact under the governing legal standards. *See Helena Parents*, 277 Mont. at 372–73. The State's allegations that "medical providers and their patients and/or parents have suffered injuries" due to alleged "misrepresentations" (TPC ¶ 15(a, f)) do not and cannot establish a case or controversy or an injury-in-fact suffered by the State that are resolvable through this litigation. The State's lack of standing is grounds enough for dismissal.

**2. The State's Indemnification Claim Fails Because WPATH Is Unrelated to the Issues in the Underlying Litigation and Was Not the Proximate Cause of Any Alleged Injury.**

Under Montana law, "[c]ommon law indemnity arises from the equitable principle that one compelled to pay for damages *caused by another* should be able to seek recovery from the responsible party." *State v. Butte-Silver Bow Cnty.*, 2009 MT 414, ¶ 32, 353 Mont. 497, 504, 220 P.3d 1115, 1120 (citing *Poulsen v. Treasure State Indus., Inc.*, 192 Mont. 69, 81, 626 P.2d 822, 829 (1981)) (emphasis added). The State fails entirely to allege any facts indicating that WPATH caused the State harm, let alone that WPATH *caused* the Underlying Litigation in any way.

The claims against the State in the Underlying Litigation arise from the State's own legislative action prohibiting any alteration to sexual designation on government-issued documents. Through SB 458, the State narrowly defined male, female, and sex, and prohibited updating gender markers on government documents. In the TPC, the State entirely fails to establish how the State's own actions—which form the basis of the Underlying Litigation—are in any way related to WPATH, let alone *caused by* WPATH. The TPC fails to even tangentially connect WPATH to the State's challenged policies reflected in SB 458, the 2022 Rule, and the MVD Policy. Although the State argues that WPATH created the "factual basis" for the claims against it in the Underlying Litigation, it makes no allegations of fact to support this theory of liability. Such an allegation cannot support a common law indemnity claim. *See Cape v.*

*Crossroads Corr. Ctr.*, 2004 MT 265, ¶ 30, 323 Mont. 140, 147, 99 P.3d 171, 177 ("unsupported, conclusory allegations are insufficient").

To establish causation, a party must show that the "conduct at issue was the cause-in-fact of that injury and/or harm." *Breuer v. State*, 2023 MT 242, ¶ 20, 414 Mont. 256, 274, 539 P.3d 1147, 1160 (citing *Kipfinger v. Great Falls Obstetrical & Gynecological Assocs.*, 2023 MT 44, ¶¶ 16, 20, 411 Mont. 269, 286, 290, 525 P.3d 1183, 1194, 1196). To show that a party's conduct is a cause-in-fact of an event, the State must plead facts supporting allegations that the "injury/harm/damages 'would not have occurred without it.'" *Id.* ¶ 20. Given the lack of any tenable connection between any WPATH conduct and the State laws challenged in the Underlying Litigation, the State fails to establish that WPATH's conduct has any causal link – much less in the *cause-in-fact* – of the Underlying Litigation. Thus, the State is unable to plead facts demonstrating proximate cause and cannot prove its indemnification claim. The failure to plead causation, standing alone, warrants dismissal of the State's third-party complaint.

**3. The State's Indemnification Claim Fails Because WPATH Did Not Act Negligently.**

To prove a claim for indemnification under Montana law, the Attorney General must establish "that the defendant [was] negligent." *Rogers*, 180 Mont. at 176 (citation omitted). The State's TPC fails to allege that WPATH acted negligently, so for this additional reason, the State's indemnification claim should be dismissed.

To plead negligence under Montana law, "the plaintiff must prove four essential elements: (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached that duty, (3) the breach was the actual and proximate cause of an injury to the plaintiff, and (4) damages resulted." *Florea v. Werner Enters., Inc.*, 681 F. Supp. 2d 1241, 1247 (D. Mont. 2010) (quoting *Peterson v. Eichorn*, 2008 MT 250, ¶ 23, 344 Mont. 540, 546, 189 P.3d 615, 621). The State does not attempt to plead, even in a conclusory fashion, that WPATH owed the State of Montana

a legal duty, nor that WPATH breached that duty, nor that such a breach injured the State or resulted in damages.

