**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, et al.,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, INC., a Texas corporation, et al.,<br><br>*Defendants*. | Case No. 4:26-cv-00748-O |

**DEFENDANT WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, INC.'S MOTION TO DISMISS**

Sarah Cummings Stewart
**REED SMITH LLP**
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Tel: (469) 680-4200
Fax: (469) 680-4299
sarah.stewart@reedsmith.com

R. Jeffrey Layne
**REED SMITH LLP**
401 Congress Avenue, Suite 1800
Austin, TX 78701
Tel: (512) 623-1801
Fax: (512) 623-1802
jlayne@reedsmith.com

Caleb Hayes-Deats*
Abbe David Lowell [DC Bar No. 358651]
Schuyler J. Standley*
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowellandassociates.com
CHayes-Deats@lowellandassociates.com
SStandley@lowellandassociates.com

**Admitted Pro hac vice*

*Attorneys for Defendant WPATH*

# TABLE OF CONTENTS


**INTRODUCTION** .......... **1**

**PROCEDURAL AND FACTUAL BACKGROUND** .......... **3**

- **I. WPATH Engages in Protected Speech on Matters of Public Concern** .......... **3**
- **II. WPATH's Suit in the District Court for the District of Columbia** .......... **5**
- **III. Plaintiffs' Complaint in the Northern District of Texas** .......... **6**

**ARGUMENT** .......... **8**

- **I. Legal Standard** .......... **8**
- **II. The FTC Fails to State a Claim Under the FTC Act and State Analogues** .......... **9**
  - A. SOC-8 Is Not a "Means and Instrumentality" for Fraud .......... 9
  - B. The FTC Cannot State a Claim Under § 5 or § 12 .......... 11
  - C. The FTC's Claims Under § 53(b) Do Not Identify Imminent Violations 22
- **III. The FTC's Claims Violate the Major Questions Doctrine by Shifting the Balance of Federal and State Authority Without Clear Statutory Authority** **24**
- **IV. Plaintiffs' Claims Constitute Viewpoint-Based Restrictions in Violation of WPATH's First Amendment Rights** .......... **28**
  - A. WPATH's Speech is Protected Professional Speech. .......... 29
  - B. WPATH's Statements Are Non-Actionable Opinions on Contested Scientific Questions. .......... 32
  - C. Plaintiffs' Claims Constitute Impermissible Viewpoint Discrimination. . 33
- **V. The States' Claims Must Be Dismissed for Lack of Jurisdiction** .......... **35**
  - A. Iowa, Nebraska, and Texas Cannot Establish Article III Standing .......... 36
  - B. State-Law Doctrines Do Not Supply Article III Standing .......... 37
  - C. Traceability and Redressability Independently Defeat the State Claims .. 37
  - D. If the Federal Claims Are Dismissed, the Court Should Decline Supplemental Jurisdiction Over All State Claims .......... 38

**CONCLUSION** .......... **39**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 2014 Radioshack ERISA Litig.*,
165 F. Supp. 3d 492 (N.D. Tex. 2016) ....................9

*Adlerstein v. Cooper Aerobics Enterprises, Inc.*,
No. 3:25-cv-2228-D, 2026 WL 820861 (N.D. Tex. Mar. 25, 2026) ....................39

*Am. For Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)....................28

*American Med. Ass'n v. FTC*,
638 F.2d 443 (2d Cir. 1980)....................24

*AMG Cap. Mgmt. LLC v. FTC*,
593 U.S. 67 (2021)....................28

*Ariix, LLC v. NutriSearch Corp.*,
985 F.3d 1107 (9th Cir. 2021) ....................13, 14, 30, 31

*Ariix, LLC v. Nutrisearch Corp.*,
No. 17CV320-LAB (DDL), 2023 WL 2933306 (S.D. Cal. Apr. 13, 2023) ....................14

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
576 U.S. 787 (2015)....................27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................8, 17, 22

*Barsky v. Bd. of Regents*,
347 U.S. 442 (1954)....................25

*Batiste v. Island Records, Inc.*,
179 F.3d 217 (5th Cir. 1999) ....................39

*Biden v. Nebraska*,
600 U.S. 477 (2023)....................24

*Bolger v. Youngs Drug Products Corp.*,
463 U.S. 60 (1983)....................12, 30, 31

*Boltex Mfg. Co., L.P. v. Galperti, Inc.*,
827 F. App'x 401 (5th Cir. 2020) ....................13

*Brookshire Bros. Holding, Inc. v. Dayco Products, Inc.*,
554 F.3d 595 (5th Cir. 2009) ....................................................................................39

*California Dental Ass'n v. FTC*,
526 U.S. 756 (1999)....................................................................................24, 30, 31

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026)...................................................................................... *passim*

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)..........................................................................................36

*Clark v. Amoco Prod. Co.*,
794 F.2d 967 (5th Cir. 1986) ....................................................................................28

*Cobb v. Cent. States*,
461 F.3d 632 (5th Cir. 2006) ....................................................................................35

*Cochran v. Astrue*,
No. 3:11-CV-1257-D, 2011 WL 5604024 (N.D. Tex., Nov. 17, 2011) ...............................28

*Collins v. Morgan Stanley Dean Witter*,
224 F.3d 496 (5th Cir. 2000) ....................................................................................10

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)..........................................................................................17

*Dent v. West Virginia*,
129 U.S. 114 (1889)........................................................................................2, 25

*Endocrine Soc'y v. FTC*,
No. CV 26-512 (JEB), 2026 WL 1257289 (D.D.C. May 7, 2026)..........................................6

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
314 F.3d 48 (2d Cir. 2002)......................................................................................13

*FTC v. Evans Prods. Co.*,
775 F.2d 1084 (9th Cir. 1985) ..................................................................................22

*FTC v. Indiana Fed'n of Dentists*,
476 U.S. 447 (1986)..........................................................................................24

*FTC v. National Casualty Co.*,
357 U.S. 560 (1958)..........................................................................................26

*FTC v. Neora LLC*,
No. 3:20-CV-01979-M, 2023 WL 8446166 (N.D. Tex. Sept. 28, 2023) ..............................11

*FTC v. Peyroux*,
723 F. Supp. 3d 1209 (N.D. Ga. 2024) ....................9, 10, 11

*FTC v. Shire ViroPharma, Inc.*,
917 F.3d 147 (3d Cir. 2019)....................22, 23, 24

*FTC v. Tashman*,
318 F.3d 1273 (11th Cir. 2003) ....................9, 14

*FTC v. Winsted Hosiery Co.*,
258 U.S. 483 (1922)....................10, 11

*Hillsborough Cnty., Fla. v. Auto. Med. Labs., Inc.*,
471 U.S. 707 (1985)....................25

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ....................9

*Learning Resources, Inc. v. Trump*,
607 U.S. 229 (2026)....................2, 24, 25

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)....................12

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024)....................21

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)....................36, 37

*Mass. Med. Soc'y v. Dukakis*,
815 F.2d 790 (1st Cir. 1987)....................25

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996)....................25

*In re Nat'l Housewares, Inc., et al. Emdeko Int'l, Inc.*,
90 F.T.C. 512 (1977)....................11

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
720 F.3d 490 (2d Cir. 2013)....................15, 20, 32

*Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,
63 F.4th 240 (3d Cir. 2023) ....................15, 17, 18, 32

*Payne v. Harris Methodist H-E-B*,
2000 U.S. Dist. LEXIS 21776 (N.D. Tex. Nov. 20, 2000)....................39

*POM Wonderful, LLC v. FTC*,
777 F.3d 478 (D.C. Cir. 2015) ........................................................................20, 21, 30, 31

*Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*,
784 F.2d 674 (5th Cir. 1986) ........................................................................................14, 18

*Regina Corp. v. FTC*,
322 F.2d 765 (3d Cir. 1963)..................................................................................................11

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995)..............................................................................................................34

*Seven-Up Co. v. Coca-Cola Co.*,
86 F.3d 1379 (5th Cir. 1996) ........................................................................................12, 13

*Simon v. E. Ky. Welfare Rts. Org.*,
426 U.S. 26 (1976)................................................................................................................37

*Taquino v. Teledyne Monarch Rubber*,
893 F.2d 1488 (5th Cir. 1990) ..............................................................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)................................................................................................................9

*Torrey v. Infectious Diseases Soc'y of Am.*,
86 F.4th 701 (5th Cir. 2023) ......................................................................................... *passim*

*United States v. Alvarez*,
567 U.S. 709 (2012)..............................................................................................................28

*United States v. Skrmetti*,
605 U.S. 495 (2025)...................................................................................................... *passim*

*W. Virginia v. EPA*,
597 U.S. 697 (2022)........................................................................................24, 25, 26, 28

*Waltham Watch Co. v. FTC*,
318 F.2d 28 (7th Cir. 1963) ..............................................................................................9, 11

*Watson v. Maryland*,
218 U.S. 173 (1910)..............................................................................................................25

*Whitman v. Am. Trucking Ass's*,
531 U.S. 457 (2001)..............................................................................................................26

*Whitney v. California*,
274 U.S. 357 (1927), *overruled on other grounds by Brandenburg v. Ohio*,
395 U.S. 444 (1969)..............................................................................................................34

*WPATH v. FTC*,
No. 26-cv-532 (JEB), 2026 WL 1257321 (D.D.C. May 7, 2026) .................................. *passim*

**Statutes**

15 U.S.C. § 45(a) .....................................................................................................25

15 U.S.C. § 45(a)(1)...................................................................................................21

15 U.S.C. § 53(b) .............................................................................................9, 22, 23

15 U.S.C. § 55(a)(1)...................................................................................................11

28 U.S.C. § 1367(a) ...................................................................................................38

28 U.S.C. § 1367(c)(3)...........................................................................................38, 39

42 U.S.C. § 1395.....................................................................................................2, 25

AS § 45.50.471 .........................................................................................................39

AS § 45.50.501 .........................................................................................................39

AS § 45.50.537 .........................................................................................................39

AS § 45.50.551(b).....................................................................................................39

Iowa Code § 147.164 ...........................................................................................26, 36

Md. Code Ann., Health-Gen. § 15-151(a)(2)(iii).......................................................27

Md. Code Ann., Health-Gen. § 15-151(b) ................................................................27

Md. Code Ann., Health-Gen. § 15-151(c)(2).............................................................27

Neb. Rev. Stat. § 71-7301 *et seq.*..............................................................................26

Tex. Health & Safety Code Ann. § 161.702 *et seq*.....................................................26

**Rules**

Fed. R. Civ. P. 12(b)(1).............................................................................................35

Fed. R. Evid. 201 .........................................................................................................3

**Other Authorities**

AM. COLL. OF CARDIOLOGY, *Clinical Practice Guidelines*, J. AM. COLL. OF
CARDIOLOGY, *available at* https://www.jacc.org/guidelines ...........................................18, 19

AM. COLL. OF OBSTETRICIANS & GYNECOLOGISTS, *Guidelines for Perinatal Care* (2017) .......... 18

Andreas Wolter et al., *Subcutaneous mastectomy in female-to-male transsexuals: Optimizing perioperative and operative management in 8 years clinical experience*, 71 J. OF PLASTIC RECONSTRUCTIVE AESTHETIC & SURGERY 344 (2018) .......... 20

