**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, INC., a Texas corporation, *et al.*,<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil No. 4:26-cv-00748-O |

**[PROPOSED] BRIEF OF ALABAMA, ARKANSAS, FLORIDA, GEORGIA, IDAHO, INDIANA, KANSAS, KENTUCKY, LOUISIANA, MISSISSIPPI, MISSOURI, NORTH DAKOTA, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, UTAH, AND WEST VIRGINIA AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF CONTENTS.......... i

TABLE OF AUTHORITIES .......... ii

INTRODUCTION AND INTEREST OF *AMICI CURIAE* .......... 1

ARGUMENT.......... 4

I. Plaintiffs Alleged Facts Showing That WPATH's Statements Were False And Misleading. .......... 4

A. While WPATH proclaims that it managed conflicts of interest according to NAM and WHO Standards, Plaintiffs allege that WPATH did not do so. .......... 5

B. While WPATH proclaims that it used the GRADE system to make recommendations, Plaintiffs allege that WPATH did not do so. .......... 7

II. The Constitution Does Not Forbid Plaintiffs From Holding WPATH Accountable For Its False And Misleading Statements.......... 11

CONCLUSION.......... 13

ADDITIONAL SIGNATORIES .......... 15

CERTIFICATE OF SERVICE .......... 16

# TABLE OF AUTHORITIES

## Cases

*Charron v. WPATH*,
No. 26-1585 (7th Cir.) ........................................ 1

*Chiles v. Salazar*,
146 S. Ct 1010 (2026) ........................................ 12

*Eknes-Tucker v. Governor of Ala.*,
80 F.4th 1205 (11th Cir. 2023) ........................................ 2

*Eknes-Tucker v. Marshall*,
603 F. Supp. 3d 1131 (M.D. Ala. 2022) ........................................ 2

*Office of Fla. Att'y Gen. v. WPATH*,
2025-CA-2660 (19th Judicial Circuit for St. Lucie Cnty, Fla.) ........................................ 1

*United States v. Skrmetti*,
605 U.S. 495 (2025) ........................................ 3

## Other Authorities

*AG Healey Sues Purdue Pharma, Its Board Members and Executives for Illegally Marketing Opioids and Profiting from Opioid Epidemic*, MASSACHUSETTS ATT'Y GEN. (June 12, 2018), https://perma.cc/WN67-JGR3 ........................................ 12

Amicus Br. of AAP, WPATH, et al.,
No. 2:22-cv-184, *Boe v. Marshall* (M.D. Ala. 2022), Doc. 91-1 ........................................ 1

Amicus Br. of AAP, WPATH, et al.,
No. 23-477, *United States v. Skrmetti* (U.S. Sept. 3, 2024) ........................................ 3

Amicus Br. of California, Massachusetts, et al.,
No. 22-11707, *Eknes-Tucker v. Governor of Ala.* (11th Cir. filed Aug. 17, 2022) ........................................ 2

*Attorney General James Wins Trial Against Quincy Bioscience for Deceptive and Fraudulent Advertising of "Memory Improvement" Supplement Prevagen*,
NEW YORK ATT'Y GEN. (May 8, 2024), https://perma.cc/S63G-H6FC ........................................ 11

*Attorney General Phil Weiser Expands Purdue Pharma Lawsuit to Include Sackler Family Members and Company Executives Who Created the Opioid Epidemic in Colorado*,
COLORADO ATT'Y GEN. (Jul. 1, 2019), https://perma.cc/BZ2U-E3TQ ........................................ 12

Balshem, *GRADE Guidelines*, 64 J. CLINICAL EPIDEMIOL. 401 (2011),
https://perma.cc/2KDY-6BW5 ........................................ 10

*Delayed Vytorin Study Results a Bitter Pill for Drug Marketers*,
WASHINGTON ATT'Y GEN. (Jul. 14, 2009), https://perma.cc/49T9-5RSU ............................... 11

Eli Coleman *et al.*, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8* (2022) ........................................................................................ 2, 4-10

National Academies of Medicine, *Clinical Practice Guidelines We Can Trust* (2011),
https://perma.cc/7SA9-DAUM.................................................................................... 5, 6

Plfs' PI Mem.,
No. 2:22-cv-184, *Boe v. Marshall* (M.D. Ala. 2022), Doc. 8 .................................................... 1

World Health Organization, *Handbook for Guideline Development* (2nd ed. 2014),
https://perma.cc/4KVV-JMV6 (2012)........................................................................... 5

