**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH,**

**Plaintiff,**

**v.**

**FEDERAL TRADE COMMISSION, *et al.*,**

**Defendants.**

**Civil Action No. 26-532 (JEB)**

**MEMORANDUM OPINION**

The Trump Administration has made it official policy to oppose medical treatments that align a patient's physical appearance with a gender identity that diverges from his or her biological sex. To that end, the Federal Trade Commission, the nation's watchdog for false advertising and deceptive commercial practices, targeted the World Professional Association for Transgender Health with a sweeping Civil Investigative Demand for information related to its medical and advocacy work in support of such gender-affirming care. WPATH then brought this suit claiming that the CID violated its First Amendment rights and seeking injunctive and declaratory relief. The Court granted a preliminary injunction, holding that the FTC had likely issued the CID in retaliation for WPATH's protected speech. But the FTC remained free to continue its investigation by other means — and so it did, culminating in its civil-enforcement action against WPATH in the Northern District of Texas. At that point, the Commission declared the CID no longer necessary and formally withdrew it. The agency now contends, based on those developments, that WPATH's claims in this litigation have become moot and should be dismissed.

The Court agrees that this case has become moot and accordingly will grant the FTC's Motion. WPATH brought this action to redress injuries caused by the CID, and now that it has been withdrawn, this Court cannot grant any further effectual relief. With no CID pending or certainly impending, there is nothing for this Court to enjoin. For similar reasons, a declaratory judgment that WPATH's First Amendment rights were violated by the now-withdrawn CID would amount to no more than an advisory opinion, with entirely speculative prospective effects. WPATH has failed to show, moreover, that the FTC is likely to repeat the challenged conduct by further investigating activities that have already been made the subject of an enforcement action. So, this case is moot, and no exception to mootness applies.

There may be little doubt on this record, as the Court preliminarily found, that the FTC violated WPATH's First Amendment rights by issuing a retaliatory CID. But that CID no longer affects WPATH's rights for the simple reason that it no longer exists, and the enforcement action that superseded it presents a distinct legal controversy — in Texas. This Court does not have jurisdiction to castigate federal agencies for past irresponsible or even unlawful conduct when its decree can have no concrete effect on the parties' present rights and obligations. As that is the case here, the Court must dismiss this action.

## I. Background

As the Court has recently described the background of this case in detail, it need only reprise the key facts and recent procedural developments here. See World Pro. Ass'n for Transgender Health v. FTC (WPATH I), 2026 WL 1257321, at *1 (D.D.C. May 7, 2026); see also Endocrine Soc'y v. FTC, 832 F. Supp. 3d 1, 4–7 (D.D.C. 2026). It draws the facts, at this stage of the litigation, principally from the Complaint and materials subject to judicial notice. See Trudeau v. FTC, 456 F.3d 178, 183 (D.C. Cir. 2006).

A. WPATH and FTC's Investigation

WPATH is a nonprofit organization that serves as a "forum" for "medical and related professionals" to convene in service of "ensuring that transgender people have access to established, medically necessary, and individualized healthcare." ECF No. 1 (Compl.), ¶ 1. Among other initiatives, it publishes Standards of Care to "articulate a professional consensus about the psychiatric, psychological, medical, and surgical management of transgender people." ECF No. 3-2 (Leo Lewis Declaration), ¶ 9. The most recent version of the Standards, called SOC8, issued in September 2022 and comprises "clinical guidelines written to promote informed, doctor-patient decision making" and to "meet the individualized healthcare needs of transgender and gender[-]diverse individuals globally." Compl., ¶ 46; see ECF No. 3-4 (Asa Radix Decl.), ¶¶ 8–9. Like all WPATH's work, SOC-8 is predicated on the view that people may have "gender identities or expressions that differ from the gender socially attributed to the sex assigned to them at birth." ECF No. 32-1 (SOC8) at 55; see Lewis Decl., ¶ 18.

Casting itself in opposition to "ideologues" who would "eradicate the biological reality of sex," the Trump Administration has declared that there are only "two sexes, male and female," which are "not changeable." Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, Exec. Order No. 14168, 90 Fed. Reg. 8615, 8615 (Jan. 30, 2025); see also Protecting Children from Chemical and Surgical Mutilation, Exec. Order No. 14187, 90 Fed. Reg. 8771, 8771 (Feb. 3, 2025) (decrying "dangerous trend" of medical treatments premised on "radical and false claim that adults can change a child's sex through a series of irreversible medical interventions"). The President has directed federal agencies to end "funding of gender ideology" and to "protect[] sex-based distinctions." 90 Fed. Reg. at 8616. He further directed the Department of Health and Human Services to produce a

report on medical treatments for transgender individuals, see 90 Fed. Reg. at 8616, which identified WPATH by name more than 250 times and dedicated a chapter to criticizing SOC8's "lack of trustworthiness." Dep't Health & Hum. Servs., Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices 157 (Nov. 19, 2025), https://perma.cc/4SLN-C434. The President also has singled out WPATH as an organization that "lacks scientific integrity" and "spur[s]" "blatant harm done to children." 90 Fed. Reg. at 8771.

Following his lead, the FTC, too, trained its sights on WPATH. The agency's mandate is to "prevent persons, partnerships, or corporations" from employing "unfair or deceptive acts or practices in or affecting commerce" that harm competitors or consumers. See 15 U.S.C. § 45(a)(2). Evidently viewing this mandate as a useful tool to "[f]ight back against the trans agenda," the current Chairman appointed by President Trump pledged to "[i]nvestigate the doctors, therapists, hospitals, and others who deceptively pushed gender confusion, puberty blockers, hormone replacement, and sex-change surgeries on children and adults while failing to disclose strong evidence that such interventions are not helpful and carry enormous risks." Compl., ¶ 91 (citation omitted). In July 2025, the FTC held a workshop on "The Dangers of 'Gender-Affirming Care' for Minors," at which participants "raised concerns about the caliber of medical evidence used to inform gender-affirming care" and specifically named WPATH, while others "denounce[d] the very existence of 'being transgender' as an 'untrue claim[]' worthy of rejection." Endocrine Soc'y, 832 F. Supp. 3d at 6–7; see Compl., ¶¶ 96–112. One participant mused that "just the act of conducting thorough investigations" of groups like WPATH "in the course of pursuing a prosecution" would be "helpful" insofar as such groups would "start losing members" and "revenue streams"; she was later hired by the FTC to lead just that sort of investigation. See Compl., ¶¶ 107–08. The FTC followed up the workshop with a public call for

comments to "evaluate whether consumers (in particular, minors) have been harmed . . . and whether medical professionals or others may have violated . . . the FTC Act by failing to disclose material risks associated with [gender-affirming care] or making false or unsubstantiated claims about the benefits or effectiveness" of such care. See ECF No. 3-31 (FTC Request for Comment) at ECF p. 5.

In January 2026, the FTC issued a Civil Investigative Demand to WPATH. See Compl., ¶ 113; see also 15 U.S.C. § 57b-1(c)(1); 16 C.F.R. § 2.7. The CID sought to determine whether WPATH "ha[d] made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of Pediatric Gender Dysphoria Treatment," and it demanded a tranche of documents reflecting internal and external communications from the recipients. See ECF No. 3-8 (CID) at ECF p. 4. The demand for documents encompassed a "vast swath of academic or research discussion in which WPATH engages." WPATH I, 2026 WL 1257321, at *3. Rather than turn over those sensitive materials, WPATH filed the instant suit to block the CID's enforcement.

Similar suits were filed by two other organizations — the Endocrine Society and the American Academy of Pediatrics — that had received similar CIDs targeting their own related work in support of gender-affirming care. See Endocrine Soc'y v. FTC, No. 26-512 (D.D.C. filed Feb. 17, 2026); Am. Acad. of Pediatrics v. FTC, No. 26-508 (D.D.C. filed Feb. 17, 2026).