All the State alleges is that WPATH "made misrepresentations to Montana medical providers, Montana patients, and parents of Montana patients through the medical providers" about gender-affirming care. TPC ¶ 15. To establish negligent misrepresentation under Montana law, a plaintiff must establish that "(1) the defendant made a representation as to a past or existing material fact; (2) the representation must have been untrue; (3) regardless of its actual belief, the defendant must have made the[] representation without any reasonable ground for believing it to be true; (4) the representation must have been made with the intent to induce the plaintiff to rely on it; (5) the plaintiff must have been unaware of the falsity of the representation; it must have acted in reliance upon the truth of the representation and it must have been justified in relying on the representation; [***and***] (6) the plaintiff, as a result [o]f his or her reliance, sustained damage." *Am. Trucking & Transp. Ins. Co. v. Nelson*, No. CV 16-160-M-DLC, 2017 WL 3218097, at *7 (D. Mont. July 28, 2017) (citing *Deichl v. Savage*, 2009 MT 293, ¶ 19, 352 Mont. 282, 289, 216 P.3d 749, 753). The State altogether fails to adequately plead elements two, three, four, five, and six of that long-established legal standard.

As outlined above, WPATH's Standards of Care are not misrepresentations. But even accepting *arguendo* that the State's provably false allegation that WPATH's Standards of Care were somehow true, WPATH had more-than-reasonable grounds for believing in the validity of its research and findings. *See, e.g.*, *Brandt*, 677 F. Supp. 3d at 888 (these Standards "were developed by experts in the field, including clinicians and researchers, who used systematic processes for collecting and reviewing scientific evidence."); *Doe*, 2024 WL 2947123, at *5 (these Standards "are widely followed by well-trained clinicians," "are used by insurers," and "have been endorsed by the United States Department of Health and Human Services.").

Furthermore, the State does not plead – because it cannot – that WPATH established its Standards of Care with the intent that the State would rely upon them in any way. Nor can the State plausibly plead that it relied upon WPATH's Standards of Care in enacting the challenged laws, as those laws *directly contradict* WPATH's recommendations. Finally, the TPC makes no effort to allege how the State, its medical providers, or its patients were injured by WPATH; such an effort would be futile since WPATH did not cause any injury. Failing to meet the foregoing elements, the State's misrepresentation claim fails as the basis for a claim of indemnification. Accordingly, the TPC should be dismissed for failure to state an indemnification claim.

### C. The State's Indemnification Claim Infringes WPATH's First Amendment Speech and Association Rights and Sets a Dangerous and Unconstitutional Precedent.

This Court should also dismiss the State's third-party complaint because its request for indemnification infringes WPATH's First Amendment speech and association rights. Allowing the State's request for indemnification to proceed would set a dangerous precedent.

All of WPATH's activities are constitutionally-protected. It is a bedrock constitutional principle that individuals are free to "engage in association for the advancement of beliefs and ideas." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). The First Amendment "necessarily protects the right of those who join together to advance shared beliefs, goals, and ideas, which, if pursued individually, would be protected by the First Amendment. *See Buckley v. Valeo*, 424 U.S. 1, 22 (1976). Such shared beliefs, goals, and ideas, are often advanced by non-profit organizations,[2] and need not be political in nature to be constitutionally-protected. *See Boy*

---

[2] *See e.g.*, *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021); *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000); *Robert v. U.S. Jaycees*, 468 U.S. 609 (1984); *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987); *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1 (1988).

*Scouts of Am*., 530 U.S. at 648. The right of expressive association extends to groups, like WPATH, that take an "official stance on a subject." *See Sullivan v. Univ. of Washington*, 60 F.4th 574, 580 (9th Cir. 2023) (citing *In Grand Jury Subpoena, No. 16-03-217*, 875 F.3d 1179, 1184 n.3 (9th Cir. 2017)). "In sum, the 'Supreme Court's expressive-association jurisprudence' applies when individuals 'have associated to advance shared views,' or engaged in 'collective effort on behalf of shared goals.'" *Id*. (citing 875 F.3d at 1184).

WPATH is a 501(c)(3) non-profit professional and educational organization that promotes evidence-based care, education, research, public policy, and respect in transgender health. WPATH maintains a peer-reviewed medical journal and publishes the Standards of Care and Ethical Guidelines that "articulate a professional consensus about psychiatric, psychological, medical, and surgical management of gender dysphoria to help professionals understand the parameters within which they may offer assistance to those with these conditions."[3] WPATH's mission and activities are squarely protected by the First Amendment's rights of free speech and free expression. *See, e.g*., *Miller v. California*, 413 U.S. 15, 34 (1973) ("The First Amendment protects works which, taken as a whole, have serious literary, artistic, political, *or scientific* value.") (emphasis added); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 446–47 (2d Cir. 2001) ("It is settled that the First Amendment protects scientific expression and debate just as it protects political and artistic expression.") (cleaned up) (quoting *Bd. of Trs. of Leland Stanford Junior Univ. v. Sullivan*, 773 F.Supp. 472, 474 (D.D.C. 1991)). The law clearly prevents the state from imposing tort liability for statements or other conduct that is constitutionally-protected. *See, e.g.*, *New York Times v. Sullivan*, 376 U.S. 254, 283 (1964).