Chris Noone *et al.*, *Critically appraising the Cass report: methodological flaws and unsupported claims*, 25 BMC MED. RES. METHODOLOGY 128 (2025), *available at* https://doi.org/10.1186/s12874-025-02581-7 .......... 5

Deutsche Gesellschaft für Kinder- und Jugendpsychiatrie, Psychosomatik und Psychotherapie (DGKJP), *Geschlechtsinkongruenz und Geschlechtsdysphorie im Kindes- und Jugendalter: Diagnostik und Behandlung* (S2k), AWMF-Register-Nr. 028-014, Version 1.0 (2025), https://register.awmf.org/de/leitlinien/detail/028-014 .......... 5

Dong Heun Lee & Ole Vielemeyer, *Analysis of Overall Level of Evidence Behind Infectious Diseases Society of America Practice Guidelines*, 171 Archives Int. Med. 18-22 (2011), *available at* https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/226373 .......... 21, 22

E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 International Journal of Transgender Health 51, (Sept. 15, 2022) .......... 3

GOV'T OF CANADA, MINISTERIAL TRANSITION BINDER: MAY 2025, § 13, *available at* https://www.canada.ca/en/correctional-service/corporate/transparency/proactive-disclosure/briefing-materials/transition-binder-2025-04.html .......... 5

HEALTH N.Z*, Gender Affirming Surgery and Speech Language Therapy* https://www.healthnz.govt.nz/health-topics/keeping-healthy/gender-health/gender-affirming-surgery-and-therapy .......... 5

INT'L J. OF TRANSGENDER HEALTH, *About this Journal*, TAYLOR & FRANCIS https://www.tandfonline.com/journals/wijt21/about-this-journal#aims-and-scope .......... 3

Meredithe McNamara *et al.*, *Combatting Scientific Disinformation on Gender Affirming Care* (2023) 152(3), *available at* https://doi.org/10.1542/peds.2022-060943 .......... 5

Pierluigi Tricoci *et al.*, *Scientific Evidence Underlying the ACC/AHA Clinical Practice Guidelines*, 301 J. Am. Med. Ass'n 831-841 (2009), https://jamanetwork.com/journals/jama/fullarticle/183453 .......... 22

## INTRODUCTION

This lawsuit seeks to radically expand the power of the Federal Trade Commission ("FTC") to regulate medical associations that provide clinical guidance to doctors and do not participate in the trade and commerce Congress empowered that agency to address. The FTC has authority to regulate "deceptive" advertisements that mislead consumers. Defendant the World Professional Association for Transgender Health ("WPATH") does not make statements to consumers. It publishes a set of non-binding Standards of Care for *doctors*. The current version of those Standards of Care ("SOC-8") cites over 1,500 scientific studies to support its guidance. The fundamental premise of Plaintiffs' lawsuit is that doctors cannot review this evidence for themselves and have instead been "duped" by scientific literature. ECF 70 ("FAC") ¶ 11.

Dismissal is required for several reasons. First, the Fifth Circuit has held that "merely publishing a medical opinion—even a hotly debated one—in a peer-reviewed journal cannot give rise to a misrepresentation claim." *Torrey v. Infectious Diseases Soc'y of Am.*, 86 F.4th 701, 704 (5th Cir. 2023). WPATH's clinical guidelines are not advertisements or commercial statements to consumers. They are scientific opinions directed to the professionals best able to evaluate them: doctors. The United States District Court for the District of Columbia ("D.C. District Court") previously found the FTC's "concerns about verifying WPATH's public statements can be addressed by consulting the lengthy bibliography accompanying its Standards of Care." *WPATH v. FTC*, No. 26-cv-532 (JEB), 2026 WL 1257321, at *4 (D.D.C. May 7, 2026). Plaintiffs do not even try to show that WPATH's citations do not support its statements or that doctors could not evaluate them in the framework in which they are offered—guidelines. Plaintiffs seek to brand one side of a scientific debate as "deceptive" without considering the science.

Second, the FTC's claims violate the "major questions" doctrine. The FTC has never asserted that its power to prohibit deceptive acts in commerce authorizes it to regulate a medical

association's clinical guidelines. Its novel assertion in this case has far-reaching political consequences, because our federal structure from "time immemorial" has empowered states to regulate the type of health and safety work in which doctors engage. *Dent v. West Virginia*, 129 U.S. 114, 122 (1889). Just last year, the Supreme Court reviewed the same evidence the FTC now cites, such as the "Cass Review," and concluded that it "underscore[s] the need for [state] legislative flexibility," *not* FTC action that seeks to usurp states' longstanding authority. *United States v. Skrmetti*, 605 U.S. 495, 524-25 (2025). Congress has withheld the power to supervise the practice of medicine from the Department of Health & Human Services. 42 U.S.C. § 1395. There is no reason to believe it granted such power to the FTC. Given the "breadth, history, and constitutional context" of the authority the FTC now asserts, it must "identify clear congressional authorization to exercise it." *Learning Resources, Inc. v. Trump*, 607 U.S. 229, 255 (2026). It cannot.

Third, Plaintiffs' claims violate the First Amendment, as the D.C. District Court has already found. *WPATH*, 2026 WL 1257321, at *4–5. Plaintiffs' disagreement with WPATH's speech does not make it "deceptive." The Supreme Court has recently held that state governments cannot prohibit professional medical speech they regard as "substandard care." *Chiles v. Salazar*, 146 S. Ct. 1010, 1027 (2026). That is what Plaintiffs seek to do: prohibit WPATH from expressing scientific opinions with which Plaintiffs disagree. If Plaintiffs refute the science underlying WPATH's Standards of Care, their remedy must be more speech, not censorship through a misguided enforcement action.

Fourth, Plaintiff States' claims for injunctive relief must be dismissed for lack of jurisdiction. Such relief cannot redress purely historical injuries, particularly where those injuries have already been remedied by state legislation. Although Plaintiffs seek injunctive relief to prevent injury to consumers, WPATH's SOC-8 speech cannot cause future injury in Iowa,

Nebraska, or Texas because any future provision of such care would constitute an independent violation of state law by third-party clinicians, not action traceable to Defendants.

## PROCEDURAL AND FACTUAL BACKGROUND

### I. WPATH Engages in Protected Speech on Matters of Public Concern

"WPATH is a nonprofit organization 'dedicated to promoting science-based medical care, education, research, and public policy in transgender health.'" *WPATH*, 2026 WL 1257321, at *1. "As part of its educational and academic activities, it publishes and updates the Standards of Care, which 'articulate a professional consensus about the psychiatric, psychological, medical, and surgical management of transgender people.'" *Id.* The latest version of the Standards of Care was published in the *International Journal of Transgender Health* in 2022. *See* E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 International Journal of Transgender Health 51, (Sept. 15, 2022) ("SOC-8"), attached as Ex. A; *see also* FAC ¶¶ 6–7 & n.1 (discussing same). The Court can take judicial notice that the *International Journal of Transgender Health* is a peer-reviewed journal published by a British publishing company, in partnership with WPATH. *See* INT'L J. OF TRANSGENDER HEALTH, *About this Journal*, TAYLOR & FRANCIS https://www.tandfonline.com/journals/wijt21/about-this-journal#aims-and-scope; Fed. R. Evid. 201.

To compile SOC-8, WPATH assembled a "multidisciplinary" committee of "subject matter experts, health care professionals, researchers and stakeholders with diverse perspectives and geographic representation." SOC-8 at S247. WPATH's Board initially selected a Guideline Steering Committee, which identified the topics that SOC-8's chapters would cover. *Id.* at 248. The Guideline Steering Committee then solicited applications to lead or serve on the committees that would formulate each chapter. *Id.* After the chapter committees drafted their respective chapters, they subjected their drafts to multiple external reviews, including review by a "group of

independent clinical academics" and a public comment process. SOC-8 at S251. The chapter leads and the Guideline Steering Committee revised SOC-8 based on this feedback, and the chapters were reviewed and approved again by the chapter committees and, ultimately, WPATH's Board of Directors. *Id.* SOC-8 rejects a "'one-size-fits-all' approach" and states that individual patients "may need to undergo all, some, or none of these interventions" based on their circumstances. SOC-8 at S7. SOC-8's "guidelines" are intended to be "flexible," and SOC-8 explicitly encourages physicians to "modify" them in response to a patient's "unique anatomic, social, or psychological situation." *Id.* at S256. For adolescents, SOC-8 calls an individualized approach ethical and necessary, while prepubescent children are not eligible for medical intervention. *Id.* at S45. Regarding adolescents, SOC-8 states:

> Given the emerging nature of knowledge regarding adolescent gender identity development, an individualized approach to clinical care is considered both ethical and necessary. As is the case in all areas of medicine, each study has methodological limitations, and conclusions drawn from research cannot and should not be universally applied to all adolescents.

SOC-8 at S45. Indeed, SOC-8 emphasizes the need to "individualize" care to each adolescent's "unique needs" no fewer than seven times. *Id.* at S50, S53, S55, S56, S58, S64, S66; *see also id.* at S68, S71, S72, S74, S77.

The published SOC-8 is signed by over 100 co-authors affiliated with institutions such as Columbia University, the Mayo Clinic, the University of Houston, Children's National Hospital, UT Southwestern Medical Center, and Harvard Medical School. SOC-8 at S1-S3. It cites more than 1,500 scholarly publications as support for its recommendations, all of which went through the review process described above. *Id.* at S178-S246.

To be sure, SOC-8 has faced criticism. FAC ¶¶ 145–60. But such criticism reflects the "fierce scientific and policy debates" in this "evolving field." *Skrmetti*, 605 U.S. at 525. Notably,

reports on both sides of the debate have had their methodologies criticized. *See, e.g.*, Deutsche Gesellschaft für Kinder- und Jugendpsychiatrie, Psychosomatik und Psychotherapie (DGKJP), *Geschlechtsinkongruenz und Geschlechtsdysphorie im Kindes- und Jugendalter: Diagnostik und Behandlung* (S2k), AWMF-Register-Nr. 028-014, Version 1.0 (2025), https://register.awmf.org/de/leitlinien/detail/028-014 (gender dysphoria treatment guidelines issued by medical organizations in Austria, Germany, and Switzerland criticizing Cass Report for methodological errors); Meredithe McNamara *et al.*, *Combatting Scientific Disinformation on Gender Affirming Care,* (2023) 152(3): e2022060943, *available at* https://doi.org/10.1542/peds.2022-060943. The Cass Review itself was the subject of substantial critique of its methodology. *See*, *e.g.*, Chris Noone *et al.*, *Critically appraising the Cass report: methodological flaws and unsupported claims*, 25 BMC MED. RES. METHODOLOGY 128 (2025), *available at* https://doi.org/10.1186/s12874-025-02581-7. Many governments and organizations, including New Zealand, Canada, some U.S. States, and the American Academy of Pediatrics, agree that the evidence supports SOC-8. *See* HEALTH N.Z*, Gender Affirming Surgery and Speech Language Therapy* https://www.healthnz.govt.nz/health-topics/keeping-healthy/gender-health/gender-affirming-surgery-and-therapy; GOV'T OF CANADA, MINISTERIAL TRANSITION BINDER: MAY 2025, § 13 (mandating consideration of WPATH's Standards of Care for gender diverse prisoners), *available at* https://www.canada.ca/en/correctional-service/corporate/transparency/proactive-disclosure/briefing-materials/transition-binder-2025-04.html.