WPATH, *Methodology for the Development of SOC8*, https://perma.cc/QD95-754H .................. 8

Yao, *Discordant and Inappropriate Discordant Recommendations*,
BMJ (2021), https://perma.cc/W7XN-ZELX.............................................................. 10

## INTRODUCTION AND INTEREST OF *AMICI CURIAE*

The States of Alabama, Arkansas, Florida, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, North Dakota, South Carolina, South Dakota, Tennessee, Utah, and West Virginia respectfully submit this brief as *amici curiae* in support of Plaintiffs' Opposition (Doc. 90) to Defendant World Professional Association for Transgender Health's Motion to Dismiss (Doc. 84).[1]

*Amici* are all too familiar with WPATH. For years, our States were told that we could *not* "regulate the practice of medicine within [our] borders" (Massachusetts Br.[2] 1) because WPATH—not States—set the standard. For example, when Alabama prohibited pediatric sex-change procedures in 2022, plaintiffs there sought a preliminary injunction based largely on the premise that Alabama's law departed from the WPATH guidelines, and WPATH set the "standard of care" using the "best available science." *See* Plfs' PI Mem., *Boe v. Marshall*, No. 2:22-cv-184 (M.D. Ala. 2022), Doc. 8 at 16. WPATH came to Alabama to say the same thing, promising the court that its "well-accepted," "established, evidence-based clinical guidelines" "save[] lives." *See* Br. of AAP, WPATH, et al., *Boe*, *supra*, Doc. 91-1 at 2-3, 7. And States like Massachusetts and California, who now claim the mantle of States' rights and the role of States "as the primary regulators of medicine," Massachusetts Br. 1, sung a different tune then, urging courts to enjoin Alabama's regulation because, they said, "[i]f Alabama's law is allowed to take effect," "teenagers in Alabama will face an untenable choice: risk severe criminal penalties for those who provide them with medically necessary puberty blockers or hormone therapies, … or forego medically necessary care and suffer potentially devastating harms to their physical, emotional, and psychological

[1] The States of Florida and Idaho currently have litigation pending against WPATH. *See Charron v. WPATH*, No. 26-1585 (7th Cir.); *Office of Fla. Att'y Gen. v. WPATH*, 2025-CA-2660 (19th Judicial Circuit for St. Lucie Cnty, Fla.).

[2] Doc. 68.

health," Amicus Br. of California, Massachusetts, et al., *Eknes-Tucker v. Governor of Ala.*, No. 22-11707 (11th Cir. filed Aug. 17, 2022), at 2-3.

Like so many parents and doctors before them, courts believed these claims. Thus, while acknowledging that "[k]nown risks" of pediatric sex-change procedures "include loss of fertility and sexual function," the district court in Alabama preliminarily enjoined enforcement of the State's law because "WPATH recognizes transitioning medications as established medical treatments and publishes a set of guidelines for treating gender dysphoria in minors with these medications." *Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1139, 1151 (M.D. Ala. 2022), *rev'd sub nom. Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205 (11th Cir. 2023), *reh'g en banc denied*, 114 F.4th 1241 (11th Cir. 2024). Because WPATH had spoken, Alabama could not.

Alabama then sought and obtained court-ordered discovery from WPATH to test the court's deference.[3] Doing so unveiled a tragic medical scandal that is now recounted in Plaintiffs' Amended Complaint here. *See* Doc. 70. Internal documents from WPATH showed that the organization crafted its Standards of Care 8 as "a tool for our attorneys to use in defending access to care."[4] Its evidence-review team "found little to no evidence about children and adolescents."[5] Some SOC-8 authors opted *out* of the evidence-review process due to "concerns, echoed by the social justice lawyers we spoke with, … that evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits."[6] And

---

[3] *See* Order, *Boe*, 2:22-cv-184 (M.D. Ala. Mar. 27, 2023), Doc. 263.

[4] Am. Compl. ¶269; *see* Defs' Ex. 181 at 75, *Boe*, 2:22-cv-184 (M.D. Ala.), Doc. 700-10. Throughout this brief, *amici* will reference evidence Alabama submitted to the court in *Boe*. Citations will be by exhibit number followed by the docket entry in parenthesis and the internal page number following the colon. *E.g.*, Ex.181 (Doc.700-10):75. Exhibits are available online: https://www.alabamaag.gov/boe-v-marshall/.