B. Litigation History

WPATH's Complaint included three claims under the First Amendment for retaliation, viewpoint discrimination, and infringement of the rights to speech and association, as well as a claim under both the First and Fourth Amendments for improper investigation. See Compl., ¶¶ 132 (Count I), 139 (Count II), 146–47 (Count III), 151–52 (Count IV). It sought declarations

to the effect that the FTC's investigation of WPATH was unconstitutional and in excess of its statutory jurisdiction, and injunctive relief barring the Commission "from taking further or continuing action to hinder, interfere with, intimidate, or restrain WPATH's exercise of its constitutional rights, including enforcing the CID." Id. at 44 (prayer for relief).

A week after filing suit, WPATH moved for a preliminary injunction against the FTC's "implementing or enforcing" the CID or "taking further unlawful action interfering with or retaliating against WPATH's exercise of its First Amendment rights." ECF No. 3-39 (Proposed PI Order) at 1–2; see ECF No. 3-1 (PI Mot.) at 22 (identifying "FTC's investigation and CID" as "adverse action" to be enjoined). The Court granted the PI in part, holding that WPATH was likely to succeed on its First Amendment retaliation claim. See WPATH I, 2026 WL 1257321, at *2–4. That claim turned on whether a "retaliatory motive was a but-for cause of the FTC's action." Id. at *3. The Court identified abundant "circumstantial evidence of animus towards WPATH," and it discounted the FTC's "attempted demonstration of a legitimate [investigative] purpose" since the Commission had "failed to offer a logical justification connecting WPATH to commercial representations" or "supposed violators" within its jurisdiction. Id. at *3–4. Given that an injunction was otherwise warranted to prevent the likely violation of WPATH's constitutional rights, the Court granted its motion "to preliminarily enjoin operation of the CID," but denied the "request to issue a broader injunction barring the FTC from 'taking further unlawful action interfering with or retaliating against WPATH.'" Id. at *5 (quoting PI Mot. at 39) (alteration adopted). As a result, WPATH never produced any information responsive to the CID. See ECF No. 61 (MTD) at 5.

Stymied in its efforts to compel information from WPATH itself, the FTC continued its investigation by alternate means. See ECF No. 64 (Opp.) at 9. The agency issued additional

CIDs to health insurers who had referenced SOC8 in their policies. Id. It also obtained information from participants in the July 2025 workshop, from responses to its public call for comments, from WPATH's website and public materials, and from "other enforcement actions and private lawsuits involving WPATH." ECF No. 53 (Defs. TRO Opp.) at 6; see MTD at 5.

These steps culminated two months later in an enforcement action that the FTC, along with several states, filed against WPATH. Instead of staying in this forum, however, the Commission filed elsewhere — that is, in the Northern District of Texas. See FTC v. World Pro. Ass'n of Transgender Health (FTC Enf't Action), No. 26-748 (N.D. Tex. filed June 17, 2026); see generally ECF No. 47-7 (Texas Compl.). The basic premise of that enforcement action is that WPATH has violated the FTC Act's "provisions against false advertising of drugs." MTD at 8. The agency claims enforcement jurisdiction over WPATH because it has operated "for the profit of its members by promoting the medical transition services that its members provide to children." Texas Compl., ¶ 6. The complaint alleges in substance that WPATH has misrepresented to physicians and consumers the strength of medical evidence and consensus underlying its Standards of Care. Id., ¶¶ 1, 6–26; see also 15 U.S.C. §§ 45(a), 52. It seeks an injunction against the challenged conduct under the FTC Act and civil monetary penalties under state consumer-protection laws. See Texas Compl., ¶¶ 409–54; id. at 118 (prayer).

The same day that it filed the Texas enforcement action, the FTC formally withdrew the CID that this Court had preliminarily enjoined. See ECF Nos. 43 (CID Withdrawal Not.); 43-1 (CID Withdrawal Ltr.). Because its investigation had "culminated in a complaint against WPATH," the FTC "no longer regard[ed] compliance with the CID . . . as necessary." CID Withdrawal Not. at 1; see also CID Withdrawal Ltr. at 1. The Commission also withdrew the CIDs issued to the Endocrine Society and the American Academy of Pediatrics, citing the

enforcement action against WPATH, though it did not pursue separate actions against those organizations. See Endocrine Soc'y, No. 26-512, ECF No. 40 (D.D.C. June 22, 2026); Am. Acad. of Pediatrics, No. 26-508, ECF No. 40 (D.D.C. June 22, 2026). The corresponding suits have since been voluntarily dismissed without prejudice. See Minute Order, Endocrine Soc'y, No. 26-512 (D.D.C. Sep. 17, 2026); Minute Order, Am. Acad. of Pediatrics, No. 26-508 (D.D.C. Aug. 24, 2026).

Finding itself alone in the FTC's crosshairs, WPATH promptly returned to this Court for an order blocking the Texas enforcement action. It contended that the FTC was attempting to "evade" this Court's "jurisdiction" and to effect an "end-run around this Court's preliminary injunction by initiating duplicative litigation in another district." ECF No. 45-1 (TRO Mot.) at 2. The Court denied that motion, however, because WPATH had not shown it was entitled to the "extraordinary remedy" of an order blocking the FTC's enforcement action in another forum. World Pro. Ass'n for Transgender Health v. FTC (WPATH II), 2026 WL 1999008, at *1 (D.D.C. July 10, 2026). The Texas action was "not an attempt to enforce the CID, which the FTC ha[d] withdrawn." Id. at *2. And since the Court's PI Order was "confined to the CID," the Texas litigation did not impinge upon its jurisdiction over the PI, leaving WPATH without any viable basis for an anti-suit injunction. Id. at *2–3. Although WPATH sought to argue that "being subject to a suit in the Northern District of Texas is itself a violation of WPATH's First Amendment rights," the Court held that it could not "hinge" that "argument" on the Court's PI decision because "that holding extended only to the facts before" the Court at the time: "the lack of justification for the sweeping CID." Id. at *2. The Court had not been "prepared" when it issued its PI "to prejudge every permutation of the FTC's future actions as unconstitutionally

retaliatory, and its role [was] not to do so now" that the investigation into WPATH had progressed to a different stage. Id.

As the Texas enforcement action has continued apace, Defendants now seek to tie up loose ends by obtaining dismissal of this action under Federal Rule of Civil Procedure 12(b)(1). See MTD at 9 (raising failure to state claim under Rule 12(b)(6) as alternative ground for dismissal).

## II. Legal Standard

"A Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of the Fraternal Ord. of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). "For this reason, 'the plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Id. at 13–14 (quoting 5A Wright & Miller's Federal Practice & Procedure § 1350 (2d ed. 1987)) (cleaned up). Unlike under Rule 12(b)(6), the court "may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant," but instead "must go beyond the pleadings [to] resolve any disputed issues of fact" necessary to determine the existence of subject-matter jurisdiction. Feldman v. Fed. Deposit Ins. Corp., 879 F.3d 347, 351 (D.C. Cir. 2018) (citations omitted); see also Jerome Stevens Pharms., Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253 (D.C. Cir. 2005). At the same time, the court must assume that the plaintiff will succeed on the merits of his claims. See In re Navy Chaplaincy, 534 F.3d 756, 760 (D.C. Cir. 2008); see also Settles v. U.S. Parole Comm'n, 429 F.3d 1098, 1107 (D.C. Cir. 2005) ("[T]he plaintiff is protected from an evidentiary attack on his asserted [merits] theory by the defendant.") (citation omitted). Looking to that expanded record, and assuming success on the

merits, the court ultimately must determine whether the plaintiff has presented a "sound legal theory" that establishes its jurisdiction over his claims. Reid v. Hurwitz, 920 F.3d 828, 835 (D.C. Cir. 2019).