The State's request sets a very dangerous precedent. Even though WPATH is not connected

---

[3] *See* "WPATH Mission and Vision," *available at* https://www.wpath.org/about/mission-and-vision (last visited August 9, 2024).

to the Underlying Litigation in any way, the State attempts to make WPATH pay for the defense of its laws simply because WPATH compiles scientific research and sets professional standards for the treatment and care of gender dysphoria, a mission the Attorney General does not support. This is exactly the kind of expression the First Amendment exists to protect. *See Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002) ("[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."); *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989). The Court should not allow the State's indemnification claim to proceed because doing so would open the floodgates to other politically-motivated retributive actions to chill disfavored non-profit organizations' constitutionally-protected speech and activities. In light of the significant First Amendment interests at stake, the State's third-party complaint should be dismissed.

**D. The State's Allegations on the Montana Consumer Protection Act Also Fail.**

The State's bizarre tag-along allegations about the Montana Consumer Protection Act ("MCPA") – that WPATH violated the MCPA by "deceptively providing services to consumers of Montana" (TPC ¶ 16) – fail to adequately plead the elements of an MCPA claim. Specifically, the State fails to plead that WPATH made deceptive statements to consumers in connection with trade or commerce, or that Montana consumers have suffered an ascertainable loss of money or property in relation to WPATH's activities – both of which are required to state an MCPA claim. *Fink v. Meadow Lake Ests. Homeowners' Ass'n*, 2016 MT 108N, ¶ 14, 384 Mont. 552; Section 30-14-102(1), 30-14-103, MCA; *Young v. Era Advantage Realty*, 2022 MT 138, ¶ 26, 409 Mont. 234, 246, 513 P.3d 505, 513 (citing *Anderson v. ReconTrust Co., N.A.*, 2017 MT 313, ¶ 22, 390 Mont. 12, 23, 407 P.3d 692, 700).

For other reasons, the State's MCPA "claim" fails. First, the MCPA requires a transaction with a "consumer" (*see* Section 30-14-102(1), MCA), but WPATH is a non-profit,

interdisciplinary professional and educational organization that does not engage in consumer transactions. Second, WPATH's statements related to the treatment of gender dysphoria concern the practice of medicine, rather than commercial transactions, and therefore cannot give rise to an action under the MCPA. *See Brookins v. Mote*, 2012 MT 283, ¶ 54, 367 Mont. 193, 210, 292 P.3d 347, 359 ("We also agree with the near unanimous line of authority that has exempted from the CPA conduct by health-care providers in the 'actual practice' of the profession."). The State has failed to plead a cognizable claim under the MCPA and thus the claim should be dismissed.

## IV. CONCLUSION

For the reasons set forth above, WPATH repsectfully request that the Court dismiss the State's frivolous and bad-faith third-party complaint in its entirety.[4]

DATED this 9th day of August, 2024.

[4] In the event the Court grants WPATH's motion, WPATH intends to file a motion to recover the reasonable expenses incurred in preparing the instant motion pursuant to Sections 25-10-102, 25-10-201, 25-10-711, and/or any other appropriate provisions of the Montana Code.

Respectfully submitted,

By: __/s/Robert Farris-Olsen______________________
Robert Farris-Olsen
MORRISON SHERWOOD WILSON DEOLA PLLP
401 North Last Chance Gulch
P.O. Box 557
Helena, MT 59624
Telephone: (406) 442-3261
rfolsen@mswdlaw.com

Justin D. Kingsolver*
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 624-2500
JKingsolver@crowell.com

Derick D. Dailey*
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Telephone: 212-224-4000
jkingsolver@crowell.com
ddailey@crowell.com

*Attorneys for Third-party Defendant WPATH*

* *Pro Hac Vice* Application Forthcoming

## CERTIFICATE OF SERVICE

I hereby certified that on the 9th day of August, 2024, a true copy of the foregoing document was served via U.S. Mail, postage prepaid, and email upon the following:

Austin Knudsen
*Montana Attorney General*
Michael Russell
Thane Johnson
Alwyn Lansing
Michael Noonan
*Assistant Attorneys General*
MONTANA DEPARTMENT OF JUSTICE
P.O. Box 201401
Helena, MT 59620-1401
michael.russell@mt.gov
thane.johnson@mt.gov
alwyn.lansing@mt.gov
michael.noonan@mt.gov

Emily Jones
*Special Assistant Attorney General*
JONES LAW FIRM, PLLC
115 N. Broadway, Suite 410
Billings, MT 59101
emily@joneslawmt.com

*Attorneys for Defendants*

Marthe VanSickle
ACLU MONTANA
P.O. Box 1968
Missoula, MT 59806
vansicklem@aclumontana.org

Alexander H. Rate
ACLU MONTANA
713 Lock Leven Drive
Livingston, MT 59047
ratea@aclumontana.org

F. Thomas Hecht
Seth A. Horvath
Tina B. Solis
NIXON PEABODY LLP
70 West Madison St, Ste 3500
Chicago, IL 60601
FThecht@nixonpeabody.com
sahorvath@nixonpeabody.com
tbsolis@nixonpeabody.com

Malita Picasso
Jon W. Davidson
ACLU LGBTQ & HIV PROJECT
125 Broad Street
New York, NY 10004
mpicasso@aclu.org
jdavidson@aclu.org

*Attorneys for Plaintiffs*

By: ______________________
Amy Kirscher

## CERTIFICATE OF SERVICE

I, Robert M. Farris-Olsen, hereby certify that I have served true and accurate copies of the foregoing Answer/Brief - Brief In Support of Motion to the following on 08-09-2024:

Alwyn T. Lansing (Govt Attorney)
215 N. Sanders St.
Helena MT 59620
Representing: State of Montana, Gregory Gianforte, Montana Department of Public Health and Human Services, Austin Knudsen, Montana Department Of Justice, Charles T Brererton
Service Method: eService

Emily Jones (Attorney)
115 North Broadway
Suite 410
Billings MT 59101
Representing: State of Montana, Gregory Gianforte, Montana Department of Public Health and Human Services, Austin Knudsen, Montana Department Of Justice, Charles T Brererton
Service Method: eService

Austin Miles Knudsen (Govt Attorney)
215 N. Sanders
Helena MT 59620
Representing: State of Montana, Gregory Gianforte, Montana Department of Public Health and Human Services, Austin Knudsen, Montana Department Of Justice, Charles T Brererton
Service Method: eService

Thane P. Johnson (Govt Attorney)
215 N SANDERS ST
P.O. Box 201401
HELENA MT 59620-1401
Representing: State of Montana, Gregory Gianforte, Montana Department of Public Health and Human Services, Austin Knudsen, Montana Department Of Justice, Charles T Brererton
Service Method: eService

Michael D. Russell (Govt Attorney)
215 N Sanders
Helena MT 59620
Representing: State of Montana, Gregory Gianforte, Montana Department of Public Health and Human Services, Austin Knudsen, Montana Department Of Justice, Charles T Brererton
Service Method: eService

Michael Noonan (Govt Attorney)
215 N SANDERS ST
HELENA MT 59601-4522
Representing: State of Montana, Gregory Gianforte, Montana Department of Public Health and Human Services, Austin Knudsen, Montana Department Of Justice, Charles T Brererton
Service Method: eService

Marthe VanSickle (Attorney)
PO Box 1968
Missoula MT 59806
Representing: Jessica Kalarchik, Jane Doe
Service Method: eService

Alexander H. Rate (Attorney)
713 Loch Leven Drive
Livingston MT 59047
Representing: Jessica Kalarchik, Jane Doe
Service Method: eService

Malita Vencienzo Picasso (Attorney)
125 Broad Street, 18th Floor
New York NY 10004
Representing: Jessica Kalarchik
Service Method: eService

Jon W. Davidson (Attorney)
125 Broad Street, 18th Floor
New York NY 10004
Representing: Jessica Kalarchik
Service Method: eService

Seth A. Horvath (Attorney)
70 West Madison Street, Suite 5200
Chicago IL 60602
Representing: Jessica Kalarchik
Service Method: eService

F. Thomas Hecht (Attorney)
70 West Madison, Suite 5200
Chicago MT 60605
Representing: Jessica Kalarchik
Service Method: eService

Tina B. Solis (Attorney)
70 West Madison Street, Sutie 3500
Chicago IA 60601
Representing: Jessica Kalarchik
Service Method: First Class Mail

Electronically signed by Amy Kirscher on behalf of Robert M. Farris-Olsen
Dated: 08-09-2024