**II. WPATH's Suit in the District Court for the District of Columbia**

On January 16, 2026, the FTC served WPATH a Civil Investigative Demand ("CID") *WPATH*, 2026 WL 1257321, at *2. WPATH sued on February 18 and the D.C. District Court granted a preliminary injunction on May 7, 2026, enjoining the FTC "from implementing or

enforcing its issued CID." *WPATH*, 2026 WL 1257321, at *5. The D.C. District Court found that WPATH was likely to succeed on its First Amendment claim that the FTC's CID was issued in retaliation for WPATH's protected speech in support of gender affirming care. The FTC did not contest that WPATH had engaged in protected speech, and the D.C. District Court found that the CID had a "chilling effect" and a "retaliatory motive" based on agency leadership's "range and depth of animus . . . toward gender-affirming care." *Id.* at *1; *see also Endocrine Soc'y v. FTC*, No. CV 26-512 (JEB), 2026 WL 1257289, at *11 (D.D.C. May 7, 2026).

The D.C. District Court went on to explain that the FTC's "attempted demonstration of a legitimate purpose" for the CID fell "flat." *WPATH*, 2026 WL 1257321. at *4. The FTC "failed to offer a logical justification connecting WPATH to *commercial* representations," *i.e.*, statements made directly to consumers or connecting it to "supposed violators" of laws the FTC has authority to enforce. *Id.* The court observed that WPATH does not make statements directly to patients; rather, it publishes reviews of scientific studies and recommendations for physicians to read and consider. *Id.* at *1. It found that "concerns about verifying WPATH's public statements can be addressed by consulting the lengthy bibliography accompanying its Standards of Care." *Id.*

### III. Plaintiffs' Complaint in the Northern District of Texas

Rather than appeal the injunction, on June 17, the FTC and four states (Alaska, Iowa, Nebraska, and Texas) filed this instant enforcement action. ECF 1. Plaintiffs allege that WPATH's "Standards of Care" have "duped" doctors and other "[m]edical professionals," although doctors also told the FTC that WPATH's Standards provide "excellent" evidence-based, expert-reviewed guidance." FAC ¶ 11. Plaintiffs simply disagree. *Id.*

Plaintiffs admit that the "experience of every child and parent is unique," but allege that clinicians follow an unspecified WPATH "script" and directly invoke it to encourage their patients "to purchase transition services." FAC ¶¶ 317, 325. The allegedly "Core Deceptive Statements,"

*id.* ¶¶ 375–405 — which are the same statements at issue in the enjoined CID, *see* ECF 38 at 12 – – do not appear in SOC-8 as alleged; they are Plaintiffs' paraphrases of nuanced, cited scientific discussions, including the passage addressed in FAC ¶ ¶ 378 & n.165 and SOC-8 at S126, S179, S201, S219. Plaintiffs don not explain why the cited studies fail to support the underlying statements or that doctors repeat the statements without independent, patient-specific judgment.

Plaintiffs' original complaint attached sixteen declarations, twelve describing care predating SOC-8—sometimes by a decade—and therefore not resulting from WPATH's supposed "script." ECF 1-1 to 1-2, 1-5 to 1-8, 1-10, 1-12 to 1-16. After WPATH identified that defect, the FAC alleged that pre-SOC-8 care may be considered because SOC-7 was "identical or materially similar to" SOC-8. FAC ¶ 7 n.2. But the two Standards differ materially. *See* SOC-7, attached as Ex. B.

For example, SOC-7 mentions "suicidality" only once, in discussing transgender people in "institutional environments, and does not mention the GRADE system, conflicts of interest, or the Delphi Process. SOC-7 at 67. Those omissions conflict with the FAC's Core Deceptive Statements Nos. 1, 2, and 5-10, which rely on SOC-8's alleged medical necessity, GRADE conflict, and Delphi statements. FAC ¶¶ 377-405. A standard that omits those features cannot be "identical" or even "materially similar" to SOC-8.

The FAC also contradicts itself by alleging that SOC-8 introduced a new "medical necessity statement" to induce insurers to cover additional procedures and that insurers did so due to SOC-8's changes. FAC ¶¶ 261-270, 273(A). Those allegations cannot be reconciled with the assertion that SOC-7 and SOC-8 are "identical or materially similar." Either SOC-8 made material changes to induce actions by insurers or it did not.

Plaintiffs' unsuccessful attempt to equate SOC-7 and SOC-8 highlights another problem

with their claims. Plaintiffs' declarants whose care occurred after SOC-8 either do not mention WPATH, ECF 70-4, decided not to transition, ECF 70-11, or both, ECF 70-9. Plaintiffs cannot overcome their failure to identify consumers deceived by SOC-8 by backfilling with examples from SOC-7 and then falsely equating two different standards.

Plaintiffs assert seven claims. Claims I-III allege that WPATH violated Sections 5 and 12 of the FTC Act because WPATH has provided doctors with the "means and instrumentalities for the commission of deceptive acts." FAC ¶¶ 409-417. Claims IV-VII allege that SOC-8 constitutes "deceptive trade practices" in violation of Alaska, Iowa , Nebraska, and Texas law. *Id.* ¶¶ 418-450.

**ARGUMENT**

Plaintiffs' claims should be dismissed for four reasons. First, the Fifth Circuit has held that medical guidelines are not actionable misstatements, and WPATH's guidelines are neither advertisements nor deceptive statements directed at consumers. Second, the FTC's unprecedented assertion of power to regulate medical guidance raises "major questions" that only Congress can answer. Absent clear authorization from Congress, the FTC cannot interfere with states' longstanding power to regulate guidance provided for the practice of medicine. Third, the First Amendment bars Plaintiffs from prohibiting medical organizations from expressing their scientific opinions, even if Plaintiffs regard those opinions as "substandard care." *Chiles*, 146 S. Ct. at 1027. Finally, Iowa, Nebraska, and Texas also lack standing to bring claims for injunctive relief because WPATH's SOC-8 speech cannot cause future injury.

## I. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Supreme Court has instructed that "courts *must* consider . . . documents

incorporated into the complaint by reference and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (emphasis added); *see also In re 2014 Radioshack ERISA Litig.*, 165 F. Supp. 3d 492, 496 (N.D. Tex. 2016) (O'Connor, J.). Such assessment prevents "plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).

## II. The FTC Fails to State a Claim Under the FTC Act and State Analogues

The FTC's claims all proceed under 15 U.S.C. § 53(b), which permits it to seek injunctive relief when it believes a "corporation is violating, or is about to violate, any provision of law enforced" by the FTC. The FTC alleges that WPATH violated Sections 5 and 12 of the FTC Act. "To establish liability under section 5 of the FTCA, the FTC must establish that (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003). Section 12 has the same elements, but "specifically addresses the dissemination of false advertisements likely to induce 'the purchase of food, drug, devices, services, or cosmetics.' " *FTC v. Peyroux*, 723 F. Supp. 3d 1209, 1240 (N.D. Ga. 2024).

### A. SOC-8 Is Not a "Means and Instrumentality" for Fraud

WPATH does not make "representations" to consumers, so the FTC instead alleges that SOC-8 gave doctors the "means and instrumentalities" for deception. FAC ¶¶ 409-417. That term of art covers literal objects or advertisements defendants "put into the hands of others" to "mislead the public." *Waltham Watch Co. v. FTC*, 318 F.2d 28, 32 (7th Cir. 1963). "Means and instrumentalities" liability prevents defendants from insulating themselves by transacting through intermediaries. Courts have found such liability in only two scenarios: (1) manufacturers who falsely label products sold by third-party retailers, *id.* at 31-32 (false claim of affiliation with

"famous 150-year-old company"); *see FTC v. Winsted Hosiery Co.*, 258 U.S. 483, 490–92 (1922) (false description of "cotton" products as "wool"). Second, courts impose "means and instrumentality liability" on promoters who prepare and disseminate a deceptive "advertising scheme" to others. *See Peyroux*, 723 F. Supp. 3d at 1247 (promoters provided "sample postcard, newspaper, magazine ads; sample patient forms; sample sales agreements"). Neither category of cases describes peer-reviewed clinical guidance.

The FAC alleges no such instrumentality. It calls SOC-8 a "script" while acknowledging that each child's and parent's experience is unique, but never identifies the supposed "script" or any statement from SOC-8 relayed to any patient. FAC ¶ 317. This Court may review SOC-7 and SOC-8, which are "central" to the FTC's claims, and confirm that they do not provide any "script." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Both reject one-size-fits-all treatment and emphasize individualized, flexible guidance that doctors must modify for each patient. SOC-8 at S7, S45, S256; SOC-7 at 2, 5. That is the opposite of a script and does not tell doctors what to say, much less how to mislead.

The differences between SOC-7 and SOC-8 further defeat the "script" theory. SOC-7 does not include many of the "Core Deceptive Statements," yet the FAC calls SOC-7 "identical or materially similar to WPATH's current guidance in SOC-8." FAC ¶ 7 n.2. That makes no sense. Different guidelines cannot constitute a single script. *See* pp. 6-8, *supra.*

No court has ever imposed "means and instrumentalities" liability based on a medical association's publication of clinical guidelines in a peer-reviewed scientific journal. Such a theory would vastly expand the scope of "means and instrumentality" liability and give the FTC unprecedented power to regulate medical guidance—and virtually all other professional guidance. Every prior "means and instrumentalities" case involved a defendant-prepared item or statement

handed to consumers. *See Winsted Hosiery Co.*, 258 U.S. at 490 ("cartons" of "underwear" labeled "'Natural Merino'"); *Regina Corp. v. FTC*, 322 F.2d 765, 770 (3d Cir. 1963) ("fictitious suggested list prices"); *Waltham Watch Co.*, 318 F.2d at 32 ("clocks bearing the name 'Waltham'"); *Peyroux*, 723 F. Supp. 3d at 1230-31 ("sample ads"; "PowerPoint presentations; patient service agreements; informed consent forms; medical intake forms;"); *In re Nat'l Housewares, Inc., et al. Emdeko Int'l, Inc.*, 90 F.T.C. 512 ¶ 4 (1977) ("printed sales presentations and promotional sales materials including brochures, form letters, questionnaires, cards, and other oral and printed information"). Clinical guidelines like the SOC, in contrast, are not advertisements or products put into patients' hands. Doctors must exercise independent clinical judgment to decide what care to recommend. That clinical guidelines might *influence* a doctor's recommendations—assuming the doctor agrees with them—does not transform the guidelines into an advertisement or product that the doctors "put into the hands" of patients. *Waltham Watch Co.*, 318 F.2d at 32.