[5] Am. Compl. ¶120; *Boe* Ex.173(Doc.560-23):22.

[6] *Boe* Ex.174(Doc.560-24):1-2.

Admiral Rachel Levine, the former Assistant Secretary for Health at HHS, demanded that WPATH remove *all* age limits for chemical treatments, chest surgeries, and even surgeries to remove children's genitals from SOC-8.[7] After some initial consternation "about allowing US politics to dictate international professional clinical guidelines,"[8] WPATH obliged. It did not disclose any of this to the public.

Only now that it has been caught does WPATH attempt a different tack. After misleading countless parents desperate to help their suffering children, WPATH disclaims responsibility: those parents, WPATH says, should have known that the vaunted Standards of Care on which they and their doctors relied were just WPATH's "opinions." Doc. 85 ("WPATH Br.") at 1. So even though it told the U.S. Supreme Court in *United States v. Skrmetti* that "scientific evidence indicates the effectiveness of treating gender dysphoria" with sex-change procedures,[9] that doing so is "both safe and effective,"[10] that side effects from the procedures "are exceedingly rare,"[11] and that its guidelines were "the result of a robust drafting, comment, and review process,"[12] WPATH relies on the Supreme Court's *rejection* of those claims to assert that its Standards of Care offer only "non-actionable opinions on contested scientific questions." WPATH Br. 32; *see id.* at 4 (citing *United States v. Skrmetti*, 605 U.S. 495, 525 (2025)).

If only WPATH and its members had told patients and their parents of that uncertainty from the beginning. Because they did not—because they instead affirmatively misled parents about the safety and efficacy of the procedures WPATH's members sold—WPATH must be held to

---

[7] Am. Compl. ¶¶110-14.
[8] *Boe* Ex.186 (Doc.700-15):32.
[9] Amicus Br. of AAP, WPATH, et al., *United States v. Skrmetti* No. 23-477 (U.S. Sept. 3, 2024), at 17.
[10] *Id.* at 25.
[11] *Id.* at 25 n.79.
[12] *Id.* at 16.

account. The Constitution provides no refuge for WPATH's false and misleading claims that sacrificed children for the profits of its members.

## ARGUMENT

### I. Plaintiffs Alleged Facts Showing That WPATH's Statements Were False And Misleading.

After misleading countless parents into believing that WPATH's Standards of Care 8 (SOC-8) were true and reliable, WPATH now says it was offering only "non-actionable opinions," WPATH Br. 32, rather than "assertions of fact," *id.* at 16. That is cold comfort to the parents who relied on WPATH's statements and recommendations for their children being based in *fact*. It also fails as a legal defense because it refuses to engage with the allegations in Plaintiffs' operative complaint.

Much of WPATH's defense relies on the premise that the statements in SOC-8 were aimed at "the professionals best able to evaluate them: doctors," and that "Plaintiffs do not even try to show … that doctors could not evaluate [the statements] in the framework in which they are offered—guidelines." WPATH Br. 1. But that is precisely what Plaintiffs allege: that WPATH told the world that it followed certain best practices for medical guidelines and that WPATH *did not follow those practices*. That deception made doctors unable to evaluate the statements in SOC-8.

Take just two examples. At the back of SOC-8 is an appendix with the methodology WPATH said it employed.[13] Among other things, it proclaims that WPATH (1) managed conflicts of interest according to two specific standards and (2) used the GRADE framework to tailor recommendation statements based on strength of evidence.[14] Plaintiffs allege they did neither.

[13] *See* Eli Coleman *et al.*, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, S247-51 (2022).
[14] *Id.*

### A. While WPATH proclaims that it managed conflicts of interest according to NAM and WHO Standards, Plaintiffs allege that WPATH did not do so.

WPATH cites two standards it said it used to manage conflicts of interest: one from the National Academies of Medicine (NAM) and the other from the World Health Organization (WHO).[15] Both standards generally recognize that the experts best equipped for creating practice guidelines are those at arm's length from the services at issue—sufficiently familiar with the topic, but not professionally engaged in performing, researching, or advocating for the practices under review.[16]

At the same time, the standards recognize that a guideline committee typically benefits from *some* involvement by clinicians who provide the services at issue.[17] Accordingly, they suggest ways for committees to benefit from conflicted clinicians while limiting their involvement. The standard from the National Academies recommends that "[m]embers with [conflicts of interest] should represent *not more than a minority* of the [guideline development group]."[18]