## III. Analysis

Defendants submit that this Court lacks ongoing subject-matter jurisdiction over WPATH's claims because the withdrawal of the CID and concomitant initiation of enforcement proceedings renders them moot. See MTD at 10–22. WPATH responds that those developments cannot moot the case because they represent "simply the next steps in the same unconstitutional course of conduct alleged in the [C]omplaint," and that at any rate this case would fall within an exception to mootness because the challenged conduct was voluntarily ceased once litigation began and has a substantial probability of recurring while evading review. See Opp. at 12–13. The Court first addresses mootness proper before turning to the exceptions to the doctrine.

### A. Mootness

Mootness arises when a case has "lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law." Diffenderfer v. Cent. Baptist Church of Miami, Fla., Inc., 404 U.S. 412, 414 (1972) (citation omitted). "Even where litigation poses a live controversy when filed, the doctrine requires a federal court to refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." Clarke v. United States, 915 F.2d 699, 701 (D.C. Cir. 1990) (*en banc*) (quotation marks and citation omitted); see Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477–78 (1990). Like with the "related" concept of standing, then, mootness "go[es] to the plaintiff's injury" and the court's ability to redress it. Reid, 920 F.3d at 833; see also Arizonans for Off. Eng. v. Arizona,

520 U.S. 43, 68 n.22 (1997) (describing mootness as "the doctrine of standing set in a time frame") (cleaned up and citations omitted). That inquiry must be satisfied for each "cause[] of action identified in the complaint." Akiachak Native Cmty. v. U.S. Dep't of Interior, 827 F.3d 100, 105 (D.C. Cir. 2016); see, e.g., Powell v. McCormack, 395 U.S. 486, 496–97 (1969).

Given these general principles, assessing mootness involves two steps: first, defining the scope of the controversy in terms of the injuries that initially gave the plaintiff standing; and second, determining whether a court can still grant any relief that redresses those injuries. The Court takes them in turn.

1. *Scope of Controversy*

"In order to assess mootness, we must first define the wrong alleged in the complaint in terms of the precise controversy it spawns." Maldonado v. District of Columbia, 61 F.4th 1004, 1006 (D.C. Cir. 2023) (quotation marks and citation omitted). That inquiry focuses on the complaint's "theory of injury," which encompasses the legal rights that a plaintiff asserts and the conduct that it alleges has violated them. Reid, 920 F.3d at 833 (quoting Haase v. Sessions, 835 F.2d 902, 907 (D.C. Cir. 1987)).

All the claims that WPATH continues to press arise under the First Amendment. Although its Complaint also asserted that the FTC's "improper investigation" violated the Fourth Amendment, see Compl. at 43 (Count IV), WPATH now "accepts" that such a claim is "not ripe" because "the FTC has not acted to enforce the CID." Opp. at 32 n.1 (requesting that Court "dismiss the part of Count IV resting on the Fourth Amendment without prejudice"). That leaves only claims rooted in First Amendment retaliation, viewpoint discrimination, and the rights of speech and association. See Compl., ¶¶ 131–49 (Counts I–III); see also id., ¶ 152 (grounding Count IV in same First Amendment interests against compelled disclosure of membership and

chilled speech). The Court based its PI Order on the retaliation claim alone and has not yet addressed the others on the merits. See WPATH I, 2026 WL 1257321, at *2. For present purposes, it assumes that WPATH will prevail across the board. See Almaqrami v. Pompeo, 933 F.3d 774, 779 (D.C. Cir. 2019).

As for the conduct that Plaintiff alleged violated its First Amendment rights, the parties advance divergent readings of the Complaint. Compare, e.g., MTD at 6 (construing Complaint as "entirely focused on the CID"), with Opp. at 16 (construing it as focused on FTC's "entire investigation" of WPATH). WPATH offers the more credible reading because the Complaint routinely references a broader "investigation" beyond the CID. See, e.g., Compl., ¶¶ 132, 139, 146. But that is ultimately beside the point. The broader investigation was apparently composed of steps such as issuing memoranda on purported violations of the FTC Act, holding a conference on the topic, and calling for public comments. See id., ¶¶ 92–93, 96, 102, 111. The Complaint does not explain, however, how those steps separately injured WPATH, as would be needed to present a justiciable controversy extending beyond the CID. Cf. id., ¶ 112 (asserting only that workshop and call for comments revealed "that the FTC has accepted and continued the Administration's reliance on pseudoscience and ideology, rather than well-established and science-based research and guidance on healthcare for transgender individuals"); id. at 34 (beginning section of Complaint entitled "FTC Targets WPATH with Investigation" by discussing issuance of CID). The "theory of injury" underlying each of WPATH's claims instead depends exclusively on the issuance of the CID. Reid, 920 F.3d at 833 (quoting Haase, 835 F.2d at 907).

Start with the retaliation claim. Under Circuit precedent, plaintiffs "clearly have standing" when they allege that they are "the targeted victims of a campaign of retaliation" — but

only if they explain how the retaliation imposes "concrete and present harm." Media Matters for Am. v. Paxton, 138 F.4th 563, 579–80, 581 (D.C. Cir. 2025); cf. Nat'l Rifle Ass'n of Am. v. Vullo, 602 U.S. 175, 183–85 (2024) (grounding First Amendment claim in concrete adverse actions caused by official's attempts to suppress disfavored speech); First Choice Women's Res. Ctrs., Inc. v. Davenport, 608 U.S. 174, 198–99 (2026) (same). Here, the only concrete harms that Plaintiff identified as underlying its retaliation claim derive from the "issuance of the CID and the resulting requirements that WPATH hire counsel to defend itself" and "expend its limited resources preparing for potential disclosures of information," as well as the resulting "chilling effect of impending disclosures and legal action." Compl., ¶ 137. The Complaint thus does not establish WPATH's standing to challenge, as unconstitutionally retaliatory, any aspects of the investigation beyond the CID.

Similar analysis applies to WPATH's other First Amendment claims. Its viewpoint-discrimination claim is predicated upon the fact that the "CID is content-based on its face," id., ¶ 139, and the Complaint identifies no other aspect of the "FTC's investigation" beyond its use of "compulsory process" — *i.e.*, the CID — that chilled or suppressed its viewpoint. Id., ¶¶ 141. The remaining claims are also grounded in a "chilling effect" theory of injury. Id., ¶ 149 (quoting Perry v. Schwarzenegger, 591 F.3d 1147, 1160 (9th Cir. 2010)); see id., ¶¶ 147, 152. Yet the Complaint notably does not claim that the pre-CID investigative steps themselves produced such an effect or explain how they could have done so. See, e.g., id., ¶ 126 (alleging only that "the CID has chilled WPATH's speech and association"); id., ¶ 129 (same); id., ¶ 134 (same). On the contrary, the record developed by WPATH at the PI stage reflected that it was previously "aware" of the FTC's "investigation into transgender healthcare" but did not modify its activities — for example, by deciding to "pause offering certain educational programs" —

until "[a]fter receiving the CID." Lewis Decl., ¶¶ 21, 23; see also Radix Decl., ¶¶ 20–25 (attributing chilling effect to risk of disclosures produced by CID); ECF No. 3-5 (Loren Schechter Decl.), ¶¶ 17–18 (same); ECF No. 3-6 (Scott Leibowitz Decl.), ¶¶ 38–39 (same); cf. Settles v. U.S. Parole Comm'n, 429 F.3d 1098, 1107 (D.C. Cir. 2005) (stating that court may "consider[] facts developed in the record beyond the complaint" to assess standing).