Because the FAC "has identified no deceptive marketing or training materials created or promulgated" by WPATH, the FTC's claims should all be dismissed. *FTC v. Neora LLC*, No. 3:20-CV-01979-M, 2023 WL 8446166, at *31 (N.D. Tex. Sept. 28, 2023).

### B. The FTC Cannot State a Claim Under § 5 or § 12

The FAC does not plausibly allege any violation of Sections 5 and 12. WPATH's statements are not advertisements, much less "false advertisements" under Section 12. Nor does the FAC identify any "deceptive" statement to consumers in violation of Section 5 or state law.

#### 1) WPATH's Statements Are Not Advertisements

No court has ever held that clinical guidelines are "advertisements," much less "false advertisements" that violate Section 12. The FTC Act defines "false advertisement," but not "advertisement." 15 U.S.C. § 55(a)(1). When interpreting the Lanham Act's prohibition on false advertising, the Fifth Circuit has identified several factors for determining whether speech is an

"advertisement." *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996). An advertisement must be "commercial speech," "for the purpose of influencing consumers to buy defendant's goods or services," and "disseminated sufficiently to the relevant purchasing public." *Id.*[1] WPATH's clinical guidelines do not meet any of those criteria.

First, WPATH does not engage in "commercial speech" under the Supreme Court's decision in *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983). The "core notion of commercial speech" is "speech which does 'no more than propose a commercial transaction.'" *Id.* at 66 (quoting *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)). SOC-8 does not "propose a commercial transaction." It "provide[s] clinical guidance to health care professionals." SOC-8 at S5. Nor does SOC-8 "reference . . . a specific product." *Bolger*, 463 U.S. at 66. SOC-8 generically describes *types* of healthcare services and categories of drugs, without suggesting what may be appropriate for any patient. *See* SOC-8 at S123 ("Each testosterone-lowering medication has a different side-effect profile."). Doctors' compensation cannot make WPATH's guidance commercial because an "economic motivation" for speech "would clearly be insufficient by itself to turn the materials into commercial speech," *Bolger*, 463 U.S. at 67; FAC ¶ 246. And *Chiles* confirms that doctors' speech in the course of treating patients is professional, not commercial speech. *Chiles*, 146 S. Ct. at 1024-25. WPATH's guidance is even further removed from any transaction.

Second, WPATH does not have the "purpose of influencing consumers to buy" *WPATH's* goods or services. *Seven-Up*, 86 F.3d at 1384. WPATH does not offer goods or services. While

[1] *Seven-Up* also considered whether a defendant is "in commercial competition with plaintiff," 86 F.3d at 1384, but the Supreme Court later held that the relevant statute, the Lanham Act, was not limited to actions by a "false-advertiser's direct competitors," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 136 (2014).

doctors may offer services, and may write prescriptions for drugs, SOC-8 never attempts to "influenc[e] consumers to buy" specific services or drugs. *See* SOC-8 at S45 ("individualized approach to clinical care is considered both ethical and necessary"); *id.* at S144 ("all PCPs should be familiar with the medications, suggested monitoring, and potential side effects associated with" hormone therapy); *cf. Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1500 (5th Cir. 1990) ("generic illustrations" not actionable misrepresentations about "specific products").

Finally, the FAC does not allege that SOC-8 is "disseminated sufficiently to the relevant purchasing public." *Seven-Up*, 86 F.3d at 1384. To be "sufficiently disseminated," the actions must be "part of an organized campaign to penetrate the relevant market," which typically involves "widespread dissemination within the relevant industry." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002). The FAC does not allege that WPATH disseminated SOC-8 to any patient, much less undertook a "campaign" of "widespread dissemination." It alleges that SOC-8 contemplates that "individuals" and "their families" might review it, FAC ¶ 307, but the same passage states that SOC-8 is "primarily a document for health care professionals," SOC8 at S5. No advertisement is "primarily" directed to an audience other than consumers. While the FAC alleges that doctors sometimes *cite* SOC-8, FAC ¶¶ 326-29, such citations do not "disseminate" the guidelines. And the FAC is silent on what portion of the "purchasing public" received SOC-8. *See Boltex Mfg. Co., L.P. v. Galperti, Inc.*, 827 F. App'x 401, 406 (5th Cir. 2020) (emails not advertisements if recipients lacked "purchasing power").

SOC-8 is not an advertisement even under the Ninth Circuit's decision in *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107 (9th Cir. 2021). In *Ariix*, a manufacturer of nutritional supplements, Usana, paid NurtiSearch "hundreds of thousands of dollars in speaking and promotion fees . . . in exchange for being rated the top supplement company" in NutriSearch's

Guide. *Id.* at 1112. The Court held that, although a "close question," the Guide constituted "commercial speech," and remanded for consideration of whether it met the definition of "advertisement." *Id.* at 1115-21. It based that determination on several factors absent here. NutriSearch's Guide directly targeted "consumers," was specifically "concocted to ratchet up sales for Usana products," and existed only to "reap the financial benefits of a hidden marketing arrangement with Usana." *Id.* at 1117. Even then, the Ninth Circuit did not conclude that the Guide was an advertisement, instead remanding to determine whether the Guide had the "purpose of influencing consumers to buy *defendant's* goods or services." *Id.* at 1120 (emphasis added); *see also Ariix, LLC v. Nutrisearch Corp.*, No. 17CV320-LAB (DDL), 2023 WL 2933306, at *7 (S.D. Cal. Apr. 13, 2023) (finding on remand that NutriSearch acted as Usana's agent). Unlike the Guide in *Ariix*, SOC-8 does not target consumers, does not rank specific products, and provides WPATH no "hidden" financial benefits. It does not seek to influence anyone to purchase *WPATH's* nonexistent goods or services (and WPATH is not alleged to have acted as any doctors' agent). The absence of *any* factor the Ninth Circuit cited means the FAC does not present even a "close question." *Id.* at 1115.

**2) WPATH's Statements Are Not Misleading**

Plaintiffs also fail to allege the core element of any claim under Section 5 or its state analogues: an actionable omission or representation. *See Tashman*, 318 F.3d at 1277. "Expressions of opinion" are "not actionable" as the basis for fraud or misrepresentation under either Section 5 or state law. *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679, 686 (5th Cir. 1986) (collecting cases).

The Fifth Circuit has held that clinical guidelines are "'medical opinions, not factual representations,' and cannot form the basis for a claim of fraudulent or negligent misrepresentation." *Torrey*, 86 F.4th at 704. In *Torrey*, the plaintiffs alleged that the Infectious

Disease Society of America ("IDSA") and doctors included "baseless treatment recommendations" in IDSA's guidelines because insurance companies paid the doctors "large consulting fees." *Id.* at 703. In plaintiffs' view, IDSA hid the effectiveness of Lyme disease treatments so that the insurance companies who paid consulting fees would not have to cover such treatments. *Id.* The Fifth Circuit affirmed dismissal of all claims. *Id.* "[M]erely publishing a medical opinion—even a hotly debated one—in a peer-reviewed journal cannot give rise to a misrepresentation claim." *Id.* at 704. "Just because Plaintiffs disagree with those opinions does not mean that IDSA is somehow liable because doctors or insurance providers found the opinions persuasive." *Id.* at 706.

Other Circuit Courts agree. Where a speaker "draws conclusions from non-fraudulent data, based on accurate descriptions of the data and methodology underlying those conclusions, on subjects about which there is legitimate ongoing scientific disagreement, those statements are not grounds for a claim of false advertising[.]" *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 (2d Cir. 2013). Articles in a "peer-reviewed journal," in particular, are "directed to the relevant scientific community," whose "readers are specialists in their fields and are best positioned to identify opinions and choose to accept or reject them on the basis of an independent evaluation of the facts." *Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 248 (3d Cir. 2023) (cleaned up). "[M]ere disputes about the reliability of a scientific study's disclosed methodology," cannot "create an actionable falsehood." *Id.* at 247.

*Torrey*, *ONY*, and *Pacira* are fatal to the FTC's Section 5 claims and any state law analogue alleging deception. Plaintiffs purport to identify ten "Core Deceptive Statements" in SOC-8. FAC ¶¶ 375–405. Those statements do not appear in SOC-8, but instead mischaracterize otherwise nuanced and well-cited scientific discussions to reflect Plaintiffs' preferred interpretation of SOC-

8. *See* pp. 6-7, *supra*. The statements Plaintiffs mischaracterize are not presented in SOC-8 as bare assertions of fact, but rather opinions about what the specific scientific studies support:

| Statement | Support |
|---|---|
| "[I]n many cases, hormone therapy is considered a lifesaving intervention." FAC ¶ 378 n.165. | "Allen et al., 2019; Grossman & D'Augelli, 2006; Moody et al., 2015." SOC8 at S126, S179, S201, S219. |
| "Access to gender-affirming medical treatment is associated with a substantial reduction in the risk of suicide attempt." SOC-8 at S174; FAC ¶ 385. | "Bauer et al., 2015." SOC-8 at S174. |
| Puberty blockers are "fully reversible." FAC ¶ 388. | "Ashley, 2019e." SOC-8 at S112, S181. |
| "Hormone treatment has been shown to improve quality of life and to decrease depression and anxiety." SOC-8 at S174; FAC ¶ 389. | "Aldridge et al., 2020; Nguyen et al., 2018; Nobili et al., 2018; Owen-Smith et al., 2018, Rowniak et al., 2019." SOC-8 at S174. |
| "Hormone therapy has been found to positively impact the mental health and quality of life of [transgender/gender diverse] youth." SOC-8 at S126; FAC ¶ 390. | "Aldridge et al., 2020; Allen et al., 2019; Bauer et al., 2015; Nobili et al., 2018; Russell et al., 2018; Ryan, 2009." SOC-8 at S126. |
| "The efficacy of [gender-affirming chest surgery] have been demonstrated in multiple domains." SOC-8 at S128; FAC ¶ 391. | Seventeen studies, including "prospective," "retrospective," and "cross-sectional" studies. SOC-8 at S128.[2] |

Plaintiffs do not address the studies cited in SOC-8 at all. The FAC nowhere alleges that those studies do not support the propositions for which they are cited. (Nor does it suggest that these studies, by also supporting transgender healthcare, are also "means and instrumentalities" doctors use to deceive patients.) Regardless, a statement in a scientific journal that cites published studies

[2] SOC-8 separately states, in Appendix D, that adolescents should not have *any* surgery unless, among other criteria, (1) they have the "emotional and cognitive maturity required to provide informed consent" and (2) any "[m]ental health concerns" have been addressed. SOC-8 at S257.

expresses an opinion that the studies support the claim. *Pacira*, 63 F.4th at 246–48. Such statements are "nonactionable opinions," because it is the "essence of the scientific method that the conclusions of empirical research are tentative and subject to revision." *Id.* at 246 (quoting *ONY*, 720 F.3d at 496); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) ("Scientific conclusions are subject to perpetual revision."). "Just because Plaintiffs disagree with those opinions does not mean that [WPATH] is somehow liable" *Torrey*, 86 F.4th at 706.