WPATH largely ignored these standards. From the get-go, it expressly limited SOC-8 authorship to existing WPATH members—clinicians and other professionals (and non) who were *already* enthusiastic about transitioning treatments.[19] As Dr. Bowers, the former president of WPATH, put it in Alabama's case, it was "important for someone to be an advocate for [transitioning] treatments *before* the guidelines were created."[20]

---

[15] *Id.* at S247; Am. Compl. ¶76.
[16] National Academies of Medicine, *Clinical Practice Guidelines We Can Trust* 81-93 (2011), https://perma.cc/7SA9-DAUM; World Health Organization, *Handbook for Guideline Development* 34-35 (2nd ed. 2014), https://perma.cc/4KVV-JMV6; *see* Am. Compl. ¶76.
[17] NAM, *supra* note 16, at 83; Am. Compl. ¶76.
[18] Am. Compl. ¶76 (emphasis added) (quoting NAM, *supra* note 16, at 83).
[19] SOC-8, *supra* note 13, at S248; Am. Compl. ¶¶77-80.
[20] *Boe* Ex.18(Doc.564-8):121:7-11 (emphasis added)

Dr. Bowers's involvement in SOC-8 offers a good illustration of the lack of real conflict checks. According to the National Academies, a "conflict of interest" is "[a] divergence between an individual's private interests and his or her professional obligations such that an independent observer might reasonably question whether the individual's professional actions or decisions are motivated by personal gain, such as financial, academic advancement, clinical revenue streams, or community standing."[21] Bowers should have been subject to that standard, serving not only as a member of the Board that oversaw and approved SOC-8 but as an author of the chapter tasked with evaluating the evidence for transitioning surgeries.

So it is notable that Bowers made "more than a million dollars" in 2023 from providing transitioning surgeries, but said it would be "absurd" to consider that a conflict worth disclosing or otherwise accounting for as part of SOC-8.[22] That was WPATH's public position as well: It assured readers that "[n]o conflicts of interest were deemed significant or consequential" in crafting SOC-8.[23]

Privately, WPATH leaders knew everything was not up to par. Dr. Coleman admitted that "most participants in the SOC-8 process had financial and/or nonfinancial conflicts of interest."[24] Dr. Robinson, the chair of the evidence-review team, said the same: She "expect[ed] many, if not most, SOC-8 members to have competing interests."[25] She even had to inform WPATH—belatedly—that "[d]isclosure, and any necessary management of potential conflicts, should take place *prior* to the selection of guideline members."[26] Unfortunately, she lamented, "this was not done

---

[21] NAM, *supra* note 16, at 78.
[22] Am. Compl. ¶79; *Boe* Ex.18(Doc.564-8):37:1-13, 185:25-186:9.
[23] SOC-8, *supra* note 13, at S177.
[24] Am. Compl. ¶80; *Boe* Ex.21(Doc.700-3):230:17-23.
[25] *Boe* Ex.166(Doc.560-16):1.
[26] Am. Compl. ¶81; *Boe* Ex. 166(Doc.560-16):1 (emphasis added).

here."[27] No matter: SOC-8 proclaims the opposite ("Conflict of interests were reviewed as part of the selection process"[28]), and Dr. Coleman testified that he did not know of any author removed from SOC-8 due to a conflict.[29]

WPATH's deception matters because it goes to the heart of the guideline's reliability. Doctors and parents reading SOC-8 would come away with the impression that the guideline statements were made by experts who neutrally evaluated the evidence and made recommendations based on science rather than personal interest. They would have that impression because WPATH said that's what it did. But according to Plaintiffs' allegations, WPATH did just the opposite and deliberately chose authors who were *already* financially or otherwise dependent on providing the services at issue to "evaluate" the services and make recommendations about whether and how they should be made available to consumers. In this way, WPATH made its guideline document *appear* neutral when it was anything but. That deception made it impossible for readers—whether doctors, parents, or the patients themselves—to evaluate WPATH's recommendations "in the framework in which they [were] offered—guidelines." *Contra* WPATH Br. 1.

### B. While WPATH proclaims that it used the GRADE system to make recommendations, Plaintiffs allege that WPATH did not do so.