Because WPATH's claimed First Amendment injuries trace exclusively to the CID, it has standing to seek redress only against that action. It matters not that the Complaint sought broader relief against the FTC's "taking further or continuing action to hinder, interfere with, intimidate, or restrain WPATH's exercise of its constitutional rights" — "including," but not limited to, "enforcing the CID." Compl. at 44 (prayer). A plaintiff's standing is defined by her injuries, not by the relief she requests. See Gill v. Whitford, 585 U.S. 48, 73 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."). The Complaint fails to offer even "general factual allegations of injury" caused by any aspect of the investigation before the issuance of the CID. Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992). The "justiciable controversy" before the Court thus does not extend so far. See MTD at 13 (citing Maldonado, 61 F.4th at 1006).

Attempting to preserve its right to broader relief, Plaintiff frames the relevant controversy much more abstractly. It refers to the FTC's entire "unconstitutional course of conduct alleged in the Complaint," all its "retaliatory actions" and "violations of [WPATH's] First Amendment rights," its use of "its power to punish and suppress WPATH's protected speech," and even the totality of its "actions aimed at WPATH." Opp. at 12–14. Those characterizations, however, confuse a legal right or violation thereof with the sort of "concrete and particularized" injury that defines the scope of a plaintiff's standing. Lujan, 504 U.S. at 560; see, e.g., Opp. at 14 (equating

WPATH's "injuries" with alleged legal violations). A plaintiff who invokes a court's jurisdiction to redress a specific injury cannot keep its case alive by abstracting to a much broader violation of its rights; mootness must turn on the "precise controversy" adumbrated in the complaint. Maldonado, 61 F.4th at 1006 (citation omitted); see also Clarke, 915 F.2d at 703 ("[W]here plaintiffs are resisting a mootness claim[,] we think they must be estopped to assert a broader notion of their injury than the one on which they originally sought relief."); Conyers v. Reagan, 765 F.2d 1124, 1127 (D.C. Cir. 1985) (similar). The question here is not generally whether the "FTC is still punishing WPATH for its protected speech," Opp. at 16, but instead whether that punishment continues to take the form that WPATH challenged in this lawsuit — namely, the CID.

In this vein, Plaintiff cannot cast the Texas enforcement action as part of the same controversy as its claims against the CID. See Opp. at 18–20, 22–23. The Complaint mentions the possibility of an enforcement action only in passing and in terms making clear that the prospect of such an action remained speculative when the Complaint was filed. See Compl., ¶ 141 ("Defendants, and the CID, additionally indicate that the FTC could conduct an enforcement action against WPATH as a result of its investigation."). WPATH would have had standing to challenge only an enforcement action that was "certainly impending" or had a "substantial risk" of being brought when this suit commenced. Hemp Indus. Ass'n v. DEA, 36 F.4th 278, 290 (D.C. Cir. 2022) (citation omitted); see also Media Matters, 138 F.4th at 581–82. The Complaint did not allege as much. Alleging that WPATH was subject to an investigation — even a bad-faith one — did not suffice because the FTC ultimately retained "enforcement discretion" and WPATH provided no basis to infer that the agency's retaliatory campaign would necessarily progress to the enforcement stage. Hemp Indus. Ass'n, 36 F.4th at 291; cf.

Endocrine Soc'y, 832 F. Supp. 3d at 11 (noting plaintiff's argument that FTC would have had "no incentive to initiate an enforcement action" if it believed it had "achieved the very outcome it wanted — less objectionable speech by the [plaintiff] — simply by issuing the CID"). Had an enforcement action obviously loomed when the Complaint was filed, WPATH surely would have said so more directly.

The Court thus concludes, as it did at earlier stages of this litigation, that the only justiciable controversy before it concerns the CID. See WPATH I, 2026 WL 1257321, at *5; WPATH II, 2026 WL 1999008, at *2. And, so defined, that controversy plainly has been overtaken by events. See FBI v. Fikre, 601 U.S. 234, 240–41 (2024). The FTC has withdrawn the CID and disclaimed any future intent to enforce it. See CID Withdrawal Not. at 1; MTD at 11 (reiterating that FTC "has no plans to try to enforce" withdrawn CID or to "obtain information pursuant to" it) (quoting ECF No. 53 (TRO Opp.) at 27, 32). The only question is whether this Court can still grant any meaningful relief relative to the CID despite the fact that it has been withdrawn.

2. *Effectual Relief*

A case "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." Chafin v. Chafin, 568 U.S. 165, 172 (2013) (citation omitted); see Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992). A court is not limited to the "precise relief sought" in the complaint; it matters only whether there is relief "within the court's power" to grant that would benefit the plaintiff with respect to his alleged harms. Ctr. for Food Safety v. Salazar, 900 F. Supp. 2d 1, 6 (D.D.C. 2012) (citations omitted). And "even the availability of a 'partial remedy' is 'sufficient to prevent a case from being moot.'" Calderon v. Moore, 518 U.S. 149, 150 (1996) (quoting Church of Scientology, 506 U.S. at 13) (cleaned up).

At the same time, courts do not have the power to award speculative relief, so the mere fact that a plaintiff can spin out "some circumstances under which a decision on the merits . . . might conceivably affect [his] substantive rights" cannot forestall mootness. Bd. of License Comm'rs v. Pastore, 469 U.S. 238, 240 (1985); see Church of Scientology, 506 U.S. at 134 n.6 (case cannot be saved from mootness by relief that would itself amount to mere "advisory opinion"); Spencer v. Kemna, 523 U.S. 1, 7 (1998) (similar). A party's ongoing interest in the litigation may be "small," but it must be "concrete." Knox v. Serv. Emps. Int'l Union, Loc. 1000, 567 U.S. 298, 307–08 (2012) (citation omitted). In sum, "effectual" relief is relief that a plaintiff could have obtained at the outset of the case and that retains some concrete benefit to him when the case is decided.

The Court separately applies these standards to the three categories of relief that WPATH posits could still be awarded in this case: injunctive relief, declaratory relief tethered to its First Amendment rights, and declaratory relief related to the FTC's statutory authority. See Opp. at 17–23.

a. Injunctive Relief

Even in light of the forgiving legal standards just outlined, any claim for injunctive relief is clearly moot. See Compl. at 44 (prayer). "Where the activities sought to be enjoined have already occurred, and the . . . courts cannot undo what has already been done, the action is moot." Headwaters, Inc. v. Bureau of Land Mgmt., 893 F.2d 1012, 1015 (9th Cir. 1989) (citation omitted). A request to enjoin a statute, regulation, or agency policy, for example, becomes "classically moot" when the object of the challenge has been repealed or superseded. Akiachak, 827 F.3d at 106; see also Clean Fuels All. Am. v. EPA, 169 F.4th 307, 311 (D.C. Cir. 2026) ("Typically, when one agency action has been superseded by a subsequent one, a

challenge to the original action is plainly moot.") (quotation marks and citation omitted); Samma v. U.S. Dep't of Def., 136 F.4th 1108, 1114 (D.C. Cir. 2025) (similar). Courts accordingly have held that no live controversy exists after a challenged subpoena is withdrawn and the issuing body disclaims future enforcement. See, e.g., Kupperman v. U.S. House of Representatives, 436 F. Supp. 3d 186, 191 (D.D.C. 2019); Senate Permanent Subcomm. on Investigations v. Ferrer, 856 F.3d 1080, 1085 (D.C. Cir. 2017). That principle applies equally to a CID, which like a subpoena is a specific request for information that has "no operative force" once withdrawn. J.T. v. District of Columbia, 983 F.3d 516, 522 (D.C. Cir. 2020).

WPATH cannot distinguish this precedent. It suggests that none of the withdrawn-subpoena cases "involved a First Amendment challenge to an agency's entire investigation." See Opp. at 22. Yet the same result would follow even if the Court accepted WPATH's broader theory of injury, since a court cannot "enjoin an investigation that has now concluded." Exxon Mobil Corp. v. Healey, 28 F.4th 383, 392 (2d Cir. 2022); see also Agora, Inc. v. Commodity Futures Trading Comm'n., 48 F. App'x 470, 471 (4th Cir. 2002) (First Amendment challenge to investigation became "moot following that investigation's termination"). WPATH also gestures at several other facts that it says, "taken together," supply a distinction: the prior cases did not "confront an agency's withdrawal of an allegedly retaliatory request for information only after it had initiated a substantially similar enforcement action that the claimant had challenged as falling outside the agency's jurisdiction." Opp. at 22. The argument appears to be that withdrawal of the CID did not moot WPATH's challenge because it extends to the enforcement action itself, a contention that the Court has already rejected. See *supra* Part III.A.1.