Plaintiffs cannot distinguish *Torrey* by arguing that WPATH does not actually believe the opinions it expresses. *Cf.* 86 F.4th at 707 n.6 (declining to address whether "nonactionable medical opinions" can support claims if doctors "knew the opinions were false"). While the FAC makes a conclusory allegation that "SOC-8 drafters knew that they did not have sufficient medical evidence to support their recommendations," such a conclusory allegation cannot impute fraudulent intent to over 100 doctors who contributed to SOC-8. *Iqbal*, 556 U.S. at 678. Moreover, SOC-8 specifically discloses the "emerging nature of knowledge regarding adolescent gender identity development" and the "methodological limitations" of the studies it cites. SOC-8 at S45. It then discloses to doctors the evidence on which it relies. Such disclosures are fully consistent with the scientific uncertainty Plaintiffs allege. The "relevant scientific community" could "accept or reject SOC-8's conclusions after "independent evaluation of the facts." *Pacira*, 63 F.4th at 248.

Nor can Plaintiffs base any claim on an assertion that SOC-8 is not "consensus-based expert opinion" or a "standard of care." FAC ¶¶ 393-402. SOC-8 discloses the identity of all authors and their affiliations, SOC-8 at S1, allowing readers to assess whether they are "experts." SOC-8's methodology section devotes five pages to describing how the authors developed their "consensus" opinions. *Id.* at S247-S251. Even if the FTC disagrees that SOC-8's authors are experts or that its methodology culminated in consensus-based opinions, such statements are

"expressions of opinion" and "not actionable." *Presidio*, 784 F.2d at 679; *Pacira*, 63 F.4th at 247 ("[M]ere disputes about the reliability of a scientific study's disclosed methodology cannot create an actionable falsehood[.]"). Whether a doctor is an expert or a statement reflects a group's consensus cannot be shown "true or false" by "empirical verification." *Presidio*, 784 F.2d at 679. Even if such verification were possible, it would be established by the fact that more than 110 doctors affiliated with renowned institutions all signed on as SOC-8 authors. SOC-8 at S1-S3.

Plaintiffs' allegations regarding conflicts of interest fare even worse. FAC ¶ 395. *Torrey* found medical guidelines non-actionable even where Plaintiffs alleged that doctors received "large consulting fees" to make "baseless treatment recommendations." 86 F.4th at 703. Plaintiffs do not allege even "large consulting fees," instead relying on an allegation that SOC-8's authors support and receive compensation for providing transgender healthcare. FAC ¶¶ 78-79. But SOC-8 discloses the affiliations the FAC alleges are conflicts of interest, eliminating any possibility of deception. For example, the FAC alleges that Dr. Eli Coleman has a conflict of interest as "director of the University of Minnesota's Institute for Sexual and Gender Health," FAC ¶ 80, but SOC-8 explicitly identifies Dr. Coleman as affiliated with the "Institute for Sexual and Gender Health" at the "University of Minnesota Medical School," SOC-8 at S1. More broadly, medical associations routinely rely on guidelines drafted by practitioners. Cardiologists draft standards of care for cardiology, *see* AM. COLL. OF CARDIOLOGY, *Clinical Practice Guidelines*, J. AM. COLL. OF CARDIOLOGY, *available at* https://www.jacc.org/guidelines, obstetricians for obstetrics, *see* AM. COLL. OF OBSTETRICIANS & GYNECOLOGISTS, *Guidelines for Perinatal Care* (2017), and so forth. Practicing doctors do not have disqualifying conflicts of interest. They are the experts on which care depends.

The FTC's understanding of conflicts of interest would require standards of care to be

drafted by doctors who do not actually provide the care in question (or who do so only for free). Although the FTC purports to rely on guidance from the National Academy of Medicine ("NAM"), FAC ¶ 68, its allegations would create an internal conflict in NAM's guidance. NAM instructs that medical guidelines must be "developed by a knowledgeable, multidisciplinary panel of experts." INST. OF MED. (US), CLINICAL PRACTICE GUIDELINES WE CAN TRUST 5 (2011, Robin Graham et al. eds.). No specialty could assemble a "panel of experts" if any doctor practicing that specialty was disqualified for purported "conflicts of interest."[3]

Finally, Plaintiffs allege that WPATH omits the side effects of certain treatments. FAC ¶¶ 403-405. First, they contend that SOC-8 does not disclose the side effects of "puberty blockers" and "cross-sex hormones." *Id.* ¶¶ 403-404. But those are *types* of drugs, and the specific drugs that fall within those types each have a "different side-effect profile." SOC-8 at S123. Because doctors decide what to prescribe, they must "be familiar with the medications, suggested monitoring, and potential side effects," *id.* at S144, and they bear ultimate responsibility to disclose and discuss side effects. SOC-8 cannot disclose in advance all potential side effects, which are highly individualized based on treatment and patient. Regardless, SOC-8 discloses many of the side effects Plaintiffs allege are omitted. While Plaintiffs allege that SOC-8 does not disclose the risk of "cognitive issues" associated with puberty blockers, FAC ¶ 403, SOC-8 specifically discloses that the "potential neurodevelopmental impact of extended pubertal suppression in gender diverse youth has been specifically identified as an area in need of continued study" and refers doctors to

---

[3] The FAC also makes no allegations connecting WPATH's statements about its methodology to any supposed "means and instrumentalities" for deception. The FAC does not allege doctors ever told patients about WPATH's "GRADE" system, "Delphi process," or lack of "conflicts of interest." FAC ¶¶ 395-399. None of Plaintiffs' declarations mention any of those topics. ECF 70-1 to 70-16. Most declarants received care before SOC-8 issued, and SOC-7 made no mention at all of the "GRADE" system, "Delphi process," or "conflicts of interest." *See* pp. 7, *supra*.

"Chen et al., 2020" for further discussion, SOC-8 at S65. And Appendix C discloses the "physical changes" and "risks" associated with hormone therapy. SOC-8 at S254; *compare* FAC ¶ 404.

Plaintiffs next allege that SOC-8 fails to disclose that mastectomy may cause "effects on non-erogenous sensation, inability to breastfeed, nerve damage, and necrosis of the nipples." FAC ¶ 405. But doctors bear responsibility for discussing "reversible and irreversible effects" of any treatment and "all potential risks and benefits." SOC-8 at S61. SOC-8 cites seventeen articles for doctors to evaluate when considering mastectomy, including articles that discuss these side effects (and others). SOC-8 at S128. For example, SOC-8 cites "Wolter et al., 2018," *id.*, which discloses a "risk for total or partial nipple graft necrosis," *see* Andreas Wolter et al., *Subcutaneous mastectomy in female-to-male transsexuals: Optimizing perioperative and operative management in 8 years clinical experience*, 71 J. OF PLASTIC RECONSTRUCTIVE AESTHETIC & SURGERY 344 (2018). Plaintiffs' allegation boils down to an assertion that doctors will not read SOC-8's citations.

In sum, medical guidelines are not actionable misstatements in the Fifth Circuit. *Torrey*, 86 F.4th at 704. The specific statements Plaintiffs challenge are conclusions that SOC-8 draws from "non-fraudulent data . . . on subjects about which there is legitimate ongoing scientific disagreement." *ONY*, 720 F.3d at 498. "Just because Plaintiffs disagree with those opinions does not mean that [WPATH] is somehow liable." *Torrey*, 86 F.4th at 706.

**3) The FAC Fails to Allege That Statements Are Unsubstantiated**

Nor can the FTC base a Section 5 claim on an allegation that WPATH's statements are "unsubstantiated." FAC ¶¶ 409-410. The D.C. Circuit has held that, where a corporation "suggests that a product's effectiveness or superiority has been scientifically established," a so-called "establishment claim," the corporation must possess either the "specific substantiation claimed" or "evidence sufficient to satisfy the relevant scientific community of the claim's truth." *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 490-91 (D.C. Cir. 2015). Putting aside that the core

deceptive statements Plaintiffs allege do not concern any specific product, but instead *types* of products, SOC-8's statements are fully substantiated. SOC-8 discloses the "specific substantiation claimed," directing doctors to the scientific studies that the authors believe support its recommendations. *See* pp. 4-5, *supra*. That should end the inquiry. Even assuming that SOC-8 needed to identify "evidence sufficient to satisfy the relevant scientific community of the claim's truth," *POM Wonderful*, 777 F.3d at 491, the FAC fails to allege what the "relevant scientific community" requires and thus cannot plausibly allege that SOC-8 failed to meet those requirements. Scientific disagreement alone cannot plausibly show lack of substantiation. Otherwise, all medical guidelines on transgender healthcare would be "unsubstantiated." *See Skrmetti*, 605 U.S. at 525 (describing "fierce scientific and policy debates"); *see* pp. 4-5, *supra*.

Although the FTC has previously argued that establishment claims must be supported by "randomized controlled human clinical trials" or "RCTs," *POM Wonderful*, 777 F.3d at 494,[4] the FAC makes no such allegation here. For good reason: very few clinical guidelines are supported by RCTs. A 2011 study of over 4,000 recommendations from IDSA—the same medical association considered in *Torrey*—found that only 14% were supported by RCTs. *See* Dong Heun Lee & Ole Vielemeyer, *Analysis of Overall Level of Evidence Behind Infectious Diseases Society of America Practice Guidelines*, 171 Archives Int. Med. 18-22 (2011), *available at* https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/226373. Even among "class A recommendations" for which doctors had "good evidence," only 23% of recommendations were supported by RCTs. *Id.* Other recommendations were based on other types of clinical trials, or

[4] Following *Loper Bright Enterprises v. Raimondo*, the Court owes no deference to the FTC's views about what level of substantiation to require. 603 U.S. 369, 413 (2024). Section 5 requires only substantiation necessary to prevent "deceptive acts." 15 U.S.C. § 45(a)(1). WPATH's statements are not "deceptive" under binding precedent. *See* pp. 14-20, *supra*.

even just "clinical experience, descriptive studies, or reports of experts committees." *Id.* Whatever sense RCTs may make for products like pomegranate juice, they can be prohibitive for medical treatments, because certain diseases "occur infrequently" and can "present in a heterogeneous manner," and withholding potentially effective treatments "might be deemed unethical." *Id.*; *see also* Pierluigi Tricoci *et al.*, *Scientific Evidence Underlying the ACC/AHA Clinical Practice Guidelines*, 301 J. Am. Med. Ass'n 831-841 (2009) (11% of cardiology recommendations supported by "level of evidence A"), https://jamanetwork.com/journals/jama/fullarticle/183453. Any argument that medicine requires RCTs to support clinical guidelines would thus defy medical consensus and upend the practice of many specialties.[5]

Ultimately, the FTC cannot assert that WPATH's statements are "unsubstantiated," because the FAC does not address WPATH's substantiation at all. Its allegations are "mere conclusory statements" that "do not suffice." *Iqbal*, 556 U.S. at 678.