WPATH also boasted that it used a process "adapted from the Grading of Recommendations, Assessment, Development and Evaluations (GRADE) framework" for "developing and presenting summaries of evidence" using a "systematic approach for making clinical practice recommendations."[30] According to WPATH, Dr. Robinson's evidence-review team was to conduct

[27] Am. Compl. ¶81; *Boe* Ex. 166(Doc.560-16):1.
[28] SOC-8, *supra* note 13, at S177.
[29] *Boe* Ex.21(Doc.700-3):232:13-15.
[30] SOC-8, *supra* note 13, at S250; *see* Am. Compl. ¶97.

systematic evidence reviews, "assign[] evidence grades using the GRADE methodology," and "present[] evidence tables and other results of the systematic review" to SOC-8 authors.[31]

Chapter authors were then to grade the recommendation statements based on the evidence.[32] Per WPATH, "strong recommendations"—"we recommend"—were only for situations where "the evidence is high quality," "a high degree of certainty [that] effects will be achieved," "few downsides," and "a high degree of acceptance among providers."[33] On the other hand, "[w]eak recommendations"—"we suggest"—were for when "there are weaknesses in the evidence base," "a degree of doubt about the size of the effect that can be expected," and "varying degrees of acceptance among providers."[34] To "help readers distinguish between recommendations informed by systematic reviews and those not," recommendations were to "be followed by certainty of evidence for those informed by systematic literature reviews":

| | |
|---|---|
| ++++ | strong certainty of evidence |
| +++ | moderate certainty of evidence |
| ++ | low certainty of evidence |
| + | very low certainty of evidence[35] |

The reality did not match the promise. To begin, as the chair of SOC-8, Dr. Coleman, wrote, "we were not able to be as systematic as we could have been (e.g., we did not use GRADE explicitly)."[36] Dr. Karasic, the chair of the mental health chapter, testified that rather than relying on systematic reviews, some drafters simply "used authors … we were familiar with."[37]

[31] SOC-8, *supra* note 13, at S249-50.
[32] *Id.* at S250.
[33] *Id.*; *see* Am. Compl. ¶¶97-98, 103.
[34] SOC-8, *supra* note 13, at 250; Am. Compl. ¶103.
[35] WPATH, *Methodology for the Development of SOC8*, https://perma.cc/QD95-754H.
[36] *Boe* Ex.190(Doc.700-18):8; *see Boe* Ex.182(Doc.700-11):157-58.
[37] *Boe* Ex.39(Doc.592-39):66:2–67:5.

WPATH also decided not to differentiate "between statements based on [literature reviews] and the rest,"[38] and ordered the removal of all notations disclosing the quality of evidence for each recommendation. A draft of the hormone chapter illustrates the change. The chapter had initially offered a "weak recommendation" ("we suggest") based on low-quality evidence ("++") that clinicians prescribe cross-sex hormones to gender dysphoric adolescents, "preferably with parental/guardian consent."[39]

At first, WPATH seemed to just remove the evidence notations. But then the recommendations themselves appeared to morph from weak ("we suggest") to strong ("we recommend"). So it was in the adolescent chapter, where all but one recommendation is now "strong"[40]—even as those recommendations are surrounded by admissions that "[a] key challenge in adolescent transgender care is the quality of evidence," with "the number of studies … still [so] low" that "a systematic review regarding outcomes of treatment in adolescents" is purportedly "not possible."[41] And so it was in the hormone chapter, where the final version of the above statement transformed into a strong "we recommend."[42] A similar re-grading occurred with WPATH's strong recommendation in favor of administering puberty blockers, "despite WPATH grading the supporting evidence as 'moderate.'"[43]

While this mismatch may not seem like a big deal, the difference between a "strong" and "weak" recommendation is important, particularly when it comes to life-altering interventions like sex-change procedures. Under GRADE, "low" or "very-low" quality evidence means,

[38] *Boe* Ex.182(Doc.700-11):62; *see Boe* Ex.9(Doc.700-2):¶¶29-36, 43-47.
[39] *Boe* Ex.182(Doc.700-11):5; *see id.* at 1-40; *Boe* Ex.9(Doc.700-2):¶¶29-36, 43-47.
[40] SOC-8, *supra* note 13, at S48.
[41] *Id.* at S45-47.
[42] *Id.* at S111.
[43] Am. Compl. ¶106.

respectively, that the true effect of the medical intervention may, or is likely to be, "substantially different" from the estimate of the effect based on the evidence available.[44] Thus, given that the estimated effect is therefore likely to be *wrong* for very low-quality evidence, it is imperative for clinicians to know the quality of evidence supporting a treatment recommendation—and why, with certain exceptions not applicable here, evidence-based medicine warns against "strong" recommendations based on low-quality evidence.[45] Yet WPATH promised clinicians that it followed this system when it actually eschewed transparency and made "strong" recommendations regardless of the evidence. That once again made it impossible for readers—doctors, parents, or the patients themselves—to evaluate WPATH's recommendations "in the framework in which they [were] offered." *Contra* WPATH Br. 1.