WPATH also contends that, although the CID has been withdrawn, its effects linger and can still be redressed. See Opp. at 21–23. True, a case generally is not moot when "the effects

of the alleged violation persist." Zukerman v. U.S. Postal Serv., 961 F.3d 431, 443 (D.C. Cir. 2020); see Clarke, 915 F.2d at 701. For example, in Church of Scientology of California, the Supreme Court declined to find privacy claims moot after a federal agency obtained the records that plaintiffs had sought to protect from disclosure because a court could "effectuate a partial remedy by ordering the Government to destroy or return any and all copies it may have in its possession." 506 U.S. at 13. Here, however, WPATH never handed over any materials that could be returned or destroyed. See ECF No. 65 (Reply) at 4. It therefore must venture beyond established principles, positing that this case remains live because the Court "could order the FTC to return any information obtained pursuant to its unconstitutional investigation . . . from third parties," such as the "medical insurance companies" that relied on SOC8 to which the agency also issued CIDs. See Opp. at 20–21.

Yet WPATH has not established that such an order would provide it with effectual relief in this case. Any injuries that WPATH continues to suffer from the FTC's issuance of CIDs to third parties are distinct from the injuries caused by the specific CID that was issued to WPATH and then withdrawn — *i.e.*, from the injuries that define the scope of the present controversy and that must remain redressable to forestall mootness. Cf. Exxon, 28 F.4th at 394 (rejecting plaintiff's "belated proposals of alternative forms of injunctive relief" as "speculative and not sufficiently tied to an ongoing injury" from concluded investigation that plaintiff had originally challenged). It remains unclear, therefore, how relief targeted at disclosures made by third parties pursuant to distinct demands for information could "redress the chilling effect" caused by the challenged CID itself. See Opp. at 21; see also Reply at 11. If Plaintiff means that an order regarding third parties' information could instead redress its injuries caused by the enforcement action — *e.g.*, by depriving the FTC of evidence to use against it in that action — it lacks

standing to seek such relief in this action. See *supra* Part III.A.1. Indeed, to the extent any lingering chill from the withdrawn CID is "held in place by" the enforcement action, it is not redressable here. See Coal. for Humane Immigrant Rts. v. Mullin, 185 F.4th 1275, 1282 (D.C. Cir. 2026) (citation omitted). The Court simply cannot grant any effectual injunctive relief *vis-à-vis* the CID now that it has been withdrawn.

WPATH also invokes the possibility that the FTC could reissue a similar CID in the future or pursue other unspecified "options to restrain or chill WPATH's exercise of its First Amendment rights." See Opp. at 20–21. Although that possibility of recurrence may bear upon the application of an exception to mootness, see *infra* Part III.B, it does not suffice to preserve a live controversy in the first instance. The prospect of a repeat CID — much less of other unspecified constitutional violations — remains entirely speculative: there is no "real and immediate threat of repeated injury." N.B. *ex rel.* Peacock v. District of Columbia, 682 F.3d 77, 84 (D.C. Cir. 2012) (citation omitted). WPATH believes otherwise, positing that further steps to investigate it are essentially assured, especially "[i]f the Texas [a]ction is dismissed." See Opp. at 27–28. In fact, whether the FTC might take such steps turns on myriad contingencies, including not only whether the enforcement action is dismissed but also whether the grounds for dismissal leave room for further investigation. The FTC doubtless has displayed an interest in targeting WPATH. But federal-court jurisdiction cannot rest on the axiom, "where there's a will, there's a way." Even when it appears "likely" that an agency "may pursue a new enforcement" action against a given target, that is "not enough to give rise to a live dispute" if the possibility remains hypothetical. Am. Bar Ass'n v. FTC, 636 F.3d 641, 647 (D.C. Cir. 2011); see also Off. of Thrift Supervision Dep't of Treasury v. Dobbs, 931 F.2d 956, 958 (D.C. Cir. 1991) (holding that possibility of "future attempts to enforce [a] subpoena" that "may not even occur" was

"insufficient to create a concrete present controversy"). WPATH cannot challenge, and this Court cannot enjoin, future violations of its rights in the abstract.

b. Declaratory Relief: First Amendment

WPATH also contends that it can obtain meaningful relief in the form of a declaration that the withdrawn CID violated its First Amendment rights. See Opp. at 17. Yet a declaratory judgment is little more than an "advisory opinion," which cannot preserve a live controversy, unless it "affects the behavior of the defendant towards the plaintiff" on a prospective basis. Hewitt v. Helms, 482 U.S. 755, 761–62 (1987) (emphasis omitted); see California v. Texas, 593 U.S. 659, 672 (2021). Such a judgment may, for instance, serve as the "basis for issuance of a later injunction" or it may have "res judicata effect in later actions." Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv., 64 F.4th 1354, 1366–67 (D.C. Cir. 2023); see 10B Wright & Miller's Federal Practice and Procedure § 2757 (4th ed. Apr. 2026 update). In any event, the judgment's prospective effect cannot "rest on . . . distant contingencies": if the "threat of governmental action" is several "steps removed from reality" — *i.e.*, if its recurrence is "remote and speculative" — then the case is moot regardless of a request for declaratory relief. Super Tire Eng'g Co. v. McCorkle, 416 U.S. 115, 123 (1974).

Those principles doom WPATH's arguments that a declaratory judgment could insulate it from future actions by the FTC. See Opp. at 18; see also id. at 12 (positing "future retaliatory actions the FTC might take elsewhere"). Where, as here, a plaintiff "merely attacks an isolated agency action, then the mooting of the specific claim moots any claim for a declaratory judgment that the specific action was unlawful." J.T., 983 F.3d at 522 (quoting City of Houston v. HUD, 24 F.3d 1421, 1429 (D.C. Cir. 1994)). Since the lawfulness of any future action would have to be assessed on its own terms, a declaration as to the lawfulness of a past action necessarily

provides limited prospective benefit. For example, a declaration that the withdrawn CID was unconstitutionally retaliatory could not displace the fact-specific inquiry that would apply to the assessment of the FTC's motive for issuing a future CID. See Hartman v. Moore, 547 U.S. 250, 256 (2006). The Court "cannot speculate on the form and content of some uncertain future policy to render an advisory opinion as to the lawfulness of" it; that is "precisely the scenario that the mootness doctrine is intended to avoid." Samma, 136 F.4th at 1114; see also City of Houston, 24 F.3d at 1429 & n.6. And even a more general declaration — for instance, that the withdrawn CID had impinged upon WPATH's constitutionally protected speech and advocacy, see Opp. at 19 — could have prospective effect only if the same activities were targeted again in the future, which at least would require that the enforcement action be dismissed on grounds that permitted further investigation. At this point, the resumption of an FTC investigation into the very same activities that are subject to the ongoing enforcement action remains several "steps removed from reality." Super Tire, 416 U.S. at 123.

Nor can a declaration, any more than an injunction, redress an ongoing injury here. WPATH again points to chilling effects caused by the withdrawn CID. See Opp. at 18. To the extent that the asserted injury amounts to a persistent perception among WPATH's members and associates that it is subject to official disfavor, such "moral stigma," disconnected from any concrete official action that "affects legal rights," does not make for a live case or controversy. Spencer, 523 U.S. at 8–9 (quoting St. Pierre v. United States, 319 U.S. 41, 43 (1943)); cf. Compl., ¶ 134 (alleging that issuance of CID "had an immediate, irreparable chilling effect on WPATH's speech, associations, and right to petition") (emphasis added). Indeed, WPATH lays bare the absence of an appropriate remedy by suggesting that a declaratory judgment would benefit it as a "signal" that the CID and "similar future actions" are unlawful. See Opp. at 18.