**C. The FTC's Claims Under § 53(b) Do Not Identify Imminent Violations**

The FTC cannot invoke Section 53(b) unless a corporation is "violating" or "about to violate" a law it enforces. 15 U.S.C. § 53(b). Courts have recognized that "unambiguous" language "does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant 'is' committing or 'is about to' commit another violation." *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156 (3d Cir. 2019); *see FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985) ("Congress only contemplated ongoing or future violations."). SOC-8 was

[5] Any argument about substantiation would be particularly misplaced because the complaint makes no effort to cite scientific substantiation for its allegations. The FAC repeatedly alleges that WPATH should have disclosed "side effects" because a single declarant suffered them. *See, e.g.*, FAC ¶ 20 nn. 3-7, 9, 13. A single person's experience is not an RCT, or even an expert opinion. Even all of Plaintiffs' declarants, taken together, represent a vanishingly small proportion of the tens of thousands of adolescents who identify as transgender. FAC ¶ 67 ("42,000 in 2021").

issued in 2022. SOC-8 at S1. But as in *Shire ViroPharma*, the FTC "waited" nearly four years "before seeking an injunction under Section 13(b)," 917 F.3d at 160, even as many states took legislative action in the interim, *see* pp. 35-38, *infra*. The FAC points to no recent statements that WPATH made to consumers that could constitute an ongoing or threatened violation.

The sixteen declarations the FTC attaches to the FAC do not satisfy § 53(b) either. No declarant identifies any statement by WPATH. Seven declarants—almost half—do not mention WPATH at all. ECF 70-4, 70-8, 70-9, 70-13 to 70-16. The rest spoke to doctors or other healthcare professionals who allegedly informed them that "WPATH recommended" certain care. ECF 70-2 ¶ 18 ("Dr. Kuper"); ECF 70-3 ¶ 6 ("Dr. Roberts"); ECF 70-5 ¶ 19 ("Dr. Hoe"); ECF 70-6 ¶ 35 ("Dr. Olson-Kennedy and Landon"); ECF 70-7 ¶ 22 (counselor named "Sara E. Wiener"); ECF 70-10 ¶ 20 ("Dr. Berg"); ECF 70-12 ¶ 24 ("Washington University Transgender Center" "derived" treatment criteria from SOC-8); *see also* ECF 70-11 ¶ 7 (unidentified "social worker" cited WPATH as "standard of care"); ECF 70-1 (learned about WPATH during "entirety of this process"). Those statements cannot be imputed to WPATH. *See* Part II.A, *supra*.

Regardless, most declarants describe care that occurred more than five years ago, with some as far back as 2012. ECF 70-10; ECF 70-1; ECF 70-2; ECF 70-5 to ECF 70-8; ECF 70-13 to ECF 70-16. That care preceded SOC-8 and thus cannot possibly show any violation relating to SOC-8. Plaintiffs try to sidestep the obvious irrelevance of these declarations to any ongoing or threatened violation by alleging that SOC-7 is "identical or materially similar" to SOC-8. FAC ¶ 7 n.2. It is not. *See* pp. 6-8, *supra*. Even the declarants who describe statements that postdate SOC-8 identify conduct that occurred more than two years ago. ECF 70-3. Two come from parents who did not allow their children to transition (and cannot have been deceived). ECF 70-9; ECF 70-11. That Plaintiffs rely on years-old allegations—and must falsely equate SOC-7 and SOC-8 to make

any allegation of deception—only underscores that they have failed to allege any violation WPATH "'is' committing or 'is about to' commit." *Shire ViroPharma*, 917 F.3d at 156.

### III. The FTC's Claims Violate the Major Questions Doctrine by Shifting the Balance of Federal and State Authority Without Clear Statutory Authority

The FTC's novel assertion of statutory authority also violates the "major questions" doctrine. *Learning Resources*, 607 U.S. at 242 (Roberts, C.J.); *Biden v. Nebraska*, 600 U.S. 477 (2023); *W. Virginia v. EPA*, 597 U.S. 697, 721 (2022). Where the government claims "broad, expansive power on an uncertain statutory basis," the Supreme Court requires courts to consider "separation of powers principles and a practical understanding of legislative intent" before holding that Congress "delegated 'highly consequential power' through ambiguous language." *Learning Resources*, 607 U.S. at 242-43 (quoting *W. Virginia*, 597 U.S. at 723-24). That "statutory text might 'as a matter of definitional possibilities' have been read to delegate the asserted power" is not dispositive. *Id.* (quoting *W. Virginia*, 597 U.S. at 732). Instead, courts must consider "context," including "constitutional structure" and "common sense," to determine whether the "economic and political significance" of the issue provides "reason to hesitate before concluding that Congress meant to confer such authority." *Id.* (quotation marks omitted).

The FTC has never asserted the "highly consequential power" to regulate a medical association's clinical guidelines. *Learning Resources*, 607 U.S. at 242-43. Every past FTC case involving a medical association has focused on alleged "unfair methods of competition," rather than supposedly "deceptive" claims in clinical guidelines.[6] Even if Section 5's prohibition on

---

[6] *California Dental Ass'n v. FTC*, 526 U.S. 756, 759 (1999) (whether Association's "advertising restrictions . . . violated the antitrust laws"); *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 448-49 (1986) ("conspiracy among dentists to refuse to submit x rays to dental insurers"); *American Med. Ass'n v. FTC*, 638 F.2d 443, 446-47 (2d Cir. 1980) (anticompetitive "restraints on advertising, solicitation, and contract practices").

"deceptive acts or practices in or affecting commerce," 15 U.S.C. § 45(a), could be stretched to reach clinical guidelines "as a matter of definitional possibilities," "context" points decisively against any inference that Congress intended that result, *Learning Resources*, 607 U.S. at 242-43.

First, under our federal system, states regulate the practice of medicine. "Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996); *Barsky v. Bd. of Regents*, 347 U.S. 442, 449 (1954). Since at least 1889, the Supreme Court has recognized that states' police powers include the power to regulate the practice of medicine. *Dent*, 129 U.S. at 122; *see Watson v. Maryland*, 218 U.S. 173, 176 (1910). Indeed, "the regulation of health and safety matters is primarily, and historically, a matter of local concern," *Hillsborough Cnty., Fla. v. Auto. Med. Labs., Inc.*, 471 U.S. 707, 715 (1985), and licensing and regulation is a state function. *Barsky*, 347 U.S. at 451. This longstanding aspect of our constitutional structure makes it "very unlikely" that Congress intended to invade states' authority to regulate the practice of medicine when it granted the FTC power to prohibit deceptive acts in commerce. *W. Virginia*, 597 U.S. at 723.

Other statutes confirm that Congress had no such intention. The Medicare statute provides, in a provision entitled "Prohibition against any Federal interference," that "[n]othing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395. Courts have recognized that this provision reflects Congress's clear intent "to minimize federal intrusion" into state healthcare regulation. *Mass. Med. Soc'y v. Dukakis*, 815 F.2d 790, 791 (1st Cir. 1987). There is no basis to believe that Congress specifically declined to authorize federal "supervision or control over the practice of medicine" by the Department of Health & Human Services in the context of a federal healthcare program, 42 U.S.C.

§ 1395, but conferred a *broader* power to supervise medical guidance even outside federal programs on the FTC through an "oblique" and "elliptical" reference to deceptive acts, *W. Virginia*, 597 U.S. at 723. Congress does not "hide" constitutional "elephants" in statutory "mouseholes." *Whitman v. Am. Trucking Ass's*, 531 U.S. 457, 468 (2001); *see also FTC v. National Casualty Co.*, 357 U.S. 560, 561–63 (1958) (setting aside order barring purportedly "deceptive" insurance practices because Congress provided federal law should not be construed to affect "any law enacted by any State for the purpose of regulating the business of insurance").

The FTC's unprecedented assertion of power to regulate medical guidance has far-reaching "political significance." *W. Virginia*, 597 U.S. at 721. States have divided on how to regulate transgender healthcare, particularly for minors. Many states deem transgender healthcare "medically necessary," cover it through their State Medicaid programs, and prohibit insurance companies from withholding coverage based on a patient's gender identity or diagnosis of gender dysphoria. ECF 68 at 5-7 & nn.8-9. Other states, including Texas, Iowa, and Nebraska, have enacted laws that prohibit physicians from offering transgender healthcare to minors or limit their ability to do so. FAC ¶ 357 (Iowa Code § 147.164 "prohibits pediatric medical transition related procedures for children"); *id.* ¶ 360 (Neb. Rev. Stat. § 71-7301 *et seq.* "protect children under the age of nineteen from pediatric medical transition"); *id.* ¶ 373 (Tex. Health & Safety Code Ann. § 161.702 *et seq*. "prohibits physicians and healthcare providers from providing medical transition treatment to minors"). Alaska has neither enacted a law prohibiting transgender healthcare for minors nor adopted a position that such care is categorically medically necessary. Thus, even among the Plaintiff States, variation exists among views on transgender healthcare for youth.

Such policy disagreements are federalism in action. The Supreme Court has recently recognized that States must have "legislative flexibility" on the issue of transgender healthcare for

minors, citing "open questions regarding basic factual issues before medical authorities and other regulatory bodies." *Skrmetti*, 605 U.S. at 524. Such flexibility turns states into "'laboratories for devising solutions to difficult legal problems.'" *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015). It "allows local policies more sensitive to the diverse needs of a heterogeneous society, permits innovation and experimentation, enables greater citizen involvement in democratic processes, and makes government more responsive by putting the States in competition for a mobile citizenry." *Id.* (cleaned up).

The FTC's claims would upend the constitutional allocation of power by interfering with states' regulation of the practice of medicine within their own borders. For example, the FTC alleges that it is "deceptive" for WPATH to state that "medical transition is 'medically necessary.' " FAC ¶¶ 381–84 (citing SOC-8 at S18). Many states not only agree with that statement but have enacted it into law. Maryland, for example, has codified its "intent" that its Medicaid program "provide gender-affirming treatment to all Program recipients for whom gender-affirming treatment is medically necessary." Md. Code Ann., Health-Gen. § 15-151(b). Such care "shall be assessed according to . . . current clinical standards of care." *Id.* § 15-151(c)(2). And the statutory definition of "gender-affirming treatment" specifically references "the current clinical standards of care for gender-affirming treatment published by" WPATH. *Id.* § 15-151(a)(2)(iii); *see also* pp. 3-5 *supra*; FAC ¶ 271 ("[M]any U.S. public and private health insurers and regulatory bodies rely on SOC-8 when making coverage determinations."). The FTC's claims would thus brand as deceptive the same "clinical standards" that Maryland's legislature has endorsed, frustrating Maryland's requirement that care "shall be assessed" in accordance with those standards. Seventeen states (including Maryland) have informed the Court that the FTC's claims "substitute its own judgment to displace Amici as regulators of medicine." ECF 68 at 7. "[S]econd-guessing

legislative choices in this area should set off alarm bells." *Skrmetti*, 605 U.S. at 552 (Barrett, J., concurring).