* * *

WPATH's motion to dismiss proceeds as though SOC-8 were a normal guideline document, as though WPATH was transparent in how it crafted the guideline, and as though WPATH did what it said it did in SOC-8. WPATH thus asserts that its statements in SOC-8 are not actionable because "[t]he relevant scientific community could accept or reject SOC-8's conclusions after independent evaluation of the facts." WPATH Br. 17 (quotation omitted). But WPATH can say this only by ignoring or heavily discounting Plaintiffs' allegations that WPATH took steps to make it *impossible* for readers to evaluate WPATH's recommendations. Accepting those allegations as true, WPATH's defense falls apart. The Court should deny WPATH's motion.

---

[44] Balshem, *GRADE Guidelines*, 64 J. CLINICAL EPIDEMIOL. 401, 404 (2011), https://perma.cc/2KDY-6BW5; *see* Am. Compl. ¶98-101.
[45] Yao, *Discordant and Inappropriate Discordant Recommendations*, BMJ (2021), https://perma.cc/W7XN-ZELX.

## II. The Constitution Does Not Forbid Plaintiffs From Holding WPATH Accountable For Its False And Misleading Statements.

In addition to glossing over Plaintiffs' factual allegations, WPATH and its *amici* offer theories of constitutional protection that would make snake-oil salesmen blush. WPATH claims that Plaintiffs seek "to restrict WPATH's exercise of its First Amendment right to free speech by attempting to prevent and punish WPATH for making statements regarding its guidelines and recommendations for provision of transgender healthcare to adolescents." WPATH Br. 33. And WPATH's *amici* led by Massachusetts assert that Plaintiffs cannot hold WPATH accountable for its misdeeds because doing so would "interfere with" *their* "authority to regulate the practice of medicine." Massachusetts Br. 2. Both arguments border on the frivolous for reasons Plaintiffs have already well explained. *See* Opp. 27-40. *Amici* offer just a few additional points.

*First*, it is blackletter law that the First Amendment does not protect misleading commercial speech. *See* Opp. 29-36. WPATH's *amici* should at least be aware of that because they routinely bring enforcement actions against companies and organizations making misleading health claims.[46] The fact that those claims may appear in medical journals or are marketed directly to doctors do not insulate them from review. Were it otherwise, for instance, States would not have been able to hold opioid manufacturers and distributors accountable for their deceptive and

[46] *E.g.*, *Attorney General James Wins Trial Against Quincy Bioscience for Deceptive and Fraudulent Advertising of "Memory Improvement" Supplement Prevagen*, NEW YORK ATT'Y GEN. (May 8, 2024), https://perma.cc/S63G-H6FC (press release highlighting New York Attorney General's "lawsuit asserting that Quincy did not have adequate scientific evidence to substantiate claims about Prevagen, including that it improves memory, improves memory within 90 days, reduces memory problems associated with aging, provides other cognitive benefits, including a health brain function, a sharper mind, and clearer thinking, and has been 'clinically shown' to do each of these things"); *Delayed Vytorin Study Results a Bitter Pill for Drug Marketers*, WASHINGTON ATT'Y GEN. (Jul. 14, 2009), https://perma.cc/49T9-5RSU (press release highlighting Washington Attorney General's settlement with drug companies that delayed release of study that showed that the cholesterol drug they continued to advertise as safe and effective was no more effective than a generic alternative).

misleading trade practices since they regularly used medical organizations or journals to launder their claims about the safety of their products.[47]

*Second*, WPATH cannot hide behind the Supreme Court's decision in *Chiles v. Salazar*, 146 S. Ct 1010 (2026). In *Chiles*, WPATH's *amicus* Colorado banned licensed counselors from engaging in talk therapy if it was designed to "help a client 'realign [his] identity with [his] sex,'" but it encouraged such therapy if it encouraged "a person undergoing gender transition." 146 S. Ct at 1018 (alterations in original and citations omitted). The Supreme Court unsurprisingly held that Colorado's law "censor[ed] speech based on viewpoint" and was thus subject to strict scrutiny. *Id.* at 1029.