Such language smacks of an advisory opinion. See Reply at 9. The Court cannot simply declare — because it cannot know — that the First Amendment immunizes WPATH from hypothetical future actions by the FTC.

Apart from future actions that the FTC might take, WPATH also points to the ongoing enforcement action, contending that a declaratory judgment would have preclusive effect there. See Opp. at 19. It is true that if a declaratory judgment "may . . . prove useful" in pursuing a "viable and unquestionably live" claim in parallel litigation, that possibility can "defeat[] any mootness argument." Crowley Gov't Servs., Inc. v. Gen. Servs. Admin., 143 F.4th 518, 527 (D.C. Cir. 2025). The judgment must, however, be "at least 'likely'" to confer a "tangible benefit" in the other case, beyond merely providing legal analysis that might persuade another court to rule in the party's favor. Wells v. Johnson, 150 F.4th 289, 302 (4th Cir. 2025) (cleaned up); cf. Haaland v. Brackeen, 599 U.S. 255, 294 (2023) ("[A] judgment's possible, indirect benefit in a future lawsuit does not preserve standing.") (quotation marks and citation omitted). WPATH's passing gesture at claims for money damages that it might bring against the Texas case's state plaintiffs in some hypothetical future action therefore cannot forestall mootness here. See Opp. at 19.

It is a somewhat closer question whether a declaratory judgment issued by this Court might confer a tangible benefit upon WPATH in obtaining dismissal of the Texas action itself. To be sure, a declaration that the withdrawn CID *per se* violated the First Amendment would not provide a tangible benefit in the Texas action because that action does not seek to enforce the CID (since it has been withdrawn) nor rely on materials disclosed pursuant to it (since none were). And this Court cannot declare the Texas enforcement action itself unconstitutional under the First Amendment because WPATH lacks standing to obtain that relief here. See *supra* Part

III.A.1. Left on the table is a declaration that the activities targeted by the CID were protected under the First Amendment. See Opp. at 17, 19. WPATH had standing to seek that relief, which could have helped it to obtain an injunction against the CID's ultimate enforcement. It is theoretically possible, moreover, that such a declaration also could help in obtaining a dismissal of the Texas action. If the target of a civil-enforcement action raises the First Amendment as an affirmative defense, see Branch Ministries v. Rossotti, 211 F.3d 137, 144 (D.C. Cir. 2000); Izen v. Catalina, 398 F.3d 363, 367–68 & n.5 (5th Cir. 2005), it presumably must show that the action was brought in retaliation for or motivated by opposition to activities that are constitutionally protected. Cf. FTC Enf't Action, No. 26-748, ECF No. 85 (WPATH Texas MTD) at 28–35 (N.D. Tex. Sep. 8, 2026) (seeking dismissal of Texas action on ground, *inter alia*, that it seeks to suppress WPATH's viewpoint and protected speech). Such a showing is generally related to the issues raised by WPATH's challenge to the CID.

That kind of general relationship, however, cannot save this case from mootness. The benefit that WPATH would obtain in the Texas action from any declaration it can seek here remains no more than speculative. Most fundamentally, a declaration here would be relevant there only to the extent that the CID and the enforcement action targeted the same types of activities. WPATH asserts that both have the same scope, see TRO Mot. at 2, 13, which is critical because "issue preclusion does not apply where issues are only similar, but not identical." Athridge v. Aetna Cas. & Sur. Co., 604 F.3d 625, 634 (D.C. Cir. 2010); see Montgomery v. IRS, 40 F.4th 702, 709 (D.C. Cir. 2022); see also Restatement (Second) of Judgments § 33 (Am. L. Inst. 1982) ("A [declaratory] judgment . . . is conclusive in a subsequent action between [the parties] as to the matters declared, and . . . as to any issues actually litigated by them and determined in the action."). The Court cannot simply take WPATH's assertion of overlap for

granted, however, if its "pleadings are insufficient to determine" the extent to which it would benefit from the relief it seeks. Powell, 395 U.S. at 499. And its pleadings are necessarily insufficient in that regard because they all have focused on the scope, breadth, and basis of the FTC's purported investigation into WPATH rather than on the agency's subsequent enforcement action.

At any rate, going beyond the pleadings does not resolve, and in fact compounds, the uncertainty concerning the efficacy of WPATH's requested declaratory relief. Translating allegations about the CID into conclusions about the enforcement action entails a significant level-of-generality problem. The CID was scattershot, targeting nearly all Plaintiff's research and advocacy activities. WPATH I, 2026 WL 1257321, at *3. The enforcement action is more focused, homing in on specific statements and practices, largely concerning the drafting and publication of SOC8. See FTC Enf't Action, No. 26-748, ECF No. 70 (FTC Texas Am. Compl.), ¶¶ 68–245 (N.D. Tex. Aug. 18, 2026). Whether the Texas action must be dismissed on First Amendment grounds thus will turn on whether the specific statements it targets and seeks to have enjoined in fact constitute, as the FTC claims, "deceptive commercial speech." Compare id., No. 26-748, ECF No. 90 (FTC Texas Opp.) at 37 (N.D. Tex. Sep. 29, 2026), with WPATH Texas MTD at 33–35.

Yet this Court has no occasion to settle whether any specific statements made by WPATH, in SOC8 or elsewhere, qualify as commercial speech or are deceptive. See MTD Opp. at 17 (seeking declaration that, generally, "WPATH's statements, including SOC-8, are protected by the First Amendment"); id. at 19 (same); see also ECF No. 32 (PI Opp.) at 24 (clarifying that FTC does "not dispute," at least for purposes of present suit, that "WPATH engages in some protected First Amendment conduct"); see also MTD at 23–24 (similar). So, a decree from this

Court that the CID targeted constitutionally protected activities in general would not settle whether the distinct statements that are the basis of the Texas action also qualify for constitutional protection.

Still, viewing the two lawsuits from a different angle might seem to reveal another intersection point. Both Plaintiff's Complaint here and its motion to dismiss in Texas charge the FTC with "attempting . . . to punish" it for its "exercise of its First Amendment right to free speech." WPATH Texas MTD at 33; see Compl., ¶¶ 132, 139. But that issue of the agency's motivation cannot be settled here for the Texas action. As a factual matter, whether retaliation motivated the CID does not formally settle whether it also motivated the subsequent enforcement action; they are distinct events that do not necessarily share a cause. And as a legal matter, different standards of causation likely apply to the two events. In Texas, unlike here, WPATH presumably would have to show not only that retaliation was a but-for cause of the FTC's actions but also that the agency had targeted it in the "absence of probable cause." Hartman, 547 U.S. at 265–66. Although the Court has declined to apply that heightened standard from the retaliatory-prosecution context to claims against CIDs, see Endocrine Soc'y, 832 F. Supp. 3d at 16, the standard seemingly would apply to retaliation claims against civil-enforcement actions writ large. See Johnson v. La. Dep't of Agric., 18 F.3d 318, 320–21 (5th Cir. 1994); see also DeMartini v. Town of Gulf Stream, 942 F.3d 1277, 1297–98, 1304 (11th Cir. 2019); Amacher v. City of Tullahoma, 179 F.4th 999, 1002–03 (6th Cir. 2026). The upshot is that the causation analysis for a claim that the CID was retaliatory, which corresponds to the declaratory judgment that this Court would have cause to issue, would not map onto the same analysis for a claim that the Texas action was retaliatory.