The FTC's claims would serve no purpose other than to override the policy decisions of states that have come to a different conclusion than the FTC on transgender healthcare. In states that have prohibited transgender healthcare for minors, like Texas, Iowa, and Nebraska, the FTC has no ongoing "deception" to enjoin. And the FTC cannot seek any "monetary relief" for past violations. *See AMG Cap. Mgmt. LLC v. FTC*, 593 U.S. 67, 70 (2021). The FTC's claims thus, as a practical matter, serve only to second guess states that have decided to continue to permit transgender healthcare for youth. The major questions doctrine recognizes that Congress must make such "major policy decisions itself, not leave those decisions to agencies." *W. Virginia*, 597 U.S. at 723. Because the FTC has not received "clear congressional authorization" to intrude upon states' authority to regulate clinical guidance, its claims must be dismissed. *Id.*

### IV. Plaintiffs' Claims Constitute Viewpoint-Based Restrictions in Violation of WPATH's First Amendment Rights

Plaintiffs' claims should be dismissed because they impermissibly discriminate based on viewpoint in violation of WPATH's First Amendment right to free speech. "The First Amendment prohibits government from 'abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.'" *Am. For Prosperity Found. v. Bonta*, 594 U.S. 595, 605–06 (2021). Courts "appl[y] the 'most exacting scrutiny'" to "content-based restrictions on protected speech[.]" *United States v. Alvarez*, 567 U.S. 709, 724 (2012) (citations omitted). This First Amendment defense is properly raised on a motion to dismiss because it appears on the face of the FAC. *See Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986); *accord Cochran v. Astrue*, No. 3:11-CV-1257-D, 2011 WL 5604024, at *1 (N.D. Tex., Nov. 17, 2011).

Notably, the FTC previously conceded that WPATH "engages in some protected First Amendment conduct." *WPATH*, 2026 WL 1257321, at *3.[7] That concession remains warranted.

**A. WPATH's Speech is Protected Professional Speech.**

The Supreme Court's decision in *Chiles v. Salazar*, 146 S. Ct. 1010 (2026), forecloses any attempt by Plaintiffs to subject WPATH's speech to diminished First Amendment protection. In *Chiles*, the Supreme Court rejected the notion that "professional speech" is a "separate category of speech" subject to "diminished constitutional protection." *Id.* at 1024–25 (internal citations omitted). "History is littered with examples of official efforts to manipulate and control professional speech—including 'the content of doctor-patient discourse'—in ways designed 'to increase state power,' 'suppress minorities,' and muzzle 'unpopular ideas.'" *Id.* (internal citations omitted). The "dangers associated with" government censorship of professional speech "are no less acute 'in the fields of medicine and public health' than they are anywhere else." *Id.* (internal citations omitted). The same protection applies to WPATH's professional guidelines.

WPATH's speech constitutes "professional speech" under *Chiles*. 146 S. Ct. at 1029. WPATH is a professional organization that publishes guidelines and standards for patient care, and the doctors Plaintiffs allege convey WPATH's purported "script" to patients are "state license holders." *Chiles*, 146 S. Ct. at 1022. Under *Chiles*, their professional speech—and the guidance that informs it—receives full First Amendment protection. Plaintiffs cannot evade that holding by relabeling WPATH's scientific and clinical guidelines as "commercial speech."

---

[7] The D.C. District Court also found "evidence of animus [by FTC] towards WPATH," which included a "'pattern of litigation and information demands,' along with articulated hostility towards proponents of gender-affirming care." *WPATH*, 2026 WL 1257321, at 7. The court there also found that the FTC "attempted demonstration of a legitimate purpose" for its investigation of WPATH "fell flat" and that it had "failed to offer a logical justification connecting WPATH to commercial representations and the supposed violators." *Id.* at 8.

The three-factor test for what constitutes "commercial" speech under *Bolger*, 463 U.S. at 66–67, asks whether (1) the speech is an advertisement, (2) it refers to a particular product, and (3) the speaker has an economic motivation. WPATH's speech satisfies none of these factors.

SOC-8 is not an advertisement and does not refer to a particular product. It is a peer-reviewed clinical guideline developed by a multidisciplinary panel and published in the *International Journal of Transgender Health*, not a promotional brochure, product catalog, or sales pitch. It does not list prices, propose transactions, or direct readers to purchase a product or service, and it does not promote a particular manufacturer or provider. *Cf. Bolger*, 463 U.S. at 62.

The FAC appears to rely most heavily on the third *Bolger* factor, alleging that WPATH's speech is commercial because its members have economic motivations. FAC ¶¶ 16, 116. But that argument proves too much. An "economic motivation" for speech "would clearly be insufficient by itself to turn the materials into commercial speech," *Bolger*, 463 U.S. at 67. Every major medical professional organization publishes guidelines that influence insurance coverage and members' revenues (notably, in both directions). Under Plaintiffs' theory, all such guidelines would be commercial speech subject to FTC regulation. That WPATH members (not WPATH itself) derive income from healthcare services is too attenuated an economic nexus to satisfy the commercial speech inquiry.

Nor do *Ariix*, *POM Wonderful*, and *California Dental* support Plaintiffs' allegations. *Ariix* involved a for-profit company that portrayed itself as independent to sell a product-comparison guide that skewed its scientific commentary for profit, 985 F.3d at 1111–12, 1118–19. Indeed, the *Ariix* court was very clear that its decision was "tied specifically to the troubling allegations in this case: they plausibly suggest that the Guide is more like a sophisticated marketing sham rather than a product review guide." *Id.* at 1119. Whatever Plaintiffs think of WPATH, they cannot dispute

WPATH is a longstanding professional organization with a multidisciplinary panel of contributors, which is very different from the one-man marketing operation at the heart of *Ariix*. *POM Wonderful* is even further afield. There, the D.C. Circuit upheld the FTC's order because the petitioner ran product advertisements that selectively touted favorable study results while concealing contrary findings from its own sponsored research to make deceptive claims to sell pomegranate juice. 777 F.3d at 484–85. The court found those ads entitled to "no First Amendment protection" because they were "deceptive and misleading" product promotions by a company about its own products. *Id.* at 499-500. Nothing in *Pom Wonderful* suggests a professional medical organization's clinical guidelines would be subject to the same framework. And *California Dental* addressed FTC jurisdiction over a dental association's advertising restrictions, not whether clinical guidelines are commercial speech, 526 U.S. at 767–68. WPATH is a nonprofit professional association publishing peer-reviewed clinical guidelines. Those authorities do not support subjecting WPATH's professional speech to diminished protection.

The FAC's emphasis on SOC-8's availability to "individuals, their families, and social institutions," FAC ¶ 307, does not transform it into commercial speech. The same passage from SOC-8 states that it is "primarily" for "health care professionals." SOC-8 at S5. No commercial speech "primarily" targets a non-commercial audience. Public access is also characteristic of clinical guidelines; the AMA's *CPT Manual*, the DSM-5, and the Endocrine Society guidelines are likewise consulted by patients, families, insurers, and policymakers. As *Bolger* recognized, speaking about a product or service that is the topic of public debate does not itself make speech commercial, and Plaintiffs do not allege that WPATH transformed SOC-8 into a consumer-directed advertisement or promotional material.

### B. WPATH's Statements Are Non-Actionable Opinions on Contested Scientific Questions.

Even if WPATH's speech could be classified as commercial—which it cannot—the challenged statements are not misleading as non-actionable opinions on contested scientific questions. The Fifth Circuit has held that, for First Amendment purposes, "statements about contested and contestable scientific hypotheses" are treated as "matters of opinion" understood as such by the relevant scientific communities and are therefore "non-actionable." *Torrey*, 86 F.4th at 706 (quoting *ONY*, 720 F.3d at 498). *Torrey* applied that principle to a medical association's clinical guidelines.

*ONY* likewise protects scientific conclusions drawn from non-fraudulent data when there is legitimate scientific disagreement. 720 F.3d at 498. *Pacira BioSciences* reinforces that disputes over the reliability of disclosed scientific methodology are not actionable because treating them as fraud would chill scientific research and discourse. 63 F.4th at 247-48.

Plaintiffs themselves allege that transgender healthcare is subject to "significant medical debate" and that there is "no consensus." FAC ¶¶ 131, 159. *Chiles* likewise recognizes a "fierce public debate" over the subject of transgender healthcare for minors. 146 S. Ct. at 1029. SOC-8 addresses precisely these contested scientific questions, thus its recommendations are non-actionable opinions under *Torrey* and *ONY*.

SOC-8 is a clinical framework that synthesizes evidence, acknowledges uncertainty, emphasizes individualized judgment, and states that its guidelines are "flexible" and may be modified by doctors for each patient's "unique anatomic, social, or psychological situation." SOC-8 at S256. That is professional guidance, not product advertising. Terms such as "medically necessary" and "evidence-based" do not change the analysis or convert SOC-8 into a claim that a product's effectiveness or superiority has been scientifically established. Such language appears

throughout clinical guidelines, and treating it as sufficient to trigger FTC enforcement would expose every medical professional organization to liability whenever its recommendations are later questioned. That result would defy the First Amendment's protection of scientific discourse.

### C. Plaintiffs' Claims Constitute Impermissible Viewpoint Discrimination.

The FAC seeks to restrict WPATH's exercise of its First Amendment right to free speech by attempting to prevent and punish WPATH for making statements regarding its guidelines and recommendations for provision of transgender healthcare to adolescents, including primarily WPATH's statements in SOC-8. *See, e.g.*, FAC ¶¶ 7, 9, 15, 84, 250, 308, 311. The FAC's claims are, at bottom, an attempt by the federal government and a coalition of states to suppress one side of an ongoing medical and scientific debate. This constitutes viewpoint discrimination—"an egregious form of content discrimination" that the First Amendment categorically forbids. *Chiles*, 146 S. Ct. at 1024 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

Plaintiffs may argue that this action targets "deceptive" speech rather than a viewpoint and allege that WPATH may argue either side of the debate but may not mislead consumers. Yet the FAC labels WPATH's published conclusions that gender-affirming care is "medically necessary" and "evidence-based" deceptive because Plaintiffs reject those conclusions. FAC ¶¶ 384–402. Plaintiffs do not subject opponents of transgender healthcare to similar (or any) scrutiny. FAC ¶¶ 149-160. That is viewpoint discrimination dressed as consumer "protection."

*Chiles* illustrates the danger. There, the Court struck down a law prohibiting a therapist from providing talk-based conversion therapy. *Id.* at 1020. The Court explained:

> [Colorado's law] censors speech based on viewpoint. Colorado may regard its policy as essential to public health and safety. Certainly, censorious governments throughout history have believed the same. But the First Amendment stands as a shield against any effort to enforce orthodoxy in thought or speech in this country. It reflects instead a judgment that every American possesses an inalienable right to

> think and speak freely, and a faith in the free marketplace of ideas as the best means for discovering truth. However well-intentioned, any law that suppresses speech based on viewpoint represents an "egregious" assault on both of those commitments.

*Chiles*, 146 S. Ct. at 1029 (*Rosenberger*, 515 U.S. at 829). That is what Plaintiffs seek here: WPATH publishes guidelines reflecting one side of a "fierce public debate" over care for minors, and Plaintiffs seek to use consumer-protection statutes to silence it. Plaintiffs, through their claims, are trying to bully WPATH into agreeing with Plaintiffs' viewpoints on this highly debated issue.