Contrary to WPATH's arguments (at 33-34), this case is nothing like *Chiles*. Unlike counselors in Colorado, WPATH has always been free to say whatever it wants. No State has banned its speech like Colorado did. But that does not mean that WPATH is immune from liability for making false and misleading claims about the safety and efficacy of pediatric sex-change procedures. Again, were it otherwise, it's hard to imagine how States could ever protect consumers from

[47] *But see, e.g.*, *Attorney General Phil Weiser Expands Purdue Pharma Lawsuit to Include Sackler Family Members and Company Executives Who Created the Opioid Epidemic in Colorado*, COLORADO ATT'Y GEN. (Jul. 1, 2019), https://perma.cc/BZ2U-E3TQ (press release highlighting Colorado Attorney General's lawsuit against opioid manufacturers who "counter[ed] evidence-based, peer-reviewed studies showing that opioids are addictive" by "create[ing] a false medical condition called 'pseudoaddiction' to sell more opioids and increase corporate profits" and "sponsored and distributed misleading studies claiming that prescription opioids were effective long-term treatments for chronic pain" while "igno[ring] expert warnings about the dangers of opioids"); *AG Healey Sues Purdue Pharma, Its Board Members and Executives for Illegally Marketing Opioids and Profiting from Opioid Epidemic*, MASSACHUSETTS ATT'Y GEN. (June 12, 2018), https://perma.cc/WN67-JGR3 (press release highlighting Massachusetts Attorney General's lawsuit against opioid manufacturers who misrepresented "the risks of opioid use to prescribers and patients" and misled "prescribers and patients about the increased risks associated with prolonged use of [ ] opioids in order to extend average treatment duration").

unfair and deceptive trade practices since those practices almost always involve speech of some kind.

*Third*, while the undersigned *amici* welcome the Massachusetts coalition's belated recognition that States indeed have the power and authority to regulate medicine even when WPATH prefers otherwise, *contra*, *e.g.*, Br. of California et al., *United States v. Skrmetti*, No. 23-477 (U.S. filed Sept. 3, 2024), at 2-13, the coalition's argument here undermines that principle by prioritizing the policy preferences of some States over the regulatory actions of others. If States indeed have the "power to regulate medicine within their borders" (Massachusetts Br. 3), that principle must apply to Plaintiff States as well. That Massachusetts chooses to let WPATH make misleading claims to consumers there does not mean that Alaska is powerless to do otherwise. Massachusetts and California can apply their policy preferences within their own borders, but they cannot apply them extraterritorially. The Tenth Amendment applies to all States and leaves plenty of room for different approaches to WPATH's deceptive and harmful trade practices.

## CONCLUSION

For these reasons, the Court should deny WPATH's motion to dismiss.

Dated: October 6, 2026

Respectfully submitted,

*s/ C. Alan Carrillo*
C. Alan Carrillo
TX Bar No. 24109693
BROWN FOX PLLC
2699 Howell St., Suite 500
Dallas, TX 75204
(214) 327-5000
alan@brownfoxlaw.com

STEVE MARSHALL
*Attorney General*
A. Barrett Bowdre*
*Solicitor General*
STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Barrett.Bowdre@AlabamaAG.gov

**Pro hac vice application forthcoming*

*(Additional signatories listed below)*

**ADDITIONAL SIGNATORIES**

TIM GRIFFIN
Attorney General
State of Arkansas

JAMES UTHMEIER
Attorney General
State of Florida

CHRIS CARR
Attorney General
State of Georgia

RAÚL R. LABRADOR
Attorney General
State of Idaho

THEODORE E. ROKITA
Attorney General
State of Indiana

KRIS W. KOBACH
Attorney General
State of Kansas

RUSSELL COLEMAN
Attorney General
Commonwealth of Kentucky

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

CATHERINE L. HANAWAY
Attorney General
State of Missouri

DREW WRIGLEY
Attorney General
State of North Dakota

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

JONATHAN SKRMETTI
Attorney General
State of Tennessee

DEREK BROWN
Attorney General
State of Utah

JOHN B. MCCUSKEY
Attorney General
State of West Virginia

**CERTIFICATE OF SERVICE**

I certify that on October 6, 2026, I electronically filed this document using the Court's CM/ECF system, which will serve counsel of record.

*s/ C. Alan Carrillo*
C. Alan Carrillo