In sum, WPATH has not shown that any declaratory judgment that its First Amendment challenges to the CID could yield would "implicate[] a core issue in [the] parallel . . . suit" in Texas." Crowley, 143 F.4th at 527. That prospect, however plausible in the abstract, collapses when one takes into account the distinct issues presented in this suit and that one. Put simply, this whole litigation has been oriented around a CID with a scope and cause that are analytically distinct from the enforcement action that superseded it. That a declaratory judgment as to the CID's lawfulness could have some "possible, indirect" bearing on the constitutionality of the Texas enforcement action does not save this suit from mootness now that the CID has been withdrawn. Haaland, 599 U.S. at 294.

c. Declaratory Relief: FTC Act

WPATH also sought a declaratory judgment that its operations "do not constitute activities in or affecting commerce" and that it is "not a 'corporation'" under the FTC Act. See Compl. at 44 (quoting 15 U.S.C. § 44). Both principles define the scope of the FTC's enforcement jurisdiction, including its ability to "commence a civil action" like the one in Texas. See 15 U.S.C. § 45(m)(1)(A). A declaratory judgment to the effect that WPATH fell beyond such jurisdiction could, of course, have a non-speculative effect on the Texas enforcement action: if given preclusive effect, it would mean that the FTC's claims against WPATH would have to be dismissed. Yet the fact that such a judgment could now happen to benefit WPATH in the Texas action does not mean that it serves as effectual relief in the context of this suit challenging the CID — *i.e.*, relief that can "redress the asserted injur[ies]" from the CID, which define the scope of the present controversy. Wisconsin Pub. Power, Inc. v. FERC, 493 F.3d 239, 263 (D.C. Cir. 2007). Indeed, the contemplated declaratory judgment would forestall the

mootness of WPATH's claims only if it somehow bore upon the FTC's authority to issue the CID.

It does not. That conclusion follows from interpreting the provisions of the FTC Act upon which WPATH predicates its request for this declaratory relief. At the outset, and to head off confusion, the Court notes that it need not assume that WPATH's reading of the FTC Act is correct. It must assume only that WPATH will prevail on the "merits of [its] claims," Sandpiper Residents Ass'n v. HUD, 106 F.4th 1134, 1141 (D.C. Cir. 2024), and its claims all arise under the First Amendment, not under the FTC's organic statute. See Compl., ¶¶ 131–52. Assuming that WPATH would succeed in showing that the CID violated the First Amendment several times over does not resolve whether a declaration regarding its status under the FTC Act would preserve its "legally cognizable interest in the outcome" of this suit. Almaqrami, 933 F.3d at 779. Put another way, the relevant question is whether the CID issued to WPATH could be declared unlawful, and the injuries caused by it partially redressed, on the basis that WPATH was not a "corporation" or that its operations were not "in or affecting commerce." 15 U.S.C. § 45(b). That question cannot be answered by assuming the merits of Plaintiff's First Amendment claims.

The Court, moreover, answers that question here on a blank slate. It had no occasion at the PI stage to determine whether the cited provisions of the FTC Act posed an independent barrier to the CID's issuance. Its analysis of Plaintiff's retaliation claim focused on the FTC's motives for issuing the CID, which only tangentially implicated the question of statutory authority. See WPATH I, 2026 WL 1257321, at *3–4 (probing "mismatch between the FTC's stated investigatory aims and its tenuous path to uncovering [legal] violations"). That the FTC likely lacked a "legitimate purpose" for issuing the CID, as the Court held, does not necessarily

mean that it lacked the statutory power to do so. Id. at *4; cf. Endocrine Soc'y, 832 F. Supp. 3d at 18 (acknowledging FTC's "broad [statutory] power" to issue CIDs).

Review of the statute reveals that the FTC's authority to issue the CID was not limited by the provisions upon which WPATH hangs its request for declaratory relief. The Commission may issue CIDs to "any person" that it has "reason to believe . . . may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to unfair or deceptive acts or practices in or affecting commerce." Id. § 57b-1(c)(1). By its terms, that broad statutory authority extends to the CID issued here. Critically, the term "person" (to whom a CID may be issued) is defined as "any natural person, partnership, corporation, association, or other legal entity." Id. § 57b-1(a)(6). There can be no dispute that WPATH is a "legal entity" — a nonprofit — to which a CID may be issued. Id. Additionally, a CID may be issued to any entity that has information "relevant to" the "unfair or deceptive acts or practices in or affecting commerce" that the FTC has jurisdiction to address; the recipient need not itself engage in such activities. Id. § 57b-1(c)(1). So, even assuming WPATH is not a "corporation" because it is not "organized to carry on business for its own profit or that of its members," and further that it does not engage in any commercial activities, it could still be subject to a CID. See id. §§ 44, 45, 46; see also MTD at 17.

In response, WPATH again insists that, beyond merely facing a CID, it was subject to a broader investigation, geared toward bringing an enforcement action, that necessarily relied upon the FTC's more limited authority under 15 U.S.C. §§ 45 and 46. See Opp. at 19–20. Whatever limits they place on the FTC, however, those statutory sections do not bear upon its authority to issue CIDs. Cf. 15 U.S.C. § 46(a), (f) (authorizing Commission to "gather and compile information concerning" entities within its jurisdiction and to make periodic reports to Congress

and public). And recall, again, that the only injuries WPATH identifies in its Complaint trace to the CID — not to the other actions like holding a workshop or soliciting public comments on topics related to WPATH's activities. See, e.g., Compl., ¶¶ 92–93, 96, 102, 111; see also *supra* Part III.A.1. Even assuming, then, that the FTC took steps apart from issuing the CID to investigate WPATH, and that those steps exceeded its statutory authority, such violations of the law have not inflicted any cognizable injury. A declaratory judgment regarding their unlawfulness therefore cannot provide any effectual relief that saves this case from mootness.

Because a declaration that WPATH fell beyond the FTC's enforcement jurisdiction would not bear upon the agency's authority to issue the CID that caused the injuries alleged in the Complaint, such relief does not preserve the live character of the "precise controversy" before the Court, no matter how helpful it might prove in the Texas action. Maldonado, 61 F.4th at 1006.

* * *

At bottom, the FTC's withdrawal of the CID has already brought about the only result that WPATH had standing to seek in this case. The question is not whether, in some general sense, Plaintiff is better off or back to normal since the CID was superseded by an enforcement action. Rather, the question is only whether the original controversy before the Court remains live. Because the Court cannot enter effectual relief, it is not.

B. Exceptions to Mootness

Yet even when, as here, a case has become "superficially moot" because the challenged conduct has ceased, a court still may proceed if, "despite the apparent demise of the controversy, its resolution has a reasonable chance of affecting the parties' future relations." Clarke, 915 F.2d at 703. WPATH thus invokes two common "exceptions" to mootness — those applicable to "a

defendant's voluntary cessation of the offending conduct" and to "actions capable of repetition yet evading review." Id. The Court addresses each in turn.

1. *Voluntary Cessation*

"[A]s a general rule, 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot." Zukerman, 961 F.3d at 442 (quoting Cnty. of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)). This rule ensures that a defendant may not "'automatically moot a case' by the simple expedient of suspending its challenged conduct after it is sued," preserving the ability to later "pick up where it left off" and "repeat 'this cycle' as necessary until it achieves all of its allegedly 'unlawful ends.'" Fikre, 601 U.S. at 241 (quoting Already, LLC v. Nike, 568 U.S. 85, 91 (2013)). If it looks like the court is being treated to a jurisdictional rope-a-dope, it can press ahead and award relief, ensuring that its "constitutional authority" is not "manipulated." Id.