Another passage from *Chiles* further demonstrates why this Court must prevent Plaintiffs' attempt to silence the side of the medical debate with which Plaintiffs disagree. There, the Court rejected the proposition that Colorado could bar speech that advocated for that "substandard care." *Chiles*, 146 S. Ct. at 1029. The Court reasoned:

> Today, tomorrow, and forever, too, any professional speech that deviates from "current beliefs about the safety and efficacy of various medical treatments" could be silenced with relative ease. . . . So what if that kind of reflexive deference to currently prevailing professional views may not always end well?
> Fortunately, that is not the world the First Amendment envisions for us. Licensed professionals "have a host of good-faith disagreements" about the "prudence" and "ethics" of various practices in their fields. Medical consensus, too, is not static; it evolves and always has. A prevailing standard of care may reflect what most practitioners believe today, but it cannot mark the outer boundary of what they may say tomorrow. Far from a test of professional consensus, the First Amendment rests instead on a simple truth: "[T]he people lose" whenever the government transforms prevailing opinion into enforced conformity.

*Id.* (internal citations omitted).

If Plaintiffs are permitted to silence WPATH's free speech because they disagree with the care that WPATH recommends, "[t]he people lose." *Id.* WPATH is contributing to the public medical debate regarding transgender healthcare. If Plaintiffs disagree with WPATH, the "remedy to be applied is more speech," not enforced silence. *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring), *overruled on other grounds by Brandenburg v. Ohio*, 395 U.S. 444 (1969).

The federal government has already engaged in such speech. As Plaintiffs allege, in "November 2025, the U.S. Department of Health and Human Services published a 400-page report titled 'Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices' ('The HHS Report'), which assessed the evidence base for the medical interventions on children that WPATH recommends and concluded that it is exceptionally weak." FAC ¶ 25. The federal government has thus already alerted doctors and the public to what it views as the problems with WPATH's speech. That is the exact remedy the First Amendment envisions: "the free marketplace of ideas as the best means for discovering truth." *Chiles*, 146 S. Ct. at 1029. Any injunction that "suppresses speech based on viewpoint represents an 'egregious' assault" on First Amendment principles. *Id.*

The D.C. District Court found that the FTC had "articulated hostility towards proponents of gender-affirming care," lacked a "legitimate purpose" to investigate WPATH because the relevant statements could be evaluated through SOC-8's bibliography, and had not consulted that bibliography before taking legal action. *WPATH*, 2026 WL 1257321, at *3–4. The FAC is simply another step in the same effort to silence speech without even considering the scientific evidence on which it relies. The FAC is not an attempt to address advertising fraud within the FTC's jurisdiction, but an effort to impose the government's preferred scientific conclusions. FAC ¶ 25. This Court should thus dismiss Plaintiffs' claims for violating WPATH's First Amendment rights.

### V. The States' Claims Must Be Dismissed for Lack of Jurisdiction

The claims for injunctive relief brought by Plaintiffs Iowa, Nebraska, and Texas should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of Article III standing. *See Cobb v. Cent. States*, 461 F.3d 632, 635 (5th Cir. 2006). Despite Plaintiffs' attempt to cure the defects in their complaint through amendment, all the state law counts for injunctive relief rest on the same alleged publications, statements, and clinical decisions as the FTC's federal counts. Iowa,

Nebraska, and Texas attempt to infer injury by pleading historical events and generalized future risk, not a concrete and imminent injury caused by WPATH and redressable by relief against WPATH as is required to establish standing. The states acknowledge that the relevant pediatric services are now prohibited in each State, and Plaintiffs cannot rely on state-law doctrines to establish federal standing. Finally, if the FTC's claims are dismissed, the Court should independently decline supplemental jurisdiction over all remaining state claims, including Alaska's.

### A. Iowa, Nebraska, and Texas Cannot Establish Article III Standing

Article III requires each plaintiff invoking federal jurisdiction to show an injury in fact that is concrete and particularized, actual and imminent, fairly traceable to the challenged conduct, and likely to be redressed by the requested relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). A plaintiff seeking prospective relief must show a "real and immediate threat" of future injury; past injury alone does not suffice. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).

The state-specific allegations in the FAC are notably thin. Iowa alleges that providers in the state *once relied* on WPATH's framework, that the proliferation of the alleged practices prompted Iowa Code § 147.164, and that the statute "came too late to protect many Iowa children." FAC ¶¶ 354–58. Texas pleads the same sequence: *historical* reliance by providers, enactment of Senate Bill 14, and that the statute "came too late" to protect many Texas children. FAC ¶¶ 370–74. Those allegations describe completed events and past injury. They do not identify a current Iowa or Texas provider planning to provide a prohibited service, a particular child facing such a transaction, or a future WPATH statement that will cause such a transaction.

Plaintiffs plead only slightly more with respect to Nebraska, as the statute there "grandfathers" in children who were receiving certain medications (though notably fails to allege that it allows the continuation of supposedly harmful surgeries described vividly elsewhere in the

FAC) and describes the story of one individual who allegedly experienced specific harm. FAC ¶¶ 359-369. But this story does not allege any ongoing injury. The group of "grandfathered in" children is a closed, historical, and necessarily shrinking population that cannot supply the "actual or imminent" future injury *Lujan* requires, 504 U.S. at 560, since it describes no prospective class of patients. Additionally, the allegation that certain organizations assist Nebraska minors in traveling out of state to obtain procedures now prohibited in Nebraska fails for want of traceability: any resulting injury flows from "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560–61 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)).

**B. State-Law Doctrines Do Not Supply Article III Standing**

State-law rules—whether they define the scope of a cause of action, toll or eliminate a limitations period, or authorize an Attorney General to sue—do not alter Article III's requirements of injury-in-fact, traceability, and redressability. No doctrine of state law can convert past injury into imminent injury or make a superseded publication current. The question is not whether a state has authorized its Attorney General to continue a state-law proceeding after conduct ceases, but whether that state has a concrete injury likely to be redressed by an order against WPATH. The FAC alleges no future transaction in the states that have banned transgender healthcare for minors, identifies no provider poised to disregard bans, and gives no reason to believe an order directed at WPATH would make such a violation less likely. The states thus lack standing.

**C. Traceability and Redressability Independently Defeat the State Claims**

Even apart from an analysis of imminence, the FAC does not plausibly connect any future state injury to WPATH. The FAC's own examples describe providers and facilities, notably not WPATH, making statements to families. FAC ¶¶ 325–27, 366–67; *see also* ¶¶ 355–56, 371–72. WPATH is not alleged to have directed a particular state transaction or controlled a provider's clinical judgment. *Lujan* and *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S.

26, 41–42 (1976), do not permit standing to be established based on an attenuated chain of events dependent on multiple independent, third-party decisions.

State law makes this causal break decisive. Iowa, Nebraska, and Texas each prohibit the pediatric services that Plaintiffs say WPATH's guidance promotes. FAC ¶¶ 357–74. Thus, any future provider who furnishes those services in one of the three States must independently violate state law. The FAC alleges no mechanism by which WPATH's continued publication, rather than the provider's decision to disobey the applicable statute, will cause a future state injury.

Redressability fails for the same reason. For conduct within their borders, the States already possess the direct remedy they identify: enforcement of their own prohibitions against providers. An injunction against WPATH would not compel an out-of-state organization to stop assisting a Nebraska child, would not prevent a provider from independently violating an Iowa or Texas prohibition, and would not change the operation of any state statute. If providers comply, the asserted future injury does not occur; if they do not, the injury is not likely to be redressed by relief against WPATH. The FAC therefore fails each of the three Article III requirements.

### D. If the Federal Claims Are Dismissed, the Court Should Decline Supplemental Jurisdiction Over All State Claims

The FAC invokes federal-question and FTC jurisdiction for the federal counts and expressly invokes 28 U.S.C. § 1367(a) for the State claims. FAC ¶ 27. Counts IV through VII plead Alaska, Iowa, Nebraska, and Texas statutory causes of action and seek state-law remedies. FAC ¶¶ 418–50. If Counts I through III are dismissed, the Court may decline supplemental jurisdiction under § 1367(c)(3), and should do so here.

Section 1367(a) permits supplemental jurisdiction only over state claims forming part of the same Article III case or controversy as claims within original jurisdiction. Section 1367(c)(3) permits the Court to decline jurisdiction when it has dismissed all claims over which it has original

jurisdiction. The Fifth Circuit states the general rule plainly: a court should decline jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial. *Brookshire Bros. Holding, Inc. v. Dayco Products, Inc.*, 554 F.3d 595, 602 (5th Cir. 2009); *see also Adlerstein v. Cooper Aerobics Enterprises, Inc.*, No. 3:25-cv-2228-D, 2026 WL 820861, at *3 (N.D. Tex. Mar. 25, 2026). The relevant considerations are judicial economy, convenience, fairness, and comity. *Batiste v. Island Records, Inc.*, 179 F.3d 217, 227 (5th Cir. 1999); *Payne v. Harris Methodist H-E-B*, 2000 U.S. Dist. LEXIS 21776, at *48 (N.D. Tex. Nov. 20, 2000).

Here, the case is still at the pleading stage. No discovery has taken place, and the Court has not developed significant familiarity with the merits or the parties. *See* ECF 42 at 39. The circumstances that can justify retaining supplemental claims—substantial completed discovery, a passed discovery deadline, or extensive pretrial proceedings—are absent. Judicial economy, convenience, and fairness therefore favor dismissal without prejudice rather than continued federal adjudication of state-law claims.

Further, Alaska's claims are also included in this analysis. The FAC alleges only that Alaska providers consulted, referenced, or relied on WPATH's framework. FAC ¶¶ 351–53. Count IV seeks relief under the Alaska Consumer Protection Act, including AS §§ 45.50.471, 45.50.501, 45.50.551(b), and 45.50.537. FAC ¶¶ 418–26. Those allegations do not invoke original federal jurisdiction. Alaska's claim is supplemental under FAC ¶ 27 and falls within § 1367(c)(3) if the FTC claims are dismissed, regardless of whether the Court reaches the standing arguments applicable to the other States.

Accordingly, if the FTC's federal claims are dismissed, the Court should decline supplemental jurisdiction and dismiss all remaining state claims without prejudice.

## CONCLUSION

For these reasons, the Court should grant WPATH's motion to dismiss Plaintiffs' claims.

Dated: September 8, 2026

Respectfully Submitted,

*/s/ Sarah Cummings Stewart*

Sarah Cummings Stewart
**REED SMITH LLP**
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Tel: (469) 680-4200
Fax: (469) 680-4299
sarah.stewart@reedsmith.com

R. Jeffrey Layne
**REED SMITH LLP**
401 Congress Avenue, Suite 1800
Austin, TX 78701
Tel: (512) 623-1801
Fax: (512) 623-1802
jlayne@reedsmith.com

*/s/ Caleb Hayes-Deats**

Caleb Hayes-Deats*
Abbe David Lowell [DC Bar No. 358651]
Schuyler J. Standley*
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowellandassociates.com
CHayes-Deats@lowellandassociates.com
SStandley@lowellandassociates.com

**Admitted Pro hac vice*

*Attorneys for Defendant WPATH*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on September 8, 2026, a true and correct copy of the foregoing document was filed with the Clerk of Court via the CM/ECF system, causing it to be served electronically on all counsel of record.

*/s/ Sarah Cummings Stewart*
Sarah Cummings Stewart