Drawing on that rationale, several recent D.C. Circuit cases have suggested that the voluntary-cessation doctrine comes into play only upon a showing that the defendant has attempted to manipulate the court's jurisdiction by yanking back a challenged policy or action at the last moment to avoid review. See Samma, 136 F.4th at 1113 (collecting cases); but see Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, 188 F.4th 400, 408 (D.C. Cir. 2026) (assessing that it is "unclear" whether finding of manipulation is threshold requirement). If so, that would be dispositive here because WPATH has not made such a showing. It offers only that the FTC engaged in "[f]orum shopping" by bringing its enforcement action in Texas rather than in this district. See Opp. at 29–30. Assuming *arguendo* that is true, forum shopping with respect to a separate action does not amount to manipulation of this Court's jurisdiction over this one. Put another way, even on Plaintiff's theory, the FTC's aim was not to preserve its ability to issue

a CID to WPATH so that it might later return to that challenged conduct, but rather to escalate its campaign in a friendlier forum. The very act that affected this Court's jurisdiction over the case, then, demonstrated that the FTC was keen to progress past (not preserve) its challenged conduct — the CID.

WPATH gets no more traction from asserting that the FTC has "repeatedly refused to litigate meritorious First Amendment claims to final judgment." Opp. at 31; cf. Agora, 48 F. App'x at 471. Beyond this case, the pattern it identifies mainly comprises a slew of CIDs issued to other transgender-health organizations; and in those cases, like here, the Commission's "refusal" to litigate the claims came about when it withdrew the CIDs following the initiation of an enforcement action against WPATH — where, of course, the First Amendment issues could be litigated as an affirmative defense. See Reply at 14. Withdrawal of the CIDs, therefore, does not affect whether the underlying First Amendment issues will be litigated, only where and when they will be. And, again, the evident purpose is not to avoid litigation over the CIDs so as to preserve the possibility to reissue them in the future; instead, the agency is deliberately escalating, not selectively abandoning, its campaign against these entities.

For similar reasons, even if manipulation is not a necessary element of voluntary cessation, the doctrine does not save this case from mootness. At this stage, the case is moot only if the challenged conduct "cannot reasonably be expected to recur" — *i.e.*, if "no reasonable expectation remains that it will return to its old ways." Fikre, 601 U.S. at 241 (cleaned up); see also Mehneh v. Rubio, 164 F.4th 928, 931 & n.* (D.C. Cir. 2026) (assigning burden to plaintiff absent evidence of defendant's attempted manipulation). Although that standard is "formidable," it is met here. Fikre, 601 U.S. at 241 (citation omitted). The FTC has withdrawn

the CID and represented that its investigation into WPATH has been superseded by its enforcement action. See Reply at 14–15.

Granted, normally when the government merely "disclaim[s] any intention" to engage in the challenged conduct again, that alone "does not suffice to make a case moot." United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953); see FCC v. Fox Television Stations, Inc., 567 U.S. 239, 255 (2012). Here, however, the enforcement action provides key context bearing upon any expectation that WPATH will be subject to future investigation. The agency evidently believed that it did not need to investigate Plaintiff further; it chose, conversely, to file a complaint in the Northern District of Texas on the basis of the information that it had already obtained. The lack of any need for further investigation obviously makes it unlikely. In fact, the same conclusion follows if one assumes that the FTC's real aim in issuing the CID was to harass WPATH, not to lay the groundwork for the enforcement action it has brought. In other words, the Court need not rely on any presumption of regularity, see MTD at 19 (invoking presumption), which would be an odd fit here given the Court's preliminary finding that the FTC likely acted unconstitutionally in retaliating against WPATH for its views. See WPATH I, 2026 WL 1257321, at *4. Whatever motivation underlies its campaign against WPATH, the FTC has channeled that campaign into a civil-enforcement action that will, as WPATH recognizes, provide the opportunity to obtain through discovery the materials that the CID previously sought. See Opp. at 10. The absence of any conceivable need — legitimate or not — for the FTC to reissue a substantially similar CID lends credibility to its representation that it does not intend do so.

WPATH also makes much of the fact that the Commission has not submitted a declaration forswearing future actions against it. See Opp. at 25. But a declaration is not required — what matters is not the form but the "substance" of the defendant's representations.

Fikre, 601 U.S. at 241; see id. at 242 (holding that "sparse declaration" did not establish mootness because the government had not disclaimed taking action against plaintiff based on substantially similar conduct in future); see, e.g., Republican Nat'l Comm. v. Pelosi, 2022 WL 4349778, at *1 (D.C. Cir. Sept. 16, 2022) (finding mootness based on "express representations made in [appellee's] motion"). Nor is it vital that a defendant "repudiat[e ] its past actions": "often a case will become moot even when a defendant 'vehemently' insists on the propriety of 'the conduct that precipitated the lawsuit.'" Fikre, 601 U.S. at 244 (quoting Already, 568 U.S. at 91). The analysis turns "alone" on "the potential for a defendant's future conduct." Id.

WPATH last responds that the "FTC has not shied away from repeatedly targeting the same entities again and again." Opp. at 27. Notably, though, Plaintiff does not go so far as to claim that the FTC has targeted the same entities for investigation repeatedly based on the same underlying conduct. Mootness hinges on the potential for recurrence of the particular conduct that gives rise to the plaintiff's claims — here, a CID targeting WPATH's protected speech and associations. WPATH alleges that the same conduct forms the basis for the Texas enforcement action, see TRO Mot. at 2, in which case it is unlikely to be the focus of further investigation for the reasons discussed above.

2. *Capable of Repetition Yet Evading Review*

A distinct, though related, mootness exception exists for conduct that has ceased before the culmination of litigation but is "capable of repetition, yet evading review." Kingdomware Techs., Inc. v. United States, 579 U.S. 162, 170 (2016) (citation omitted). "A dispute qualifies for that exception only if (1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." United States v. Sanchez-Gomez,

584 U.S. 381, 391 (2018) (quotation marks and citation omitted). "The party invoking the exception bears the burden to show that both elements are satisfied." J.T., 983 F.3d at 523. Here, even if WPATH could satisfy the first "evading review" prong, it could not satisfy the second "capable of repetition" prong. Cf. Kingdomware Techs., 579 U.S. at 170 (suggesting that typical duration of two years is sufficiently short to satisfy first prong). Whatever "capable" means in ordinary speech, here it refers to something more than a mere "theoretical possibility." Ferrer, 856 F.3d at 1088 (cleaned up). To "qualify as 'capable of repetition[,]' . . . there must instead be a reasonable expectation or demonstrated probability that the action will recur." Id. (cleaned up). And the "wrong" that is "capable of repetition" must be "defined in terms of the precise controversy it spawns" — that is, "in terms of the legal question it presents for decision." J. T., 983 F.3d at 524 (quoting PETA v. Gittens, 396 F.3d 416, 422–23 (D.C. Cir. 2005)). In order to present the same legal questions, a future CID issued to WPATH would need to be "materially similar" in scope and motivation, targeting similar activities for similar reasons. See Fed. Election Comm'n v. Wisconsin Right To Life, Inc., 551 U.S. 449, 463 (2007). The question, then, is whether there is a "reasonable expectation" of such a CID being issued.

That same question applied in the voluntary-cessation context, and the same answer follows here: WPATH has not established a "reasonable expectation" that it "will be subjected to the same action again." Sanchez-Gomez, 584 U.S. at 391. It simply is not reasonably likely that, having undertaken an enforcement action against WPATH based on certain conduct, the FTC will reverse course to investigate it again for the same conduct.

* * *

Having concluded that WPATH's claims in this lawsuit are moot and that no exception to mootness applies, the Court need not consider the FTC's additional arguments that the claims

should also be dismissed on the merits. The Court additionally will reject WPATH's request in its brief, see Opp. at 39–40, for leave to amend its Complaint because it is not filed as an appropriate motion with a proposed amended pleading. See Hudson v. Am. Fed'n of Gov't Emps., 308 F. Supp. 3d 388, 395 (D.D.C. 2018).

## IV. Conclusion

The Court will accordingly grant Defendants' [61] Motion to Dismiss. An Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: October 29, 2026